UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FUBOTV INC., et al.,<br><br>                    Plaintiffs,<br><br>        -against-<br><br>THE WALT DISNEY COMPANY, et al.,<br><br>                    Defendants. | 24-CV-01363 (MMG)<br><br>__OPINION & ORDER__ |

MARGARET M. GARNETT, United States District Judge:

### INTRODUCTION

In February 2024, Defendants The Walt Disney Company ("Disney"), Fox Corporation ("Fox"), and Warner Brothers Discovery, Inc. ("WBD") (collectively, the "JV Defendants") announced the formation of a joint venture (the "JV") to create a new television streaming service centered on live sports content. The JV was known internally among the partners as "Raptor" or "Project Raptor" and later branded externally as "Venu Sports" or "Venu." Shortly after the public announcement of the JV, Plaintiffs fuboTV Inc. and fuboTV Media Inc. (together, "Fubo") filed this litigation, raising several antitrust claims related to the launch of the JV and the Defendants' business practices regarding the licensing of live sports. On April 8, 2024, Fubo filed a Motion for Preliminary Injunction (the "Motion") to temporarily block the JV from launching, or alternatively, to enjoin the JV Defendants from enforcing certain contractual restraints in their licensing agreements which, Fubo claims, preclude the existence of any meaningful rival to the JV. *See* Dkt. Nos. 94, 95 ("Mot."). Following a period of intense but expedited discovery, the Court held a five-day evidentiary hearing from August 6–12, 2024.

Although the JV itself is new, the idea of a live-sports-only streaming service is not. Even as the television industry has changed dramatically over the last decade, the ability to

broadcast live sports has remained a crucial and irreplaceable source of revenue and power. Live sporting event broadcasts continue to attract massive viewership, despite steady declines in audiences for non-sports-related television content and increasing departures from the multi-channel pay TV ecosystem (whether as "cord-cutters" or "cord-nevers").

In 2015, in recognition of the stable and growing demand for live sports content, Fubo launched as a relatively specialized streaming service, initially focused on soccer fans but with aspirations to grow into a broader "sports-forward" multi-channel streaming service. To provide television content to its customers, Fubo, like any other distributor, enters into "carriage agreements" with television networks for the rights to license and distribute those networks' programming. When it comes to live sports programming, the JV Defendants dominate. Together, they own over 60% of the telecast rights to nationally broadcast live sports, and an even larger share of the most-watched sports like football and basketball and the most-watched events like playoff or championship games. Fubo, like all other TV distributors, must therefore contract with one or more of the JV Defendants if they want to offer customers even the most basic array of live sports content.

But Fubo claims that its original goal of providing a streaming service focused on live sports has been hampered or thwarted by restrictive terms in the contracts with the television programming networks, including the JV Defendants. Among these complaints is the claim that the contracts force Fubo to carry (and pay for) unwanted non-sports networks that its customers rarely watch, as a condition of securing the rights to carry must-have sports channels. In the pay TV industry, this practice is called "bundling." These bundling requirements are not unique to Fubo's contracts with the JV Defendants; bundling has been a pervasive industry practice for decades, and other much larger TV distributors like Comcast, Charter, DIRECTV, and DISH

likewise face similar restrictions. Due to these bundling practices, Fubo says it has effectively

been morphed into the opposite of its original vision: a "bloated" bundle of channels, not unlike

every other multi-channel TV distributor, with little choice but to charge steep prices to its

customers just to stay afloat and cover its licensing costs. After the JV was announced as

offering consumers the first "unbundled" sports-focused multi-channel streaming service that

Fubo (and others in the market) had long strived to be, Fubo initiated this antitrust action and

moved for an injunction to temporarily block its launch.

   To get a preliminary injunction, one of the most powerful tools in the arsenal of judicial

remedies, Fubo must show that it is likely to succeed on the merits of its claims, that it will suffer

imminent irreparable harm in the absence of an injunction, that the balance of equities tip in its

favor, and that the injunction does not harm the public interest. In their defense, the JV

Defendants say any purported harm to Fubo from the JV is either the result of factors

independent of the JV, derives from legitimate competition at work, or can be remedied by

money damages later. While it's undisputed that Fubo has never once had a profitable quarter (a

common phenomenon for startups in the first decade of their existence), both its internal

projections and those by some third-party market analysts predict it is set to at least break even in

2025 (what Fubo calls the "path to profitability"). But if the JV launches, witness testimony and

documentary evidence firmly establish that a swift exodus of large numbers of Fubo's

subscribers (both current and reasonably anticipated near-term future subscribers) is likely, and

that Fubo's bankruptcy and delisting of the company's stock will likely soon follow. These are

quintessential harms that money cannot adequately repair.

   As to the merits of Fubo's antitrust claims, the JV Defendants argue that the JV is *pro*-

competitive, not *anti*-competitive. They say the JV will not concentrate market power or restrain

trade because the JV Defendants will continue to independently license their respective networks to other distributors and the JV will have extensive firewalls in place to protect sensitive commercial information being shared between the JV Defendants.  These protections, they claim, will ensure against any potential concentration or collusion in the relevant markets.  And while their witnesses admit that the terms on which the JV is set to receive the JV Defendants' programming content is unlike any the JV Defendants have ever provided another distributor, they argue that such innovation does not imply the creation of a new market over which the JV will dominate and that, in any event, they are entitled to sell their valuable products to different buyers on any lawful terms they choose.  They also claim that Fubo's complaints of "forced bundling" are false and, even if they were true, are perfectly legal and legitimate business practices.  The Court need not, and does not, reach the question of the legality of bundling at this stage of the case.  The credible testimony reinforced by voluminous documentary evidence in the record that firmly establishes the JV Defendants' longstanding and unbroken practice of bundling sports with non-sports content is sufficient.

Put simply, the antitrust problem presented by the JV is as follows: if the JV is allowed to launch, it will be the *only* option on the market for those television consumers who want to spend their money on multiple live sports channels they love to watch, but *not* on superfluous entertainment channels they do not.  And the JV's corporate owners—the JV Defendants—are the same players that (1) used their longstanding bundling practices to create the void in the pay TV market tailor-made for the live-sports-only JV to fill, and also (2) exercise near-monopolistic control over the ability for a different live-sports-only streaming service to exist and compete with the JV.  Indeed, shortly before the JV was announced, the JV Defendants *explicitly agreed* to "stay clear" of supporting another platform like the JV for at least the next three years.

Irrespective of any agreement between them, though, once the JV launches, the JV Defendants have no reason to take actions that could allow for the emergence of direct competitors. Quite the opposite: the multi-year monopolistic runway they have created for themselves will provide powerful incentives to thwart competition and hike prices on both consumers and other distributors. But even if the JV Defendants swear that such price-hiking and competition-excluding will not actually occur (though, as discussed below, there is good reason to believe that it will), one purpose of antitrust injunctions is to prevent anticompetitive incentives from forming in the first place so that American consumers do not have to simply take their word for it and hope for the best.

The Court has carefully considered all of the briefing, testimony, evidence, and argument offered in support of and in opposition to the Motion. Because Fubo is likely to be successful in proving its claims that the JV will violate this country's antitrust laws, because Fubo and American consumers will face irreparable harm in the absence of an injunction, and because the equities and the public interest weigh in favor of preserving the status quo pending full and fair adjudication of all issues in this matter, the Motion is HEREBY GRANTED.

## BACKGROUND

### I.  FACTUAL BACKGROUND[1]

#### A.  The Parties

Plaintiffs fuboTV Inc., a Florida corporation, and fuboTV Media Inc., a Delaware corporation, together operate as Fubo. Founded in 2015, Fubo is a multi-channel television

---

[1] Except as otherwise noted, the factual background described herein derives from the facts as set forth by the parties in the briefs, declarations, exhibits, and witness testimony provided in support of or in opposition to the Motion. Fubo offered declarations from Thomas Schultz, Jonathan Orszag, James Trautman, David Gandler, John Janedis, Alberto Horihuela, Todd Mathers, Gary Schanman, and Robert Thun in support of the Motion (*see* Dkt. Nos. 97–105, 108, 109, 111, 112, 160-1, 161-1, 248-27, 248-136, 248-137). On opposition, the JV Defendants submitted declarations from J. Wesley Earnhardt, Edwin S.

streaming service with a focus on live sports content operating in the United States, Canada, and Spain.

Defendants in this matter are Disney, ESPN, Inc. and ESPN Enterprises, Inc. (together, "ESPN"),[2] Hulu, LLC ("Hulu," and collectively with Disney and ESPN, the "Disney Defendants"),[3] Fox, and WBD.

Disney, a Delaware corporation headquartered in Burbank, California, is a multinational media and entertainment conglomerate with assets and affiliates including film and television studios, programming networks, local television stations, streaming platforms, and entertainment parks and travel experiences. Disney's sports programming is concentrated within ESPN, which operates multiple pay TV networks including ESPN, ESPN2, SEC Network, ACC Network, and ABC Sports, among others. Disney and ESPN own broadcast rights to live sporting events from the National Football League ("NFL"), National Basketball Association ("NBA"), Major League Baseball ("MLB"), National Hockey League ("NHL"), college football and basketball, and professional tennis and golf.

---

Desser, Michael D. Whinston, Ph.D., and Anthony Petitti (*see* Dkt. Nos. 234, 236, 234-151, 236-133, 234-152, 236-134, 234-153, 236-135). The Preliminary Injunction Hearing (the "Hearing"), held from August 6 to August 12, 2024, included live testimony from 18 witnesses: James Trautman, David Gandler, Todd Mathers, Benjamin Grad, Sal Marchesano, Gary Schanman, John Nallen, James Pitaro, Alberto Horihuela, John Janedis, Jonathan Orszag, Edwin Desser, David Espinoza, Bruce Campbell, Justin Connolly, Scott Miller, Anthony Petitti, and Michael D. Whinston. *See generally* Transcript of the Preliminary Injunction Hearing (hereinafter "Hearing Tr."). At the Hearing, numerous exhibits and demonstratives were also admitted into evidence, which are referenced herein by the exhibit number provided on the record. Prior to the Hearing, the parties also submitted testimony in the form of deposition designations from seven additional witnesses: Ameet Padte, Paul Cheesbrough, Peter Distad, Dan Fox, Robert Iger, Justin Lancer, and Justin Warbrooke. *See* Dkt. No. 250, Ex. B. No further individualized citations to these documents will be made herein except as specifically quoted or referenced.

[2] ESPN is a Disney subsidiary. While ESPN is a Defendant in the broader action, it is not a party to the JV and is therefore not a subject of the Motion. As described further herein, though, ESPN's programming is included in the content to be offered by the JV. ESPN is incorporated in Delaware and headquartered in Bristol, Connecticut.

[3] Like ESPN, Hulu is a Defendant in the broader action but is not a direct party to the JV. Hulu is a Disney affiliate incorporated in Delaware and headquartered in Santa Monica, California.

Defendant Fox, which is incorporated in Delaware and headquartered in New York, owns and operates the Fox broadcast network, several major pay TV networks including the Fox News Channel, numerous local television stations, and a free ad-supported streaming platform called Tubi. The Fox Sports division provides sports programming to the Fox broadcast network as well as several pay TV networks including Fox Sports 1, Fox Sports 2, and the Big Ten Network. Fox controls broadcast rights to live sporting events from the NFL, MLB, Major League Soccer ("MLS"), The National Association for Stock Car Auto Racing ("NASCAR"), college football and basketball, and major international soccer events such as the World Cup.

Defendant WBD, incorporated in Delaware and headquartered in New York, is the third-largest media company in the United States. It operates multiple film and television studios, numerous TV networks, the CNN news channels, and the Max streaming platform. WBD also owns TNT Sports, which controls WBD's sports programming rights from the NBA, NHL, MLB, National Collegiate Athletic Association ("NCAA")'s March Madness championships, and NASCAR. These live sports events are broadcast on multiple of WBD's TV networks, including TNT, TBS, and TruTV, and on occasion are also streamed on Max.

### B. Sports and the Live Pay TV Industry

The linear[4] pay TV industry is made of three basic tiers: (1) creation, *i.e.*, the development of television content; (2) programming, *i.e.*, the packaging of television content by the networks; and (3) distribution, *i.e.*, the delivery of television to consumers. Some companies,

---

[4] "Linear" channels are those that are programmed in a time sequence, with content offered in a particular order and at a specific time. For example, on August 14, 2024, ESPN's schedule was "Get Up" (a sports news and opinion show) from 8:00 am to 10:00 am; "First Take" (a sports-oriented debate and opinion show) from 10:00 am to noon; "The Pat McAfee Show" (a sports news and commentary show hosted by a former NFL player) from noon to 1:00 pm; the live Little League World Series games at 1:00 pm, 3:00 pm, 5:00 pm, and 7:00 pm; "Rhythm Masters" (a documentary style show relating music and sports to one another) from 9:00 pm to 10:00 pm; and "SportsCenter" (ESPN's flagship sports news, highlights, and analysis show) from 10:00 pm to midnight.

such as the major media conglomerates that comprise the JV Defendants in this case, participate in more than one tier of the industry. This case concerns, in particular, the pay TV industry for live sports. The three tiers described above generally operate as follows with respect to the live sports segment of the pay TV industry: (1) the sports leagues and governing bodies create content by developing and scheduling sporting events and then license the rights to televise those events to (2) sports-focused television networks, like ESPN, TNT, and Fox Sports, as well as traditional broadcast networks like ABC and Fox, who typically provide commentators and other packaging elements to the sporting event telecast, and then in turn license the rights to distribute the programming content to (3) distributors that package and deliver the network channels to the consumer for viewing, such as traditional multichannel video programming distributors ("MVPDs") like Comcast, Charter, or DIRECTV, and, increasingly, virtual MVPDs ("vMVPDs") such as YouTube TV, Hulu + Live TV, and Fubo.

    **Creators: The Sports Leagues.** The governing bodies of the major sports leagues control the telecast rights to their events. They include the U.S.-based NFL, NBA, NHL, MLB, PGA Tour, NCAA, NASCAR, as well as international sports entities such as the English Premier League and Fédération Internationale de l'Automobile, which governs Formula One Racing ("F1"). As discussed further below, the rights to these sporting events are more valuable than other television content, and therefore the governing bodies of these leagues have significant leverage when negotiating contracts for their telecast licensing. Accordingly, the contracts for these rights are typically long-term and exceedingly profitable for the leagues. As illustrative examples, the NFL entered into media rights agreements in 2021, which took effect in 2023, with CBS, NBC, Fox, ESPN, and Amazon valued at $110 billion over 11 years; MLB recently entered into seven-year agreements with Fox, Turner Sports, and ESPN valued between $3.2 and

$5.1 billion; the NBA's current media rights deals with NBCUniversal, Amazon, ESPN, and Turner Sports are estimated to be worth $76 billion over 11 years; and even traditionally lower-interest sports (in the United States) such as MLS and F1 have recently garnered media rights deals valued at $2.5 billion and $75 million, respectively.  The practical reality of these steep prices is that only the largest television programmers, and, increasingly, well-capitalized technology corporations (such as Amazon or Apple), can negotiate telecast licensing deals directly with the leagues.

**Programmers: Television Networks**.  The programmers of these live sports events include pay TV networks owned by the JV Defendants, such as ESPN (Disney), TNT (WBD), and FOX Sports 1 (Fox), among others such as CBS Sports and USA, which are owned by CBS Broadcasting Inc. (itself a subsidiary of ViacomCBS) and Comcast's NBCUniversal, respectively.  Programmers add value by combining the live sports content from the leagues with programmer-produced content, such as play-by-play or color commentary, proprietary editing, and on-field interviews.  They then package that content into linear channels for distribution.  Operating as the middle tier in this three-tiered market, the networks in turn generate revenue by selling advertising minutes during the broadcast, and by licensing their channels to distributors on a per-subscriber per-month basis (known as "affiliate fees") through contracts with the distributors, dubbed "carriage agreements."  Carriage agreements govern the terms under which the networks provide the distributors access to their programming and detail the parties' respective rights to advertising dollars and programming inventory.

**Distributors: MVPDs and vMVPDs**.  MVPDs are services that distribute multiple linear television networks directly to consumers.  Some of the most well-known MVPDs in the United States include cable and satellite companies like Comcast, DISH, DIRECTV, and

Verizon Fios. vMVPDs are—practically speaking—the same as MVPDs, except virtual. This means that rather than delivering the aggregated live and on-demand TV content by satellite or cable boxes like traditional MVPDs, vMVPDs stream the content to consumers over broadband internet. Popular vMVPDs include Hulu + Live TV, Fubo, and YouTube TV. MVPDs and vMVPDs negotiate directly with the networks described above—such as Disney, Fox, WBD, NBC, and CBS—for the rights to license television networks, including those that host live sports content.[5]

### C. The Live Pay TV Industry Practice of "Bundling"

Put simply, the term "bundling" in the pay TV ecosystem refers to the practice by programmers of packaging several of their networks together to be distributed either together (to at least some degree), or not at all. For example, in exchange for the rights to distribute ESPN to subscribers, Disney might require a distributor to *also* carry its entertainment channels like the Disney Channel or Freeform; and if that distributor does *not* want to carry these other channels, it does not get to distribute ESPN. Hence, ESPN is "bundled" with Disney Channel and Freeform.

Bundling has been an industry-wide practice for at least the last four decades. Bundling is ubiquitous because in many cases, at least some subset of consumers enjoy having ready access to hundreds of channels and doing so on a less-expensive basis than they otherwise would

---

[5] Traditional broadcast networks (ABC, NBC, CBS, and Fox broadcast) also have rights to a significant number of live sporting events and remain available for free over the airwaves to customers with the equipment and geographic location to receive those broadcast signals, in addition to their availability on MVPDs and vMVPDs. In recent years, some major media companies in the middle tier have formed proprietary vMVPDs that prominently feature the programmer's own channels and content, including live sports, but also include content from others, such as NBCUniversal's Peacock streaming service and ViacomCBS' Paramount+ streaming service. As discussed further *infra* § I(D), operating separately but in parallel to this three-tier system are companies that offer streaming video on demand ("SVODs") such as Netflix, Amazon Prime Video, and Hulu. To a much lesser extent, SVODs and other direct-to-consumer offerings also distribute some live sports content to consumers.

if they paid for each channel individually. This was especially true in the heyday of traditional linear pay TV, before the rapid spread of broadband internet heralded the advent of streaming video on-demand platforms ("SVODs") and other on-demand sources for entertainment-focused programming. The bundle allowed consumers to have a relatively affordable "one stop shop" for all sources of entertainment for a single household, including sports, news, entertainment, movies, and more. Even as some consumers enjoyed the benefits of the bundle, others resented paying for products they did not want or watch; this was true even before the advent of on-demand internet-based entertainment options.

Bundling is the subject of heavy and lengthy negotiations between programmers and distributors, and the finalized terms are memorialized in the parties' carriage agreements. These carriage agreements, in addition to setting forth the bundling requirements, typically contain what are referred to as "minimum penetration requirements" (in industry shorthand, "min pens") for those bundled networks. Minimum penetration requirements specify the proportion of subscribers that a distributor is obligated to make a particular network available to. For example, in a hypothetical agreement between Fubo and Disney, a minimum penetration requirement of 85% for Nat Geo Wild (a Disney-owned entertainment channel) would mean that Fubo is contractually obligated to distribute the Nat Geo Wild channel to 85% of all Fubo subscribers and pay the corresponding affiliate fees for Nat Geo Wild regardless of the number of subscribers who actually watch the channel. Programmers can also require that their channels be bundled with competitor channels: requiring, for example, that a distributor include a minimum number of other children's entertainment channels in any package that includes Cartoon Network, or requiring that if a distributor offers any package containing any other children's entertainment channel, that package must also include Cartoon Network.

Minimum penetration requirements and bundling have allowed programmers to extract significant value from under-performing or lower-performing channels. In some instances, programmers can use bundling to get twice the revenue they otherwise would from certain linear channels.[6] They do this by combining "must have" channels (*e.g.*, ESPN) with less-desirable channels (*e.g.*, Freeform) so that one cannot be purchased without the other, and then by setting high minimum penetration requirements on the latter to ensure that they are receiving affiliate fees for that secondary channel from as many subscribers as possible, regardless of whether those subscribers are watching the content. In essence, bundling and minimum penetration requirements allow programmers to leverage the value of their high-demand content to ensure "eyeballs" (and affiliate fees) for their lower-demand content, as well as provide an incubator to grow new or niche channels that might not otherwise be profitable on their own.

Because this combination of bundling and minimum penetration requirements is so powerful and profitable, programmers are not typically in the business of unbundling their networks from one another. When unbundling does occur, it usually happens with less-expensive entertainment-only channels (*e.g.*, The Hallmark Channel), because the programmers are not otherwise guaranteed to distribute that channel. Sports-focused channels, or general entertainment channels that also feature high-interest sporting events such as NFL games, however (which, as discussed further below, are uniquely valuable to programmers and uniquely expensive to distributors), are rarely unbundled. Indeed, prior to the JV, the JV Defendants'

---

[6] *See, e.g.*, Warbrooke Dep. 196:11–17.

sports-focused channels have **never** been unbundled from their non-sports offerings, as corporate insider witnesses and documents reveal.[7]

Economically, this makes sense. For-profit companies are in the business of maximizing shareholder value, and bundling has for years allowed programmers in the middle tier of the live pay TV ecosystem to both afford the expensive telecast rights to sports events and reap enormous profits from distributors. Recent changes in the pay TV industry, though, are shifting consumer behavior. The "fat" bundle—meaning a linear pay TV model that includes hundreds of television channels of all varieties purchased together for a single monthly fee—is no longer as appealing to consumers as it may once have been, or as accepted by consumers (regardless of appeal) who now have other options. Changes in the industry and resulting changes in realizable consumer preferences have rapidly forced programmers and distributors alike to adapt.

### D.  Cutting the Cord: The Consumer Exodus from the "Fat" Bundle

The pay TV industry is in the midst of a dramatic transformation. Traditional MVPDs, dominant since the advent of in-home pay television, rely on cable, satellite, and set-top equipment technology and infrastructure to deliver content to viewers' homes. But that traditional TV infrastructure, while still used by millions of Americans, is no longer strictly necessary. TV can now be distributed over broadband internet rather than through cable and satellite. Over the last decade, millions of consumers have cancelled their subscriptions with MVPDs that often required a physical cable connection or satellite dish on their homes, in favor

---

[7] *See* PX055; Lancer Dep. 23:25–25:6; Hearing Tr. 363:8–16 ("Q: [. . .] Now, Mr. Nallen, when Fox licenses its networks to MVPDs, Fox has not licensed its sports channels separately from its nonsports channels, correct? // A. That's correct. // Q. Fox has never historically unbundled its channels, correct? // A. That is correct. // Q. And Raptor will be the first time that Fox licenses its sports channels without its nonsports channels, correct? // A. That is correct."); Hearing Tr. 1028:18–21 (JV Defendants' expert witness Dr. Whinston affirming that he believes the JV is "the first time in the history of these companies that the defendants are unbundling their sports channels from their other channels").

of vMVPDs which stream TV content via the broadband that consumers already have in their homes (sometimes from those same cable or satellite companies, or from legacy telephone companies like Verizon), through their mobile cellular service, or through free Wi-Fi in a variety of commercial and public locations. Millions more consumers have left the linear pay TV universe altogether. In only the last nine years, since 2015, the total subscribers for live pay TV multi-channel services (MVPDs and vMVPDs) has decreased by *over 26%*. The industry shorthand for this abandonment of MVPDs (whether traditional or virtual) is "cord cutting," and the consumers who have made that change are known as "cord cutters." Fittingly, consumers that may have never had an MVPD service of any kind are dubbed "cord nevers."

Cord cutting has been hastened by the explosion in popularity of SVODs like Netflix, Amazon Prime Video, Hulu, and Apple TV+, which also deliver content to consumers over the internet. SVODs circumvent the traditional linear pay TV distribution scheme entirely by offering their content, which they both license and create, for consumer viewing directly on proprietary platforms and apps. While technology has allowed consumers to "time-shift" their viewing of linear channels to some degree, SVOD services have no linear programming at all, and their content is available entirely "on demand." Between 2015 to 2023, SVODs subscribers increased by *over 430%*. As discussed below, SVODs are replacements for MVPDs for some consumers, and supplements to ongoing MVPD subscriptions for other consumers.

What does all this have to do with live sports? Well, despite this dramatic and ongoing consumer exodus from the fat bundle, linear pay TV remains the dominant source of live sports programming. While some SVODs have licensed the rights to certain live sports events, SVODs are not currently the standard delivery mechanism for the overwhelming majority of live sports content to consumers. These proportions are beginning to change, as well-capitalized tech firms

behind some leading SVOD services bid for sports telecast rights.  For example, Amazon Prime Video recently announced an $11 billion 11-year deal with the NFL for streaming rights to Thursday Night Football and a $1.8 billion-per-year over 11 years agreement to be the exclusive streaming service for 66 regular-season NBA games.  Netflix has also announced that it will exclusively stream two NFL Christmas Day games.  Furthermore, some sports leagues and regional sports networks also self-distribute content directly to consumers through their own platforms, circumventing the programmers and distributors altogether.  The industry calls these Direct to Consumer, or "DTC" platforms.  These DTCs include NBA League Pass, MLB.TV, NFL+, NHL.TV, YES, and F1 TV.  These too represent a much smaller percent of the rights to live sports events than traditional broadcasters, and are typically limited by various blackout requirements that accompany the leagues' distribution agreements with their licensee programmers.

So, while SVODs and DTCs may well turn out to be the sports hubs of the future, the vast majority of current live sports offerings remain only available to consumers with traditional or virtual MVPD subscriptions (or some method of accessing free broadcast channels, an increasingly minute number of U.S. households[8]).  This means that a disproportionate percentage of sports fans have remained in the fat bundle in order to retain access to the content they value most (and, as a corollary, sports fans have become the primary audience for the fat bundle, as they are among the few categories of consumer who cannot meet their television content needs

---

[8] Neilsen estimates that fewer than 20% of U.S. households have the *ability* to access free "over the air" channels; fewer than 5% of households have "over the air" access and do not also have MVPD and/or SVOD subscriptions.  *See* "Beyond big data: The audience watching over the air," NIELSEN (Jan. 2024) *available at* https://www.nielsen.com/insights/2024/beyond-big-data-the-audience-watching-over-the-air/ (last accessed August 15, 2024).

elsewhere)—a conclusion that follows naturally from the above facts, and that was also ratified by every industry witness at the Hearing in this matter.

### E.  The Unique Value and Significance of Live Sports TV

Live sports are special, with a unique combination of qualities that other television content lacks.  The most obvious and important of these is that live sports are live; each event occurs one time only and the appeal lies in the uncertainty of the outcome, which evaporates almost immediately upon the event's conclusion.  This ephemerality is why 97% of all sports broadcasts are consumed in real time.  Indeed, with few exceptions (rare and one-off events like the Oscars or a presidential debate), live sports are the only remaining "appointment television." But there are also other features that make live sports exceptional in the pay TV landscape: many professional and college sports seasons last for months out of the year, often culminating in multi-day or even multi-week playoff or championship periods; audiences, comprised of loyal fans, are remarkably reliable and durable; and unlike almost any other form of entertainment, live sports transcend typical and entrenched demographic divides.

This alchemical combination of non-replicable content, consistent and passionate viewership, predictable audiences on specific days and times, and broad cultural appeal makes live sports extraordinarily valuable media properties.  Advertising spots during live sporting events consistently go for the highest prices in the market.  Because virtually all sports are viewed in real time, advertisers minimize the risk that their commercials are fast-forwarded through by impatient viewers.  Live sports are likewise the most expensive of all television content for distributors to license from programmers.  On average, sports networks cost $1.30 per subscriber per month for distributors to license, while non-sports networks cost only an average of $0.71 per subscriber per month.  At the top of the list of most expensive networks to license is ESPN, which costs distributors an average of a whopping $9.42 per subscriber per

month.  Regional sports networks ("RSNs"), which are television channels that present sports programming confined to a specific local media market, range in fees from approximately $3.50 to $8.50 per subscriber per month.  TNT, owned by WBD, which carries an array of high-value professional and college sports, costs approximately $3.00 per subscriber per month.

In contrast to other categories of television content, the popularity of live sports only continues to grow.  In 2023, 96 of the 100 most watched telecasts across the pay TV ecosystem were live sports events.  The JV Defendants' sports-focused programming follows this same pattern.  2023 was a viewership high point in the history of Fox Sports, with approximately 450 billion minutes of sports content consumption across all networks.  And for TNT and TBS, owned by WBD, all twenty of the top twenty telecasts on these networks in 2023 were live sports events.  Sports' flourishing popularity makes networks with sports licensing rights essential to include in any competitive live pay TV package, especially considering the changes in the market caused by cord cutting.  Disney's CEO Bob Iger explicitly acknowledged this in 2016 when he said, "[Y]ou cannot launch a new multichannel platform – a platform or bundle, whether it is, by the way, 30 channels or whether it is 150 channels, you can't do it successfully without ESPN."[9]

### F.  The JV Defendants' Dominance Over Live Sports Licensing

Together, the JV Defendants control approximately 54% of all U.S. sports rights, and at least 60% of all nationally broadcast U.S. sports rights.  There is significant evidence in the record that the true figures may be even larger.[10]  With respect to licensing rights for the "Big

---

[9] PX337 at 18.
[10] *See* PX086 at 3 (JV Defendants' internal document stating that "FOX-DIS-WBD Combined" "Total Sports Viewing" "Market Share" is "62%"), PX243 at 1 (ESPN CEO James Pitaro stating the JV Defendants' share of "U.S. sports rights" is "actually over 60%!"), PX211 ("the JV bundle will contain an estimated 62% of total sports events" including "80% of National games, including 81% of all Regular Season and 98% of all Playoffs").

Five" sports—the NFL, NBA, MLB, NHL, and college football—the JV Defendants control

closer to *three-fourths* of the market.[11]  And for professional baseball, hockey, football, and

basketball, the JV Defendants own closer to 80% of the rights of all nationally broadcast games

and *98% of all playoff games*.[12]

     This means that alone, Disney, Fox, and WBD are each significant players in live sports

licensing, who otherwise compete against each other both to secure sports telecast rights and to

attract viewers to their live sports programming.  But together, they are dominant.  The only

other programmers with a significant share of live sports telecast licenses are NBC and CBS.

Therefore, to get any meaningful amount of live sports content to consumers, multichannel

distributors must contract with at least one of the JV Defendants.  And because of their market

power and the undisputed value of their products, the JV Defendants have significant leverage in

carriage negotiations with distributors.  Their sports content enables them not only to charge high

license fees, but also secure favorable distribution and contractual provisions pertaining to their

non-sports networks as well.  In fact, in 2020, Fubo had to drop WBD's networks because it

could not afford both Disney and WBD's terms, and other distributors like Charter have had

recent "blackout" periods due to, in part, the high rates the JV Defendants were seeking for

sports content and onerous bundling requirements for other non-sports networks in order to

secure sports channels.

---

[11] *See* PX245 at 3 (ESPN President Mr. Pitaro reporting that the JV's "networks and services captured over 85% of college football, NBA, MLB, and NHL audience share in 2022" and "nearly 45% of the NFL audience"); PX404 (WBD CEO Mr. Zaslav stating that together, the JV Defendants "have about 75% of the sports"); Iger Dep. 20:17–24 ("Q. And, management anticipates that Raptor will have 85 percent of major league baseball viewing hours? // A. Yes. // Q. And management also expects that Raptor will have 100 percent of all NHL viewing hours. Is that correct? // A. Yes.").

[12] *See* PX211.

### G.  The Joint Venture

Recognizing the unique value of their sports content in an age of waning linear pay TV, discussions among the JV Defendants regarding a potential sports-focused joint venture began in spring 2023.  Originally, Disney approached Fox about potentially licensing its content for ESPN Flagship (an ESPN-only streaming service expected to launch in 2025), and Fox in turn proposed the idea of a joint venture instead.  Serendipitously, around this same time WBD also approached Fox about a similar streaming joint venture.  Ultimately, all three JV Defendants undertook discussions and negotiations, during which they referred to the incipient JV with the codename "Raptor."

On February 6, 2024, Disney, Fox, and WBD signed a nonbinding term sheet and publicly announced the JV as a streaming application that will provide the JV Defendants' sports programming direct to consumers.  The press release announcing the JV stated that the streaming application would "bring together the [JV Defendants'] portfolios of sports networks," including "content from all the major professional sports leagues and college sports."[13]  Unlike any other offering currently in the market, the JV will offer 14 of the top sports channels in the United States *completely unbundled* from any other of the JV Defendants' networks.  The target consumer will—for the first time—be able to subscribe to a vast array of the sports content he or she wants, without paying for entertainment content he or she does not.

According to the JV Defendants, Raptor was intended to attract "moderate" sports fans among cord-cutters and cord-nevers who are not currently subscribers to linear pay TV through an MVPD or vMVPD service.  As Mr. Pitaro, President of ESPN, testified, the JV "is about speaking to, attracting sports fans, especially younger sports fans that are very price sensitive,

---

[13] Business Wire, "ESPN, FOX and Warner Bros. Discovery Forming Joint Venture to Launch Streaming Sports Service in the U.S.," (Feb. 6, 2024).

19

who are on the sidelines right now and getting them off the sidelines, whether they are on sidelines because they have cut the cord or they have never subscribed."[14]  The reason the "sidelines" sports fan is the JV's purported target customer (as opposed to any sports fan in the pay TV market) relates to a phenomenon called "cannibalization."  Cannibalization refers to the JV's potential to "eat" the affiliate fees that JV Defendants already earn from customers currently in the MVPD or vMVPD ecosystem.  For every customer currently in the "bundle," the JV Defendants earn fees not only on their sports channels that customer pays for, but also on all their other channels bundled alongside their sports channels, regardless of whether the sports fan or anyone else in the fan's household watches them.  However, the JV will pay each JV Defendant per-subscriber affiliate fees *only* for the *unbundled* sports networks it carries, which therefore means correspondingly less revenue (at least measured in terms of affiliate fees) to the JV Defendants.  Hence, the JV Defendants and their C-Suite decision-makers say the JV is not intended to "steal" customers from the MVPD market, but rather to attract sports fans who like sports enough to subscribe to the JV, but not enough to subscribe to an MVPD or vMVPD. Despite these claims, the JV Defendants' own internal documents estimate that between 50 and 70% of the JV's subscribers will be viewers who drop a current MVPD subscription to instead subscribe to the JV.[15]  Even with this extensive cannibalization, capturing the remaining sports-focused viewer is so valuable that one JV Defendant estimated that Raptor would still be

---

[14] Hearing Tr. 481:6–10.

[15] *See* PX261 at 19 (████████████████████████████████);
DX067 at 7 (██████████████████████████████████); PX253 at 7 ██████████
███████████████████████████████████████████████████"); *see also*
Hearing Tr. 481:11–19 (Pitaro Direct: "Q. So from day one you testified that you have been intending to target cord-nevers and cord-cutters and doing everything you can to do that, correct? // A. Yes. // Q. And despite that stated intent, at this point in January 2024, you told Disney's board and executives that you expected 67 percent of Raptor subscribers to be trade-downs from pay TV, is that correct? // A. That is correct.  My job is to make sure that we are being financially conservative and putting in front of them a plan that we believe we can hit.").

extremely profitable to its partners if just one new customer subscribed for every three customers who switched from their current MVPD.[16]

Since its announcement, despite this lawsuit and reported regulatory scrutiny by the U.S. Department of Justice, the JV has charted a steady progression towards launch. On March 15, 2024, Peter Distad—a former Apple and Hulu executive—was announced as CEO of the JV. On May 8, 2024, Lachlan Murdoch, Executive Chairman and CEO of Fox, announced that 150 engineers and executives were working to prepare the JV for launch. On May 16, the JV Defendants officially announced "Venu Sports" (pronounced "venue") as the external name and branding for Raptor.

Because it has yet to launch, not all the JV's specific terms and offerings are available. A few features, though, are relevant and undisputed:

- *Programming*: The JV will include 14 linear networks from the JV Defendants: seven Disney networks (ABC, ESPN, ESPN2, ESPNU, ESPNews, SEC Network, and ACC Network), four Fox networks (Fox, FS1, FS2, and Big Ten Network), and three WBD networks (TNT, TBS, and TruTV). It will also provide subscribers access to ESPN+, the digital companion services of SEC Plus and ACC Network Extra, and the base tier of ESPN Flagship (expected to launch in 2025).

- *Launch Date*: While no firm date for the JV's launch has been publicized, it is generally set to become available sometime in fall 2024, to correspond with the beginning of the NFL season, pending regulatory approval.[17]

- *Subscriber Price*: The JV will cost consumers $42.99/month. A seven-day free trial subscription is planned as an offering, as well as month-long free trials for customers

---

[16] *See* PX026 at 11 ██████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████"); *see also* Hearing Tr. 811:25–812:5 (Espinosa Cross: "Q. As long as Fox attracts a certain [ratio] of cord-nevers to cord-cutters, in this document 1:3, Fox has a profit incentive to maximize the size of Raptor, correct? // A. Correct. And we have an incentive to make sure that the majority of subscribers come from outside, because the higher the ratio, the more money we make.").

[17] During the Hearing and closing arguments, several references were made to an expected launch date in late August 2024. The JV itself has not publicly confirmed that date.

who already subscribe to an SVOD controlled by one of the JV Defendants, such as Disney+ or Max.

- _Initial Term_:  The initial term of the JV is limited to nine years from the date of the launch.  The term sheet is silent as to renewals or extensions of that period.

- _Non-Exclusive Content on Favorable Terms_:  Individual channels of content offered on the JV will not be exclusive to it.  MVPDs, vMVPDs and other services that currently have distribution rights to JV Defendants' networks will continue to be able to offer them to their subscribers, and the JV Defendants will continue to be able to offer their networks to other distributors, including their own future DTC services like ESPN Flagship.  However, the JV will receive "most favored nation" status on affiliate fees: paying no more than any distributor within an agreed-upon set of six comparable distributors.

- _Corporate Governance_:  Each JV Defendant will have two of the six seats on the JV's Board of Directors.  The JV will be run by independent management, and the JV Defendants will have limited roles in its day-to-day operations.  The JV will not negotiate sports licensing rights directly with the leagues.  Furthermore, the JV will have various firewalls in place to avoid sharing competitively sensitive information among the JV Defendants and between them and the JV, including information regarding affiliate fees, packaging and bundling requirements, contract terms with third parties, subscriber-level data, and non-aggregated advertising or viewership data.

- _Financial Terms_:  Each JV Defendant will own an equal one-third stake in the JV.  Each JV Defendant will enter into a separate carriage agreement with the JV for the distribution of its own channels designated for the JV.  The JV Defendants will each earn affiliate fee revenue for their own networks and any on-demand content licensed to the JV.  Each JV Defendant will retain 100% of the advertising revenue for their channels and programs.[18]

- _Non-Compete_:  As part of the binding term sheet for the JV, the JV Defendants executed a "non-compete" agreement.  This non-compete does not interfere with each JV Defendant's ability to license their programming to other distributors, but does "limit the [JV Defendants] from owning any form of equity interest, including a revenue-sharing or profit-sharing interest, in a commercial venture, where the focus of the commercial venture is the operation of a sports-centric vMVPD similar to the JV Platform […] for a period of three (3) years from the Launch Date."[19]

---

[18] Typically, an MVPD distributor retains about two minutes per hour of advertising space and the associated revenue, and the balance belongs to the programmer.  _See_ Hearing Tr. 213:16–214:15.

[19] JX045 at 17.

Even before these details about the JV were known, Fubo executives recognized the JV as an existential threat to Fubo.[20] Since its founding, Fubo has consistently marketed itself as a live sports-focused streaming service. "Fubo" is itself a play on the word "football" (as in soccer, not American football). Fubo receives most of its customers through its seven-day free trial offer, and Fubo's internal data reveals that free trials spike considerably on days with major sporting events.[21] More than 80% of "first views," (*i.e.*, the first piece of content a customer watches for at least five minutes immediately after starting a Fubo free trial) are live sports programming.[22] Furthermore, *half* of all first views on Fubo are for Disney or Fox channels, and *92%* of first views across all Fox channels are for sports content. This data reflects the reality that Fubo's customers are predominantly sports-motivated consumers. But Fubo's least-expensive base package—which does not include any WBD networks (but does include RSNs)—costs consumers almost double what the JV will.

The market recognized this tension immediately: the day the JV was announced, Fubo's stock dropped 22%. According to Fubo's executives, including its CFO John Janedis, the company is confident that if the JV launches, Fubo will lose between 300,000 and 400,000 subscribers before the end of 2024, causing an almost-immediate projected revenue loss between

---

[20] The recognition of the JV as an existential threat to MVPDs and vMVPDs was not limited to those at Fubo. *See* Hearing Tr. 442:25–443:18 (███████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████ ███████████████████████████ ████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████ ████████████████████."); *see also* PX216 at 4 (██████████████████ ███████████████████.").

[21] *See* Hearing Tr. 538:5–539:11.

[22] *See* Hearing Tr. 540:20–541:5.

$75 million and $95 million.[23]  Less than three weeks after the JV's announcement, in recognition of these market realities, Fubo initiated this "bet-the-company" litigation.

## II.  PROCEDURAL HISTORY

### A.  Fubo Files this Action and Moves for an Injunction

Fubo initiated this action by complaint on February 22, 2024, seeking a declaratory judgment against Defendants Disney, ESPN, Hulu, Fox, and WBD for violations of federal and state antitrust laws and equitable relief in the form of a permanent injunction.  *See* Dkt. No. 1. On April 9, 2024, Fubo filed the Motion, seeking to preliminarily enjoin the launch of the JV or, in the alternative, enjoin the JV Defendants from enforcing certain bundling restrictions in their carriage agreements with Fubo.  *See* Dkt. Nos. 94–112.  Fubo included 10 declarations in support of the Motion:  (1) Thomas G. Schultz, Fubo's attorney (*see* Dkt. No. 97); (2) Jonathan Orszag, Fubo's expert economics witness on the competitive effects of the proposed JV (*see* Dkt. Nos. 98, 99); (3) James Trautman, Fubo's expert on the pay TV industry (*see* Dkt. Nos. 100, 101); (4) David Gandler, Fubo's co-founder and Chief Executive Officer (*see* Dkt. Nos. 102, 103); (5) John Janedis, Fubo's Chief Financial Officer (*see* Dkt. Nos. 104, 105); (6) Alberto Horihuela, Fubo's co-founder and Chief Operating Officer (*see* Dkt. Nos. 106, 107); (7) Todd Mathers, Fubo's Senior Vice President of Content Strategy (*see* Dkt. Nos. 108, 109); (8) Henry Ahn, Fubo's current advisor and former Chief Business Officer and Board member (*see* Dkt. No. 110)[24]; (9) Gary Schanman, Executive Vice President and Group President of Video Services for EchoStar Corporation, owner of DISH Network Corporation ("DISH") (*see* Dkt. No. 111); and (10) Robert Thun, DIRECTV's Chief Content Officer (*see* Dkt. No. 112).

---

[23] *See* Hearing Tr. 592:24–593:5; *see also* Dkt. Nos. 104, 105 ("Janedis Decl.") ¶¶ 25–29.
[24] The Declaration of Henry Ahn was later withdrawn from the record in support of Fubo's PI Motion.  *See* Dkt. No. 199.

On April 9 and 10, 2024, Fox, WBD, and the Disney Defendants filed separate motions to dismiss Fubo's original complaint. *See* Dkt. Nos. 113–116, 119, 120, 122, 125, 126, 129, 130. Also, on April 10, 2024, Defendants jointly requested a stay of discovery pending resolution of their motions to dismiss (*see* Dkt. Nos. 128, 132), which Fubo opposed on April 12, 2024, asserting that "the parties should be afforded the opportunity to conduct discovery so that the Court will have an adequate evidentiary record on which to rule on [the Motion]" (*see* Dkt. No. 135).

On April 16, 2024, the Court held an initial pre-trial conference. At the conference, the Court focused on Fubo's Motion and discussed the need to set a date for the Hearing as well as an expedited discovery schedule. *See* Dkt. No. 149. Shortly thereafter, the Court issued an order denying Defendants' request to stay discovery and directing the parties to file a joint letter proposing a hearing date for the Motion and a schedule for limited discovery, as well as staying all briefing on Defendants' pending motions to dismiss. *See* Dkt. No. 137. On April 19, 2024, the Court scheduled the Hearing for August 7, 2024 and entered an expedited discovery schedule.[25] *See* Dkt. No. 140.

On April 29, 2024, Fubo filed an amended complaint. *See* Dkt. Nos. 144, 145. The following day, the Court issued an order reiterating that all briefing on Defendants' pending motions to dismiss was stayed and adjourning "any deadline . . . by which the Defendants must respond to the Amended Complaint" pending the outcome of the Hearing. *See* Dkt. No. 146.

### B. The Parties Engage in Expedited Pre-Hearing Discovery and Raise Related Disputes

The parties filed numerous discovery motions in advance of the Hearing.

---

[25] The Hearing was later rescheduled to begin on August 6, 2024, to afford the parties additional time to present witness testimony. *See* Dkt. No. 199.

First, Fubo moved to amend the discovery schedule on May 14, 2024 in order to supplement its expert declarations and to allow Fubo to submit supplemental expert disclosures (*see* Dkt. Nos. 160, 161), which the JV Defendants opposed via letter motion on May 16, 2024, arguing that Fubo's "request to file a series of new and untimely expert disclosures . . . would prejudice Defendants" (*see* Dkt. No. 163). On May 22, 2024, the Court issued an order granting Fubo's motion. *See* Dkt. No. 171.

On May 23, 2024, Fubo moved to compel the JV Defendants to produce documents "concerning their practice of requiring third-party distributors like Fubo to license their content on a 'bundled' basis" and the Disney Defendants to include "four key executives" as document custodians, as well as to set an end date for document productions for May 17, 2024, rather than late April as the JV Defendants proposed. *See* Dkt. No. 176. On May 28, 2024, the JV Defendants opposed Fubo's requests, asserting that Fubo failed to offer "any legitimate reason" for extending the deadline to produce documents and that Fubo's bundling claim "lack[ed] merit," as did its "unjustified and unworkable" request for additional document custodians. *See* Dkt. No. 177. On May 31, 2024, the Court held a conference, during which the Court denied Fubo's request for additional discovery on bundling and granted in part its request to add two of the four Disney executives as custodians. *See* Dkt. No. 187.

The same evening, Fubo filed another motion requesting that the Court compel the JV Defendants to "produce text messages between or among document custodians concerning topics" relevant to the Motion. *See* Dkt. No. 179. On June 4, 2024, the JV Defendants opposed, arguing that Fubo's "belated and burdensome" request should be denied because it exceeded the "limited scope of discovery" for the Hearing. *See* Dkt. No. 181. The Court denied Fubo's motion. *See* Dkt. No. 182.

On June 14, 2024, Fubo filed a motion requesting that the Court quash six deposition notices served by the JV Defendants for Fubo employees Marisa Elizondo, Sal Marchesano, Yale Wang, Ben Grad, and Ameet Padte, and former employee Henry Ahn. *See* Dkt. Nos. 185, 186. On June 19, 2024, the JV Defendants responded, asserting, *inter alia*, that the six witnesses they were seeking to depose were relevant and should be compelled. *See* Dkt. Nos. 190, 191. The Court held two conferences—the first on June 20, 2024, and the second on June 28, 2024— on this issue. At the June 20 conference, the JV Defendants outlined the kinds of "non-duplicative information" deposing Ms. Elizondo, Mr. Marchesano, and Mr. Wang would provide that could not be obtained solely from deposing Mr. Mathers and Mr. Horihuela (whom Fubo had already agreed to produce for scheduled depositions). *See* Dkt. No. 196. After hearing Fubo's rebuttal, the Court "provisionally grant[ed] the motion to quash as to Ms. Elizondo, Mr. Marchesano, and Mr. Wang;" however, the Court informed the parties that it would revisit the issue on June 28, *i.e.*, after Mr. Mathers's and Mr. Horihuela's depositions, if Defendants continued to believe that those three witnesses' testimony were necessary and "non-duplicative." *Id.* at 21:12–23. At the June 28 conference, Defendants, having resolved the issue of Ms. Elizondo's deposition, reiterated the need to take Mr. Marchesano's deposition, this time to address three topics that Mr. Mathers's deposition failed to address. *See* Dkt. No. 208. The Court subsequently ordered Fubo to produce Mr. Marchesano for a half-day deposition. *Id.* at 8:2–6. That same day, the Court issued an order summarizing the resolution reached at these conferences requiring Fubo to make three witnesses—Mr. Grad, Mr. Padte, and Mr. Marchesano—available to the JV Defendants for deposition. *See* Dkt. No. 199.[26]

---

[26] As noted above, the dispute over Mr. Ahn's deposition was resolved by Fubo's agreement to withdraw the Ahn Declaration and the Defendants' resulting agreement to withdraw his notice of deposition.

On June 29, 2024, Fubo filed a motion requesting that the Court compel Fox to produce documents without certain redactions relating to confidential business information. *See* Dkt. No. 204. That same day, the Disney Defendants filed an unrelated letter motion requesting that the Court either compel DIRECTV, a third-party, to produce certain documents or otherwise to exclude the Declaration of Robert Thun, DIRECTV's Chief Content Officer, and his testimony from the Hearing altogether. *See* Dkt. Nos. 205, 206. On July 1, 2024, the Court ordered the parties to appear for a conference on July 2, 2024, to discuss these two motions. *See* Dkt. No. 207. On July 1, 2024, Fox opposed Fubo's motion to compel, asserting that the unredacted confidential business information that Fubo was seeking was "irrelevant" to the JV and for purposes of the Hearing. *See* Dkt. No. 211. DIRECTV also opposed the Disney Defendants' motion to compel, arguing that the Disney Defendants' demands consisted of "wholly unjustified" attempts to "obtain intrusive discovery into [DIRECTV's] confidential business strategies and competitively sensitive commercial information." *See* Dkt. No. 212. On July 2, 2024, the Court held a conference, during which the Court granted in part and denied in part the parties' motions to compel. *See* Dkt. No. 216. Specifically, the Court granted Fubo's motion insofar as it ordered Fox to produce unredacted versions of all responsive documents (excepting slide decks where an entire slide was non-responsive when viewed as a standalone document) and denied Disney Defendants' motion for discovery from DIRECTV except with respect to DIRECTV's carriage agreements with various non-Defendant programmers, which the Court ordered produced. Upon encouragement of the Court at the July 2, 2024 conference, the parties submitted an Amended Stipulated Protective Order on July 5, 2024, including new confidential designations for Highly Confidential Attorney's Eyes Only material and Highly Confidential

Outside Attorney's Eyes Only material, in order to facilitate discovery.  *See* Dkt. No. 217.  The Court entered the Amended Stipulated Protective Order on July 8, 2024.  *See* Dkt. No. 218.

On July 19, 2024, the Court entered the parties' Joint Pre-Hearing Stipulation, which set forth certain parameters for briefing in opposition and on reply to the Motion as well as guidelines pertaining to the introduction of testimony and exhibits at the Hearing.  *See* Dkt. No. 220.  That same evening, Fubo filed another discovery motion proposing that "that the parties provide deposition designations to the Court for its review outside of the [Hearing], rather than using trial time[.]"  Dkt. No. 221.  On July 22, the JV Defendants opposed, *see* Dkt. No. 222, and on July 24 the Court granted the motion and ordered the parties to submit the deposition designations in video form to the Court by Friday, August 2.  *See* Dkt. No. 226.

Fubo filed another motion to compel discovery on July 22, 2024, seeking production of certain intra-Defendant communications that were withheld or redacted by the JV Defendants on the basis of common-interest privilege (*see* Dkt. Nos. 224, 225); the JV Defendants opposed on July 24, 2025 (*see* Dkt. Nos. 229, 230).  On July 26, 2024, the Court held a conference to hear from the parties on the motion.  At the conclusion of the conference, the Court granted Fubo's motion to compel and ordered Defendants to produce the relevant redacted or withheld communications by Monday, July 29.  *See* Dkt. No. 237.

### C. The JV Defendants Oppose the Motion, Fubo Replies, and the Parties File Pre-Hearing Submissions

On July 25, 2024, after approximately three months of expedited but extensive discovery, the JV Defendants filed a single, consolidated, 65-page opposition to the Motion.  *See* Dkt. Nos. 238, 239 (the "Opposition," or "Opp.").[27]  The Opposition was filed with supporting declarations

---

[27] The JV Defendants originally filed their opposition memorandum of law on July 25, 2024 (*see* Dkt. Nos. 233 and 235) but later filed a "corrected" version on July 29, 2024 (*see* Dkt. Nos. 238, 239).

from: (1) J. Wesley Earnhardt, attorney for the Disney Defendants, attaching 140 exhibits (*see* Dkt. Nos. 234, 236); (2) Edwin S. Desser, the JV Defendants' expert on the sports broadcasting market, the JV's anticipated role in and effect on that market, and other market-related issues pertinent to the Motion (*see* Dkt. Nos. 234-151, 236-133); (3) Michael D. Whinston, Ph.D., the JV Defendants' rebuttal expert witness on economics and antitrust matters (*see* Dkt. Nos. 234-152, 236-134); and (4) Anthony Petitti, commissioner of the Big Ten Conference, Inc. (*see* Dkt. Nos. 234-153, 236-135).

On August 1, 2024, Fubo filed its 45-page Reply in support of the Motion (*see* Dkt. Nos. 245, 247, the "Reply"), attaching four supplemental supporting declarations, including from: (1) Thomas G. Schultz, which attached 143 exhibits (*see* Dkt. Nos. 246, 248); (2) a "Second" declaration from Robert Thun, DIRECTV's Chief Content Officer (*see* Dkt. No. 248-27); and "Updated" declarations from Fubo's experts (3) James Trautman (*see* Dkt. No. 248-136) and (4) Jonathan Orszag (*see* Dkt. No. 248-137).  The same day, the parties jointly submitted their list of testifying witnesses, exhibits sought to be admitted at the Hearing, and deposition designations.  *See* Dkt No. 250.[28]

On August 2, 2024, non-parties Sports Fans Coalition, American Economic Liberties Project, the Electronic Frontier Foundation, Open Markets Institute, and Public Knowledge (collectively, the "Amici") moved for leave to file a brief as *amici curiae* in support of Fubo's Motion.  *See* Dkt. Nos. 253, 253-1 ("Amici Br.").  The Amici describe themselves as "five organizations devoted to advocacy on behalf of consumers and the public interest in the context of antitrust policy and litigation, as well as other issue areas."  Dkt. No. 253 at 1.  The following day, the JV Defendants opposed the Amici's motion for leave to file, arguing that the proposed

---

[28] The parties originally filed their Joint Pre-Hearing Submission on August 1, 2024 (*see* Dkt. No. 243) but filed a "corrected" version on August 2, 2024 (*see* Dkt. No. 250).

brief was untimely, would prejudice the JV Defendants, and would not be helpful for the Court's resolution of the Motion. *See* Dkt. No. 259. On August 5, 2024, the Court granted the Amici's motion to file, finding that the proposed brief had "the potential to aid the Court and 'offer insights not available from the parties.'" *See* Dkt. No. 267.

In the week prior to the Hearing, the parties filed a flurry of motions and responses relating to sealing and confidentiality procedures to govern evidentiary and testimonial matters at the Hearing. *See* Dkt. Nos. 241 (letter from non-party EchoStar regarding sealing procedures during Hearing), 255–258 (JV Defendants' motion to seal certain documents and testimony during Hearing, and supporting declarations), 261 (EchoStar's letter in response to JV Defendants' motion to seal), 260 (parties' joint proposed stipulation regarding confidentiality procedures). On August 5, 2024, the Court held a conference to discuss these issues and rule on the pending motions, ultimately announcing a procedure to protect highly confidential business information of the parties at the Hearing that included guidelines as to when documents would be shown on public screens; when they would be limited to the parties, the witnesses, and the Court; and when the courtroom would be sealed altogether, if no less-restrictive option were available to safeguard highly confidential or competitively sensitive information. *See* Dkt. No. 288. The Court entered the parties' Joint Pre-Hearing Stipulation re: Confidentiality Procedures the same day. *See* Dkt. No. 275.

### D. The Hearing

The Hearing began on Tuesday, August 6, 2024, and lasted until August 12, 2024. On August 6, 2024, after opening arguments from counsel, the Court heard testimony from Mr. Trautman, Mr. Gandler, and Mr. Mathers. Mr. Mathers continued his testimony on August 7, 2024, and testimony from Mr. Grad, Mr. Marchesano, Mr. Nallen, Mr. Schanman, and Mr. Pitaro followed. On August 8, 2024, Mr. Horihuela, Mr. Janedis, Mr. Orszag, Mr. Desser, and Mr.

31

Espinosa testified.  Mr. Petitti, Mr. Espinosa (on cross examination), Mr. Campbell, Mr. Connolly, Mr. Miller, and Dr. Whinston testified on August 9, 2024.  In addition to these live witnesses, the parties submitted approximately five-and-a-half hours of video deposition testimony in lieu of live testimony from Mr. Padte, Mr. Cheesbrough, Mr. Distad, Mr. Fox, Mr. Iger, Mr. Lancer, and Mr. Warbrooke.  The Court viewed this video testimony outside of court time during the same week that the live testimony was presented in court.

Prior to the Hearing, on August 5, 2024, the JV Defendants moved to exclude from the record the Second Declaration of Mr. Thun, *see* Dkt. No. 248-27, which Fubo had filed in support of its Reply.  *See* Dkt. Nos. 273, 274.  In their motion, the JV Defendants argued the new declaration from Mr. Thun was submitted in bad faith in contravention of an agreement Fubo and DIRECTV had made to not provide testimony from Mr. Thun at the Hearing in exchange for the cancelling of Mr. Thun's deposition, and that acceptance of the new declaration would prejudice them due to their inability to test the assertions within.  *Id.*  Fubo and DIRECTV subsequently opposed.  *See* Dkt. Nos. 276, 278, 282, 283.  On August 7, 2024, the Court heard from the parties and counsel for DIRECTV regarding the JV Defendants' motion, and denied the JV Defendants' motion to strike the Second Thun Declaration on August 8, 2024.  *See* Hearing Tr. 374:3–388:8; 523:16–524:17.

Summations were given on the morning of August 12, 2024, and the parties each submitted post-hearing briefing that evening.  *See* Dkt. Nos. 285 ("Fubo Post-Hearing Br."); 286, 287 ("JV Defs. Post-Hearing Br.").  This Opinion and Order followed.

## DISCUSSION

When interpreting a statute that authorizes federal courts to grant preliminary injunctions, "absent a clear command from Congress, courts must adhere to the traditional four-factor test"

for a preliminary injunction to issue.  *Starbucks Corp. v. McKinney*, __ U.S. __, 144 S. Ct. 1570, 1576 (2024).  The text of Section 16 of the Clayton Act, the statute under which Fubo brings this Motion, reads in relevant part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue[.]

15 U.S.C. § 26.

Nothing in Section 16's text overcomes the presumption that the four traditional preliminary injunction criteria govern.  To obtain a preliminary injunction, therefore, Fubo must make a clear showing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) an injunction is in the public interest.  *Starbucks*, 144 S. Ct. at 1575 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008)).  For the reasons discussed herein, Fubo has met all four factors.[29]

---

[29] Fubo's opening briefing in support of the Motion was filed prior to the Supreme Court's decision in *Starbucks Corp. v. McKinney*, and posited that the Second Circuit's "serious questions" standard for the issuance of preliminary injunctions should govern.  *See* Mot. at 8; *see also New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("A party seeking a preliminary injunction must ordinarily establish (1) 'irreparable harm'; (2) 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party'; and (3) 'that a preliminary injunction is in the public interest.'") (quoting *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011)).  On Reply, Fubo maintained that *Starbucks* did not abrogate the long-recognized "serious questions" standard.  *See* Reply at 20 n.15.  Whichever formulation controls is not dispositive to the outcome of the Motion, however, because the Court finds that Fubo has shown "likelihood of success on the merits," and has therefore necessarily presented "serious questions going to the merits."

## I.      LIKELIHOOD OF SUCCESS ON THE MERITS

Ultimately, this case is to be tried by a jury.  *See* Compl. ¶ 340.  "To establish a

likelihood of success on the merits, a plaintiff 'need not show that success is an absolute

certainty.  [It] need only make a showing that the probability of . . .prevailing is better than fifty

percent.'"  *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quoting

*Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)), *appeal dismissed as moot sub nom. Broker Genius*

*Inc. v. Gainor*, 756 F. App'x 81 (2d Cir. 2019); *accord M.V. Music v. V.P. Records Retail Outlet,*

*Inc.*, 653 F.Supp.3d 31, 41–42 (E.D.N.Y. 2023); *Regeneron Pharms., Inc. v. U.S. Dep't of*

*Health & Hum. Servs.*, 510 F. Supp. 3d 29, 41 (S.D.N.Y. 2020).  The question the Court must

consider, therefore, is whether a reasonable and properly instructed jury is more likely than not

to rule for Fubo following a trial on the merits.  While a full trial has not yet occurred, the parties

have engaged in significant discovery and, at the Hearing, the Court heard five full days of

testimony from 18 live witnesses and seven video deponents, many of whom are likely to testify

at a full trial on the merits, including the parties' respective experts.  The Court has observed

each witness's demeanor, considered the content of their testimony within the context of the

documentary evidence and entire facts of this case, and heard argument from the lawyers

regarding how the governing law applies to these facts.  All this, in addition to the voluminous

briefing submitted by the parties, has informed the Court's conclusion that Fubo is ultimately

likely to succeed in demonstrating that the JV will substantially lessen competition or tend to

create a monopoly in contravention of this country's antitrust laws.

### A.  The Clayton Act § 7 Claim

Section 7 of the Clayton Act prohibits transactions whose effect "may be substantially to

lessen competition in any line of commerce in any section of the country."  *United States v.*

*Phila. Nat'l Bank*, 374 U.S. 321, 355 (1963) (internal quotation marks omitted); *see also* 15

U.S.C. § 18.  The prohibition may be effectuated prior to the entry into a market of the proposed combination.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 346 (1962) ("We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency[.]").  And the prohibition applies to joint ventures as well as traditional mergers or other business combinations.  *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 169 (1964) (applying Section 7 to joint venture because "[t]he joint venture, like the 'merger' . . . often creates anticompetitive dangers.  It is the chosen competitive instrument of two or more corporations previously acting independently and usually competitively with one another. . . .  If the parent companies are in competition . . . it may be assumed that neither will compete with the progeny in its line of commerce.").  The antitrust laws recognize that joint ventures between horizontal competitors pose particular dangers to competition.  As the Supreme Court explained in *Copperweld Corp. v. Independent Tube Corp.*, 467 U.S. 752 (1984):

> The reason Congress treated concerted behavior more strictly than unilateral behavior is readily appreciated. Concerted activity inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands. In any conspiracy, two or more entities that previously pursued their own interests separately are combining to act as one for their common benefit. This not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction. Of course, such mergings of resources may well lead to efficiencies that benefit consumers, but their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly.

*Id.* at 768–69.

Applied to the facts of this case, these principles lead inexorably to the conclusion that a joint venture between three horizontal competitor programmers, in a market segment with high barriers to entry and dominated by a relatively small number of companies, who together control "one-half of the essential product of the industry" in a downstream distribution market, must be enjoined as anticompetitive.  *See United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp.

412, 430 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1063 (2d Cir. 1981).  Indeed, *Columbia Pictures*

presents a scenario strikingly similar to this case.  At an analogous time of rapid change in the

television and film industry, film studios that controlled just over half of the first-run theatrical

releases (and a higher percentage of so-called "blockbuster" movies) sought to capture a share of

the burgeoning pay TV movie channel market by creating a joint venture that would provide the

films of the partner studios to a jointly owned pay TV channel called "Premiere."  The court

granted a preliminary injunction to block the launch of the joint venture as anticompetitive—a

ruling that was affirmed by the Second Circuit.  *See id.*[30]

     Before moving on to its analysis, the Court pauses briefly to dispose of one of the JV

Defendants' primary legal arguments.  The JV Defendants argue that the Supreme Court's

decisions in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398,

407 (2004) and *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438, 442

(2009) control this case and compel the rejection of Fubo's claims.  But the reliance on *Linkline*

and *Trinko* is inapt for at least two independent reasons.  First, those cases involved actions

brought under Section 2 of the Sherman Act, not Section 7 of the Clayton Act, and primarily

allege specific technical *per se* violations of the Sherman Act not applicable here.  Second,

*Linkline* and *Trinko* both involved unilateral conduct by existing and well-established companies,

who operated as lawful monopolies (as a result of a combination of historical accident and

---

[30] The JV Defendants assert that *Columbia Pictures* is not relevant precedent because the
Premiere joint venture included a provision that the partner studios would not provide their films to any
other pay TV movie channel for the first nine months that the films were available on Premiere.  The
Court rejects that view.  The decision in *Columbia Pictures* did not rest solely on the anticompetitive
effects of this "exclusivity" provision; moreover, as discussed further below, the JV in this case also
contains elements of express exclusivity and clear incentives for other types of exclusive dealing.  In any
event, as discussed further below, alleged anticompetive conduct (outside of *per se* illegal conduct not
relevant here) is to be assessed holistically, taking into account all of the particular facts and
circumstances of the challenged combination and the market conditions in which it would operate.

regulatory action), not a new joint venture or concerted action by horizontal competitors.
Specifically, courts have been clear that the "no duty to deal" defense raised by the JV
Defendants in reliance on *Linkline* and *Trinko* is not a defense to concerted actions. *See, e.g.*,
*Buccaneer Energy v. Gunnison Energy Corp.*, 846 F.3d 1297, 1309 (10th Cir. 2017); *In re
Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 1004 (N.D. Ill. 2023).

Finally, many of the JV Defendants' arguments, both legal and factual, depend upon
asking the Court to look at only one aspect of the JV, one moment in time of the JV Defendants'
dealings with their downstream customers, or one segment of the television market, in isolation.
But this approach finds no support in the antitrust caselaw, outside of the *per se* technical
violations not at issue in this case. Rather, when assessing whether conduct substantially lessens
competition or tends to restrain trade, "plaintiffs should be given the full benefit of their proof
without tightly compartmentalizing the various factual components and wiping the slate clean
after scrutiny of each. The character and effect of a conspiracy are not to be judged by
dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore
Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (internal references omitted).
*See also Duke Energy Carolinas LLC v. NTE Carolinas II LLC*, ___ F.4th___, 2024 WL
3642432, at *11–12 (4th Cir. Aug. 5, 2024) (rejecting piecemeal or siloed approach to antitrust
claims: "exclusionary efforts [must] be considered in their totality").

### 1.  The Relevant Market: The Live Pay TV Market

To evaluate anticompetitive effects of a joint venture under the Clayton Act, courts must
first determine the relevant market. *Brown Shoe Co.*, 370 U.S. at 324. To do so, courts look to
consumer demand. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).
Form should not be elevated over substance when determining a market's contours. *See
Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992) ("Legal

presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.  This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'").  Rather, courts should consider the entire context of the "structure, history and probable future" of the relevant industry.  *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974) (quoting *Brown Shoe*, 370 U.S. at 322 n.38).

Fubo proposes three markets for the Court's consideration of the JV's potential anticompetitive effects: (1) the "Skinny Sports Bundle Market," (2) the "Live Pay TV Market," and (3) the "Sports Licensing Market."  *See* Reply at 20–34.  The JV Defendants encourage the Court to instead look to the broader "Pay TV Market," which includes not only MVPDs, vMVPDs, and DTCs, but also SVODs.  *See* Opp. at 38–40.  At this preliminary stage of the case, the Court need not perform a comprehensive market analysis.  However, the Court does find, even on an incomplete record, that the JV Defendants are unlikely to be successful in their claims that the broader Pay TV Market is the relevant market.  The Court also finds, for the reasons discussed herein, that Fubo has offered evidence sufficient for a finding that it is likely to succeed in showing that the JV will at least tend to lessen competition in the Live Pay TV Market.[31]

One of the only undisputed issues in this case is that the relevant consumer is the sports fan who watches, or would like to watch, sports on a live telecast.  Consumers of live sports, however, vary in their preferences.  Some sports fans are omnivorous and want to watch as much

---

[31] The Court's preliminary determination here does not exclude the possibility that upon a fuller record, narrower or separate markets such as Fubo's purported Skinny Sports Bundle or Sports Licensing Markets may be appropriate for the assessment of other antitrust harms.  *See Brown Shoe*, 370 U.S. at 325 ("[W]ithin this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.").

sports content as possible, regardless of the type of sport or the team playing.  For these fans, MVPDs or vMVPDs which carry the broadest range of live sports may be the best option.  Some sports-watchers are team-loyal, and choose which product they will purchase based on which product will allow them to watch as many of their favorite team's games as possible.  For these fans, MVPDs, vMVPDs, and some DTCs (such as YES, for Yankees fans) may all be acceptable substitutes for one another.  And yet another category of sports-watching fans includes those who have a deep interest in one or two specific sports, either niche sports like F1, cricket, or golf, or major sports like college basketball.  Again, these consumers may be satisfied with a larger MVPD or vMVPD subscription but may prefer a slimmer DTC option if their preferred sport is readily available on a DTC for less money.[32]

The only current market that serves all these consumers of live sports is the Live Pay TV Market, which includes traditional MVPDs, vMVPDs, and some limited newer DTCs such as NFL Sunday Ticket, and YES.  MVPDs (both traditional and virtual) tend to have a broader range of sports programming but also include, due to widespread programmer industry practices, a required range of non-sports programming that customers must accept and pay for, even if they are only interested in the sports.  A smaller and newer selection of DTC options tend to cost consumers less but also provide access to a much narrower subset of live sports events.  SVODs, currently, carry very few live sports.[33]

---

[32] These examples are illustrative and do not necessarily exhaust the various preferences among all potential watchers of live sports.

[33] SVODs include *some* live sports programming, to be sure.  But the key analysis for antitrust purposes whether the relevant products are "acceptable substitutes." *See PepsiCo, Inc.*, 315 F.3d at 105 ("Products will be considered to be reasonably interchangeable if consumers treat them as 'acceptable substitutes.'").  Because no sports fan who falls into any of the above categories would be able to purchase a Netflix or Amazon Prime Video subscription and get all the live sports he or she wanted without *also* purchasing a MVPD, vMVPD, or DTC subscription, SVODs are not acceptable substitutes for those services.  Thus, the broader Pay TV Market is inapt.

Just like the relevant market in *Columbia Pictures*, the current Live Pay TV Market is highly competitive and in the midst of dramatic change due to technological and demographic changes.  507 F. Supp. at 418 (describing recent demographic changes leading to pay television market shifts); *see also* Hearing Tr. 139:6–10; 406:4–19; 715:12–23.  And just like in *Columbia Pictures*, in response to these market changes, the JV Defendants—horizontal competitors in the programming market—have joined together to use their combined market power in the programming tier to create a joint venture that will allow them to dominate the distribution tier. For the reasons discussed below, the JV is likely to lessen competition in the Live Pay TV Market.

### 2. The JV Defendants Have Granted the JV an Exclusive License to Unbundled Sports Programming

Even after limited and expedited discovery, it is indisputable that the JV Defendants have long used the combination of bundling and minimum penetration requirements to make live pay TV distributors carry content they otherwise would reject, or would only offer based on express customer preferences, and therefore, those distributors are forced to pass those superfluous costs on to consumers who, in many cases, also do not want that content, or would not pay for the content if they had the choice.  Now, *for the first time ever*, the JV Defendants, who are otherwise competitors both in securing the rights to broadcast live sports and in securing viewers for their content, are granting a firm a license to unbundled sports content.  That firm is their own JV.

At the Hearing, multiple Fubo executives testified to their firsthand experience with mandatory bundling.  Mr. Mathers, Fubo's Senior Vice President of Content Acquisition, testified that ███████████████████████████████████████████████████████

████████████████████████████████████████████████████.  *See*

40

Hearing Tr. 202:23–203:6 (" ███████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████")

Disney likewise r█████████████████████████████████████████████

██████████.  *See* Hearing Tr. 287:1–288:1; *see also* Hearing Tr. 153:12–15 (Gandler Cross:

"Q. You didn't ask for a broad bundle from Warner Bros., right, sir? // A. We didn't ask for the

fat bundle.  We asked for the skinny bundle that will be provided to Venu, and we were told

no.").

  Fubo is not alone in navigating these imposed bundling requirements.  Mr. Schanman,

Executive Vice President of Video Services for EchoStar (owner of DISH and Sling TV),

testified extensively to his experience negotiating carriage agreements with the JV Defendants.

Mr. Schanman has worked for other distributors in this industry, including industry

heavyweights like Cablevision, Charter Communications, and Comcast, who represent the

largest numbers of viewers in the MVPD space.  *See* Hearing Tr. 427:9–13.  In particular, he

testified that ████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████.  *See* Hearing Tr. 434:10–436:14.

Furthermore, Robert Thun—Chief Content Officer for DIRECTV—submitted a declaration in

support of Fubo's Motion and ██████████████████████████████████████

███████████████████████████████.  *See* Dkt. No. 248-27 ("Second Thun Decl.").  In his

declaration, Mr. Thun states █████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. Second Thun Decl. ¶ 3.

Indeed, the Court agrees with Mr. Thun and finds the JV Defendants' denials of the

existence of their bundling practices to be entirely incredible and completely belied by the ample

evidence before the Court that bundling is pervasive in the industry.  At the Hearing, Justin

Connolly, President of Platform Distribution for Disney, testified that Disney has historically

sold its networks as a part of a "bundle," and that it is "common practice in the industry," that

"every programming group does[.]"  *See* Hearing Tr. 869:15–21. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████. *See* Hearing Tr. 877:22–

879:14.  Upon further inquiry by the Court, though, ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ *See* Hearing Tr. 879:15–883:8; 886:4–

887:10.  These offers and agreements, therefore, were clearly materially different than a true

offer to unbundle sports from non-sports content, on anything remotely similar to the terms that

the JV Defendants will be giving to their own JV.

The JV Defendants also imply in their arguments to this Court that bundling is not

"imposed" or "forced" because, in their view, no distributor has ever come right out and asked

for a "skinny sports bundle."  Even assuming that were true (and, to be clear, it is a view of the

record that has almost no foundation and is belied by the JV Defendants' own witnesses'

explanations of how relationships between programmers and distributors work in the market),

Mr. Grad credibly testified that ███████████████████████████████████████

█████████████████████████████████████████. *See* Hearing Tr. 290:15–24

(███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

██████████████████); *see also* Hearing Tr. 163:7–19 (Gandler Cross:  "Q. And you didn't say

to, her whoa, whoa, whoa, I want a skinny sports bundle, right, sir? // A. I did not. // Q. And you

didn't say, this is unacceptable, right, sir? // A. To her specifically or to her boss? // Q. To either

of them. // A. Well, if you said counsel has provided you with e-mails from Fox, then you should

know that I did ask for specific channels.  I was told no.  I agreed to accept a full suite of

channels. [. . .]").  Mr. Schanman similarly confirmed that i██████████████████████

███████████████████████████████████████████████████████

██████████.  *See* Hearing Tr. 436:1–14 ("████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████ ").  It is also common sense that sophisticated negotiating parties do not risk

credibility by asking for something they know is going to be outright rejected by their

negotiating partner, on any terms.

The record is also clear that if the JV Defendants were willing to unbundle live sports

content, distributors would jump at the opportunity to offer sports-only content and have long

desired to offer such a sports-focused package to their customers.  *See, e.g.*, Padte Dep. 152:22–

153:7 ("Q. And the fact that Fubo offers sports channels and also non-sports channels makes it a

differentiator – that's a differentiator against the JV.  Right? // A. To a large extent, the inclusion

of non-sports channels is a restriction imposed by the programmers.  It's not a source of

differentiation that we would unilaterally choose.  I think we would like to offer smaller and

skinnier bundles at lower price points.").  In fact, the Court can be confident that Fubo would

offer a skinny sports bundle if it could because, as Fubo's Content Acquisition Lead Mr.

Marchesano testified, it is already doing so in Canada.

> THE COURT: [. . .] And within Fubo, within its business plans, again, in a hypothetical dream world, is Fubo thinking about products to serve different kinds of customers?
>
> THE WITNESS: Absolutely.  I can give an example.
>
> THE COURT: Yes.  That would be helpful.
>
> THE WITNESS: Say in Canada, where we don't have the similar type of bundling requirements, we offer more soccer-specific packages.  We offer soccer plus general entertainment package. […] We would love to offer hockey, but we are also now introducing -- we are trying to build a cricket package out, where we have gotten cricket rights.  We can offer just a smaller cricket-focused package to customers to serve those needs, and if they want to then add general entertainment, boom, we can add that on.  If they want to add soccer to that, then we can add that on.  It's really just giving the customer all of the different options to meet them where they are for their watch needs.
>
> THE COURT: And under your current carriage agreements and current industry practices, we have been hearing a lot about, in this trial, in this hearing, if you were able to offer all the different products that you think there might be buyers for.
>
> THE WITNESS: In the U.S. today, no.

Hearing Tr. 332:22–333:25.  While, as noted above, the Court need not (and does not) determine the legality of programmers' bundling practices in order to decide the Motion, it is difficult to avoid the conclusion that, on balance, these practices are bad for consumers.  For example, in Mr. Schanman's testimony at the Hearing, ███████████████████████████████████████████████ ███████████████████████████████████████████████.  *See* Hearing Tr. 441:8–442:10.  These mind-bending costs do not just hurt the wallets of sports-loving consumers by making them pay for non-sports channels they don't want, but also hurt those customers who only want entertainment channels but pay significantly higher costs because they are made to pay for unwatched sports, the most expensive of all content.  *See* Hearing Tr. 444:14–445:17.

Finally, the record is also unambiguous that the JV will mark the first time that the JV Defendants are offering their live sports content on an unbundled basis.  John Nallen, COO of Fox, testified as much, and other JV Defendant witnesses and documents reveal that they understand the fundamental appeal of the JV is this feature:  first *and only* unbundled multi-channel sports programming.  *See* Hearing Tr. 395:22–396:8; *see also* PX024 ("Notably, through this offering the content owners are 'unbundling' their channels by offering only the sports-centric channels in the product."); PX055 ("Raptor represents the first time we are unbundling our networks, which presents certain fundamental risks to our core Pay-TV business model"); Lancer Dep. 24:3–25:6.

Again, whether bundling is itself illegal under the antitrust laws is not a question currently before the Court.  But what is clear on the current factual record is that bundling has been uniformly and systematically imposed on each distributor in the live pay TV industry except the JV, preventing any other distributor from offering a multi-channel sports-focused

streaming service.  As discussed further below, the JV is the vehicle through which the JV

Defendants will capitalize on this opportunity, to potential anticompetitive effects.  Because the

Court must scrutinize joint ventures within "structure, history and probable future" of the

particular markets that the joint venture will affect, *Gen. Dynamics Corp.*, 415 U.S. at 498, the

JV Defendants' bundling practices is crucial context to the ultimate determination of the success

of Fubo's Section 7 claim.

### 3. The JV Provides an Anticompetitive Runway for the JV Defendants to Control the Future of the Live Pay TV Market

As discussed above, the JV Defendants are granting the JV an exclusive right to license

their sports networks unbundled from their general entertainment channels.  This exclusive

license allows them to use the JV to "capture demand" in the market:  demand that is the

byproduct of their own historical (and ongoing) bundling practices.  *See* PX089 at 15 (internal

Fox marketing strategy document stating: "We are capturing demand, not creating it."); *see also*

PX220 (Mr. Connolly, Disney President of Platform Distribution, explaining that the JV "is

primarily about creating and launching a new package which others cannot currently develop and

others likely have significant encumbrances to launch[.]…").  Not only do the JV Defendants

intend to capture this demand, but the JV is structured and incentivized to maximize the extent to

which the JV Defendants keep that demand to themselves.[34]  Although each JV Defendant

intends to continue to license its own sports programming to other distributors after the launch of

the JV, the JV will:  (1) include an explicit three-year agreement among the JV Defendants not to

---

[34] The JV Defendants assert that nothing in the JV term sheet would prevent each JV Defendant
unbundling their own sports content for another distributor in the future and therefore the JV does not
represent an "exclusive" arrangement as to unbundling.  *See* JV Defs. Post-Hearing Br. at 1, 5.  Many
things in this world are theoretically possible.  But the Court is not required to accept that things are likely
to happen which are not happening now and have never happened in the past, merely because the thing is
not prohibited by any contractual agreement.  The assertion is belied by the record in this case and, as
discussed below, by a common-sense assessment of the economic incentives created by the JV.

invest in other skinny sports bundles; (2) incentivize the JV Defendants to prevent and suppress other potential sports-oriented-bundles from emerging to compete with the JV and draw away subscribers; (3) disincentivize the JV Defendants from meaningfully competing with each other and from entering the market unilaterally; (4) provide the JV Defendants the "backstop" to allow them to raise prices or enforce onerous bundling and min pen requirements on other distributors by changing the incentives of each JV participant to "walk away" from distributor negotiations; and (5) leave the road clear for the JV Defendants to eventually raise prices on consumers.  For these reasons at least, the launch of the JV will tend to lessen competition in the Live Pay TV market by allowing the JV Defendants an unobstructed runway to establish market dominance over future submarkets and drive out competitors within the rapidly changing Live Pay TV Market, all to the detriment of consumers and competition when compared to a world without the JV.

*First*, as part of the binding term sheet for the JV, the JV Defendants entered into an explicit "Non-Compete" agreement which forbids the JV Defendants from "owning any form of equity interest, including a revenue-sharing or profit-sharing interest, in a commercial venture, where the focus of the commercial venture is the operation of a sports-centric vMVPD similar to the JV Platform . . . for a period of three (3) years from the Launch Date."[35]  *See* PX289 at 17. This agreement contractually prohibits any of the JV Defendants from joining forces with other competitor sports licensors—such as CBS and NBC—in order to develop a competing sports-focused vMVPD.  *See* Warbrooke Dep. 216:5–14 ("Q: So – so give you an example. ESPN for

---

[35] The term sheet also includes an express agreement between the JV Defendants not to distribute the JV through other third-party MVPDs.  *See* PX289 at 5 ("The JV Platform shall not be licensed to, or distributed by, any current or former distributor of any JV Network (*e.g.*, MVPDs or vMVPDs), including affiliated entities, provided that the Members may unanimously agree on specific terms for bundling and/or resale by MVPD-affiliated platform, mobile, and/or broadband services.").

three years would be prevented from launching a sports-focused digital MVPD with NBC and CBS in which ESPN/Disney have an equity stake.  Is that fair? // A: That is correct.  So we could not – we could not do carriage deals with CBS and NBC and run a compete – competing digital MVPD for this three-year period.").  This non-compete agreement does not prevent the JV Defendants from licensing their programming to other MVPDs and vMVPDs and carves out a specific exception for DTCs launched by the JV Defendants (so that Disney can continue with its plans to launch ESPN Flagship in 2025, but could not convert ESPN Flagship into a multi-channel sports service that also included non-Disney sports programming).  Before it was written down, however, the agreement originated in a phone call in late January 2024 in which the JV Defendants agreed that they "would all stay clear of a Raptor-like platform[.]"  *See* PX053; *see also* Hearing Tr. 402:24–403:2 (Nallen Direct: "Q. You, Mr. Pitaro, and Mr. Campbell agreed on a phone call in late January 2024 that you would all stay clear of a Raptor-like platform, isn't that true sir? // A. That's true.").

Furthermore, the three-year period is also consistent with the same time horizon on which other carriage agreements with the JV Defendants expire.  Thus, even if the JV Defendants were willing to offer to license their sports programming on fully unbundled terms to other distributors, many of those distributors will remain contractually obligated to continue to offer bundled content to a majority of their subscribers during the pendency of this non-compete, while at the same time the JV enjoys the benefits of offering exclusive live sports-only content without competition (including from one another).  In the Live Pay TV market in which live sports rule, this could put these distributors at a significant disadvantage and provide the JV Defendants with an unobstructed runway to dominance.  *See* PX028 (Internal Fox email: "Basically [Charter, Comcast, DIRECTV, Hulu, and YouTube TV are] the only one's [*sic*] with

enough leverage to really push us, plus most operators *by the time they renew won't be big enough to really matter*.") (emphasis added).  An explicit agreement with such significant "anticompetitive potential" "warrant[s] scrutiny even in the absence of incipient monopoly," and should be analyzed in the context of the JV Defendants' other concerted conduct.  *Copperweld Corp.*, 467 U.S. at 769; *see also In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 244 (S.D.N.Y. 2019) ("competitive landscape" is "directly related" to anticompetitive effects of agreement).

    *Second*, even absent any explicit agreement, the existence of the JV itself incentivizes the JV Defendants to prevent and suppress other potential sports-focused bundles from meaningfully competing, and the JV Defendants have the market power to follow through on these incentives. The JV Defendants know the unique value of their unbundled sports programming and are aware that any other competitor offering such unbundled live sports will devalue the JV.  *See* PX019 (Paul Cheesbrough email to John Nallen: "*Things we're trying to avoid*: . . .  Anything that can offer competing features or functions to the sports fan around a material set of content e.g. a dedicated sports product, that can be marketed head on against Raptor.") (emphasis in original). Indeed, the JV Defendants described the prospect of distributors seeking unbundled sports content after the JV launches as a "risk" to the JV's value.  *See* Lancer Dep. 27:14–28:3 (discussing the "risk" that distributors will insist on trying to replicate the JV's unbundled content.  In the inception of the JV, the JV Defendants even discussed a "Potential Path," wherein they would "ensure that all [JV Defendants] can't break their linear channels and streams to be re-bundled into other services," because it would "stop[] others combining the user experience into a single place like Raptor is attempting to – *it maintains Raptor's uniqueness to the sports fan*."  PX019 (emphasis added).  These documents and testimony support the

common-sense notion that the JV Defendants—in owning, launching, and investing in the JV—
will be materially incentivized to act (whether explicitly coordinated or not) to prevent others
from diminishing the value of their investment.

*Third*, the JV may tend to lessen competition because it disincentivizes the JV
Defendants from meaningful competition against each other.  The JV Defendants control a
significant amount of the content that would be necessary for *any* meaningful competitor to the
JV.  For such a competitor to emerge, in all likelihood one or more of the JV Defendants would
have to be involved in launching it, whether by agreeing to fully unbundle their sports channels
for another distributor, or launching a DTC/MVPD hybrid service themselves that would feature
their own sports channels alongside licensed sports channels from other programmers.
Executives within the JV Defendants, being astute businessmen, recognized this dynamic as the
JV began to take shape.  On January 4, 2024, as the term sheet was being finalized, Mr. Nallen
(Fox COO) wrote in response to Mr. Lancer's concerns about intra-JV Defendant competition:
"Don't know why they would really want to compete with a platform they [are] putting $300m
each into.  Don't overthink this one."  *See* PX015; *see also* Hearing Tr. 403:19–405:9.  Another
Fox executive, Mr. Cheesbrough, testified in his deposition that potential competition between
the JV Defendants could "dilute devaluing the offering around Raptor.  And given the money we
were proposing to invest in that joint venture, we felt that was a risk that we really kind of
wanted to understand or mitigate."  Cheesbrough Dep. 215:2–16.  It does not require executive-
level acumen to conclude, however, that once the JV is launched, the JV Defendants' incentives
will not be aligned toward competition among themselves or competition between potential
unilateral offerings and the JV.  They will want to ensure their investment succeeds.

*Fourth*, the JV provides the JV Defendants with a comfortable "backstop" in negotiations, which will leave them able to raise prices or enforce additional bundling requirements on other distributors by changing the incentives of each JV participant to "walk away" from negotiations.  As noted above, carriage agreements in the current pay TV ecosystem are typically the subject of hard-fought negotiations, with both programmer and distributor seeking the best deal for themselves, and, as relevant here, programmers incentivized not to end negotiations without a deal because they do not wish to risk the total loss of the distributor's viewers.  A world with the JV will materially change those incentives.  The JV will offer consumers an option to receive their must-have live sports content at a fraction of the cost of what current MVPDs and vMVPDs can offer.  The JV Defendants will receive affiliate fees and advertising revenue generated from every subscriber to the JV.  Because of the central importance of live sports to the MVPD customer, the JV Defendants dramatically increase their leverage in negotiations with MVPDs once the JV is launched.  If MVPDs are unwilling to pay the price demanded for the JV Defendants' sports programming, in the but-for world where the JV exists, the JV Defendants know that they will not lose all of the MVPD's customers if they walk away from the negotiations:  many of those otherwise "lost" customers could be recaptured by the JV.  Mr. Schanman provided the Court with a firsthand accounting of this dynamic in his testimony at the Hearing.  *See* Hearing Tr. 449:13–450:5.

Indeed, on the record before the Court, this does not appear to be a theoretical dynamic.  The JV Defendants expect *at least* 50% of the JV's subscribers will be "trade downs," from existing MVPD or vMVPD services.  *See supra* n.15.  And while the JV Defendants claim the JV will only attract approximately 5 million subscribers by 2028, *see* Hearing Tr. 392:18–21; 483:15–22, that number is based only on a comparison to Hulu + Live TV and tends to

contradict the JV Defendants' own commissioned research studies which indicate that a skinny sports offering like the JV will have significantly broader appeal. *See* JX013; JX014; PX255; PX275.[36]  Furthermore, although the JV Defendants urge that they do not want to cannibalize MVPD subscribers because that would hurt their bottom line, the structure of the JV incentivizes the collection of subscribers *regardless* of where in the live pay tv ecosystem those subscribers come from.  For example, half of the annual bonus of the JV's CEO, Mr. Distad, is dependent on "Subscriber Goal Attainment," and most of the rest is driven by revenue numbers rather than profit numbers.  *See* PX069 at 18; *see also* Distad Dep. 25:17–26:20.  If Mr. Distad achieves 9 million subscribers by 2027, he receives *800%* of his base bonus.  Distad Dep. 32:4–33:16.  He does not get paid less if any proportion of those subscribers leave their MVPD subscriptions to "trade down" to a subscription to the JV; his compensation package counts all subscribers the same.  In addition, the JV partners have agreed to split any profits evenly in thirds, even though the channels contributed by each JV Defendant differ greatly in value.  *See* JX045 at 6 ("Upon consummation of the Closing (as defined below), each Member shall hold an equal initial ownership interest in the Joint Venture ('JV Interest') of 33 1/3%.").  This arrangement makes economic sense only if the JV Defendants do not expect the JV to make a significant profit as a stand-alone business; the economic proposition for the JV Defendants is to earn back their investment, and then some, through affiliate fees (and, to a lesser extent, from controlling 100% of advertising minutes on channels shown by the JV).  Affiliate fees come from subscribers, and

---

[36] There are indications in the record that the JV Defendants do not really believe their own estimate, or that such a lowball estimate stretches reason. *See, e.g.*, Dkt. No. 248-142 (admitted into evidence as PDX-938) (Internal WBD email to Mr. Campbell: "Since we're talking about a 5M # (which I think he threw out there to try to allay concerns the JV product would drive a ton of incremental cord cutting)"); PX026 at 11 ("[W]e fully anticipate the service will have an impact on consumers opting to trade down to a skinnier bundle at a lower price[.]"); *see also* Hearing Tr. 925:9–11 (Connolly Cross: "THE COURT: And ESPN+, if I understand correctly, has approximately 25 million subscribers, right? // THE WITNESS: That's correct, yes.")

the more subscribers the better. The JV will face essentially no pressure to achieve profitability as an independent business, so long as it continues to attract subscribers in ever-growing numbers. All this indicates that the JV's design will significantly lessen the negotiating power of existing MVPDs and vMVPDs, further limiting any potential competition with the JV, and altering the market in an anti-competitive direction.

*Fifth*, the JV may eventually allow the JV Defendants to raise prices directly for consumers, unchecked by meaningful competition. If the JV Defendants are able to use the runway granted by the JV Defendants' past (and current) bundling practices, the three-year non-compete period to maintain the uniqueness of the JV as a consumer offering (and indeed likely eliminate competitors that exist in the market today), they may have an unchecked ability to raise prices to the limit of consumer tolerance. The JV Defendants recognized the immense value of this first mover advantage in a rapidly changing market. *See* JX003 (Email from Mr. Espinosa: "Large pay tv operators would ultimately get unbundling rights as a result of Raptor[.] . . . However, it would take them time to secure and take advantage of that flexibility. In the meantime, Raptor could have an opportunity to attract subscribers and gain scale."). In their discussions in forming the JV in December 2023, they specifically envisioned an offering in which the JV would be "$50 expected retail price at launch, *with price increasing ~$5 each subsequent year[.]*" *See* JX059 (emphasis added); *see also* Fox Dep. 147:23–148:16 ("Q: Do you believe that the joint venture if it launches will be able to increase its price by $5 per year without significant subscriber loss? // A: I believe it's possible because if you look at our actual full model, we are not assuming a huge number of subscribers. // Q: And do you believe that the joint venture will be able to increase its price by $5 without significant churn? // A: There will be some churn, especially because it's a, you know, sports-focused JV, and so as I mentioned, in the

summer, there aren't as many sports events, so churn is unavoidable. But I do believe that there is room for price increases.").

For Fubo to succeed in its Section 7 claim, it is not required to prove with certainty that all of the above anticompetitive risks will come to fruition, or that the JV Defendants "intended" in forming the JV to profit from any such anticompetitive effects. *See* Frank H. Easterbrook, *On Identifying Exclusionary Conduct*, 61 Notre Dame L. Rev. 972, 977 (1986) ("Objective indicators, not intent, are what matter.").  It need only show that the effect of the JV may be to "substantially to lessen competition, or to tend to create a monopoly" in "any line of commerce." 15 U.S.C. § 18; *see also Columbia Pictures Indus., Inc.*, 507 F. Supp. 412.  Because, on the record before the Court, the evidence is overwhelming that at least one of the above-described aspects of the JV will tend to produce anticompetitive effects in a relevant market, the Court finds that Fubo is likely to succeed on the merits of this claim.

### B. The Sherman Act § 1 Claim

In pursuit of its alternative remedy of an injunction prohibiting the JV Defendants from enforcing the bundling, packaging, and penetration requirements in their carriage agreements with distributors, Fubo asks the Court to determine its likelihood of success in proving that these restraints constitute unlawful "tying" under Section 1 of the Sherman Act.  *See* Mot. at 20–23; Reply at 44–45.  Because the Court herein finds Fubo is likely to succeed on the merits of its Section 7 claims and grants the primary preliminary injunction Fubo seeks, the Court declines to analyze its Section 1 claim further.[37]  *See 725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d

---

[37] Furthermore, the Court noted on multiple occasions—including during the Initial Pretrial Conference, the numerous discovery conferences preceding the Hearing, and once more at the Hearing— that Fubo's Section 1 tying claims do not constitute an emergency and therefore should not be addressed on a motion for preliminary injunction. *See, e.g.,* Hearing Tr. 382:17–383:2 ("THE COURT: [. . .] I think we have all agreed the lawfulness -- in the sense of the claim in Fubo's complaint that that conduct is *per se* illegal, tying, -- is not something we are going to decide in this hearing because it is not -- it doesn't

424, 459 (S.D.N.Y. 2019) ("Plaintiffs need not demonstrate a likelihood of success on the merits of every claim—rather, they need only show a likelihood of success on the merits of at least one of [their] claims.") (internal quotation marks omitted). The Court likewise declines to grant Fubo's alternative remedy as the appropriate way to remediate the potential Clayton Act § 7 claim. Not only is the temporary enjoining of the JV's launch an adequate remedy on that claim, but the Court also agrees with the JV Defendants and antitrust precedent that courts should avoid involving themselves in re-ordering the complexities of the ongoing contractual and business relationships among market participants. The Court is not a central planner. If bundling (as to Fubo specifically or as a general industry practice) is to be struck down as an antitrust violation, it should come only after a full trial on the merits.

## II.  IRREPARABLE HARM

All parties agree that "[i]rreparable harm is 'the *sine qua non* for preliminary injunctive relief.'" *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 726 (S.D.N.Y. 2017) (quoting *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1295 (2d Cir. 1995). "To prove irreparable harm, the movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Id.* (internal references omitted). The Court finds that the JV's risk of imminent harm to Fubo and to consumers justifies a preliminary injunction.

### A.  The JV's Imminent and Irreparable Harm to Fubo

Fubo has made a clear showing that it will suffer imminent and irreparable injury if this Court does not enjoin the JV from launching until a full trial on the merits can be held. It is well-

---

meet the standards for PI in terms of emergency. It's existed for a long time. Obviously the fact of bundling is very relevant to the factual context of this case in which the Court has to decide whether the proposed JV violates the antitrust laws and that decision is being made in a factual context of how the industry works and how the defendants have conducted their business.").

settled law in this Circuit that a "threat to the continued existence of a business can constitute irreparable injury," necessitating a preliminary injunction. *Id.* at 725 (quoting *Nemer Jeep–Eagle, Inc. v. Jeep–Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993)); *see also Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) ("We have found irreparable harm where a party is threatened with the loss of a business."); *Stellar Beach Rentals, LLC v. Redstone Advance, Inc.*, No. 23-cv-955 (VSB), 2023 WL 4421809, at *3 (S.D.N.Y. July 8, 2023) ("[W]hen the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted[.]") (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1, p. 157 (3d ed. 2013)); *Haymount Urgent Care PC v. Gofund Advance, LLC*, No. 22-CV-1245 (JSR), 2022 WL 836743, at *3 (S.D.N.Y. Mar. 21, 2022) (finding a "material risk of the business's collapse" sufficient for showing of irreparable harm).

The JV Defendants offer three main arguments in response to Fubo's charges of imminent harm. First, they assert Fubo's claims of irreparable harm lack credibility. *See* JV Defs. Post-Hearing Br. at 8; Hearing Tr. 1115:23–1116:1; 1117:7–9 (JV Defendants' Summation). Second, they say Fubo's alleged harms are the result of its own "weak" business, and that its failure is likely imminent regardless of any action by the JV Defendants. *See* Opp. at 53–54; JV Defs. Post-Hearing Br. at 9. Lastly, they argue that even if the JV will harm Fubo in the short term, those harms are compensable with money damages at the conclusion of this litigation, and thus do not justify an injunction at this preliminary stage. *See* Opp. at 61–62; JV Defs. Post-Hearing Br. at 8. All three arguments fail.[38]

---

[38] The JV Defendants also argue that any harm to Fubo from the JV is the result of legitimate competition at work. *See* Opp. at 54–55. However, since the Court herein finds that Fubo is likely to succeed on its Section 7 claims, it is also likely that any such competition posed by the JV is contrary to the antitrust laws.

### 1.      Fubo's Forecasts of Imminent Irreparable Harm are Credible

Fubo has submitted sworn declarations, live witness testimony, ordinary course business documents, and statistical data all uniformly evidencing that the launch of the JV will precipitate the imminent downfall of its business.  Fubo's specific predictions are that the JV's expected launch in late August will cause it to lose approximately 300,000 to 400,000 (or nearly 30%) of its subscribers, suffer a significant decline in its ability to attract new subscribers, lose between $75 and $95 million in revenue, and be transformed into a penny stock awaiting delisting from the New York Stock Exchange, all before year-end 2024.  At the Hearing, Fubo's CEO David Gandler summarized this chain reaction of events:

> [W]e will very quickly lose customers because [the JV] is launching into the most important time of the year for us.  Once we lose customers, we'll have to revise our guidance down.  Once we revise our guidance down, the stock will plummet below $1.  We will be delisted.  We won't be able to service our debt.  KPMG will issue a going concern, and we'll find ourselves very quickly in bankruptcy court, Chapter 7.

Hearing Tr. 127:15–22.  Fubo's CFO likewise testified the JV would cause Fubo to "lose a significant number of subscribers. . . .  [T]hat has an impact on our revenue, and ultimately, that would likely lead to insolvency."  Hearing Tr. 592:24–593:5; *see also* Janedis Decl. ¶¶ 25–45. The Court found these statements credible and reliable based on these witnesses' backgrounds as experienced businesspeople, the Court's observation of their demeanor, and the internal consistency and coherence of the totality of their testimony.

But the Court does not base its finding of irreparable harm solely on the statements of Fubo's insiders, no matter their credibility.  Ample documentary evidence kept in the ordinary course of Fubo's business corroborates Mr. Gandler's and Mr. Janedis' testimony.  The record is replete with unrebutted evidence that Fubo successfully markets itself as a sports-focused vMVPD to a sports-focused audience.  Specifically, Fubo uses digital marketing such as Google Search to promote its services in connection with specific live sporting events or seasons.  *See*

Hearing Tr. 528:9–13; 533:1–24.  The vast majority of Fubo's customers come from its seven-day free trial offer, 70% of which join Fubo for a sports-related broadcast.  *See* Hearing Tr. 532:2–19; 534:5–10.  Moreover, on major sports days, Fubo's free trials spike dramatically, often just before the start time of the sporting event.  *See* Hearing Tr. 536:11–539:2.  For example, on November 25, 2023, two major college sports games were broadcast: Michigan vs. Ohio State (on FOX), and Georgia vs. Georgia Tech (on ABC).  That day, 143,117 customers signed up for free trials of Fubo.  *See* Hearing Tr. 538:10–23; PX203.  On average, Fubo gets only approximately 20,000 free trials per day, and on a day with no live sports broadcasts, that number typically drops closer to 5,000.  *See* Hearing Tr. 538:22–539:2.

Fubo closely tracks its customers' "first views," which is the first program that Fubo's new subscribers watch for at least five minutes following their first encounter with Fubo (whether through an initial free trial or signing up for a paid subscription).  *See* Hearing Tr. 539:15–19; *see also* Hearing Tr. 540:1–3 (Horihuela Direct: "Q.  [. . .] Is first-view data something that Fubo tracks in the ordinary course of its business? // A.  Yes, we tracked this for many years now.").  80% of all first views are live sports programming.  *See* Hearing Tr. 540:20–24; *see also* Hearing Tr. 541:1–5 (Horihuela Direct: "Q.  And how do you determine what counts as a sports program for purposes of allocating first views? // A.  A sports program will be anything that is a live game or a rerun of a game or, you know, a sports-centric program, such as Sports Center, for example.").  Fubo also tracks its customers' "longest views" as a "gut check" on the accuracy of its first view data.  *See* Hearing Tr. 543:4–12.  "Longest views" measures the program that is watched the longest within the first 24 hours after a customer first logs into Fubo.  *Id.*  The share of Fubo's customers whose first view is a live sports program is

*extraordinarily* closely correlated to the proportion of Fubo's customers whose longest view is a live sports program, often only deviating within a percentage point, if at all. *See* PX179.

Fubo's ordinary course data reveals not only that most customers join Fubo to watch sports programming, but also that they *stay* for sports programming, and then sometimes *leave* when their particular sports season is over. Approximately 75% of Fubo's free trials occur during football season, from September to February. *See* Hearing Tr. 543:17–535:3. Moreover, customers join Fubo specifically to watch the JV Defendants' sports content. From July 2023 to June 2024, covering a full year of multiple sports seasons, 48% of first views were of Disney or Fox sports programming. *See* Hearing Tr. 541:23–542:7. During football season, that number exceeds 50%. *Id.* And after football season concludes, a significant number of customers tend to cancel their subscriptions. *See* Hearing Tr. 535:24–536:3. When football starts back up again, a corresponding number tend to reactivate their subscriptions, *see* Hearing Tr. 550:18–551:19; 553:2–12, and so the cycle continues. This cyclical phenomenon is called "seasonality," and reflects the sports-focus of most Fubo customers. Seasonality also inevitably leads to subscriber "churn," which refers to the proportion of existing subscribers who cancel their Fubo subscription. *See* Hearing Tr. 616:24–617:2.

At bottom, this data bolsters Fubo's showing of irreparable harm: consistently and fundamentally reinforcing, in various ways, that Fubo's customers care particularly about live sports, and they are driven to Fubo primarily for its sports—not entertainment—programming. More specifically, even, it reveals that a meaningful number of subscribers care about accessing the live sports on the JV Defendants' networks. Because this data was kept in the ordinary course of Fubo's business for years and used to inform its own strategic and marketing decisions, the JV Defendants' claims that Fubo's complaints in seeking this preliminary injunction are

pretextual or otherwise "made for litigation" fall flat.  Rather, the data strongly corroborates Fubo's claims that the JV will have an outsized effect on its business and that its projections of imminent insolvency are not unsubstantiated.  These documents and the related testimony clearly support the common-sense conclusion that when the JV launches as an option for customers to get those networks at *half* of Fubo's price, they will have little to no reason to choose a Fubo free trial over a JV one.[39]

### 2.  Fubo's Historical Unprofitability Does Not Invalidate Its Showing of Imminent Harm

The JV Defendants next argue that Fubo's harms are not the result of the JV but are instead the consequences of Fubo's status as a "weak competitor."  *See* Opp. at 1, 53; JV Defs. Post-Hearing Br. at 9.  They argue that "Fubo's precarious financial condition predates the JV," and that its "'self-inflicted' wounds are not irreparable harm."  JV Defs. Post-Hearing Br. at 9. But Fubo has made a clear showing that its imminent risk of insolvency and collapse is not its own doing but the JV's, and the JV Defendants have offered no support for the implication that only sturdy and well-established firms are entitled to the protection of the antitrust laws.

True, Fubo has never been profitable.  Fubo does not dispute this.  *See* Hearing Tr. 589:4–5 (Janedis Direct: "Q.  Now, is Fubo currently profitable? // A.  Currently, no, Fubo is not profitable.").  Unlike other, more-established distributors in the market like DIRECTV or DISH, Fubo has only existed for nine years.  And unlike other relatively new vMVPDs such as

---

[39] The Court is unpersuaded by the JV Defendants' reliance on Mr. Gandler's immediate public comments following the announcement of the JV, or his internal pep talk to his executives around the same time.  *See* Hearing Tr. 176:22–177:7; 177:14–178:22.  After the details of the JV were known and Fubo had time to use its own data to analyze the likely effect of the JV's launch, Fubo disclosed the imminent risk of insolvency to its shareholders and the investing public, and Mr. Gandler filed a sworn declaration in this litigation.  *See* Dkt. Nos. 102, 103; Hearing Tr. 596:13–23 (Mr. Janedis, Fubo CFO, testifying that Fubo disclosed the imminent risk of insolvency to Fubo investors in both "SEC filings and earnings releases" after the announcement of the JV).

YouTube TV or Hulu + Live TV, Fubo does not have a giant conglomerate parent company at its helm.  Fubo is essentially a startup and, having gone public only four years ago, remains in its relative infancy.[40]

Fubo credibly anticipates, though, that profitability is just around the corner.  *See* Hearing Tr. 589:9–11 (Janedis Direct: "Q.  And when does Fubo expect to become profitable? // A.  We currently expect to become profitable in 2025.").  This prediction was not fabricated for this litigation; Fubo announced it to shareholders back in August 2022.  *See* Hearing Tr. 589:18–21; *see also* FuboTV 2022 Investor Day Webcast (August 16, 2022) *available at* https://ir.fubo.tv/events-and-presentations/event-details/2022/FuboTV-2022-Investor-Day/default.aspx (last accessed August 15, 2024) (Mr. Janedis stating, "[w]e continue to work towards our long-term targets of adjusted EBITDA profitability and positive cash flow in 2025"). The very same morning Fubo's CEO David Gandler testified in this proceeding, Mr. Gandler announced Fubo's most successful quarter ever and further reiterated in an earnings call with investors that, absent the launch of the JV, it is expected to become profitable within the next year.  *See* Hearing Tr. 126:18–127:8.  Fubo executives, like those of all publicly traded companies, owe duties under the securities laws to make truthful statements to the market.

---

[40] For comparison, it took Uber 15 years to turn a profit.  *See* Andrew J. Hawkins, "Uber ends the year in the black for the first time ever: The once perennially unprofitable company has finally found its financial footing," THE VERGE (Feb. 8, 2024), *available at* https://www.theverge.com/2024/2/8/24065999 /uber-earnings-profitable-year-net-income (last accessed Aug. 15, 2024) ("For the first time in its history, Uber ended the year having made more money than it spent on its ride-hailing and delivery operations. As noted by Business Insider, the company reported an operating profit of $1.1 billion in 2023, compared to a $1.8 billion *loss* in 2022.").  Similarly, Netflix was not profitable for its first six years.  *See* Daniel Pereira, "Is Netflix profitable?," THE BUSINESS MODEL ANALYST (Mar. 16, 2023) *available at* https://businessmodelanalyst.com/is-netflix-profitable/ (last accessed Aug. 15, 2024).  And Spotify did not turn a profit for more than 12 years after its founding and returned to posting losses soon after its first profitable year.  *See, e.g.,* "Why Did It Take So Long for Spotify to Turn a Profit?," NASDAQ (Mar. 9, 2019) *available at* https://www.nasdaq.com/articles/why-did-it-take-so-long-spotify-turn-profit-2019-03-09 (last accessed Aug. 15, 2024).

Even ignoring these insiders' public statements, Fubo's internal model for predicting subscriber trends (and therefore its predicted revenue and cash flow) indicates that Fubo's expectations of profitability by 2025 are credible. At the Hearing, Fubo put forward significant evidence that its internal models of subscriber growth have a proven track record of accuracy. Since 2022, Fubo's internal forecasts of subscriber data had an average variance of only 6% from guidance provided to investors, and often exceeded the guidance. *See* Hearing Tr. 588:7–17. Given its historic reliability and the fact that Fubo has no reason to keep inaccurate data for its own internal analyses, the Court gives this evidence significant weight.

In the face of the testimony, public statements to the market, and internal ordinary course data, therefore, the JV Defendants cannot make a satisfactory showing that Fubo stands on the precipice of bankruptcy absent the launch of the JV. Moreover, Fubo need not show it will achieve any particular metric of extraordinary success absent the JV, so long as it can show that it would be a going concern absent the launch and likely will not be one for long following the launch. The record is clear that the causal engine of Fubo's predicted demise is the launch of the JV, and an injunction must therefore issue because "[i]t is well settled in this circuit that [m]ajor disruption of a business can be as harmful as termination[.]" *trueEX, LLC*, 266 F. Supp. 3d at 726–27 (internal references omitted).

### 3. Fubo's Harms Cannot be Adequately Compensated by Monetary Damages

Fubo has made a credible showing that, if the JV is permitted to launch, its business will likely cease to exist shortly thereafter. The JV Defendants' final argument fails, therefore, for the simple reason that this harm is exactly the kind that money cannot repair.

The caselaw in this Circuit is clear that money is not a remedy for the total collapse or likely insolvency of a business. *See Nemer Jeep-Eagle, Inc.*, 992 F.2d at 436 ("money damages

are inadequate compensation" for a threat to "continued existence" of business); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of New York*, 749 F.2d 124, 126 (2d Cir. 1984) ("The loss of . . . an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages."); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) ("But the right to continue a business . . . is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award."). Courts have likewise found money inadequate to compensate parties for other similarly disastrous harms Fubo forecasts as consequences from the JV's launch, such as delisting from the NYSE and the resulting difficulties raising necessary capital. *See, e.g.*, *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007); *Norlin Corp. v. Rooney, Pace, Inc.*, No. 84 Civ. 0298 (DNE), 1984 WL 892, at *2 (S.D.N.Y. Apr. 16, 1984), *aff'd*, 744 F.2d 255 (2d Cir. 1984).

These cases uniformly instruct the Court that the prudent course of action in the face of the injuries Fubo faces is not to deny Fubo an injunction now, expecting that it will receive money damages later should it ultimately prevail, but to maintain the status quo pending the resolution of this lawsuit.[41]

---

[41] The JV Defendants argue in passing that, because Venu is a joint venture with a nine-year initial term rather than a merger, the Court need not enjoin it now because it "can be unwound relatively easily" if Fubo is eventually successful after a full trial on the merits. *See* Opp. at 15, 53. But the unwindability of the JV is neither here nor there. As discussed, Fubo is entitled to an injunction because its imminent harms cannot be later repaired with money. The relative ease of the dissolution of the JV, even assuming the truth of that assertion, is therefore of little solace to Fubo and of little relevance to the Court.

### B.  The JV's Potential for Harm on Competition and Consumers

Although this is Fubo's Motion, and thus its burden alone to bear, because this is an antitrust action the Court also weighs the risks of irreparable harm to consumers in allowing an anticompetitive JV to enter the market prior to full resolution of the merits of this litigation.  *See New York ex rel. Schneiderman*, 787 F.3d at 661 (2d Cir. 2015) ("Threaten[ed] economic harm to . . . consumers . . . is plainly sufficient to authorize injunctive relief.") (quoting *California v. Am. Stores Co.*, 495 U.S. 271, 283 (1990)).

Even on the preliminary record before the Court, it is apparent that competition and consumers may be harmed if the JV launches before its permissibility under the antitrust laws is conclusively determined.  As discussed above with respect to Fubo's likelihood of success, the JV has at least the potential to fundamentally harm competition and consumers by allowing horizontal competitors to coordinate rather than compete, and to monopolize a segment of the market they created and now control as a result of their longstanding business practices; and by creating incentives for each JV Defendant to raise prices to distributors for their programming rather than fairly negotiate as parties who both have something to lose.  As the Amici point out in their submission, these consequences greatly increase the risk that consumers will be vulnerable to price increases, decreased quality, and decreased options in the market.  *See* Amici Br. at 12–15.

### III.  THE BALANCE OF THE HARDSHIPS

In assessing the balance of the equities factor, the Court must determine whether Fubo would "suffer decidedly greater harm from an erroneous denial of an injunction than the defendants would suffer from an erroneous grant."  *trueEX, LLC*, 266 F. Supp. 3d at 725.  Absent an injunction, Fubo has made a clear showing that it faces imminent subscriber loss, likely followed by bankruptcy, delisting, and the collapse of its business.  Should an injunction

64

wrongly issue, however, the JV Defendants face a mere delay in the launch of their JV.  To be sure, the JV Defendants have invested substantial resources in the JV and will not be able to capitalize on any such investment unless and until the preliminary injunction is lifted.  But the JV Defendants offered ***no*** witness testimony or documentary evidence on the harms (economic or otherwise) that they may face from any such delay.  Apart from obvious, general conclusions, such as the fact that it would be comparatively better, one assumes, for the JV to launch prior to the NFL season rather than after and that it is generally better to have money in the bank now than later, the Court cannot divine a quantifiable harm to the JV Defendants where the record illuminates none.[42]  Because the evidence shows that Fubo "risks sustaining serious and likely unquantifiable economic injury to its business," and the JV Defendants do not, the balance of the hardships tips firmly in Fubo's favor.  *Id*. at 726.

## IV.    THE IMPACT ON THE PUBLIC INTEREST

In analyzing the fourth and final factor, the Court must ensure that "the public interest would not be disserved by the issuance of a preliminary injunction." *Id.* (internal references omitted).  The injunction sought by Fubo will not harm the public interest.  On the contrary,

---

[42] In their Post-Hearing Brief (which the Court only permitted on the eve of the Hearing, long after the JV Defendants had filed their Opposition brief, and contrary to its previous advice that the parties should assume there would be no post-hearing briefing), the JV Defendants assert for the first time that a bond must accompany any preliminary injunction that issues.  *See* JV Defs. Post-Hearing Br. at 10.  They ask for "$100 million" to account for the JV Defendants' "expected affiliate fees from [the JV] over the first four months[.]"  *Id*.  The JV Defendants offer no legitimate analysis in support of that figure, citing only to PX414, ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████.  *See* PX414 at 16.  In the face of such a conclusory and undeveloped record, and without the opportunity for Fubo to respond, the Court need not issue a bond.  *See Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974) ("In construing this language [in Rule 65], we have stated that, especially in view of the phrase—'as the court deems proper'— the district court may dispense with security where there has been no proof of likelihood of harm to the party enjoined.").

because Fubo has established a likelihood of success on the merits of its Section 7 Clayton Act

claims, and that the launch of the JV will likely cause the exit of a current market option for

consumers, the public interest is served by an injunction preserving the status quo pending full

adjudication of these matters.  *See Columbia Pictures Indus., Inc.*, 507 F. Supp. at 434 ("Far

more important than the interests of either the defendants or the existing industry. . . is the

public's interest in enforcement of the antitrust laws and in the preservation of competition.").

## CONCLUSION

Though the Court has reached its own conclusions on the record before it with respect to

every element necessary for this preliminary injunction to issue, it is worth noting that the

Court's concerns about the anti-competitive effects of the JV appear to be widely shared both by

Fubo's competitors in the private sector (such as DISH,[43] DIRECTV,[44] and others[45]), and by a

---

[43] *See* Dkt. No. 111 (Declaration of Gary Schanman, Echostar EVP and Group President of Video Services) ¶¶ 6–18; *see also* Hearing Tr. 442:25–444:1; 447:9–450:5 (Schanman Direct).

[44] *See* Dkt. No. 112 (Declaration of Robert Thun, DIRECTV Chief Content Officer) ¶¶ 5, 6 ("DIRECTV has grave concerns about the effect that the sports content joint venture between the defendants in this case will have on competition for the distribution of sports programming.  More specifically, the joint venture partners are offering content in a manner that they do not allow DIRECTV or other distributors to offer to consumers.  Rather, the joint venture partners require that DIRECTV offers a large bundle of channels and do not allow DIRECTV to offer a smaller sports-focused bundle of channels.  Should Raptor be permitted to launch while the joint venture partners continue to restrict DIRECTV (or other distributors) from offering a similar consumer offering, consumers will be deprived of meaningful competition from DIRECTV and others."); Second Thun Declaration ¶¶ 8, 9 ("██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

[45] *See* PX216 (████████████████████████████████████████████████████████████████████████████████████████████████████████████████████)

66

range of voices in the public arena, including non-profit consumer advocacy organizations,[46] members of Congress,[47] and the U.S. Department of Justice.[48]  In contrast, the Court is aware of no third party extolling the allegedly pro-competitive benefits of the JV, nor publicly supporting its launch, save Mr. Petitti, Commissioner of the Big Ten Conference.  Mr. Petitti, who testified on behalf of the JV Defendants, *see* Hearing Tr. 785:5–794:11; Dkt. Nos. 234-153, 236-135, admitted a lack of familiarity with any of the claims at issue in this matter, *see* Hearing Tr. 791:10–21.  Moreover, Mr. Petitti's network partner, the Big Ten Network, is majority-owned by Fox and will be offered on the JV.  *See* Hearing Tr. 793:25–794:2.  And crucially, the gravamen of Mr. Petitti's testimony was that the Big Ten cares predominantly about increasing viewership of its content, regardless of the source of those viewers, and his support for the JV was premised on the assumption that it might be another place for sports fans to find Big Ten sporting events. *See* Hearing Tr. 793:3–11.  Nothing in that testimony suggests that the JV will be pro-competitive.

Ultimately, then, even Mr. Petitti's testimony reinforces the issues at stake in this matter. All parties are aligned in the observation that the maximum potential viewers of live sports are not currently being adequately captured by the existing array of services in the live pay TV industry.  All parties also agree that more efficiently serving this segment of the market, with

---

[46] *See generally* Amici Br., Dkt. No. 253-1.

[47] *See* Andrew Marchand, "Dept. of Justice being asked to investigate Disney, Fox, Warner Bros joint venture," The Athletic (Aug. 7, 2024), *available at* https://www.nytimes.com/athletic/ 5685739/2024/08/07/ dept-of-justice-disney-fox-warner-bros-tnt/ (last accessed Aug. 15, 2024) ("Sens. Elizabeth Warren and Bernie Sanders and Rep. Joaquin Castro have sent a letter to the Department of Justice asking it to investigate and potentially prevent Disney, Fox and Warner Bros' from starting a joint venture that will combine the resources of ESPN, Fox Sports and TNT Sports in a direct-to-consumer streaming service called Venu Sports."); *see also* Dkt. No. 248-25 (July 30, 2024 letter from Nancy Pelosi to Jonathan Kanter).

[48] *See* "US to scrutinize Disney, Fox, Warner sports streaming deal, Bloomberg Law reports," REUTERS (Feb. 16, 2024), *available at* https://www.reuters.com/business/media-telecom/doj-scrutinize-disney-fox-warner-bros-sports-streaming-deal-bloomberg-law-2024-02-15/ (last accessed August 15, 2024).

content central in its own way to American culture and the American consumer, would be a boon to the economy and a benefit to consumers.

The fundamental disagreement, therefore, lies in exactly who should be able to capture this market, and by what means they should be permitted to do so. Because the parties should be able to litigate this crucial issue on a full and fair record, and because doing so requires the preservation of the status quo, the Court, having considered and weighed all competing interests before it, finds that "[a]ny doubt concerning the necessity of the safeguarding of the public interest should be resolved by the granting of a preliminary injunction," *Columbia Pictures Indus., Inc.*, 507 F. Supp. at 434, the Motion is HEREBY GRANTED.

### ORDER FOR PRELIMINARY INJUNCTION

This cause having come on to be heard upon Fubo's complaint, Fubo's Motion for a Preliminary Injunction and its memoranda of law, authorities, declarations, and exhibits offered in support thereof, the responses thereto by the JV Defendants, and an evidentiary hearing having been conducted, it appears to the Court that Fubo is likely to succeed on its claims that by entering into the JV, the JV Defendants will substantially lessen competition and restrain trade in the relevant market in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. It also appears that a balance of equities tips decidedly in favor of Plaintiffs and the public interest would be served by the entering of a preliminary injunction. It further appears that the absence of preliminary injunctive relief may severely limit or frustrate the effectiveness of any order or decree which the Court may render after trial. Consequently, the Court has authority under Section 16 of the Clayton Act, 15 U.S.C. § 26, and Rule 65 of the Federal Rules of Civil Procedure to issue such preliminary relief as may be deemed just.

It is therefore HEREBY ORDERED, ADJUDGED, AND DECREED that the JV Defendants and their officers, directors, employees, agents, and all other persons acting on their behalf are hereby ENJOINED and RESTRAINED from launching the JV pending final adjudication of the merits of this case or further order of the Court.

Dated: August 16, 2024
      New York, New York

SO ORDERED.

_____
MARGARET M. GARNETT
United States District Judge