# 24-2210

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

FUBOTV, INC., AND FUBOTV MEDIA, INC.,

*Plaintiffs-Appellees*,

v.

THE WALT DISNEY COMPANY, *et al.*,

*Defendants-Appellants*.

(Full caption commences on inside cover)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF OF DEFENDANTS-APPELLANTS (PAGE PROOF BRIEF)

Antony L. Ryan
J. Wesley Earnhardt
Yonatan Even
Damaris Hernández
Michael P. Addis
M. Brent Byars
CRAVATH, SWAINE &
  MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

*Counsel for The Walt
Disney Company; ESPN,
Inc.; ESPN Enterprises,
Inc.; Hulu, LLC*

Andrew J. Levander
Steven E. Bizar
Steven A. Engel
John (Jay) Jurata
Michael H. McGinley
Erica Fruiterman
DECHERT LLP
1095 Avenue of the
Americas
New York, NY 10036
(212) 698-3500

*Counsel for Fox
Corporation*

David L. Yohai
Adam C. Hemlock
Theodore E. Tsekerides
Robert W. Taylor
A.J. Green
Elaina K. Aquila
WEIL, GOTSHAL &
  MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Counsel for Warner
Bros. Discovery, Inc.*

FUBOTV, INC., AND FUBOTV MEDIA, INC.,

*Plaintiffs-Appellees*,

v.

THE WALT DISNEY COMPANY; ESPN, INC.;
ESPN ENTERPRISES, INC.; HULU, LLC;
FOX CORPORATION; WARNER BROS. DISCOVERY INC.

*Defendants-Appellants*.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for Defendants-Appellants The Walt Disney Company; ESPN, Inc.; ESPN Enterprises, Inc.; Hulu, LLC; Fox Corporation; and Warner Bros. Discovery Inc., respectively, certify the following.

- The Walt Disney Company, a publicly held corporation, has no parent corporation and no publicly held corporation owns ten percent (10%) or more of its stock.

- ESPN Enterprises, Inc. is wholly owned by Defendant ESPN Inc., which is eighty percent (80%) owned by ESPN Holding Company, Inc., which is wholly owned by ABC Holding Company, Inc., which is wholly owned by ABC, Inc., which is an indirect subsidiary of The Walt Disney Company. The remaining twenty percent (20%) of ESPN, Inc. is owned by The Hearst Corporation. No other entity owns ten percent (10%) or more of ESPN Enterprises, Inc. or ESPN, Inc.

- Hulu, LLC, is approximately thirty-six percent (36%) owned by ABC Enterprises Acquisition, LLC, which is a wholly owned indirect subsidiary of The Walt Disney Company; thirty percent (30%) owned by TFCF-Hulu Holdings, Inc., which is a wholly

i

owned subsidiary indirectly held by TFCF America, Inc. and The Walt Disney Company; and approximately thirty-three percent (33%) owned by the Comcast Corporation. No other entity owns ten percent (10%) or more of Hulu, LLC.

- Fox Corporation is a publicly held corporation. To Fox Corporation's knowledge, other than Blackrock, Inc., a publicly held corporation that may own 10% or more of the equity of Fox Corporation, no publicly held corporation owns 10% or more of the equity of Fox Corporation.

- Warner Bros. Discovery, Inc. ("WBD") is a publicly held corporation. WBD has no parent company, and to the best of WBD's knowledge, no publicly held corporation owns 10% or more of WBD's stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF CONTENTS........................................................................ iii

TABLE OF AUTHORITIES ...................................................................v

PARTIES.........................................................................................ix

INTRODUCTION .............................................................................1

JURISDICTIONAL STATEMENT .........................................................4

STATEMENT OF THE ISSUES.............................................................5

STATEMENT OF THE CASE................................................................6

I.     The Television Ecosystem Is Competitive and Dynamic. .............6

II.    Venu Provides Consumers a New Choice and Removes None. ..................10

III.   The Proceedings Below. ..........................................................12

SUMMARY OF ARGUMENT ............................................................16

STANDARD OF REVIEW .................................................................17

ARGUMENT ..................................................................................18

I.     The District Court Erred by Dispensing with the Antitrust Injury
       Element of Fubo's Claims. ........................................................18

       A.   The District Court Did Not Address the Antitrust Injury Element.....19

       B.   Fubo's Claimed Injuries Would Be Caused by Increased
            Competition from Venu's Entry...........................................21

C.    None of the Potential Harms or Anticompetitive Effects Hypothesized by the District Court Would Injure Fubo. .....................25

II.    The District Court Failed To Follow Supreme Court Precedent Holding that Vertically Integrated Firms Have No Duty To Supply Competitors on Terms that Make It Easier for Them To Compete in a Downstream Retail Market. ......................................................................................27

    A.    The Supreme Court's Decisions in *linkLine* and *Trinko* Confirm that Venu Is Permissible. ...........................................................27

    B.    The District Court's Efforts To Distinguish *linkLine* and *Trinko* Fail. .......................................................................................34

III.    The District Court Erred by Concluding that Venu Is Likely To Have Anticompetitive Effects. .........................................................................40

    A.    The District Court Erred by Rooting Its Analysis in Preexisting Industry-Standard "Bundling" Practices that Exist Independent of Venu. ..........................................................................................41

    B.    The District Court Erred by Failing To Recognize that Venu's Entry as a New, Lower-Priced Competitor Is Procompetitive. ...........46

IV.    The District Court Erred by Relying on Alleged Anticompetitive Effects in Markets that the District Court Did Not Find. .........................................49

V.    The District Court Erred in Finding Irreparable Harm. ...............................57

VI.    The District Court Erred by Failing To Order a Security Bond. ...................60

CONCLUSION .........................................................................................................63

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)(7)(C) ............................................................................................................65

CERTIFICATE OF SERVICE ................................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990).................................................................passim

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ............................................45

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)..............................................................49

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977).......................................19, 20, 24, 25

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
    846 F.3d 1297 (10th Cir. 2017) ...........................................38

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990)..............................................................25

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986).....................................2, 19, 22, 23

*City of New York v. Group Health Inc.*,
    649 F.3d 151 (2d Cir. 2011) .................................................49

*Corning Inc. v. PicVue Elecs., Ltd.*,
    365 F.3d 156 (2d Cir. 2004) .................................................18

*Daniel v. Am. Bd. of Emergency Medicine*,
    428 F.3d 408 (2d Cir. 2005) .................................................20

*Dexter 345 Inc. v. Cuomo*,
    663 F.3d 59 (2d Cir. 2011) ............................................58, 59

*Fraser v. Major League Soccer, L.L.C.*,
    284 F.3d 47 (1st Cir. 2002)...................................................47

*FTC v. Microsoft Corp.*,
   681 F. Supp. 3d 1069 (N.D. Cal. 2023) ...............................................56

*FTC v. Qualcomm, Inc.*,
   969 F.3d 974 (9th Cir. 2020) ....................................................34, 49

*Geneva Pharms. Tech. Corp. v. Barr Labs.*,
   386 F.3d 485 (2d Cir. 2004) ......................................................passim

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007) ................................................................27

*In re Adderall XR Antitrust Litig.*,
   754 F.3d 128 (2d Cir. 2014) ...........................................28, 33, 34

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   680 F. Supp. 3d 919 (N.D. Ill. 2023)...............................................38

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) ...........................................................33, 34

*Interlink Int'l Fin. Servs. v. Block*,
   145 F. Supp. 2d 312 (S.D.N.Y. 2001) .......................................60, 61

*JLM Couture, Inc. v. Gutman*,
   91 F.4th 91 (2d Cir. 2024) ...............................................................17

*New York ex rel. Schneiderman v. Actavis PLC*,
   787 F.3d 638 (2d Cir. 2015) ............................................................25

*New York v. Deutsche Telekom AG*,
   439 F. Supp. 3d 179 (S.D.N.Y. 2020) .............................................40

*Nokia Corp. v. InterDigital, Inc.*,
   645 F.3d 553 (2d Cir. 2011) .......................................................60, 62

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018)..................................................................passim

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
   555 U.S. 438 (2009).................................................................passim

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
　776 F.2d 185 (7th Cir. 1985) (Easterbrook, J.)....................................................54

*Port Dock v. Oldcastle*,
　507 F.3d 117 (2d Cir. 2007) ...............................................................................20

*United States v. AT&T Inc.*,
　310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir.
　2019) ...........................................................................................45, 56, 57

*United States v. Colgate & Co.*,
　250 U.S. 300 (1919)...........................................................................................29

*United States v. Columbia Pictures*,
　507 F. Supp. 412 (S.D.N.Y. 1980), *aff'd* 659 F.2d 1063 (2d Cir. 1981)
　...........................................................................................................37, 38

*United States v. E.I. DuPont de Nemours & Co.*,
　353 U.S. 586 (1957)...........................................................................................49

*United States v. Grinnell Corp.*,
　384 U.S. 563 (1966)...........................................................................................35

*Verizon Communications v. Law Office of Curtis V. Trinko, LLP*,
　540 U.S. 398 (2001)................................................................................passim

*Winter v. Nat. Res. Def. Council, Inc.*,
　555 U.S. 7 (2008)...............................................................................................18

**Statutes & Rules**

15 U.S.C. § 26............................................................................................26, 60

28 U.S.C. § 1292(a)(1)....................................................................................5

28 U.S.C. § 1331..............................................................................................4

28 U.S.C. § 1337(a) .......................................................................................4

Clayton Act ...........................................................................................passim

Section 7 of the Clayton Act...............................................................passim

Section 16 of the Clayton Act .................................................................19

Fed. R. Civ. P. 65(c)..............................................................................60

Sherman Act...................................................................................passim

Section 1 of the Sherman Act ...................................................12, 20, 35

Section 2 of the Sherman Act ...........................................................34, 35

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law* ..............................................41, 57

FTC & DOJ, *Antitrust Guidelines for Collaborations Among Competitors*
  (Apr. 2000)......................................................................................24, 41

## PARTIES

| Abbreviation | Parties |
|:---:|:---:|
| Disney | The Walt Disney Company; ESPN, Inc.; ESPN Enterprises, Inc.; Hulu, LLC |
| Fox | Fox Corporation |
| WBD | Warner Bros. Discovery, Inc. |
| Fubo | FuboTV, Inc.; FuboTV Media, Inc. |

## INTRODUCTION

The district court's decision contradicts well-settled antitrust law. The ruling denies consumers a new, lower-cost, innovative product—so as to protect Fubo from ***increased*** competition. That is the opposite of what the antitrust laws seek to achieve. This Court should reverse.

The district court preliminarily enjoined Defendants from launching a new streaming service, Venu Sports ("Venu"). Venu would be a sports-focused multichannel video program distributor ("MVPD") which would offer, on a non-exclusive basis, Defendants' networks that telecast live sports. Venu is designed to attract price-conscious sports fans who have dropped out of, or never been part of, the traditional TV ecosystem.

Venu would have no ***exclusive*** content; every network available on Venu would remain available to consumers via other MVPDs. Venu also would lack many widely viewed sports and non-sports networks. For example, it would not carry CBS, NBC, CNN, Fox News and many others. Venu would provide an additional, lower-cost option by offering a subset of the networks MVPDs typically carry at a lower price. Thus, Venu's entry would increase output and lower prices. Fubo (a competitor) might not like that, but consumers would, and consumers are the appropriate focus of antitrust law.

The district court's order contradicts numerous controlling Supreme Court and Second Circuit precedents and should be reversed:

*First*, the district court erred by dispensing with the requirement that Fubo show antitrust injury. The district court concluded that it need not address antitrust injury because it found a violation of the Clayton Act and some harm to Fubo, in the form of lost subscribers. (Op.56n.38.) But the Supreme Court repeatedly has rejected that approach. Time and again it has held that, even in an extreme case where the challenged conduct indisputably is unlawful and harmful to plaintiff (both of which Defendants contest here), a court still must analyze whether the harm stems from something ***anticompetitive*** about the conduct, as opposed to something procompetitive or neutral. The Supreme Court, in *Cargill, Inc. v. Monfort of Colorado, Inc.*, made clear that harm from increased price competition—*i.e.*, losing customers to a lower-priced product—cannot be antitrust injury under Section 7 of the Clayton Act. 479 U.S. 104, 116 (1986). But the district court based its injunction on that very harm. Specifically, the district court found that some consumers would choose Venu because of its lower price, and that some of those consumers would come from Fubo, which would reduce Fubo's revenues and risk its insolvency. (Op.57-60.) But that is precisely the procompetitive effect of lower prices that *Cargill* held could not result in antitrust injury as a matter of law. 479 U.S. at 116-17.

2

***Second***, the district court erred in holding that it was anticompetitive for Defendants to provide sports-focused packages of networks to Venu because each Defendant, acting unilaterally and prior to the joint venture, had not offered those same terms to Fubo or other MVPDs. That holding conflicts with the Supreme Court's decisions in *Verizon Communications v. Law Office of Curtis V. Trinko, LLP*, 540 U.S. 398 (2001), and *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009), which held that companies have "no duty to deal with their rivals under terms and conditions that the rivals find commercially advantageous". 555 U.S. at 450. That is true even if Defendants' unilateral dealings at the wholesale level of the market—here, in licensing to MVPDs like Fubo—make it harder for those MVPDs to compete with Venu at the retail level—here, in selling video services to consumers. *Id.* at 451.

***Third***, the district court erred in concluding that Venu would have anticompetitive effects. Most fundamentally, a Clayton Act claim requires the anticompetitive effects to result from the challenged transaction itself—here, the formation of Venu—not preexisting conduct. *Geneva Pharms. Tech. Corp. v. Barr Labs.*, 386 F.3d 485, 511 (2d Cir. 2004). The district court, however, erroneously focused on "bundling" practices that predate Venu by decades, are widespread across the industry, and would exist whether or not Venu is launched. The district court compounded that error by holding that Venu would cause anticompetitive

3

effects by offering a new, differentiated product with fewer networks at a lower price. Lower prices—however they are set—cannot be anticompetitive as a matter of law. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990).

***Fourth***, the Supreme Court has held that antitrust claims must be assessed within an "area of effective competition", which requires first defining a relevant antitrust market, and then determining market power and competitive effects ***in that market***. *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018). Here, the district court defined only one antitrust market—the Live Pay TV Market—but found no market power or anticompetitive effects ***in that market***. Instead, the district court determined Venu would "monopolize" a "segment" that the court expressly declined to adopt as an antitrust market, and further identified potential anticompetitive effects in a separate upstream market that it also did not define. That was error.

The district court's injunction forecloses competitive entry, decreases consumer choice and denies consumers lower prices—all with the effect of shielding Fubo ***from competition***. The decision should be reversed.

## JURISDICTIONAL STATEMENT

The district court exercised jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a). The district court granted Fubo's motion for a preliminary injunction

on August 16, 2024, Dkt291.  The Defendants timely appealed on August 19, 2024, Dkt293.  This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Did the district court err by failing to require Fubo to show a threat of antitrust injury, as required by *Cargill*, 479 U.S. 104?

2.      Did the district court err by concluding, contrary to *linkLine*, 555 U.S. 438, that Defendants would violate the antitrust laws by each unilaterally licensing Fubo and other TV distributors on terms that are less favorable than the terms on which they have agreed to license their joint venture?

3.      Did the district court err by holding that Defendants' joint venture would harm competition:  (i) due to decades-long licensing practices predating the joint venture, *Geneva Pharms.*, 386 F.3d at 511; or (ii) by treating the joint venture's ***pro***competitive effects—such as new entry and lower prices—as if they were anticompetitive, *see Atl. Richfield*, 495 U.S. at 340?

4.      Did the district court err by failing to analyze market power and anticompetitive effects in the relevant market, *i.e.*, in "the area of effective competition", *Am. Express*, 585 U.S. at 543?

5.      Did the district court err in finding that Fubo faced a threat of irreparable harm and by failing to consider whether Fubo's claimed irreparable harm constitutes antitrust injury?

5

6.      Did the district court err by dispensing with the requirement that Fubo post a security bond, notwithstanding Defendants' losses that would result from a wrongful injunction?

## STATEMENT OF THE CASE

**I.      The Television Ecosystem Is Competitive and Dynamic.**

The decision below concerns the pay TV ecosystem, which is "highly competitive and in the midst of dramatic change due to technological and demographic changes". (Op.40.) Participants in that ecosystem include content creators (such as studios and sports leagues), programmers who license content and present it on their networks, and distributors (MVPDs) who deliver content to consumers, including through bundles of networks licensed from programmers. The graphic below provides a simplified illustration of the industry:

6



(*See* DDX8.7; TT954:2-956:11.)  (DTCs and SVODs are defined below.)

Defendants are programmers.  They license content from leagues and studios, package that content together with their own programming into networks, and license out those networks for distribution to consumers.  (Op.9.)  Fubo is an MVPD.  (Op.10.)  It licenses in networks from numerous programmers, packages together bundles of networks to create subscription offerings, and sells those subscriptions to consumers, who can tune in to watch the networks.

For decades, traditional MVPDs—such as Spectrum or DISH—distributed networks via cable or satellite, each offering a large bundle of networks to satisfy an entire household.  (Op.2.)  Today, virtual MVPDs—such as YouTube TV, Hulu + Live TV and Fubo—also offer broad, MVPD-like bundles of

networks, but via the Internet. (Op.9-10.) Fubo's basic package includes over 190 channels. (TT323:25-324:6.) Fubo carries Disney and Fox networks, but, today, has no WBD networks. (TT932:2-10.)

Recent years have seen an "explosion in popularity of" alternative means of accessing content, namely "SVODs [streaming video-on-demand services] like Netflix, Amazon Prime Video, Hulu, and Apple TV+". (Op.14.) The proliferation of SVODs has dramatically accelerated the number of "cord-cutters" and "cord-nevers"—those who do not subscribe to an MVPD. (Op.2, 14.) Since 2015, "total subscribers for live pay TV multi-channel services (MVPDs and vMVPDs) has decreased by *over 26%*". (Op.14.) (Virtual MVPDs are sometimes called "vMVPDs" to distinguish them from traditional MVPDs, but they are included in the term "MVPDs" in this Brief.)

MVPDs are a critical source of revenue for programmers such as Defendants. In exchange for the right to carry a programmer's networks, MVPDs pay a monthly fee to programmers for every subscriber that receives each network, pursuant to the terms of a "carriage agreement". (Op.9.) Programmers also earn revenue from advertising minutes. (Op.9.) Thus, the more subscribers a network reaches, the more revenue programmers like Defendants earn. (Op.20.)

Cord-cutting threatens programmers (and MVPDs) by taking consumers away from MVPD subscriptions altogether, costing them affiliate fees

8

and advertising revenue. Programmers also face increased competition in acquiring rights to broadcast sports. SVODs, such as Apple TV, Amazon Prime Video and Netflix, have bid up the price of sports rights. (Op.14-15.) Sports leagues also have started their own direct-to-consumer platforms ("DTCs"), such as NBA League Pass, MLB.TV, NFL+, NHL.TV and F1 TV, bypassing programmers and MVPDs altogether. (Op.15.) Programmers are caught in a perfect storm: content costs are rising while revenue is shrinking, both due to increased competition.

To weather this storm, programmers have taken steps to diversify their distribution methods. One approach is self-distribution through DTC services, bypassing MVPDs. Those products include Peacock, owned by non-party NBCUniversal, and Paramount+, owned by non-party Paramount Global. (Op.10n.5.) Disney has publicly announced a forthcoming sports DTC platform, ESPN Flagship. (Op.19, 22.) And WBD's DTC service, Max, also offers consumers the B/R Sports add-on, where they can access WBD's live sports. (Op.7.)

Venu, the subject of this appeal, is another way Defendants are trying to combat steep declines in the number of MVPD subscribers by diversifying the manner in which their networks are distributed to consumers.

**II.     Venu Provides Consumers a New Choice and Removes None.**

On February 6, 2024, Defendants announced Venu, a new, lower-cost, sports-centric joint venture.  (Op.19, 21.)  Venu would operate as an MVPD, offering subscribers a package of 14 sports-carrying networks owned by Defendants.  (Op.19, 21.)  Venu would lack a number of popular networks available on other MVPDs, including some that offer highly rated live sports events (such as NBC and CBS), as well as other news, entertainment and children's networks (such as Fox News, CNN, MSNBC, USA Network and the Disney Channel).  Because Venu would offer fewer networks, it would be sold at a correspondingly lower price, $42.99 per month.  (Op.21.)  Defendants hoped Venu would "attract 'moderate' sports fans among cord-cutters and cord-nevers who are not currently subscribers to linear pay TV through an MVPD or vMVPD service".  (Op.19; TT481:6-19.)

Defendants agreed to license their networks to Venu on a non-exclusive basis.  (Op.22.)  Thus, "services that currently have distribution rights to JV Defendants' networks will continue to be able to offer them to their subscribers".  (Op.22.)  In forming Venu, Defendants did not place any restrictions on how each Defendant may license its networks in the future; "Defendants will continue to be able to offer their networks to other distributors, including their own future DTC services like ESPN Flagship."  (Op.22.)  The ***sole*** limitation to which

Defendants agreed is a limited, three-year restriction on Defendants having an equity stake in another Venu-like distribution JV. (Op.22.)

Each Defendant would own one-third of Venu. (Op.22.) Each would license its networks to Venu at market rates, pursuant to "separate carriage agreement[s]" with Venu (Op.22), and each would sell advertising on its own networks (Op.22). Venu would be run by independent management, and "have various firewalls in place to avoid sharing competitively sensitive information among the JV Defendants and between them and the JV". (Op.22.) Venu would not combine any of Defendants' programming or licensing businesses.

The launch of Venu is not without risk for Defendants. Defendants will lose money for every subscriber who switches from an existing MVPD to Venu. Such "cannibalization" hurts Defendants because they earn affiliate fees for each network a subscriber receives. (Op.20.) When a subscriber "trades down" from another MVPD (which carries all or most of Defendants' networks) to Venu (which carries only a handful), Defendants earn lower affiliate fees from that subscriber. (Op.19-20.) But because Defendants earn nothing from cord-cutters or cord-nevers, attracting them to Venu would be profitable. Each Defendant independently analyzed this tradeoff and projected that Venu would attract enough "cord-cutters" and "cord-nevers" to make Venu revenue-accretive for each

11

Defendant, despite the costs of cannibalization. (Op.20-21&n.16; PX026-11; PX253-7; JX058-6; TT811:25-812:5; TT480:2-481:21; TT832:19-834:1.)

### III. The Proceedings Below.

On February 22, 2024, Fubo filed a complaint asserting antitrust claims against Defendants. (Dkt1.) As relevant here, Fubo alleged that the launch of Venu would violate Section 7 of the Clayton Act and Section 1 of the Sherman Act. (Dkt145at64-65.) Fubo does not allege "predatory" pricing.

On April 8, 2024, Fubo filed a motion to enjoin the launch of Venu or, in the alternative, to prevent Disney and Fox from enforcing "bundling" terms in preexisting licensing agreements with Fubo. (Dkt94, 95.)

After expedited discovery limited to the JV, the district court held a five-day hearing. (Op.1.) Defendants presented each issue raised in this appeal to the district court.[1] On August 16, 2024, the district court enjoined the launch of Venu. The district court did not adopt any antitrust market proposed by the parties. Rather, without supporting expert, survey or economic evidence, the district court

---

[1] (Antitrust injury: Dkt238at1, 54-55, Dkt287at7-8; no duty-to-deal: Dkt238at47-48, Dkt287at5-6; anticompetitive effects: Dkt238at51-53, Dkt238at65, Dkt287at5-7; *Ohio v. Am. Express*: Dkt238at45-48, Dkt287at3-5; irreparable harm: Dkt238at53-62, Dkt287at8-9; bond: Dkt287at10.)

*sua sponte* defined three categories of TV-watching sports fans.[2]  (Op.38-39.)

Based on its own definition of the relevant consumers, the district court concluded

that "[t]he only current market that serves all these consumers of live sports is the

Live Pay TV Market, which includes traditional MVPDs, vMVPDs, and some

limited newer DTCs such as NFL Sunday Ticket, and YES".  (Op.39.)

      The district court did not assess the competitive effects of Venu in the

Live Pay TV Market it defined.  Instead, the district court concluded that Venu

could monopolize a "skinny sports bundle" "segment" (Op.64; *see also* Op.4), a

conclusion the district court reached after expressly declining to adopt Fubo's

proposed "skinny sports bundle" market (Op.38).

      The district court concluded that Venu could harm competition in that

downstream segment, and also somewhere upstream (where TV programmers

license content to MVPDs), despite not defining any upstream licensing market at

all.  (Op.38.)  The court concluded that Venu could potentially harm competition in

one or more of the following ways:  (i) discouraging Defendants from forming

---

[2] The sports fans identified by the district court are:  (i) "omnivorous" fans, who "want to watch as much sports content as possible"; (ii) fans who are "team-loyal, and choose which product they will purchase based on which product will allow them to watch as many of their favorite team's games as possible"; and (iii) fans with a "deep interest in one or two specific sports, either niche sports like F1, cricket, or golf, or major sports like college basketball".  (Op.38-39.)

13

competing joint ventures due to the three-year non-compete clause; (ii) creating an incentive for Defendants to "prevent and suppress other potential sports-oriented bundles from emerging to compete with the JV and draw away subscribers"; (iii) creating a disincentive for Defendants to "meaningfully compet[e] with each other and from entering the market unilaterally"; (iv) serving as a "backstop" to allow Defendants to raise prices or enforce onerous bundling and minimum penetration requirements on MVPDs; and (v) "leav[ing] the road clear for the JV Defendants to eventually raise prices on consumers". (Op.46-47.)

The district court also discussed the longstanding industry practice of bundling. Despite stating that it "need not, and does not, reach the question of the legality of bundling at this stage of the case" (Op.4)—and despite previously staying all discovery into the topic of bundling unrelated to the JV (Op.26)—the district court made sweeping findings regarding bundling, including that bundling had been "uniformly and systematically imposed on each distributor in the live pay TV industry except the JV, preventing any other distributor from offering a multi-channel sports-focused streaming service". (Op.45-46.) The district court found no agreement among Defendants concerning how each licenses its networks to MVPDs. Nor did it find any agreement among Defendants to refuse to deal with MVPDs in favor of Venu. Accordingly, bundling, if it is ubiquitous outside of

14

Venu, is that way because of unilateral licensing practices of each Defendant and
other non-party programmers.

Although the legality of bundling was not before the district court, the
district court decided Fubo's motion based on the "crucial context" of "the JV
Defendants' bundling practices". (Op.46.) Because of historical bundled licenses,
the district court identified "the antitrust problem presented by the JV" as Venu
being "the *only* option on the market" for consumers who want to watch live sports
but not other TV content. (Op.4.)

The district court did not address Defendants' arguments that Venu
posed no threat of antitrust injury to Fubo. Instead, in a footnote, the district court
concluded that "since the Court herein finds that Fubo is likely to succeed on its
Section 7 claims, it is also likely that any such competition posed by the JV is
contrary to the antitrust laws". (Op.56n.38.)

The district court also concluded that Fubo had shown a threat of
irreparable harm. The district court held that, because Venu would offer a cheaper
service that some sports fans would choose to try instead of Fubo (Op.60), Fubo
would lose 300,000 to 400,000 current or projected subscribers to Venu as of the
end of 2024, and calculated a projected revenue loss to Fubo of $75 million to
$95 million. (Op.23-24, 57.) The district court concluded that projected revenue
loss could cause Fubo to become insolvent. (Op.62.)

15

## SUMMARY OF ARGUMENT

The district court erroneously concluded that Fubo is likely to succeed on the merits of its Clayton Act claims:

*First*, the district court erred by failing to require Fubo to show antitrust injury. (Part I.) The district court did not perform the antitrust injury analysis mandated by controlling Supreme Court precedent. That, by itself, requires reversal. Applying the requisite analysis, Fubo cannot show antitrust injury. A competitor like Fubo cannot claim antitrust injury from harm caused by *increased competition* with a new entrant that lowers prices. *Cargill*, 479 U.S. at 115-16. Instead, a plaintiff must identify some *anticompetitive* harm it would suffer. Here, Fubo's claimed harm—losing subscribers to Venu—results from Venu's procompetitive, price-lowering effect. Thus, Fubo cannot show antitrust injury as a matter of law.

*Second*, the district court erred by concluding that the antitrust laws bar each Defendant from licensing its content to Venu on different terms than each separately licenses its content to MVPDs. (Part II.) The Supreme Court repeatedly has rejected this theory, holding that producers have no antitrust duty to deal with distributors *at all*, much less on terms that distributors want, even when the producers compete with the distributors downstream. *linkLine*, 555 U.S. at 449; *Trinko*, 540 U.S. at 410.

16

**Third**, the district court impermissibly found anticompetitive effects stemming from historical bundling practices, rather than limiting its analysis to the competitive impact of Venu's entry. *Geneva Pharms.*, 386 F.3d at 511. (Part III.A.) And the district court mistook procompetitive, pro-consumer effects of Venu—*i.e.*, a new and differentiated product at a lower price—for anticompetitive effects. *Atl. Richfield*, 495 U.S. at 340. (Part III.B.)

**Fourth**, the district court violated the Supreme Court's directive that anticompetitive effects and market power must be analyzed in a well-defined antitrust market. *Am. Express,* 585 U.S. at 543. (Part IV.)

Separate from the merits of Fubo's claim, the district court also erred in determining that Fubo faces a threat of irreparable injury (Part V), and by declining to require that Fubo post a security bond (Part VI).

## STANDARD OF REVIEW

This Court reviews "the district court's legal holdings de novo". *JLM Couture, Inc. v. Gutman*, 91 F.4th 91, 99 (2d Cir. 2024). This Court reviews the "ultimate decision" to grant a preliminary injunction for abuse of discretion. *Id.* A district court abused its discretion if it "(1) based its ruling on an erroneous view of the law, (2) made a clearly erroneous assessment of the evidence, or (3) rendered a decision that cannot be located within the range of permissible decisions." *Id.* The

17

denial of a bond is also reviewed for abuse of discretion. *Corning Inc. v. PicVue Elecs., Ltd*., 365 F.3d 156, 157 (2d Cir. 2004).

## ARGUMENT

"To obtain a preliminary injunction … Fubo must make a clear showing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) an injunction is in the public interest." (Op.33.) A "clear showing" is required because a mere "possibility" of irreparable harm is insufficient. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## I. The District Court Erred by Dispensing with the Antitrust Injury Element of Fubo's Claims.

Antitrust injury is an indispensable element of Fubo's claims. But the district court expressly declined to consider whether Fubo suffered antitrust injury. (Op.56n.38.) That was error. Based on the district court's own findings, Fubo's claimed injuries result from Venu's lower price, which means that Fubo's claimed harm stems from competition-***enhancing*** effects of Venu, rather than from anything anticompetitive. *See Atl. Richfield*, 495 U.S. at 344. The antitrust laws do not tolerate an injunction that protects a competitor like Fubo from price-lowering competition. *See Cargill*, 479 U.S. at 115-17. This error itself requires reversal.

18

### A.    The District Court Did Not Address the Antitrust Injury Element.

To secure an injunction under Section 16 of the Clayton Act, a plaintiff must show that, absent relief, it will suffer antitrust injury—*i.e.*, "threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful". *Id.* at 113. That is a bedrock principle of antitrust law. Because the antitrust laws were "enacted for the protection of competition, not competitors", competitors can seek recourse only if their harm flows from harm to competition. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977).

Determining whether a plaintiff has suffered antitrust injury requires careful analysis. Even conduct that is assumed or found to violate the antitrust laws "may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition." *Atl. Richfield*, 495 U.S. at 344. "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition *reducing* aspect or effect of the defendant's behavior." *Id.* To determine whether a plaintiff has established antitrust injury, a court must match "the actual injury the plaintiff alleges" to some "anticipated ***anticompetitive*** effect of the specific practice at issue". *Port Dock v. Oldcastle*, 507 F.3d 117, 122 (2d Cir. 2007) (emphasis added).

19

The district court never performed that analysis. Instead, the district court concluded it did not need separately to consider antitrust injury because it had found Venu likely to violate Section 7 of the Clayton Act. (Op.56n.38.) That was an error of law. Both the Supreme Court and this Court repeatedly have held that an antitrust violation and antitrust injury "are distinct matters that **must** be shown independently". *Atl. Richfield,* 495 U.S. at 329 (emphasis added). For example, in *Atlantic Richfield*, the Supreme Court rejected the notion that "any loss flowing from a *per se* violation of § 1 automatically satisfies the antitrust injury requirement". *Id.* In *Brunswick*, the Supreme Court applied the same logic to the Clayton Act, rejecting the argument that "once a merger is found to violate § 7, all dislocations caused by the merger are actionable, regardless of whether those dislocations have anything to do with the reason why the merger was condemned". 429 U.S. at 487. The mere "fact that private plaintiffs have been injured by acts that violate the antitrust laws is not enough" to establish antitrust injury. *Daniel v. Am. Bd. of Emergency Medicine*, 428 F.3d 408, 438 (2d Cir. 2005).

The district court committed the precise error those cases condemned. Once the district court (erroneously) found a violation of the antitrust laws, it assumed that any harm flowing from Venu necessarily would constitute antitrust injury to Fubo, which is the opposite of what *Atlantic Richfield* teaches. 495 U.S. at 344. The sum total of the district court's reasoning is as follows: "since the

20

Court herein finds that Fubo is likely to succeed on its Section 7 claims, it is also

likely that ***any such competition posed by the JV*** is contrary to the antitrust laws".

(Op.56n.38 (emphasis added).)  But "competition" cannot be "contrary to the

antitrust laws"; rather, precisely because Fubo's claimed harm stems from

"competition posed by the JV" (*id.*), Fubo cannot show antitrust injury as a matter

of law.  *Atl. Richfield*, 495 U.S. at 344.

> **B.    Fubo's Claimed Injuries Would Be Caused by Increased
> Competition from Venu's Entry.**

The district court found that Fubo would be harmed solely by

competition-***enhancing*** aspects of the joint venture.  The district court concluded,

in the portion of its Opinion on injury to Fubo, that "the JV's expected launch in

late August will cause [Fubo] to lose approximately 300,000 to 400,000 (or nearly

30%) of its subscribers" and "suffer a significant decline in its ability to attract new

subscribers", causing "the imminent downfall of its business".  (Op.57.)

According to the district court, Fubo's loss of subscribers would result from

Venu's ability to offer a new, lower-priced product, finding that it is

"commonsense" that many sports-focused subscribers will choose Venu over Fubo

"when the JV launches as an option for consumers to get [sports] networks at *half*

of Fubo's price".  (Op.60.)

21

Those findings foreclose antitrust injury. The Supreme Court repeatedly has held that a plaintiff cannot show antitrust injury when its harm results from increased competition due to lower prices because "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury. We have adhered to this principle regardless of the type of antitrust claim involved." *Atl. Richfield*, 495 U.S. at 340. In the Clayton Act context, the Supreme Court has made clear that "the threat of loss of profits due to possible price competition following a merger does not constitute a threat of antitrust injury", even if the merger were assumed to violate the Clayton Act. *Cargill*, 479 U.S. at 116. It would be a "perverse result" for the antitrust laws to prevent lower prices for consumers, and "inimical" to the antitrust laws to block a transaction in order to prevent price-lowering competition. *See id.* at 115-16.

*Cargill* is dispositive. A meatpacker suing to enjoin the merger of its rivals argued that it would be harmed because the post-merger entity would have the scale to gain market share by paying its suppliers more for cattle while charging lower prices to consumers on finished beef products. 479 U.S. at 114-15. The plaintiff based its injury on the need to lower prices to remain competitive, which would lower its profits. *Id.* In rejecting the claim that the loss of profits constitutes antitrust injury, the Court recognized that the post-merger combination

22

may be "dominant" and that its ability to lower prices may result from "multi-plant efficiencies" gained through a merger of rivals. *Id.* at 116. But it nevertheless concluded that it would be "perverse" to prevent such a dominant firm from engaging in "vigorous competition" by cutting its prices. *Id.* The Court held that losses from lower prices could not constitute antitrust injury as a matter of law, regardless of whether the merger was unlawful. *Id.* It did not matter that the plaintiff had accused the post-merger firm of simultaneously increasing its rivals' costs for an input (fed cattle), while decreasing the retail prices of the finished goods (packaged beef), concluding that such a "price-cost squeeze" does not result in antitrust injury. *See id.* at 108.

As in *Cargill*, Fubo's claimed injuries result from Venu's ability to offer a new, attractive product at a lower price. Thus, Fubo's "loss of profits due to possible [non-predatory] price competition following" the launch of Venu "does not constitute a threat of antitrust injury" as a matter of law. *Id.*

Here, antitrust injury is even more clearly lacking than in *Cargill*. Venu's goal is to attract new subscribers off the sidelines of the pay TV industry by offering them a new product at a lower price. Venu's goal is ***not*** to take subscribers away from existing MVPDs like Fubo, because Defendants lose money from every subscriber "cannibalized" in that way. (Op.20.) That focus of Venu— expanding the audience of sports programming—is a procompetitive benefit that

23

was lacking in *Cargill*.  *See Ohio v. Am. Express*, 585 U.S. 529, 549 (2018)

("expanding output" is a procompetitive benefit).[3]  But it also is icing on the cake:

***even if*** "the structure of the JV incentivizes the collection of subscribers *regardless*

*of where in the live pay tv ecosystem those subscribers come from*" (Op.53), that

cannot cause antitrust injury because attracting subscribers via lower prices ***is***

***competition***, not a potential source of antitrust injury, as *Cargill* and other cases

have held.  479 U.S. at 116.

Fubo's admission that it would face the same claimed loss of profits

from any lower-priced offering further confirms its lack of antitrust injury.  *See*

*Brunswick*, 429 U.S. at 487.  Fubo's expert economist conceded that if, rather than

engaging in Venu, each Defendant chose to allow one or more MVPDs, but not

Fubo, to offer a skinny bundle of Defendants' sports networks at a lower price,

Fubo still would face "harm from the fact that other people have skinny sports

bundles and Fubo doesn't".  (TT709:15-710:6.)  That is, Fubo would still lose

subscribers to cheaper sports-focused offerings, even in the absence of the

---

[3] Similarly, the FTC and DOJ have explained that a joint venture among competitors can benefit consumers when it "allow[s] its participants to better use existing assets, or … provide[s] incentives for them to make output-enhancing investments that would not occur absent the collaboration."  FTC & DOJ, *Antitrust Guidelines for Collaborations Among Competitors* § 2.1 (Apr. 2000) ("*Collaboration Guidelines*").

supposedly anticompetitive joint venture. That means losing subscribers to a lower-priced skinnier alternative is not a viable source of antitrust injury. In *Brunswick*, for example, the Court held that because the same injury to the plaintiff could occur even if the defendant did not engage in anticompetitive conduct, the injury could not be antitrust injury. *Brunswick*, 429 U.S. at 487. So too, here. Harm that could occur whether or not Defendants launch Venu cannot be antitrust injury from Venu.

### C. None of the Potential Harms or Anticompetitive Effects Hypothesized by the District Court Would Injure Fubo.

The district court erred in concluding that "threatened economic harm to consumers" was sufficient to justify an injunction. (Op.64.) A private plaintiff must demonstrate antitrust injury ***to itself***. *See Atl. Richfield*, 495 U.S. at 345.

The cases cited by the district court are inapposite. In those cases, states brought cases on behalf of their resident consumers and proved antitrust injury to those consumers. (Op.64 (citing *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 661 (2d Cir. 2015); *California v. Am. Stores Co.*, 495 U.S. 271, 283 (1990)).) Fubo is not suing on behalf of consumers. It is a private plaintiff suing on behalf of itself; as a result, it must show antitrust injury to itself. *Atl. Richfield*, 495 U.S. at 345.

25

The district court did not identify any other harm as causing antitrust injury to Fubo. This is dispositive because in order to obtain a preliminary injunction, Fubo was required to show a "danger of irreparable loss or damage" to itself that is both immediate **and** constitutes an antitrust injury. *See* 15 U.S.C. § 26 (permitting preliminary injunctions "upon a showing that the danger of irreparable loss or damage is immediate"); *Cargill*, 479 U.S. at 113 (holding that 15 U.S.C. § 26 only authorizes injunctions against loss or damage that is an antitrust injury). No harm found by the district court qualifies.

For example, the district court stated that Venu could have the "potential" to create "incentives for each JV Defendant to raise prices to distributors for their programming rather than fairly negotiate as parties who both have something to lose". (Op.64.) That conclusion cannot establish harm **to competition** as a matter of law. *See infra* Part IV. But even if it could, the district court never found that would cause immediate antitrust injury **to Fubo**.

Nor could it. Fubo already has preexisting, multi-year agreements with Disney and Fox that set Fubo's licensing costs for the near future (PX192.13 (Disney through mid-2027); PX191.4 (Fox through November 2025)). Fubo has no carriage agreement with WBD at all. (Op.18.) Trial in this matter has been scheduled for October 2025. Venu could not alter the outcome of Defendants' negotiations with Fubo before that trial, because the terms of Fubo's agreements

26

are set through trial.  Fubo cannot base its request for a preliminary injunction

pending trial on supposed harms that it could not possibly suffer before trial.  *See*

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68 (2d Cir. 2007).

*     *     *

The district court erred by disregarding the indispensable requirement

that Fubo show antitrust injury.  In doing so, it insulated Fubo *from* competition by

enjoining the launch of a new product at a lower price, which would have

increased output by serving the unmet needs of consumers.  The injunction

"perverse[ly]" protects a competitor at the expense of competition and is

"inimical" to the antitrust laws.  *Cargill*, 479 U.S. at 115-16.  That fundamental

error requires reversal.

## II. The District Court Failed To Follow Supreme Court Precedent Holding that Vertically Integrated Firms Have No Duty To Supply Competitors on Terms that Make It Easier for Them To Compete in a Downstream Retail Market.

### A. The Supreme Court's Decisions in *linkLine* and *Trinko* Confirm that Venu Is Permissible.

The preliminary injunction also should be reversed because the

district court erroneously disregarded the Supreme Court's decisions in *Trinko* and

*linkLine*.  Even dominant firms have no duty-to-deal with their competitors—much

less "under terms and conditions that the rivals find commercially advantageous".

*linkLine*, 555 U.S. at 450; *Trinko*, 540 U.S. at 410.  The antitrust laws do not

27

require each Defendant to grant MVPDs like Fubo favorable licensing terms to enable them to replicate Venu's offering and price.

Fubo's core argument is that Venu would have an unfair competitive advantage because it could offer Defendants' unbundled sports-centric networks in the downstream market even though Defendants have not licensed their channels to Fubo on an unbundled basis in the upstream market. But the antitrust laws do not impose upon firms a duty to deal with their competitors at all, much less on the terms they prefer. This "no duty to deal" doctrine is a fundamental principle of antitrust law, subject only to "few existing exceptions". *Trinko*, 540 U.S. at 411. "Today, the sole exception to the broad right of a firm to refuse to deal with its competitors comes into play only when a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134 (2d Cir. 2014). Fubo has not alleged that here.

The district court erred in concluding that Venu would have anticompetitive effects resulting from the disparity between the bundled license provided to most MVPDs and the "skinnier" bundle licensed to Venu. In the district court's view, Defendants' unilateral bundling practices result in distributors such as Fubo having carriage agreements that require them to distribute packages of dozens of networks, which result in higher prices than Venu would charge for its narrower set of networks. (Op.4.) Even if that were true, it is not an antitrust

28

problem: *linkLine* and *Trinko* hold that Defendants have no antitrust duty to aid

Fubo and other distributors by licensing them on "advantageous terms", such as by

offering them the same packages of sports-focused channels provided to Venu.

*See linkLine*, 555 U.S. at 450. That remains true even if, through Venu,

Defendants seek to compete downstream with distributors.

The Supreme Court concluded in *Trinko* that firms have no duty to aid

their competitors. There, Verizon, an incumbent local telephone carrier with

control over the local telephone infrastructure, was accused of denying

"interconnection services to rivals in order to limit entry". 540 U.S. at 407. The

Court applied "traditional antitrust principles" and adhered to its now century-old

holding that "the Sherman Act does not restrict the long recognized right of [a]

trader or manufacturer engaged in an entirely private business, freely to exercise

his own independent discretion as to parties with whom he will deal." *Id.* at 408

(quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). The Court

concluded that Verizon's "alleged insufficient assistance in the provision of service

to rivals is not a recognized antitrust claim under this Court's existing refusal-to-

deal precedents". *Id.* at 410.

Then, in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,

the Supreme Court applied *Trinko*, again, to a vertically integrated firm operating

at two levels of a supply chain—wholesale and retail. 555 U.S. at 449. AT&T

29

was an incumbent telephone company that supplied network services to DSL

Internet service providers at the wholesale level; at the same time, AT&T offered

its own DSL Internet services to consumers at retail. *Id.* at 443. AT&T's rival

DSL providers accused AT&T of a "price squeeze": AT&T **increased** the

wholesale prices it charged the DSL providers to use its telephone network, yet

**reduced** the retail prices it charged consumers for its own DSL service, thereby

preventing its DSL retail rivals from being able to match its DSL retail price. *Id.*

The Supreme Court held that "a straightforward application" of

*Trinko* resolved the case. *Id.* at 449. Because under *Trinko* AT&T had the right

not to deal with its potential rivals **at all**, AT&T necessarily had no duty to deal

with its rivals "under terms and conditions that the rivals find commercially

advantageous". *Id.* at 450. *linkLine* further rejected the argument that AT&T's

charging of lower prices in the retail market for its own DSL services—allegedly

to "squeeze" its competitors' margins—changed the analysis: "low prices benefit

consumers regardless of how those prices are set, and so long as they are above

predatory levels, they do not threaten competition". *Id.* at 451.

In *linkLine*, the Supreme Court made clear that it had "repeatedly

emphasized the importance of clear rules in antitrust law [because] [c]ourts are ill

suited 'to act as central planners, identifying the proper price, quantity, and other

terms of dealing'." *Id.* at 452. The Supreme Court has fashioned two "clear rules"

that require reversal here: (i) a firm "certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous", *id.* at 450; and (ii) "low prices are only actionable under the Sherman Act when the prices are below cost" because "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition", *id.* at 451.

The district court's concern about the extent to which Venu may benefit from Defendants' upstream unilateral licensing practices ignores *linkLine* and *Trinko*. Defendants have decided to compete with MVPDs in the retail market (through Venu). Each Defendant makes its own independent licensing decisions upstream, in a wholesale market for programming licensing. Each remains free to license MVPDs on whatever terms each deems appropriate. Venu does not change or restrict anything about those licensing practices. Thus, even if Venu would "squeeze" Fubo's profits—by charging consumers lower prices than Fubo can, given its existing licenses—that would not be anticompetitive. The Supreme Court in *linkLine* rejected exactly that theory as "nothing more than an amalgamation of a meritless claim at the retail level and a meritless claim at the wholesale level". *linkLine*, 555 U.S. at 452. Because "low prices benefit consumers", and because "cutting prices in order to increase business often is the very essence of competition", the district court was wrong as a matter of law to condemn Venu on

31

this basis. *Id.* at 451-52. The injunction upends the goals of antitrust law and harms consumers by "chilling legitimate price cutting". *Id.* at 452. Absent predatory pricing—which is not alleged here—lower consumer prices are procompetitive no matter how they are set. *Id.* at 451.

The district court's analysis is thus squarely at odds with these Supreme Court precedents. For example, here is how the district court summarized its view of the core issue in the case:

> Put simply, the antitrust problem presented by the JV is as follows: if the JV is allowed to launch, it will be the *only* option on the market for those television consumers who want to spend their money on multiple live sports channels they love to watch, but *not* on superfluous entertainment channels they do not.

(Op.4.) That supposed "antitrust problem" is no different from the duty-to-deal theory rejected by *linkLine* and *Trinko*: (1) at the wholesale level, each Defendant (and practically every other TV programmer) unilaterally has reached agreements with MVPDs to license broad bundles of networks; yet, (2) at the retail level, Defendants' JV, Venu, will offer a lower-priced sports-focused bundle. The district court found the combination of (1) and (2) to be potentially anticompetitive because it would enable Venu to outcompete Fubo on price with respect to some sports-focused consumers. (Op.45-46.) But that is exactly the theory rejected by *linkLine*: because Defendants have no duty to unilaterally deal on Fubo's preferred

32

terms at the wholesale level, it is not improper for each Defendant to grant Venu a better deal than it grants Fubo at that wholesale level, even if that would provide Venu a competitive advantage at the retail level. At bottom, the district court impermissibly faulted each Defendant for failing to share its "advantage" with Venu's rivals. *Trinko*, 540 U.S. at 407-08.

The district court erroneously derived a host of supposedly anticompetitive effects from Defendants' decisions not to assist rival MVPDs. (*See, e.g.*, Op.46, 48, 53.) In fact, although the district court stated that the legality of "the JV Defendants' longstanding and unbroken practice of bundling sports with non-sports content" was beyond the scope of its decision (Op.4, 45), those preexisting bundling practices became the basis on which the district court criticized Venu. Not only is that fundamentally unfair—the district court did not permit discovery concerning historical bundling, nor conduct an evidentiary hearing about it (Op.26)—it also is wrong as a matter of law. There is nothing anticompetitive about Defendants retaining advantageous licensing terms for themselves. *See linkLine*, 555 U.S. at 450; *Trinko*, 540 U.S. at 410; *Adderall*, 754 F.3d at 134-35 (manufacturer of patented drug had no duty to supply generic versions for resale by competitors); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (elevator manufacturers had no duty to enable competitors to service their elevators).

33

### B. The District Court's Efforts To Distinguish *linkLine* and *Trinko* Fail.

The district court's attempts to distinguish *linkLine* and *Trinko* fail.

***First***, the district court confined the no-duty-to-deal rule to "specific technical *per se* violations of the Sherman Act". (Op.36.) But neither *Trinko* nor *linkLine* involved *per se* violations of the Sherman Act. Both involved monopolization claims governed by the rule of reason and both were decided according to "traditional antitrust principles". *Trinko*, 540 U.S. at 407-08; *linkLine*, 555 U.S. at 447. Appellate courts have repeatedly applied the no-duty-to-deal rule outside any "specific technical" context. *E.g.*, *Adderall*, 754 F.3d at 133; *Elevator Antitrust*, 502 F.3d at 52-53. That makes sense. The no-duty-to-deal doctrine reflects the courts' time-honored understanding that Congress enacted the antitrust laws "for the protection of *competition*, not *competitors*". *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 993 (9th Cir. 2020). It preserves the antitrust laws as the "Magna Carta of free enterprise", *Trinko*, 540 U.S. at 415, not a mandate for courts to determine how companies should do business and with whom.

***Second***, the district court concluded that *linkLine* and *Trinko* "involved actions brought under Section 2 of the Sherman Act, not Section 7 of the Clayton Act". (Op.36.) But that is a distinction without a difference. Both *linkLine* and *Trinko* considered whether a plaintiff could show a harm to

34

competition, *Trinko*, 540 U.S. at 407; *linkLine*, 555 U.S. at 447-48, just as Fubo must here.  Fubo complains about existing licensing terms in the wholesale market, which each Defendant reached unilaterally.  Defendants have no agreement among themselves about how to license to Fubo or any distributor other than Venu, and under *linkLine* and *Trinko*, their decision to offer Venu better terms is not anticompetitive.

   ***Third***, the district court erroneously distinguished *linkLine* and *Trinko* because they involved "existing and well-established companies, who operated as lawful monopolies".  (Op.36.)  Those facts were irrelevant to those decisions; the Supreme Court did not suggest the rules would be different—and specifically stricter—for companies that are not incumbent monopolists.  Nor would that make sense:  if even a ***monopolist*'s** refusal to deal with its competitors cannot result in antitrust liability, then certainly a non-monopolist's refusal cannot.  Without monopoly power (or the attempt to obtain it) there can be no liability for monopolization under Section 2, *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966), and under Section 1, the lack of market power reduces, rather than heightens, the risks to competition posed by vertical restraints such as Defendants' carriage agreements with MVPDs, *see Am. Express*, 585 U.S. at 543 n.7.

   Nor does it make sense to draw a distinction for present purposes between the "existing … lawful monopolies" enjoyed by AT&T and Verizon and

Venu's status as a new venture. The alleged monopoly power at issue in *linkLine* derived from AT&T's control over network infrastructure **upstream**. 555 U.S. at 450. Thus, the relevant comparison is not to Venu's entry **downstream**, which has no impact on how Defendants license their networks to other MVPDs. Instead, the apt comparison would be to Defendants' licensing practices **upstream**. Those licensing practices are longstanding, unilateral and independent of Venu. (Op.8-9.)

> **Fourth**, the district court erroneously concluded that *linkLine* and *Trinko* were inapplicable because they did not involve "concerted action by horizontal competitors". (Op.37.) But the bundling practices alleged to have created the antitrust problem identified by the district court do not stem from concerted action by horizontal competitors. As the district court expressly found, "bundling has been a pervasive industry practice for decades", and programmers have **unilaterally** engaged in bundling for years. (Op.2.) There was no evidence of—and the district court did not find—any agreement among Defendants regarding how each of them had licensed or would license their networks to MVPDs. (Op.22.) As a result, any disadvantage imposed upon Fubo and other MVPDs from bundling stemmed from unilateral licensing decisions, not joint conduct, and thus is permissible under *linkLine* and *Trinko*.

> Rather than apply *linkLine* and *Trinko*, the district court relied on *United States v. Columbia Pictures*, 507 F. Supp. 412, 420 (S.D.N.Y. 1980), *aff'd*

36

659 F.2d 1063 (2d Cir. 1981) (table), a 44-year-old district court decision that predated the Supreme Court's decisions in *Trinko* and *linkLine*. Although the district court deemed *Columbia Pictures* "strikingly similar to this case" (Op.36), what is most striking is the crucial difference in the alleged claims. In *Columbia Pictures*, the defendants engaged in a group boycott; that is, a ***concerted*** refusal to deal with distributors. 507 F. Supp. at 428. There, the four dominant motion picture studios formed a JV to launch a new satellite TV network that would ***exclusively*** broadcast the movies released by the JV studios. *Id.* at 419. Critically, to effectuate that exclusivity, the JV members agreed that, for a period of nine months following a movie's release, each studio would permit the movie to be aired ***only*** on the JV's network ***and nowhere else***. *Id.* The court treated that as a group boycott against competing movie distributors that was *per se* unlawful under the Sherman Act. *Id.* at 427.

Here, by contrast, ***Defendants have no agreement concerning how each will license its networks to other MVPDs***; there is no joint refusal to deal or group boycott or any other agreement whatsoever concerning those unilateral practices. (Op.22.) Indeed, it is undisputed that Defendants' networks will continue to be available to distributors other than Venu—including on Fubo itself—and each Defendant could offer its networks to any distributor on ***any*** terms (including unbundled terms) in the future. (Op.22.) The district court referred to

37

the non-compete term of Venu, but correctly found that "[t]his non-compete does not interfere with each JV Defendant's ability to license their programming to other distributors"; it only prevents Defendants from owning an equity interest in another Venu-like JV distributor. (Op.22.) Thus, this case presents the opposite fact pattern from *Columbia Pictures*.

The district court also stated that "*Columbia Pictures* did not rest solely on the anticompetitive effects of this 'exclusivity' provision", but also on the effects of other conduct addressed by that case. (Op.36n.30.) The other conduct to which the district court alluded was a *per se* illegal formula that the companies used to "establish or stabilize prices". *Columbia Pictures*, 507 F. Supp. at 426. No such conduct is present—or even alleged—in this case.

The other cases cited by the district court in support of its conclusion that "*linkLine* and *Trinko* [are] not a defense to concerted actions" (Op.37) each involved a concerted refusal to deal or a group boycott, which, again, was not found here. *See Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1309 (10th Cir. 2017); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 1004 (N.D. Ill. 2023). Although Fubo initially implied it would prove a group boycott (TT16:12-15), it conspicuously abandoned that claim—because there is no evidence whatsoever to support it.

38

*Finally*, the district court deemed *linkLine* and *Trinko* irrelevant because "alleged anticompetitive conduct (outside of *per se* illegal conduct not relevant here) is to be assessed holistically".  (Op.36-37&n.30.)  But that conclusion is foreclosed by *linkLine* itself.  There, the Supreme Court rejected efforts to "join a wholesale claim that cannot succeed with a retail claim that cannot succeed, and alchemize them into a new form of antitrust liability never before recognized by this Court" because "[t]wo wrong claims do not make one that is right".  555 U.S. at 457.  The Court emphasized that the judiciary must be "very cautious in recognizing … exceptions" to the no-duty-to-deal rule because of the economic costs of "mistaken inferences and the resulting false condemnations". *Trinko*, 540 U.S. at 408, 414.  As the Supreme Court explained, imposing duties-to-deal would require "antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing—a role for which they are ill suited".  *Id.* at 408; *see also id.* at 415-16.

Under the district court's reasoning, the only way for Defendants to avoid the injunction against Venu would be to alter their existing unilateral licensing contracts with Fubo so that Fubo can compete with Venu on terms it deems advantageous.  Nothing in the antitrust laws empowers federal courts to distort the free market in that manner.  This Court should reverse the district court's erroneous injunction.

## III.   The District Court Erred by Concluding that Venu Is Likely To Have Anticompetitive Effects.

Courts generally assess a challenged transaction under Section 7

through a three-part burden-shifting framework:

> Typically the [plaintiff] establishes a prima facie case by showing that the transaction in question will significantly increase market concentration, thereby creating a presumption that the transaction is likely to substantially lessen competition.  Once the [plaintiff] establishes the prima facie case, the [defendant] may rebut it by producing evidence to cast doubt on the accuracy of the [plaintiff]'s evidence. … Finally, if the [defendant] successfully rebuts the prima facie case, the burden of production shifts back to the [plaintiff] … .

*New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198-99 (S.D.N.Y. 2020)

(citation omitted).

The district court did not use anything resembling that framework.

Far from increasing market concentration, Venu would reduce market

concentration.  As a new entrant, it adds a new competitor to the market, without

eliminating any competitors.  Moreover, like most joint ventures, Venu provides

well-established procompetitive benefits by "reduc[ing] the costs or risk facing

individual firms", "enabl[ing] the firms to develop a product or process that, acting

individually, they could not develop", Areeda & Hovenkamp, *Antitrust Law*

¶ 1902, and "allow[ing] its participants to better use existing assets", *Collaboration*

*Guidelines* § 2.1.

40

The district court found harm to competition only because it incorrectly focused on the competitive impact of bundling rather than the launch of Venu. ***Launching Venu*** would increase competition, not reduce it, and the injunction against it should be reversed.

### A. The District Court Erred by Rooting Its Analysis in Preexisting Industry-Standard "Bundling" Practices that Exist Independent of Venu.

When evaluating a challenged transaction under Section 7 of the Clayton Act, courts are limited to "evaluat[ing] if the acquisition will tend to increase concentration of market power and/or inhibit competition". *Geneva Pharms.*, 386 F.3d at 511. "The Clayton Act is concerned with whether an acquisition or merger *itself* may cause antitrust injury." *Id.* The question presented by Fubo's Clayton Act claim is whether there would be less competition after Venu entered the market than there was before.

The district court never answered that question. Rather than confine its analysis to Venu's effects, the court grounded its analysis in bundling practices that have long defined the pay TV industry. The district court considered the root of "the antitrust problem" to be the JV members' "longstanding bundling practices". (Op.4.) But, as the district court itself observed, "bundling has been uniformly and systematically imposed on each distributor in the live pay TV

41

industry" for decades, "preventing any other distributor from offering a multi-channel sports-focused streaming service".  (Op.45-46.)

This Court's decision in *Geneva Pharmaceuticals* forecloses the district court's reliance on bundling.  *Geneva* instructed district courts on how to assess cases, like this one, that involve multiple forms of conduct, some of which is alleged to violate the Sherman Act based on preexisting conduct and some of which is alleged to violate the Clayton Act's prohibition on transactions that lessen competition.  Under the Clayton Act, only anticompetitive effects caused by the challenged transaction itself count.  If preexisting practices such as bundling are anticompetitive, those concerns must be addressed under the Sherman Act, not the Clayton Act.

In *Geneva*, generic drug manufacturers brought claims under the Sherman Act, alleging that a supplier of chemicals had entered into a "secret exclusive dealing arrangement" with a generic drug manufacturer.  386 F.3d at 494.  The arrangement was alleged to deny plaintiffs the ability to compete in selling generic pharmaceuticals.  *Id.*  This Court reversed the entry of summary judgment on the Sherman Act claims, remanding them for trial.  *Id.* at 510, 514.  In the interim, the defendant had increased its ownership interest in the chemical supplier from 75% to 100%, and the plaintiffs also brought claims under Section 7 of the Clayton Act to challenge that acquisition.  *Id.*

42

Notwithstanding its conclusion that trial should be held on the Sherman Act claims, this Court dismissed the Clayton Act claims. *Id.* at 512. The Court explained that the Clayton Act "is not co-extensive with the Sherman Act"; the Clayton Act focuses on whether the challenged transaction "*itself* may cause antitrust injury", a question distinct from whether the participants in the transaction are engaged in other anticompetitive conduct. *Id.* at 510-11. Because "the crux of the antitrust claims" was an exclusive dealing agreement "entered into before" the challenged transaction, the Clayton Act claim failed. *Id.* at 511. The "only evidence competitors were foreclosed or that there was a clog on competition" was based on preexisting behavior, not the transaction. *Id*. The plaintiffs thus had not met their "burden to present evidence that the purchase violated the Clayton Act". *Id.* at 512.

The district court erroneously disregarded *Geneva*. Rather than ignore the preexisting effects of bundling and focus on the competitive impact of Venu (*i.e.*, a new competitor with a differentiated product offered at a lower price), the district court did the opposite. It focused on the preexisting effects of bundling and ignored the procompetitive effects of Venu. (Op.40-46.) But, under *Geneva*, whether bundling that preceded Venu by decades (Op.10) is anticompetitive cannot be relevant to an assessment of Venu under Section 7; only the effect on competition of ***Venu itself*** is relevant to that assessment.

43

The court should not have considered bundling at all given the motion's focus on the Section 7 claim against Venu, as the court's opinion appears to have recognized. (Op.4, 45.) Still, the court made bundling the linchpin of its holding, despite (i) permitting no discovery regarding bundling, except as it related to the JV (Op.26); (ii) holding no evidentiary hearing and receiving no briefing on historical bundling practices (Op.26, 54n.37); and (iii) committing to the principle that its preliminary injunction analysis would "not reach the question of the legality of bundling at this stage of the case" (Op.4). The district court's rulings prior to the hearing assured that the preliminary injunction phase of the case would not focus on bundling practices. Ignoring this, and lacking an appropriate evidentiary record, the district court erroneously declared that bundling practices "are bad for consumers", a conclusion that it deemed "difficult to avoid". (Op.45.) That conclusory pronouncement was essential to the entry of the injunction; as noted above, the district court specifically found that "the antitrust problem" in this case stems from Defendants' bundling, to which, as described above in Part II.A, the district court assigned a host of anticompetitive effects.

*Geneva* teaches that was error because bundling does not stem from Venu; the error is magnified here because there was not even sufficient evidence on which to evaluate bundling. In addition, if this Court were to adopt the district court's attack on bundling, it would open a circuit split with the Ninth Circuit's

44

previous holding that bundling practices in the cable TV industry are "fully consistent with a free, competitive market". *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012).[4]

       The district court's reliance on preexisting bundling practices was also unsupported by the record. The district court never explained how bundling, in and of itself, harms competition. It did not define markets for tied and tying products. It did not permit discovery into bundling's numerous procompetitive benefits. Nor did it explain why, absent bundling, programmers would necessarily charge distributors less or distributors would necessarily charge consumers less— both of which are critical economic questions on which the district court heard no evidence. The district court's attack on traditional bundling practices—which existed long before Venu and will continue undisturbed under the district court's injunction—was flatly inconsistent with this Court's precedent and factually unfounded. It should be reversed.

----

[4] Since *Brantley*, bundling has continued, while the TV ecosystem has grown only more competitive and fragmented as a result of the growth of vMVPDs, SVODs and DTCs. *See United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 176 n.6 (D.D.C. 2018) (finding that "the industry has undergone significant changes since mid-2016" and "video programming margins are declining"), *aff'd*, 916 F.3d 1029, 1031-32 (D.C. Cir. 2019). The district court found that "the current Live Pay TV Market is highly competitive and in the midst of dramatic change due to technological and demographic changes." (Op.40.)

**B.    The District Court Erred by Failing To Recognize that Venu's Entry as a New, Lower-Priced Competitor Is Procompetitive.**

With preexisting bundling practices out of the picture, this Court's analysis must focus on the competitive effects that Venu would have on the market.  And those effects are decidedly procompetitive.  New competition that lowers prices, grows the audience of sports programming and meets an unmet need for consumers is, by definition, procompetitive, not anticompetitive.  *See Am. Express*, 585 U.S. at 549 (expanding output); *Atl. Richfield*, 495 U.S. at 340 (lower prices).

Venu's entry as a new competitor at a lower price increases competition in a market that the district court determined was already "highly competitive".  (Op.40.)  Indeed, the district court concluded that "the target consumer [for Venu] will—for the first time—be able to subscribe to a vast array of the sports content he or she wants, without paying for entertainment content he or she does not".  (Op.19.)  Although the district court treated that as a ***flaw***, a JV that provides consumers an additional option at a lower price is unambiguously a pro-consumer outcome that cannot violate the Clayton Act, whether or not the district court was correct to assume that bundling practices that are independent of Venu had prevented similar offerings becoming available sooner.

46

The district court attempted to flip these procompetitive effects on their head by suggesting that Venu would have an "exclusive" right to offer what it called "skinny sports bundles". (*E.g.*, Op.40.) As the district court framed it, this would give Venu the ability "to monopolize a segment of the market" that Defendants, through Venu, "created and now control". (Op.64.) We address below in Part IV why the district court erred in predicting that Venu would monopolize a "segment" that the district court never defined as a market. But, even assuming that the district court had properly defined a market susceptible of monopolization, and that Venu would be the first and only entrant into that market, that new entry still would be procompetitive because it would result in the creation of a new product that does not now exist.

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 69-70 (1st Cir. 2002), illustrates this point. In *Fraser*, the First Circuit rejected the claim that the formation of Major League Soccer ("MLS") violated the Clayton Act. *Id.* Before MLS "there was no enterprise engaged in providing Division I soccer in the United States", so the court found it "plainly correct" to say that "a combination that added Division I soccer in this country could hardly reduce competition where none before existed". *Id.* As with MLS, if the district court's "skinny sports bundle monopoly" theory were accepted, Venu would "add[] a new entrant without

subtracting any competitors" and would add a new product that did not previously exist, which "could hardly reduce competition". *See id.*

The district court was troubled because there are purportedly no **existing** "skinny sports bundles" in the market, such that Venu would have the advantage of being the first mover into that new product segment. (Op.3.) But that is not an antitrust problem: "Every first mover into a new market has a monopoly during its initial period of exclusivity. The antitrust laws have not been applied to condemn the transient advantage inherent in being a first mover because to do so would stifle innovation." *Geneva Pharms.*, 386 F.3d at 501.

The district court similarly erred by failing to appreciate that increased competition on price is *per se **pro**competitive. The Supreme Court repeatedly has stated that lower prices can **never** threaten competition absent predatory, below-cost pricing—which Fubo does not allege here. *See Atl. Richfield*, 495 U.S. at 340; *see also linkLine*, 555 U.S. at 451. Even if Venu's lower price would drive out rivals, that is not anticompetitive. That is because the "exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting". *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993).

48

## IV. The District Court Erred by Relying on Alleged Anticompetitive Effects in Markets that the District Court Did Not Find.

The district court not only failed to identify cognizable anticompetitive harm, it also searched for competitive harm in markets it never defined. Courts "usually cannot properly apply the rule of reason without an accurate definition of the relevant market". *Am. Express*, 585 U.S. at 543. Without a sound market definition, the Supreme Court explained, "there is no way to measure [the defendant's] ability to lessen or destroy competition". *Id.* For that reason, "[a] threshold step in any antitrust case is to accurately define the relevant market, which refers to 'the area of effective competition'." *Qualcomm*, 969 F.3d at 992. "Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition." *United States v. E.I. DuPont de Nemours & Co.*, 353 U.S. 586, 593 (1957); *City of New York v. Group Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011).

The district court violated these basic principles. The court did not adopt any of the market definitions proposed by the parties and their respective economic experts. (Op.38&n.31.) Instead, the court defined a "Live Pay TV Market", which includes all video services that serve "consumers of live sports"—traditional cable operators (MVPDs), Internet-based virtual cable operators

49

(vMVPDs) and some undefined subset of sports streaming options "such as NFL Sunday Ticket, and YES". (Op.39.) But when the district court turned to assessing any anticompetitive effects of Venu, it disregarded that market, and instead focused on a market "segment" and an upstream market it never defined. (Op.64.) That was error. *Am. Express*, 585 U.S. at 543.

        <u>The Skinny Bundle "Segment" of the Pay TV Market.</u> The district court focused its anticompetitive effects analysis on what it called a "segment" of its Live Pay TV Market that includes only skinny sports bundles. It concluded, for example, that Venu would have the ability to "monopolize a segment of the market [Defendants] created and now control". (Op.64.) It also concluded that Defendants could exercise "near-monopolistic control" over live-sports-only streaming services. (Op.4.) But the district court expressly declined to define a "market" for "skinny sports bundles", as Fubo had urged. (Op.38.)

        The district court never defined what products would qualify for its "skinny sports bundle segment". Nor did the district court explain why certain products available to consumers today—such as various SlingTV sports packages—would be excluded from its skinny sports bundle segment. Despite those failings, the district court rested its injunction on the conclusion that Venu would "monopolize" this market segment. But without defining a relevant antitrust market, a court cannot reach any conclusion about whether or not Venu

50

would monopolize anything, or properly assess whether a defendant's conduct would pose any harm to competition. *See Am. Express*, 585 U.S. at 543. Declining to find a "skinny sports bundle market", but then finding monopolization of a "skinny sports bundle segment", disregards settled antitrust principles and is reversible legal error.[5]

The district court's erroneous approach to market definition caused other errors. For example, the court framed the "antitrust problem" as whether, if "the JV is allowed to launch, it will be the *only* option on the market for those television consumers who want to spend their money on multiple live sports channels they love to watch, but *not* on superfluous entertainment channels". (Op.4.) Similarly, the court cited as alleged anticompetitive effects incentives to "prevent and suppress other potential sports-focused bundles from competing" with Venu (Op.49), which would prevent "Defendants from meaningfully competing with each other" to provide sports-focused services (Op.47). But to correctly assess whether Venu actually would lessen competition in the ways the

---

[5] To be clear, the district court was correct not to find a "skinny sports bundle market". Among other issues, Fubo failed to establish the boundaries of the market it alleged. Fubo's expert economist could not identify the maximum number of channels that would qualify as "skinny" or the minimum amount of sports that would make a bundle sports-focused, and could not say even whether a skinny bundle built around the Fox Sports channel would fit in the proposed market. (TT695:2-6; TT695:18-696:2.)

51

district court assumed it could, the court should have considered whether such effects were likely to occur ***in the Live Pay TV Market*** (the broad and diverse market the district court found)—a task it never performed because it reverted to analyzing its skinny sports bundle segment. (Op.46-47.)

That is critical: unrebutted evidence demonstrates that Venu would face significant competition even for sports-focused services within the Live Pay TV Market. Defendants themselves would compete with Venu in that market: WBD already has launched the sports-focused "B/R" add-on to its Max streaming service (TT834:2-7), and Disney intends to launch Flagship, which will include all of its sports-related content (TT491:21-492:6). Other sports-focused MVPDs also compete in the Live Pay TV Market. Sling offers sports-focused bundles that are substantially skinnier and cheaper than Fubo. (TT463:3-468:21.) And, as the figure below shows, sports fans could purchase a number of sports-focused services to obtain different combinations of sports content at almost any price point—by subscribing to an MVPD or by combining individual streaming services that broadcast sports. (TT702:7-10; TT979:13-980:2; PDX703; PX414-24; DDX10.1-10.7.)



(DDX11.34 (summarizing OrszagEx.20; DDX10; DDX8.21).)

The district court's error is perhaps clearest where it announced that "the JV may eventually allow the JV Defendants to raise prices directly for consumers, unchecked by meaningful competition". (Op.53.) It attributed that prediction to the supposed ability "to maintain the uniqueness of the JV as a consumer offering". (Op.53.) But Venu indisputably would ***not*** be "unique" in the Live Pay TV Market. The inclusion of other significant competitors in "the area of effective competition" would prevent Venu from accomplishing the anticompetitive effects assumed by the district court, including its ability to increase consumer prices. *See Am. Express*, 585 U.S. at 543-44. Contrary to the

district court's assertion, when analyzed within the market the district court

actually defined, Venu would not be "unchecked by meaningful competition".

(Op.53.)

Similarly, the district court referred to a limited, three-year non-

compete in the JV agreement, which prevents each of the Defendants from taking

an equity stake in another sports-focused JV.  (Op.48.)  The district court reasoned

that the non-compete would allow Venu to "enjoy[] the benefits of offering live

sports-only content without competition (including from one another)".  (Op.48.)

But again, ***within the Live Pay TV Market***, the limited non-compete does not

preclude competition from non-JV members, or among the JV members

themselves, for the sale of sports programming to consumers.  The district court

itself recognized that "[t]his non-compete agreement does not prevent the JV

Defendants from licensing their programming to other MVPDs and vMVPDs and

carves out a specific exception for DTCs launched by the JV Defendants."

(Op.48.)  Further, limited restraints such as the JV non-compete do not threaten

competition when they "are part of a larger endeavor whose success they promote"

and thus enable competition-enhancing cooperation.  *Polk Bros., Inc. v. Forest City*

*Enters., Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985) (Easterbrook, J.).

TV Programming Licensing.  The district court also ran afoul of

*American Express* when it determined that "the JV provides the JV Defendants

54

with a comfortable 'backstop' in negotiations, which will leave them able to raise prices or enforce additional bundling requirements on other distributors by changing the incentives of each JV participant to 'walk away' from negotiations". (Op.51.) The court identified Venu's potential use as a "backstop" in negotiations between programmers and distributors as an anticompetitive effect. But such negotiations occur not in the Live Pay TV Market the court defined, but rather in some undefined upstream market for the licensing of TV programming to distributors, which the district court never analyzed. That was error.

Without defining an upstream market, the district court could not find that Defendants had relevant market power in any such market. *Am. Express*, 585 U.S. at 543. Nor could the district court properly have analyzed whether vertical interactions between Defendants and distributors were anticompetitive. As the Supreme Court has put it, "[v]ertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market." *Am. Express*, 585 U.S. at 543n.7.

The district court did refer to a "programming tier" of the Live Pay TV Market and asserted that Defendants have "combined market power" in that tier. (Op.40.) But, again, the district court did not define any relevant antitrust market corresponding to the "programming tier". Rather, the district court

55

declined to adopt Fubo's proposed "Sports Licensing Market" containing such transactions (Op.38), and the sole market the district court did find only encompasses MVPDs' sale of TV services to consumers. Transactions in the "programming tier"—which occur between programmers and distributors—are not properly included in the same market with transactions in the "distribution tier"— where services are sold to consumers.

The district court's identification of a "backstop" as an anticompetitive effect illustrates the district court's error. Every entry by an upstream supplier into a downstream market (*i.e.*, vertical integration)—whether unilateral, through a vertical acquisition, or through a JV—creates such a backstop. Any company that is vertically integrated has itself as a fallback option downstream. The district court's approach—to assume that the existence of that "backstop" is anticompetitive—would render *every* vertical integration anticompetitive, and any vertical merger illegal. That is not the law. *See AT&T*, 310 F. Supp. 3d at 224 (permitting vertical merger because it would "not make sense as a matter of logic" for programmers to limit their distribution in such negotiations, and long-term agreements already prevented price increases); *see also FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1097 (N.D. Cal. 2023) ("[I]f this merger could be condemned simply because the combined company would derive *some* economic benefit from withholding, *any* vertical merger could be

56

condemned on the same ground, despite the indisputable pro-competitive effects of many vertical mergers."); Areeda & Hovenkamp, *Antitrust Law* ¶ 1020 ("Most instances of vertical integration, including those that result from mergers, are economically beneficial. As a result, the presumptions in favor of vertical mergers should be stronger than the presumptions favoring horizontal mergers.").[6]

The district court's failure to conduct a rigorous analysis of the likely effects of Venu within the area of effective competition requires reversal.

## V. The District Court Erred in Finding Irreparable Harm.

The district court committed reversible error by concluding that Fubo would suffer irreparable harm.

*First*, as explained above in Part I, only threatened antitrust injuries can support an injunction under the Clayton Act. *See Cargill*, 479 U.S. at 122. The only threatened irreparable harm that the district court identified—Fubo's projected subscriber losses and possible bankruptcy—would result from price-lowering competition, not any anticompetitive effect. It was error for the district court to base its injunction on irreparable harm that is not also an antitrust injury.

---

[6] The *AT&T* court noted that the "dearth" of caselaw examining vertical integrations is "unsurprising, considering that the Antitrust Division apparently has not tried a vertical merger case to decision in *four* decades!" 310 F. Supp. 3d at 193-94.

**Second**, Fubo's subscriber loss is reparable, not irreparable. The court quantified Fubo's damages by finding that Fubo would "lose between $75 and $95 million in revenue". (Op.57.) Fubo conceded that it would "know in hindsight" how many subscribers Fubo had lost to Venu and, by extension, how much revenue it had lost. (TT622:20-623:14.) Because Fubo's losses can be awarded as compensatory damages at the close of trial, any such harm is reparable as a matter of law. *See, e.g.*, *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011).

**Third**, the district court accepted Fubo's speculative and implausible claim that these losses would force Fubo into bankruptcy. That was clear error. After filing this lawsuit, Fubo's CEO publicly declared to investors that "losing the lawsuit" would not "really change anything". (DX12-12.) Fubo's effort to undo that candid statement rests on implausible predictions that Venu would cause Fubo to have around 300,000 to 400,000 fewer present and future subscribers ***as of year-end 2024***—a decline of nearly 30% within four months of Venu's planned launch. (Op.57.) But Defendants' pre-launch, pre-litigation projections estimated that Venu would attract roughly 1 million total subscribers by year-end 2024, with only half to two-thirds of them coming from existing pay TV subscribers. (PX414-14; DX67-7; PX253-23; JX58-4,6; DX22-154¶319&n.424.) Given Fubo's 2% share of subscribers in pay TV, it defies common sense to assume that Fubo would stand

58

to lose multiple hundreds of thousands of subscribers (as opposed to the 10,000 to 20,000 subscribers its size would suggest, if Venu attracted 1 million subscribers). Even if Venu gained *five times* the number of subscribers as Defendants projected (or if Fubo were particularly hard hit by competition from Venu), Fubo's subscriber losses still would not approach the implausible level Fubo said would lead to bankruptcy. *See Dexter*, 663 F.3d at 63 (irreparable harm cannot be "remote or speculative").

The inclusion of both lost current subscribers and lost potential subscribers further confirms that Fubo's claim of irreparable injury is remote and speculative. Fubo's model projects the loss of only about 78,000 *existing* subscribers. (DX22-151¶311.) The rest are *projected* "future subscriber[s]" who supposedly will sign up for Fubo's free trial and later pay for a subscription. (Dkt105at¶20.) Fubo stakes its speculative claim of imminent demise on its future inability to gain new subscribers who will choose Venu instead. The loss of subscribers Fubo does not currently have cannot be irreparable.

The district court erroneously endorsed Fubo's "remote", "speculative" and reparable theory of harm. *Dexter*, 663 F.3d at 63. This requires reversal.

59

## VI. The District Court Erred by Failing To Order a Security Bond.

The district court's decision not to require a bond to protect Defendants from the harm of a wrongful injunction compounds its errors. A preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper". Fed. R. Civ. P. 65(c); 15 U.S.C. § 26 (requiring a "proper bond against damages for an injunction improvidently granted"). "Since a preliminary injunction may be granted on a mere probability of success on the merits, generally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011). "Rule 65(c) does not require the certainty of harm" as a condition of a bond. *Interlink Int'l Fin. Servs. v. Block*, 145 F. Supp. 2d 312, 318 (S.D.N.Y. 2001). "[I]n setting the amount of security for a preliminary injunction, the trial court should err on the high side," since "an error on the low side may produce irreparable injury, because damages for an erroneous preliminary injunction may not exceed the amount of the bond." *Id.*; *see also Nokia*, 645 F.3d at 557.

Although the district court stated that it "may dispense with security when there has been no proof of likelihood of harm to the party enjoined" (Op.65n.42), the district court did ***not*** find that a wrongful injunction would cause

60

Defendants no harm. (*Cf.* Op.65 (concluding that it "cannot divine a quantifiable harm")).) Such a finding could not be squared with the district court's own factual findings. For example, the district court found that "the JV Defendants have invested substantial resources in the JV and will not be able to capitalize on any such investment unless and until the preliminary injunction is lifted". (Op.65.) The district court further found that Venu is intended to "capitalize" on its investments by attracting subscribers that will result in affiliate fees paid to each Defendant (Op.52), and that Venu will be "extremely profitable" for the Defendants if it attracts customers who do not currently subscribe to another MVPD (Op.21). Under these findings, Defendants' damages from a wrongful injunction are significant, but the district court's decision not to require a bond leaves Defendants unprotected against such damages.

The Defendants proposed a $100 million bond, which corresponded to a projection of additional affiliate fees Defendants would earn during the first four months of Venu. (Op.65n.42.) The district court disregarded this request on the basis that the projection "does not indicate what portion of that projected revenue is profit" or account for "costs the JV Defendants will save while the JV is paused". (Op.65n.42.) But enjoined parties need not prove their likely harm "with certainty", and district courts calculating bond amounts should "err on the high side". *Interlink*, 145 F. Supp. 2d at 318. The time to litigate the precise amount of

61

Defendants' damages is after the injunction is vacated, not before the bond is required; the bond represents "the ***maximum*** extent of [Fubo's] potential liability", not a final judgment on damages. *Nokia*, 645 F.3d at 557 (emphasis added).[7]

If the preliminary injunction is not reversed, this Court should direct the district court to require a security bond.

---

[7] The district court erroneously stated that Fubo had no opportunity to respond to Defendants' request for a bond. (Op.65n.42.) The Federal Rules and the Clayton Act make a bond a necessary condition for granting a preliminary injunction, so Fubo could not have been surprised by the need to address the issue. Defendants addressed the issue in a post-hearing brief; Fubo had that same opportunity.

## CONCLUSION

For the foregoing reasons, the order granting a preliminary injunction should be reversed, and the injunction should be vacated.

Dated: September 20, 2024

CRAVATH, SWAINE & MOORE LLP

*/s/ J. Wesley Earnhardt*

Antony L. Ryan
J. Wesley Earnhardt
Yonatan Even
Damaris Hernández
Michael P. Addis
M. Brent Byars
Two Manhattan West
  375 Ninth Avenue
    New York, NY 10001
      (212) 474-1000

*Counsel for The Walt Disney Company;
ESPN, Inc.; ESPN Enterprises, Inc.; and
Hulu, LLC*

DECHERT LLP

*/s/ Andrew J. Levander*

Andrew J. Levander
Steven E. Bizar
Steven A. Engel
John (Jay) Jurata
Michael H. McGinley
Erica Fruiterman
1095 Avenue of the Americas
    New York, NY 10036
        (212) 698-3500

*Counsel for Fox Corporation*

WEIL, GOTSHAL & MANGES LLP

*/s/ David L. Yohai*

David L. Yohai
Adam C. Hemlock
Theodore E. Tsekerides
Robert W. Taylor
A.J. Green
Elaina K. Aquila
767 Fifth Avenue
    New York, NY 10153
        (212) 310-8000

*Counsel for Warner Bros. Discovery Inc.*

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate

Procedure, I certify under penalty of perjury that the foregoing Brief of Defendants

is prepared in a proportionally spaced typeface (14-point Times New Roman) and

contains 13,859 words, 13,743 words calculated by the Microsoft Word word

processing program and 116 manually counted words contained in included

graphics, and excluding parts of the Brief exempted by Rule 32(a)(7)(B)(iii).

September 20, 2024

                                        _/s/ J. Wesley Earnhardt_
                                        J. Wesley Earnhardt

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2024, I electronically filed the Brief of the Walt Disney Company; ESPN, Inc.; ESPN Enterprises, Inc.; Hulu, LLC; Fox Corporation; and Warner Bros. Discovery Inc. with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF.

*/s/ J. Wesley Earnhardt*
J. Wesley Earnhardt