# 24-2210-cv

## United States Court of Appeals

### *for the*

## Second Circuit

———————————

FUBOTV INC., FUBOTV MEDIA INC.,

*Plaintiff-Appellees,*

— v. —

THE WALT DISNEY COMPANY, WARNER BROS. DISCOVERY, INC., ESPN, INC., ESPN ENTERPRISES, INC., HULU, LLC, FOX CORPORATION,

*Defendants-Appellants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## *AMICUS CURIAE* BRIEF FOR PROF. AARON HEDLUND, PROF. R. GLENN HUBBARD, PROF. JEFF PRINCE, PROF. RICHARD SCHMALENSEE, PROF. STEVEN TADELIS, AND PROF. DAVID J. TEECE IN SUPPORT OF APPELLANTS

KENNETH E. LEE
STEVEN W. KESSLER
LEVINE LEE LLP
*Attorneys for Amici Curiae*
400 Madison Avenue
New York, New York 10017
(212) 223-4400

CP COUNSEL PRESS    (800) 4-APPEAL • (332990)

## **TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE ..............................................................1

ARGUMENT ........................................................................................2

I.    By Enjoining the Joint Venture, the District Court Denied Consumers Access to a Desirable Product Likely to Increase Consumer Welfare to Protect a Competitor................................................2

II.    The District Court Has Improperly Assumed That Consumers Will Be Harmed Because the Joint Venture Will Provide the JV Defendants With a "Backstop" in Negotiations With Non-JV Distributors ..............................................................9

CONCLUSION ......................................................................................17

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ......................................................................... 2

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   2024 WL 278565 (E.D.N.Y. Jan. 25, 2024) ....................................... 3

*MacDermid Printing Sols. LLC v. Cortron Corp.*,
   833 F.3d 172 (2d Cir. 2016) ............................................................. 3

*Nat'l Fuel Gas Supply Corp. v. FERC*,
   468 F.3d 831 (D.C. Cir. 2006) ........................................................ 10

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984) ....................................................................... 2, 3

*United States v. AT&T Inc.*,
   310 F. Supp. 3d. 161 (D.D.C. 2018) ..................................... 10, 15, 16

**Rules**

Federal Rule of Appellate Procedure 29 ........................................... 1, 18

Federal Rule of Appellate Procedure 32 ............................................... 18

**Other Authorities**

James C. Cooper et al., *Vertical Antitrust Policy as a Problem of Inference*, 23 Int'l
   J. of Indus. Org. 639 (2005) ............................................................ 10

Gregory S. Crawford et al., *The Welfare Effects of Vertical Integration in
   Multichannel Television Markets*, 86 Econometrica 891 (2018) ................. 11, 13

Jerry A. Hausman & Gregory K. Leonard, *The Competitive Effects of a New
   Product Introduction: A Case Study*, 50 J. Indus. Econ. 237 (2002) ..................... 4

Jerry A. Hausman, *Valuation of New Goods under Perfect and Imperfect Competition*, *in* The Economics of New Goods (1996)..........................................4

Jerry A. Hausman, *Valuing the Effect of Regulation on New Services in Telecommunications*, Brookings Papers on Economic Activity.  Microeconomics, (1997) ......................................................................................................4

Lynne Pepall et al., *Industrial Organization: Contemporary Theory and Empirical Applications* (5th ed. 2014)..........................................................................11, 14

## <u>INTEREST OF AMICI CURIAE</u>[1]

Amici are individuals who teach and conduct research in the area of economics, with a particular focus on antitrust and competition.[2]  They have an interest in promoting clear, consistent, and economically sound antitrust policy and law.

Amici have reviewed the district court's August 16, 2024 Opinion and Order (the "Opinion & Order") preliminarily enjoining the JV Defendants from launching the JV to create a new television streaming service centered on live sports content.[3] Amici believe that the district court's decision is inconsistent with baseline economic principles and policy and longstanding tenets of antitrust law, and is likely to impose significant adverse effects on consumers.  Accordingly, Amici write to provide the

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the undersigned hereby certify that: no party's counsel authored this brief, in whole or in part; and no party, party's counsel, or any other person—other than Amici or their counsel—contributed money that was intended to fund preparing or submitting this brief.

[2] Amici are, in alphabetical order: Professor Aaron Hedlund of Purdue University; Professor R. Glenn Hubbard of Columbia University; Professor Jeff Prince of Indiana University; Professor Richard Schmalensee of the Massachusetts Institute of Technology; Professor Steven Tadelis of the University of California, Berkeley; and Professor David J. Teece of the University of California, Berkeley.  The brief presents the views of the individual signers.  Institutions are listed for identification purposes only.

[3] Unless otherwise noted, capitalized terms are given the same meaning ascribed to them in the Opinion & Order.

Court with their view of the district court's decision based on their expertise in the field of economics.

All parties to this appeal have consented to the filing of this brief.

## ARGUMENT

The district court's decision to preliminarily enjoin the JV's launch has denied consumers access to a desirable product which, as the district court itself recognized, is likely to benefit consumers if it is permitted to enter the market. What is more, the district court took this drastic step based on the purported harm this product would cause to a particular competitor, Fubo, and on tenuous assumptions regarding the effect that the JV would have on the live sports-viewing landscape. The district court's decision is at odds with efficient economic policy and the underlying purposes of antitrust law, and the preliminary injunction therefore should be vacated.

I.  **By Enjoining the Joint Venture, the District Court Denied Consumers Access to a Desirable Product Likely to Increase Consumer Welfare to Protect a Competitor**

Consumers are best off when output is high and prices are low. Consistent with this fundamental economic reality, courts have recognized that antitrust law is designed to benefit consumers by enhancing competition. *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 221 (1993) (noting that the "antitrust laws' traditional concern [is] for consumer welfare and price competition"); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107 (1984)

(noting that "Congress designed the Sherman Act as a consumer welfare prescription" (citations omitted)); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 278565, at *30 (E.D.N.Y. Jan. 25, 2024) ("Ultimately, consumer welfare has been the backbone of antitrust policy for over forty years."). That is why courts wisely require an antitrust plaintiff to demonstrate that the challenged action harms *consumers*, not just competitors. *See, e.g.*, *MacDermid Printing Sols. LLC v. Cortron Corp.*, 833 F.3d 172, 187 (2d Cir. 2016) ("[B]ecause the antitrust laws protect competition, not competitors, a plaintiff must show that more than its own business suffered; it must ultimately show that the challenged action harmed consumers." (alteration in original) (citation and internal quotation marks omitted)).

If permitted to launch, the JV would provide consumers with a product (a sports streaming platform offering a broad spectrum of live sports content) at a price ($42.99 per month) that is otherwise not available in the market. (*See* Opinion & Order at 21.) Given these facts, the introduction of this desirable product to the market is likely to benefit consumers. This is especially true where the product is new and differentiated (i.e., it will supplement, rather than replace, the current sports-streaming products being offered in the marketplace). Consumers benefit from such products in two ways: (1) from the additional product variety itself; and (2) from the additional competition for existing products created by the new

product's introduction.[4]  *See, e.g.*, Jerry A. Hausman & Gregory K. Leonard, *The Competitive Effects of a New Product Introduction: A Case Study*, 50 J. Indus. Econ. 237, 238 (2002) (analyzing the effect on consumer welfare of the introduction of a new product, Kleenex Bath Tissue, and finding that consumers benefited both from lower prices and additional variety and, on balance, were "made significantly better off by the introduction" of the new product); *see also, e.g.*, Jerry A. Hausman, *Valuation of New Goods under Perfect and Imperfect Competition*, *in* The Economics of New Goods 207, 235 (1996) (finding that "new-brand introduction should often be considered favorable by most economists given its significant welfare-increasing effects"); Jerry A. Hausman, *Valuing the Effect of Regulation on New Services in Telecommunications*, Brookings Papers on Economic Activity. Microeconomics, 1, 35 (1997) (evaluating the telecommunications industry, noting that "[n]ew telecommunications services can create very large gains in consumer welfare" and that regulation, and "lengthy delays in the introduction of new telecommunications services" can cause "very large losses in consumer welfare" that "cannot be regained in subsequent periods").

---

[4] Typically, the introduction of a new product will apply downward pricing pressure on the suppliers of existing products.  In this context, this means that the JV's launch and offering of its product would incentivize existing competitors to lower their prices, which would, of course, benefit consumers.

Indeed, the district court acknowledged that when the JV launches, consumers will have the option to watch the 14 linear networks included in the JV, and have access to ESPN+ and ESPN Flagship, at "*half* of Fubo's price." (Opinion & Order at 60; *see also id.* at 23 (noting that "Fubo's least-expensive base package . . . costs consumers almost double what the JV will").) The district court further found that the JV's product will be "[u]nlike any other offering currently in the market." (*Id.* at 19; *see also id.* at 4 (noting that the JV's product would be "the *only* option on the market for those television consumers who want to spend their money on multiple live sports channels they love to watch, but not on superfluous entertainment channels they do not"); *id.* at 67–68 (acknowledging that "the maximum potential viewers of live sports are not currently being adequately captured by the existing array of services in the live pay TV industry" and that "serving this segment of the market . . . would be a boon to the economy and a benefit to consumers").)

Nevertheless, the district court enjoined the JV from launching—thereby depriving consumers of the JV's product—primarily on the grounds that it will harm Fubo, a company that would compete against the JV. (*See* Opinion & Order at 55 ("Fubo has made a clear showing that it will suffer imminent and irreparable injury if this Court does not enjoin the JV from launching until a full trial on the merits can be held.").) The Opinion & Order is replete with references to the purported effects of the JV's launch on Fubo:

- "But if the JV launches, witness testimony and documentary evidence firmly establish that a swift exodus of large numbers of Fubo's subscribers (both current and reasonably anticipated near-term future subscribers) is likely, and that Fubo's bankruptcy and delisting of the company's stock will likely soon follow." (*Id.* at 3.)

- "According to Fubo's executives, including its CFO John Janedis, the company is confident that if the JV launches, Fubo will lose between 300,000 and 400,000 subscribers before the end of 2024, causing an almost-immediate projected revenue loss between $75 million and $95 million." (*Id.* at 23–24.)

- "Fubo's specific predictions are that the JV's expected launch in late August will cause it to lose approximately 300,000 to 400,000 (or nearly 30%) of its subscribers, suffer a significant decline in its ability to attract new subscribers, lose between $75 and $95 million in revenue, and be transformed into a penny stock awaiting delisting from the New York Stock Exchange, all before year-end 2024." (*Id.* at 57.)

- "Rather, the data strongly corroborates Fubo's claims that the JV will have an outsized effect on its business and that its projections of imminent insolvency are not unsubstantiated. These documents and the related testimony clearly support the common-sense conclusion that when the JV launches as an option for customers to get those networks at *half* of Fubo's price, they will have little to no reason to choose a Fubo free trial over a JV one." (*Id.* at 60.)

The district court's focus on Fubo, however, was misplaced. Sound economic policy dictates that the introduction of a product likely to benefit consumers has significant procompetitive benefits even if a particular supplier, such as Fubo, may be harmed. In fact, the more attractive the new product is to consumers, the more competitors will necessarily be harmed. Absent special circumstances not applicable here, economists do not—and courts should not—care about firms losing business because they cannot satisfy consumers to the same degree their competitors can if

the reason is that the competitors offer a more attractive product. Put simply, that is the essence of competition.

Instead of focusing on the JV's impact on Fubo, the district court should have centered its analysis on the JV's impact on consumers. While the district court referenced the JV's effect on consumers (*see* Opinion & Order at 55 ("The Court finds that the JV's risk of imminent harm to Fubo *and to consumers* justifies a preliminary injunction." (emphasis added)); *see also id.* at 64 ("Although this is Fubo's Motion, and thus its burden alone to bear, because this is an antitrust action the Court also weighs the risks of irreparable harm to consumers in allowing an anticompetitive JV to enter the market prior to full resolution of the merits of this litigation.")), the district court's analysis of that effect was lacking. Most notably, the district court failed to sufficiently appreciate the basic economic reality underlying this case: *the JV will provide consumers with a previously unavailable product, for which there is significant demand, at an attractive price point*. And the district court did not even attempt to quantify the likely increase in consumer welfare that the JV's launch would create, let alone compare that benefit (and any others) to the JV's purported anticompetitive effects (which the district court likewise failed to adequately quantify). The need for a balancing of likely pro- and anticompetitive effects is a core tenet of economics, and without conducting such a balancing, the

district court was in no position to determine whether the JV's launch is, on balance, anticompetitive.

Although quantifying the likely increase in consumer welfare is not a simple exercise (and is not an exercise that has been undertaken by Amici), based on the district court's own findings in this case, that increase is likely to be substantial. Specifically, the district court's finding that Fubo will "lose approximately 300,000 to 400,000 (or nearly 30%) of its subscribers" as a result of the JV's launch (Opinion & Order at 57), if correct, means that 300,000 to 400,000 consumers would prefer the JV's product to Fubo's. Put slightly differently, that means that at least 300,000 to 400,000 consumers would benefit from the introduction of this product into the market.[5] Moreover, given the significant difference in price between Fubo and the JV's product (*see* Opinion & Order at 23 (noting that "Fubo's least-expensive base package . . . costs consumers almost double what the JV will")), the benefit to those 300,000 to 400,000 consumers is likely to be significant.

Accordingly, when the district court professed a desire to "preserv[e] the status quo" (Opinion & Order at 5), the status quo it sought to preserve is one where hundreds of thousands of consumers are unable to purchase a desirable product that is likely to significantly increase their welfare. Such a status quo is not worthy of

---

[5] Of course, both parties agree that the JV's product would attract consumers other than Fubo subscribers.

8

preservation unless there is a sturdy data-driven basis for concluding that, notwithstanding the availability of this desirable product, consumers will, on balance, be harmed.  Based on Amici's review of the Opinion & Order, the district court had no such basis here.

**II.**     **The District Court Has Improperly Assumed That Consumers Will Be Harmed Because the Joint Venture Will Provide the JV Defendants With a "Backstop" in Negotiations With Non-JV Distributors**

In granting the preliminary injunction, the district court found that "the JV provides the JV Defendants with a comfortable 'backstop' in negotiations, which will leave them able to raise prices or enforce additional bundling requirements on other distributors by changing the incentives of each JV participant to 'walk away' from negotiations."  (Opinion & Order at 51.)  The district court's theory appears to be that the existence of the JV will embolden the JV Defendants to raise the prices that they charge to non-JV distributors for their content because they know that one of two things will happen: (1) the non-JV distributors will balk and refuse to pay the higher prices, leading those distributors to lose subscribers (who want the JV Defendants' programming); or (2) the non-JV distributors will pay the higher prices, be forced to pass along those costs to consumers, and lose subscribers who will seek a lower-cost option.  Either way, the theory goes, certain of those subscribers will be "recaptured" by the JV Defendants when they sign up for the JV's streaming service. (*See id.*)  Although the district court did not use this terminology, in economics

parlance, the district court seems to have found that the vertical relationship brought about by the JV would likely lead to "vertical foreclosure" (i.e., the raising of rivals' costs).

While vertical integration can be anticompetitive under certain limited circumstances, it is typically procompetitive, *see, e.g.*, James C. Cooper et al., *Vertical Antitrust Policy as a Problem of Inference*, 23 Int'l J. of Indus. Org. 639, 648 (2005) (conducting a review of literature and noting the "paucity of support for the proposition that vertical restraints/vertical integration are likely to harm consumers" and the significant number of studies finding that "the use of vertical restraints in the particular context studied improved welfare unambiguously (i.e., resulted in lower prices and larger quantities)"), a fact that courts have long recognized, *see, e.g.*, *United States v. AT&T Inc.*, 310 F. Supp. 3d. 161, 197 (D.D.C. 2018) ("Vertical mergers often generate efficiencies and other procompetitive effects."), *aff'd* 916 F.3d 1029 (D.C. Cir. 2019); *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("We began by emphasizing that vertical integration creates efficiencies for consumers.").[6]

---

[6] One major benefit that courts recognize is a reduction in, or elimination of, double marginalization.  *See e.g.*, *AT&T*, 310 F. Supp. 3d at 197 (describing double marginalization as "the situation in which two different firms in the same industry, but at different levels in the supply chain, each apply their own markups (reflecting their own margins) in pricing their products" and noting the government's concession that the case "implicates one 'standard benefit' associated with vertical

Here, the district court apparently concluded that this vertical relationship is anticompetitive. But assessing the countervailing pro- and anticompetitive effects of a vertical relationship is complex.[7] *See e.g.*, Lynne Pepall et al., *Industrial Organization: Contemporary Theory and Empirical Applications* 455 (5th ed. 2014) ("*Industrial Organization*") (noting that "[v]ertical mergers raise complicated issues," that "[t]here is no simple way of determining which of these forces is likely to be the stronger," and that "[r]esolution of these issues in any particular case must, as always, depend on careful evaluation of the realities of the specific situation"); *see also* Gregory S. Crawford et al., *The Welfare Effects of Vertical Integration in Multichannel Television Markets*, 86 Econometrica 891, 891 (2018) ("*Welfare Effects*") (noting the "vast" "theoretical literature on the pro- and anti-competitive impacts of vertical integration"). And, in reaching its conclusion, the district court failed to consider key relevant issues and made a series of assumptions that should not have been made without robust, data-driven economic analysis.

*First*, the district court assumed that the existence of the JV would incentivize the JV Defendants to materially raise the prices that they charge to non-JV distributors for their content. *Second*, the district court assumed that the JV

---

mergers: the elimination of double marginalization"). The district court did not address double marginalization in the Opinion & Order.

[7] Notably, the district court made no effort to quantify the magnitude of the purportedly anticompetitive effect of vertical foreclosure.

Defendants would, in fact, be able to raise those prices. *Third*, the district court assumed that any increase in such prices would harm consumers overall, notwithstanding the availability of the lower-cost option provided by the JV.

As to the district court's first assumption, incentives in this field are complicated, and a thorough analysis is required to determine whether the JV Defendants would even have the incentives assumed by the district court. An economist considering this issue would undoubtedly want to consider, at minimum:

- **Bargaining power vis-à-vis each distributor.** Setting aside the purported "backstop" (Opinion & Order at 51), do the JV Defendants possess the same degree of bargaining power vis-à-vis each distributor or different degrees? If the bargaining power is different, which distributors have more or less and how do they compare with one another?

- **The profit margins for the JV Defendants vis-à-vis each distributor.** Do the JV Defendants' profit margins differ depending on the distributor? If so, by how much? Would those differences in profit margins impact the JV Defendants' approach to carriage agreement negotiations? How so?

- **The sequence and timing of carriage agreements.** Do the JV Defendants' existing carriage agreements expire at the same time? If they expire at different times, how does the sequence of agreement expiration affect the JV Defendants' incentives?

- **The likely reactions of non-JV distributors to price increases.** Would the distributors tolerate a price increase? Which ones? How large of a price increase would they tolerate? Would they pass along a price increase to consumers? If so, how much of their increased costs would they pass along? Would the distributors stop carrying the programming of one or more of the JV Defendants? Would they carry the programming but limit it to certain packages?

- **The likely responses by consumers.** If the distributors take the actions described above, how would consumers react? Would some

12

percentage of them pay the higher price?  What percentage?  How large of a price increase would they tolerate (i.e., how price sensitive are they)?  Does price sensitivity differ by distributor?  How so?  Would some percentage of consumers terminate their subscription?  What percentage?  Would terminating subscribers purchase another option?  Which one?

- **Other motivations for the JV Defendants.**  Are there any motivations for the JV Defendants other than short-term profit maximization?  Are they incentivized to increase viewership of their content, and sacrifice short-term profits, to maximize long-term profits?  Might the sport league content creators be unwilling to sign licensing deals with firms with lower viewership even if those firms can offer more money in the short term?

These types of negotiations between programmers and distributors are complex and nuanced, and significant data and economic modeling are necessary to project, with any level of confidence, how such negotiations would go.  *See, e.g.*, *Welfare Effects* at 902–22 (presenting a complex predictive model regarding viewership, subscription, distributor pricing, and affiliate fee bargaining in service of investigating the effects of vertical integration in the television market).  At bottom, in concluding that the "backstop" provided by the JV would "materially change [the JV Defendants'] incentives" (Opinion & Order at 51), the district court oversimplified what economists recognize is a complicated and multifaceted issue.[8]

---

[8] There is an illustrative example of the complex nature of this dynamic involving some of the very parties in this case.  Disney, one of the JV Defendants, has an affiliate, Hulu, that competes directly with other non-affiliated MVPDs and vMVPDs (as the JV would).  Nevertheless, there is no indication that Hulu has provided Disney with a "backstop" that has harmed consumers vis-à-vis increased leverage in negotiations with other distributors.  This is because there are many

Additionally, the carriage agreements between the JV Defendants and the non-JV distributors may include limitations and/or restrictions on the JV Defendants' ability to raise prices. The Opinion & Order provides no indication that the district court examined or evaluated these carriage agreements with any level of analytical rigor. (*See* Opinion & Order at 51–52.) Thus, even if sufficient incentives to raise prices existed, depending on contractual restrictions, the JV Defendants may not be able to act on those incentives.

Further, even if the JV were to provide the JV Defendants with increased bargaining leverage and the JV Defendants were to use that leverage to raise the prices charged to non-JV distributors, that would not necessarily be anticompetitive because it would not necessarily harm consumers. *See, e.g.*, *Industrial Organization* at 455 ("It is worth noting, however, that even when foreclosure and a price squeeze for independent rivals does happen, it may nonetheless be the case that final consumers are made better off with the vertical merger. Policy makers should therefore not be too hasty in condemning a vertical merger simply because it disadvantages rival firms."). For instance, if the non-JV distributors were to absorb increased prices without passing along their increased costs to consumers via higher subscription fees, then the consumer would not be adversely affected. And even if

---

factors at play in this arena, and the interplay of those factors is not as cut-and-dried as the district court makes it seem.

consumers did unsubscribe from the non-JV distributors (either because of higher prices or because the distributor stopped offering programming they demand), given the lower-cost option offered by the JV, consumers may end up benefiting or being unaffected.

The *AT&T* case is an instructive contrast.  In that case, the court considered reams of evidence and engaged in a robust analysis of the government's "increased bargaining leverage" theory of harm, spanning more than forty pages.[9]  *See* 310 F. Supp. 3d at 198–241.  Notably, the court started from the fundamental proposition that "[v]ertical mergers often generate efficiencies and other procompetitive effects," *id.* at 197, and recognized that the relevant analysis is to determine whether the "asserted harms outweigh the merger's conceded consumer benefits," *id.* at 198. Then, the court meticulously considered the evidence proffered by the government— which included "testimony and economic modeling" from an economist who opined that "Turner would be able to extract greater affiliate fees from distributors due to increased bargaining leverage Turner would gain on account of its relationship with AT&T," *id.* at 199—before ultimately concluding that the government failed to meet

---

[9] The government's theory in that case is similar to Fubo's theory in this one.  *See AT&T*, 310 F. Supp. 3d at 198 ("Specifically, the Government contends that, should the challenged merger proceed, Turner's relationship with AT&T will enable Turner to extract greater prices from AT&T's rival distributors for its 'must-have' content than it could without the merger.  The Government argues that distributors would then pass on those price increases to their subscribers, resulting in an increase of hundreds of millions of dollars in annual consumer payments." (citations omitted)).

its burden of showing that the "challenged merger [would] lead to *any* raised costs on the part of distributors or consumers—much less consumer harms that outweigh the conceded $350 million in annual cost savings to AT&T's customers," *id.* at 241.

Economists may disagree as to the ultimate decision in the *AT&T* case, but both parties litigated that case—and the court decided that case—based on rigorous analysis and modeling of a hypothetical post-merger world. *See AT&T*, 310 F. Supp. 3d at 165 (describing the court's task as "weighing the parties' competing visions of the future of the relevant market and the challenged merger's place within it" and noting that "[n]othing less than a comprehensive inquiry into future competitive conditions in that market is expected"). In this case, in contrast, the district court's finding regarding a negotiating "backstop" consists of little more than two pages. (Opinion & Order at 51–53.) And the district court failed to discuss, let alone carefully evaluate, any economic model offered by Fubo similar to the model in the *AT&T* case. (*See id.*) The district court should have analyzed the issue with a similar level of analytical, economics-centric rigor—especially before issuing a preliminary injunction precluding a lower-cost option from being made available to consumers and thereby jeopardizing the accompanying increase in consumer welfare.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should vacate the district court's preliminary injunction and remand this case for further proceedings.

Dated: September 27, 2024          Respectfully submitted,

   */s/ Kenneth E. Lee*
Kenneth E. Lee
Steven W. Kessler
**LEVINE LEE LLP**
400 Madison Avenue
New York, New York 10017
Telephone: (212) 223-4400
klee@levinelee.com
skessler@levinelee.com

*Attorneys for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type volume limits set forth in Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,165 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:      New York, New York
             September 27, 2024

                              */s/ Kenneth E. Lee*
                              Kenneth E. Lee
                              **LEVINE LEE LLP**
                              400 Madison Avenue
                              New York, New York 10017
                              Telephone: (212) 223-4400
                              klee@levinelee.com