# 24-2210

## In the United States Court of Appeals for the Second Circuit

FUBOTV, INC., AND FUBOTV MEDIA, INC.,
*Plaintiffs-Appellees*,

v.

THE WALT DISNEY COMPANY, ET AL.,
*Defendants-Appellants*.

**BRIEF OF FLORIDA, ALABAMA, IOWA, KENTUCKY, MISSISSIPPI, AND SOUTH CAROLINA AS *AMICI CURIAE* SUPPORTING APPELLANTS AND REVERSAL**

On Appeal from the United States District Court
for the Southern District of New York
No. 1:24-cv-01363-MMG

JAMES H. PERCIVAL
 *Chief of Staff*
KEVIN A. GOLEMBIEWSKI
 *Senior Deputy Solicitor General*

ASHLEY MOODY
 *Attorney General of Florida*
HENRY C. WHITAKER
 *Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
henry.whitaker@myfloridalegal.com

September 27, 2024

*Counsel for Amici States*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTEREST OF AMICI STATES AND SUMMARY OF ARGUMENT ................ 1

ARGUMENT ....................................................................................................... 3

I.   SUITS BY HORIZONTAL COMPETITORS SHOULD BE VIEWED WITH SKEPTICISM. ............................................................................................. 3

II.  THE DISTRICT COURT ERRED IN VIEWING THE JOINT VENTURE'S PROCOMPETITIVE EFFECTS AS AN ANTITRUST PROBLEM. ................................... 9

CONCLUSION ................................................................................................... 13

CERTIFICATE OF COMPLIANCE .................................................................. 15

CERTIFICATE OF SERVICE ........................................................................... 16

# TABLE OF AUTHORITIES

## Cases

*Alberta Gas Chems. Ltd. v. E.I. Du Pont De nemours & Co.*,
826 F.2d 1235 (3d Cir. 1987)................................................................3

*Atl. Richfield Co. v. USA Petrol. Co.*,
495 U.S. 328 (1990) ....................................................................2, 3

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979).............................................................10

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ..............................................................5, 10, 12

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ..........................................................................2

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ..........................................................................2

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016)........................................................2, 6, 9

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) .......................................................................10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ..........................................................................3

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013).....................................................9, 12

*Pulse Network, L.L.C. v. Visa, Inc.*,
30 F.4th 480 (5th Cir. 2022)..............................................................6

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) ..........................................................................3

*State Oil Co. v. Khan*,
522 U.S. 3 (1997) ...................................................................5

*Sterling Merch., Inc. v. Nestle, S.A.*,
656 F.3d 112 (1st Cir. 2011) ..............................................6

*United States v. Penn-Olin Chem. Co.*,
378 U.S. 158 (1964) .............................................................7

**Other Authorities**

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (1995) .......................3, 7

D. Daniel Sokol, *The Strategic Use of Public and Private Litigation in Antitrust as Business Strategy*, 85 S. Cal. L. Rev. 689 (2012) ...........................8

Daniel E. Crane, *Optimizing Private Antitrust Enforcement*, 63 Vand.
L. Rev. 675 (2010) .........................................................6, 7

Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1
(1984) ......................................................................4, 8

Geoffrey A. Manne & Joshua D. Wright, *Google and the Limits of Antitrust: The Case Against the Case Against Google*, 34 Harv.
J.L. & Pub. Pol'y 171 (2011) ......................................7, 8, 9

Herbert Hovenkamp, *Merger Actions for Damages*, 35 Hastings L.J.
937 (1984) .................................................................4, 7

James Risen, *Chrysler Drops Suit on GM-Toyota Venture*, L.A. Times
(Apr. 13, 1985): https://perma.cc/K5KN-SSEB ..................................5

R. Preston McAfee & Nicholas V. Vakkur, *The Strategic Abuse of the Antitrust Laws*, U.S. Dep't of Justice (last visited Sep. 13, 2024):
https://perma.cc/2E9P-8KQN, *reprinted from* 1 J. Strategic Mgmt.
Educ. 3 (2004) ...............................................................3, 8

Richard A. Posner, *Antitrust in the New Economy*, 68 Antitrust L.J.
925 (2001) ...............................................................6, 7, 8

Robert C. Weinbaum, *The General Motors-Toyota Joint Venture: A Legally Sound Competitive Strategy*, 31 Wayne L. Rev. 1195 (1985) ........................................................................................5

Thomas W. Hazlett, *Is Antitrust Anticompetitive?*, 9 Harv. J.L. & Pub. Pol'y 277 (1986) .........................................................................5, 8

## INTEREST OF AMICI STATES AND SUMMARY OF ARGUMENT[1]

Amici States are charged with enforcing state and federal antitrust laws. They have a strong interest in promoting procompetitive conduct, protecting their citizens from anticompetitive conduct, and ensuring courts properly distinguish the two.

FuboTV brought this antitrust action to stop a joint venture created by Disney, Fox, and Warner Brothers. The joint venture will offer consumers a new, innovative streaming platform. Consumers "will—for the first time—be able to subscribe to a vast array of the sports content [they] want[], without paying for entertainment content" that they don't want. Op. 19. The district court, however, issued a preliminary injunction under the Clayton Act that "restrain[s]" Disney, Fox, and Warner Brothers "from launching" that product. *Id.* at 69.

The question in this case is whether a court should preliminarily enjoin the introduction of a new product into the market based on concerns raised by a competitor that the product is so superior to what is currently available that it is an existential threat to some existing competitors. Under a proper understanding of antitrust law, and on the current record, the answer is no. "[A]ntitrust laws . . . were enacted for 'the protection of competition not competitors.'" *Brunswick Corp. v.*

---

[1] As States, Amici may file this "brief without the consent of the parties or leave of court." Fed. R. App. P. 29(a)(2). They are not required to file a disclosure statement under Federal Rule of Appellate Procedure 29(a)(4)(E) or a certificate of interested persons. *See* Fed. R. App. P. 26.1(a), 29(a)(4)(E).

*Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

As courts have observed, "antitrust litigation brought by competitors" presents "a special hazard." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 691 (4th Cir. 2016) (Wilkinson, J.). Competitors can use antitrust lawsuits against their rivals to stifle competition—for example, to prevent rivals from lowering prices or from offering a new product that is superior to what the competitor can provide. As a general matter, anticompetitive conduct *benefits* horizontal competitors by driving up prices in the relevant market, while procompetitive conduct *harms* horizontal competitors by taking their market share or driving down their prices. *See Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 345 (1990). Courts must therefore be wary of competitor suits to ensure they do not "hijack" antitrust laws for "anticompetitive ends." *It's My Party*, 811 F.3d at 691.

Unfortunately, the district court appears to have fallen for this all-too-common gambit, temporarily preventing the joint venture from providing consumers a new product "at *half* of Fubo's price." Op. 60. In doing so, especially based on a preliminary and incomplete record, the court "turn[ed] the [antitrust] laws on their head" by allowing Fubo to use them as a tool for protectionism. R. Preston McAfee & Nicholas V. Vakkur, *The Strategic Abuse of the Antitrust Laws*, U.S. Dep't of Justice (last visited Sep. 13, 2024): https://perma.cc/2E9P-8KQN, *reprinted from* 1

2

J. Strategic Mgmt. Educ. 3 (2004) (explaining that using antitrust litigation to discourage a firm's entry into a market is a strategic abuse of antitrust laws).

## ARGUMENT

**I.** **SUITS BY HORIZONTAL COMPETITORS SHOULD BE VIEWED WITH SKEPTICISM.**

"[C]ourt[s] must be especially careful" when considering competitor suits. *Alberta Gas Chems. Ltd. v. E.I. Du Pont De nemours & Co.*, 826 F.2d 1235, 1239 (3d Cir. 1987). Although antitrust law is a "consumer welfare prescription," competitors often bring suits that harm consumers. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979) (quotation omitted). This is true for two related reasons.

**A**. Frequently, "a competitor will be injured and hence motivated to sue only when a[n] . . . arrangement has a *procompetitive* impact on the market." *Atl. Richfield Co.*, 495 U.S. at 345. "When a horizontal merger, price fixing, market division, or similar collaboration among competitors substantially reduces competition, consumers suffer, while rivals benefit." *See* 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 373b (1995). Rivals can charge higher prices, which increases their profits, so it is irrational for them to bring an antitrust suit and invite judicial scrutiny of their market. *See Atl. Richfield Co.*, 495 U.S. at 345; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (observing that competitors "stand to gain from any conspiracy to raise the market price"). By contrast, when a firm innovates, reduces prices, or otherwise engages in

3

robust competition, consumers benefit while rivals' profits suffer. *See* Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 35 (1984). Rivals lose market share, and lower prices erode their profits. *See id.*

This "substantial divergence . . . between [a competitor]'s motive for bringing" an antitrust "action and the public policy" underlying antitrust law can be particularly evident in joint-venture cases. *See* Herbert Hovenkamp, *Merger Actions for Damages*, 35 Hastings L.J. 937, 972 (1984). There are generally "two" types of joint ventures: "one [involves] firms [that] are conniving to reduce output and drive up prices, and the other" involves firms that "have found a way to combine their skills to make a new [product] at lower costs than either could alone." Easterbrook, *supra*, at 36. The first is anticompetitive, while the second is procompetitive because the joint venture injects a new product into the market that benefits consumers. *Id.* Yet a competitor has incentive to bring an antitrust suit only against the second venture. *Id.* Consequently, a competitor suit against a joint venture that is introducing a new product to the market frequently "contains the formula of its own dismissal": The competitor's decision to bring the suit shows that the competitor views the venture as procompetitive. *Id.*

An infamous example is Chrysler's lawsuit in the 1980s to stop a joint venture involving GM and Toyota. Thomas W. Hazlett, *Is Antitrust Anticompetitive?*, 9 Harv. J.L. & Pub. Pol'y 277, 325–26 (1986); Robert C. Weinbaum, *The General*

4

*Motors-Toyota Joint Venture: A Legally Sound Competitive Strategy*, 31 Wayne L. Rev. 1195, 1199 (1985). GM and Toyota "pool[ed] resources to . . . efficiently" produce a "subcompact" car "designed specifically for the first-time car buyer." Hazlett, *supra*, at 325. Because GM and Toyota entered a joint venture, rather than a merger, "any fear of monopolistic output restrictions" was "minimiz[ed]." *Id.* at 326. Even so, Chrysler filed an antitrust suit against the venture. *Id.* It could not "compete successfully in the marketplace," so it tried to "protect its market share in the courtroom." *Id.* Chrysler eventually settled with GM and Toyota—and then pursued a "joint venture of its own with Mitsubishi." James Risen, *Chrysler Drops Suit on GM-Toyota Venture*, L.A. Times (Apr. 13, 1985): https://perma.cc/K5KN-SSEB.

Antitrust law, in short, is meant to protect consumers, not competitors like Chrysler who seek to use the courts to shield their market share. Yet competitors are harmed only when other firms are delivering superior value to consumers. No matter how the firms are achieving that, antitrust does not provide a remedy: "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws," which "do not create a federal law of unfair competition." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993); *see also State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) (explaining that "[l]ow prices . . . benefit consumers regardless of how [they] are

set"); *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 489 (5th Cir. 2022) ("Loss from competition itself—that is, loss in the form of customers' choosing the competitor's goods and services over the plaintiff's—does not constitute antitrust injury, even if the defendant is violating antitrust laws in order to offer customers that choice.").

**B.** Additionally, competitor suits present "a special hazard," *It's My Party*, 811 F.3d at 691, because "unlike consumers [or the government], competitors have" strong "incentives" to weaponize antitrust litigation. *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121 (1st Cir. 2011). That is, in addition to typically suffering injury only when a firm is delivering superior value to consumers, competitors have strong incentives to use antitrust lawsuits in those circumstances for anticompetitive purposes.

For starters, determining whether a joint venture violates antitrust laws requires courts to "balance efficiency against" potential effects of market power—a task that is riddled with "uncertainty" and speculation. Richard A. Posner, *Antitrust in the New Economy*, 68 Antitrust L.J. 925, 935 (2001). Joint ventures are "an archetypal problem in antitrust law" because they can increase value for consumers but can also create a risk of future monopolistic conduct. Daniel E. Crane, *Optimizing Private Antitrust Enforcement*, 63 Vand. L. Rev. 675, 704 (2010). "Joint ventures . . . are often efficiency-enhancing devices that bring about tremendous

consumer benefits by standardizing interconnections, creating economies of scale or scope, facilitating optimal planning, and spreading risk." *Id.* Sometimes, though, "the aggregation of economic power in a joint venture can lead to the creation and exercise of market power." *Id.* at 704–05. Through antitrust litigation, competitors can smother joint ventures because courts must engage in "a good deal of speculation" to determine whether a venture's "market power" risks harm that outweighs its "efficiencies." *See* Hovenkamp, *Merger Actions*, *supra*, at 955–56, 972 (discussing "the ambiguity and complexity of substantive merger law"); Posner, *supra*, at 935–39.[2] And this risk is heightened where, as here, the court must conduct this analysis on a preliminary record. *See* Areeda & Hovenkamp, *supra*, ¶ 347.

That risk of "error" can also be compounded when a joint venture is introducing a market innovation. Geoffrey A. Manne & Joshua D. Wright, *Google and the Limits of Antitrust: The Case Against the Case Against Google*, 34 Harv. J.L. & Pub. Pol'y 171, 185 (2011) ("[I]nnovation is closely related to antitrust error."). "Because innovation involves new products and business practices," courts are prone to "misunderstand[]" a market innovation, which "increase[s] the

---

[2] Mergers and joint ventures both require courts to balance market power and efficiencies, but joint ventures present a lower risk of anticompetitive conduct because unlike mergers, they generally increase the number of firms in the market. *See United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170 (1964) ("The merger eliminates one of the participating corporations from the market while a joint venture creates a new competitive force therein.").

likelihood that they view the innovation as anticompetitive and subject to antitrust scrutiny." *Id.*; Easterbrook, *supra*, at 4 (examining courts' "[i]nhospitality" towards new "business practices").

Next, even if a competitor does not ultimately prevail in an antitrust lawsuit, it can use the courts to drive up the innovative firm's costs, erode the firm's market advantage, and distract the firm with burdensome litigation. McAfee & Vakkur, *supra*; D. Daniel Sokol, *The Strategic Use of Public and Private Litigation in Antitrust as Business Strategy*, 85 S. Cal. L. Rev. 689, 697–98 (2012); Posner, *supra*, at 939. Once litigation begins, the firm must devote time not only to the litigation but also to the potential public-relations fallout from it. Any resulting delay affords competitors time to "execute [market-based] defenses" to the competitive threat posed by the new product. McAfee & Vakkur, *supra*; *see also* Hazlett, *supra*, at 329 n.141.

These concerns are not theoretical. Since the birth of antitrust law, competitors have used it strategically. In the late 1800s, George Rice—who owned a competitor to Standard Oil— "made a bad business decision" that "increased his shipping costs" and left him "less efficient than Standard Oil." Sokol, *supra*, at 715. He then used "public and private antitrust litigation strategies" to combat Standard Oil's market edge. *Id.* Rice "spent a considerable amount of time crafting a story to the press akin to David versus the Goliath of Standard Oil." *Id.* Wielding that "discourse, along

with [lawsuits and] filings to government agencies at both the state and federal levels," Rice "raise[d] Standard Oil's costs of doing business." *Id.* at 715–16.

Courts cannot stop companies from weaponizing antitrust law, but they should recognize that competitor suits present a "special hazard," and exercise restraint when passing on them, particularly without a full hearing on the merits. *It's My Party*, 811 F.3d at 691. Anticompetitive suits are, after all, an assault on consumers—the very group that antitrust law is designed to protect. *See Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.) (concluding that antitrust law "protect[s] the process of competition, with the interests of consumers, not competitors, in mind"). The suits strangle competition and innovation, "deterring [both] the introduction of new goods and expenditures on innovation." Manne & Wright, *supra*, at 186.

## II. THE DISTRICT COURT ERRED IN VIEWING THE JOINT VENTURE'S PROCOMPETITIVE EFFECTS AS AN ANTITRUST PROBLEM.

This case demonstrates why courts should approach competitor suits with caution, especially at the preliminary-injunction stage. Fubo has secured an injunction that will prop up its business, at the expense of consumers. The injunction temporarily sidelines a joint venture that will deliver value to consumers by offering an innovative product. Consumers "will—for the first time—be able to subscribe to a vast array of the sports content [they] want[], without paying for entertainment

9

content" that they don't want. Op. 19. And they will be able to access that content at "*half* of Fubo's price." *Id.* at 60.

The district court went astray because it focused on the effect of the joint venture on firms like Fubo, rather than the effect on consumers. It entered a preliminary injunction because of concerns that the joint venture would reduce the number of firms competing in the "Live Pay TV Market." *See id.* at 46–54. Rival firms like Fubo, the court concluded, will be unable to compete with the joint venture because of preexisting market dynamics, and the companies participating in the joint venture will have less incentive to offer live-sports platforms. *See id.* But "exclusionary effect[s]" alone do not establish that a joint venture will harm "consumers"; exclusionary effects are just as likely to result from procompetitive conduct as anticompetitive conduct. *See Brooke Grp.*, 509 U.S. at 223. To preliminarily enjoin the joint venture, the district court had to find that Fubo carried its burden to prove exclusionary effects that will likely harm *consumers*. *See id.*; *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (stating that antitrust law bars conduct with "anticompetitive effect[s] that are harmful to the consumer"); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 275 (2d Cir. 1979) ("The mere possession of monopoly power does not [i]pso facto condemn a market participant.").

The district court did not do that. The closest it came was its finding that the joint venture "may eventually allow . . . Defendants to raise prices directly for consumers, unchecked by meaningful competition." Op. 53. In support, the court cited evidence that Defendants believe the joint venture might be able to raise its subscription fee "by $5 per year." *Id*. But that does not come close to showing that the joint venture will harm consumers.

On the contrary, based on the current record, the joint venture will fill a market gap, providing a product for consumers who are currently unserved—sports fans who want live sports and nothing else. *Id*. at 19 (finding that the joint venture's "target consumer" is that group). The district court made no finding suggesting that if the joint venture raises its subscription fee by $5 per year, it will cease providing value to those consumers.

The record also reflects that the joint venture will put downward pressure on prices. Upon launching, the joint venture will charge $42.99 per month, whereas Fubo currently charges over $80. *See id*. at 21, 60 (noting that the joint venture's product is "*half* of Fubo's price"). So even if the joint venture were to raise its subscription fee $5 per year, it is not clear how that would be worse for consumers than the status quo. Under the district court's own conclusion that the joint venture and Fubo will be competitors in the "relevant market," *id*. at 38–39, the joint venture will reduce prices in that market by a considerable margin. To "depriv[e] consumers

11

of th[ose] benefits" using the extraordinary relief of a preliminary injunction, the district court needed to conclude that the joint venture would gain "enough market power" not only to "set higher than competitive prices" in the future but also to "sustain" those prices for "long enough" to strip consumers of the benefits they received from years of the joint venture's low prices. *Brooke Grp.*, 509 U.S. at 224–26. The court, however, did not undertake that analysis.

The only conduct that the district court specifically found harmful to consumers is "bundling" (i.e., the use of contracts that require content distributors to carry a particular bundle of content). Op. 45. Although the court emphasized that it did not "need" to opine on bundling at this stage, it concluded "that, on balance, [bundling] is bad for consumers." *Id.* But whether bundling—which is part of the market status quo—is bad for consumers is irrelevant.[3] Even assuming that bundling is an anticompetitive practice that has created a market "opportunity," *id.* at 46, a new firm can take advantage of that opportunity without raising antitrust concerns. The relevant question is whether the firm will advance "the interests of consumers" or instead harm competition. *Novell*, 731 F.3d at 1072. The joint venture will do the former by filling the current market gap and offering consumers a platform that

---

[3] The district court made no finding that the joint venture increases Defendants' incentives to bundle going forward.

provides them "a vast array of the sports content [they] want[], without . . . entertainment content" that they don't want. Op. 19.

The district court should have denied the preliminary injunction and allowed the joint venture to introduce its new product to consumers.

### CONCLUSION

This Court should vacate the preliminary injunction.


September 27, 2024

Respectfully submitted,

ASHLEY MOODY
  *Attorney General of Florida*

*/s/ Henry C. Whitaker*
HENRY C. WHITAKER
  *Solicitor General*
JAMES H. PERCIVAL
  *Chief of Staff*
KEVIN A. GOLEMBIEWSKI
  *Senior Deputy Solicitor General*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
(850) 414-3300
*henry.whitaker@myfloridalegal.com*

*Amici Curiae*

Steve Marshall
ATTORNEY GENERAL OF ALABAMA

Brenna Bird
ATTORNEY GENERAL OF IOWA

Russell Coleman
ATTORNEY GENERAL OF KENTUCKY

Lynn Fitch
ATTORNEY GENERAL OF MISSISSIPPI

Alan Wilson
ATTORNEY GENERAL OF SOUTH CAROLINA

## CERTIFICATE OF COMPLIANCE

1.      I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5) and Local Rule 29.1(c). This brief contains 3,002 words, including all headings, footnotes, and quotations, and excluding the parts exempted under Fed. R. App. P. 32(f).

2.      In addition, this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

*/s/ Henry C. Whitaker*
Henry C. Whitaker

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 27th day of September 2024, this brief was electronically filed with the Clerk of Court using the ACMS system, which will serve all counsel of record.

*/s/ Henry C. Whitaker*
Henry C. Whitaker