# 24-2210-cv

## United States Court of Appeals

### *for the*

## Second Circuit

———————◆———————

FUBOTV INC., FUBOTV MEDIA INC.,

*Plaintiff-Appellees,*

— v. —

THE WALT DISNEY COMPANY, WARNER BROS. DISCOVERY, INC.,
ESPN, INC., ESPN ENTERPRISES, INC., HULU, LLC, FOX CORPORATION,

*Defendants-Appellants.*

—————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF ON BEHALF OF *AMICUS CURIAE* PROFESSOR RICHARD EPSTEIN IN SUPPORT OF APPELLANTS

BRENDON DEMAY
ZACHARY KERNER
BRIAN T. GOLDMAN
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Avenue, 14th Floor
New York, New York 10017
(646) 837-5151

*Attorneys for Amicus Curiae*

# **<u>TABLE OF CONTENTS</u>**

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTEREST OF AMICUS ...................................................................... iv

INTRODUCTION ..................................................................................1

ARGUMENT ..........................................................................................3

   I.   THE DISTRICT COURT'S ANALYSIS OF BUNDLING IS WRONG. ......3

      A.  Background on Bundling ........................................................3

      B.  Bundling Is Procompetitive....................................................4

      C.  The District Court's Theory that Bundling Is Anticompetitive Has Been Long Discredited ................................................................6

   II.  THE INJUNCTION BANNING A NEW, IN-DEMAND PRODUCT FAILS TO ACCOUNT FOR PROCOMPETITIVE BENEFITS.............................12

  III.  THE DISTRICT COURT'S ANALYSIS OF ANTICOMPETITIVE EFFECTS IGNORED FUNDAMENTAL PRINCIPLES CONCERNING PROCOMPETITIVE BENEFITS OF VERTICAL INTEGRATION..........16

      A.  The Joint Venture Implements a Vertical Relationship with Respect to Programming and Distribution ...............................................16

      B.  The District Court Did Not Apply Antitrust Principles on Vertical Integration ............................................................17

CONCLUSION.....................................................................................19

CERTIFICATE OF COMPLIANCE.........................................................21

CERTIFICATE OF SERVICE .................................................................22

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Blough v. Holland Realty, Inc.*,
  574 F.3d 1084 (9th Cir. 2009)................................................................7

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012).....................................................4, 6, 11

*Cascade Health Sols. v. PeaceHealth*,
  515 F.3d 883 (9th Cir. 2008)................................................ 3, 4, 5, 6

*Comcast Cable Commc'ns, LLC v. FCC*,
  717 F.3d 982 (D.C. Cir. 2013) ..........................................................18

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992)............................................................................4

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004) ...................................................14

*FTC v. Pharmtech Rsch., Inc.*,
  576 F. Supp. 294 (D.D.C. 1983) ........................................................13

*FTC v. Warner Commc'ns Inc.*,
  742 F.2d 1156 (9th Cir. 1984)............................................................13

*FTC v. Weyerhaeuser Co.*,
  665 F.2d 1072 (D.C. Cir. 1981) ................................................. 13, 14

*It's My Party, Inc. v. Live Nation, Inc.*,
  811 F.3d 676 (4th Cir. 2016)................................................................5

*Jefferson Parish Hospital Dist. No. 2 v. Hyde*,
  466 U.S. 2 (1984)...............................................................5, 8, 9, 11

*National Fuel Gas Supply Corp. v. FERC,*
    468 F.3d 831 (D.C. Cir. 2006) ...............................................................18

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.,*
    555 U.S. 438 (2009) ................................................................................8

*Reifert v. S. Cent. Wis. MLS Corp.,*
    450 F.3d 312 (7th Cir. 2006) ...................................................................7

*Town Sound & Customer Tops, Inc. v. Chrysler Motors Corp.,*
    959 F.2d 468 (3d Cir. 1992) .................................................................4, 5

*United States v. AT&T Inc.,*
    310 F. Supp. 3d 161 (D.D.C. 2018) ......................................................19

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ..............................................................................12

*Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors,*
    850 F.2d 803 (1st Cir. 1988) ...................................................................8

*Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.,*
    224 F. Supp. 2d 657 (S.D.N.Y. 2002) ...................................................16

**Other Authorities**

David T. Scheffman and Richard S. Higgins, *Vertical Mergers: Theory and Policy,*
    12 Geo. Mason L. Rev. 967 (2004) .......................................................17

Herbert J. Hovenkamp, *Antitrust and Nonexcluding Ties* (2012).................... 5, 7, 9

Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 756................................................................17

Robert H. Bork, *The Antitrust Paradox* (2d ed. 1993) ............................................18

## INTEREST OF AMICUS[1]

Richard A. Epstein is the Laurence A. Tisch Professor of Law at New York University School of Law; the James Parker Hall Distinguished Service Professor Emeritus of Law and senior lecturer at the University of Chicago Law School; and the Peter and Kirsten Bedford Senior Fellow at the Hoover Institution. He has taught on many subjects including antitrust law, constitutional law, and law and economics. His published scholarship includes more than a dozen books and countless articles.

Amicus believes that the central aim of antitrust law is to ensure free-market competition, providing consumers with better goods and services at lower prices, and he has an interest in ensuring that antitrust doctrine is guided by and reflects modern economic principles. The decision below disregards those laudable goals. The District Court's theory of competitive harm rests on incorrect, outdated, and unsupported assumptions about business practices long understood by antitrust scholars and economists to be procompetitive. Amicus submits this brief to discuss those errors and to explain why the arrangement here, when properly considered in

---

[1] No counsel for any party to this case authored this brief in whole or in part, and no person other than amicus and his counsel made a financial contribution for the preparation or submission of this brief. The parties have consented to the filing of this brief.

light of modern antitrust and economic principles, does not present an antitrust

problem.

## INTRODUCTION

Faced with practices that have long been understood as procompetitive, and faced with Defendants' decision to offer a new, in-demand product at a price consumers will pay, the District Court ruled that the practices were anticompetitive and that the new, in-demand product should be enjoined. In reaching that result, the District Court made several fundamental errors under antitrust law. Those errors led the District Court to view the arrangement here as anticompetitive. This amicus brief discusses those errors and explains why the District Court's assumptions regarding anticompetitive effects are wrong.

First, although the District Court purported not to address the legality of "bundling," the District Court repeatedly and unequivocally expressed its hostility to bundling and stated its belief that bundling is anticompetitive. That belief led the District Court to rule that the overall arrangement at issue here is anticompetitive. But courts and antitrust scholars have long understood bundling to be *pro*competitive. Bundling reduces overall prices, reduces transaction costs, and saves production costs. Meanwhile, although the District Court attempted to articulate a theory of why bundling is supposedly anticompetitive, that theory was conspicuously not accompanied by any citation to antitrust law or literature. To the contrary, the Supreme Court, the Courts of Appeals, and antitrust scholars have rejected the District Court's theory of harm to competition.

1

Second, the District Court's application of the four-factor test for issuing an injunction failed to properly consider the public interest. The District Court stated over and over again that the joint venture's new product, if offered, would be in high demand and would be offered at a price consumers will pay. Yet the District Court oddly concluded that the public interest would be served if this new, in-demand product is *banned* during the pendency of the suit. That is backwards. The public interest unequivocally favors allowing consumers to buy new, in-demand products they want. Far from being an antitrust problem, a properly functioning market will encourage firms to offer desirable products at desirable prices, and it appears Defendants have done just that. The well-established test for issuing an injunction encourages courts to uphold, not enjoin, this kind of publicly beneficial activity.

Third, the District Court's discussion of purported anticompetitive effects reflects an outdated hostility to vertical integration. The District Court theorized that Defendants' vertical production-distribution system would be unfavorable for other distributors, like Plaintiff, who wish to distribute Defendants' products but will have less leverage in negotiating to obtain those distribution rights. That analysis is flawed. Vertical integration is now well-understood to create efficiencies, reduce costs, and encourage innovation. By definition, all vertically integrated firms will have more "leverage" when negotiating with outside

2

distributors, so the observation that a vertically integrated firm possesses such leverage does not lead to the conclusion that the vertical relationship is anticompetitive.

## ARGUMENT

### I. THE DISTRICT COURT'S ANALYSIS OF BUNDLING IS WRONG.

#### A. Background on Bundling

"Bundling is the practice of offering, for a single price, two or more goods or services that could be sold separately." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). In the context of pay television, bundling refers to the industry-wide "practice by programmers of packaging several of their networks together to be distributed either together (to at least some degree), or not at all." (Op.10.) "Bundling is the subject of heavy and lengthy negotiations between programmers and distributors," (Op.11) and, at times, distributors have resisted having to accept large bundles. Then, one step downstream (i.e., at the consumer level), as the District Court recognized, "[b]undling is ubiquitous because in many cases, at least some subset of consumers enjoy having ready access to hundreds of channels and doing so on a less-expensive basis than they otherwise would if they paid for each channel individually." (Op.10–11.)

For purposes of claims under the Sherman Act, television bundling practices may be analyzed as a "tying" arrangement. "Tying" or "bundling" arrangements are a species of vertical agreement typically evaluated under the rule of reason. "A

3

tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product . . . .'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992).

The most well-known case concerning bundling in television is *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012). There, consumers of television shows alleged that (1) programmers like NBC Universal improperly required cable distributors to purchase NBC's low-demand channels in order to get the high-demand channels; and (2) cable distributors required consumers to take all of NBC's channels in a bundle rather than channel-by-channel. *Id.* at 1200–01. The Ninth Circuit affirmed the grant of a motion to dismiss for failure to state a claim, holding that the complaint did not adequately allege that the programmers' bundling practices caused "a cognizable injury to competition." *Id.* at 1202.

B. Bundling Is Procompetitive

For many years, courts and economists have recognized the potential procompetitive benefits of bundling. *E.g.*, *Cascade*, 515 F.3d at 895; *Town Sound & Customer Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 477 (3d Cir. 1992). As the Supreme Court has observed, "[b]uyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively—conduct that is entirely consistent with the Sherman Act." *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

4

First and foremost, bundles tend to reduce prices. *Cascade*, 515 F.3d at 895; *Town Sound and Custom Tops*, 959 F.2d at 488. When two goods are sold separately, the sellers will take a profit margin on both goods; if instead the goods are sold as a bundle, the seller tends to accept a single profit margin that is lower than the sum of the individual profit margins. The result is lower average prices. Professor Hovenkamp refers to this effect as the elimination of double marginalization. Herbert J. Hovenkamp, "Antitrust and Nonexcluding Ties" (2012), at 4–5.

Second, bundling tends to reduce transaction costs. Bundles provide a "one-stop shop" that reduces the need for separate negotiations and transactions for each of the many items in a bundle. *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 688 (4th Cir. 2016). The important dynamic is that as the number of items in a bundle increases, the number of potential partial bundles quickly becomes massive. The transaction costs of one product offering—the full bundle—are lower than the transaction costs for the many different partial bundles that different consumers might be interested in. "For example, in the case of blanket licenses the bundled form of the license enables licensees to have instant, protected access to every song in the bundle without having to negotiate individually." Hovenkamp, *supra*, at 5. And from an antitrust perspective, there is nothing special about the specific partial bundle that Plaintiff wants—the District Court specifically declined

5

to hold that Plaintiff's desired partial bundle constitutes an antitrust market. (Op.38n.31).

The court in *Brantley* noted this phenomenon, cautioning that the plaintiffs' desired outcome could have far-reaching negative effects—it would "cast doubt on whether musicians would be free to sell their hit singles only as a part of a full album, or writers to sell a collection of short stories . . . . [and] call into question whether Programmers and Distributors could sell cable channels at all, since such channels are themselves packages of separate television programs." *Brantley*, 675 F.3d at 1202 n.10. Fracturing products in this manner imposes transaction costs that a more-efficient market might be able to avoid.

Third, bundling allows firms to pass along savings in production costs that arise from economies of scope. *Cascade*, 515 F.3d at 895. *Cascade* involved a challenge to a defendant hospital's bundling of primary, secondary, and tertiary health care; although those levels of care are different, they can be provided at a lower cost at one hospital rather than separate hospitals because those services often rely on overlapping equipment and staff.

C. The District Court's Theory that Bundling Is Anticompetitive Has Been Long Discredited

For many years, courts and economists have rejected the District Court's primary theory for why bundling supposedly harms competition. The District Court expressed its belief that bundling is "bad for consumers" because it "hurt[s]

the wallets of sports-loving consumers by making them pay for non-sports channels they don't want" and hurts consumers who don't like sports by "mak[ing] [them] pay for unwatched sports, the most expensive of all content." (Op.45.) Courts and economists have definitively rejected this notion that tying is anticompetitive because it forces consumers to pay for something they don't want. That is because the concept of consumers "paying for something they don't want" is an artifice without a firm economic grounding. Sellers of an in-demand product set prices to capture demand, and buyers pay a price that reflects the value they place on the product. If a seller bundles a highly desired product together with products that a consumer would not ordinarily buy, then the bundle price is best viewed as the market price of the highly desired product alone. *E.g.*, *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089–90 (9th Cir. 2009) (applying this principle and rejecting tying claim) (quoting IX Areeda & Hovenkamp ¶ 1724b, at 270 (2004 Supp. 2009) ("In order to obtain desired product A, let us suppose, the defendant's customer is forced to take product B, which it does not want, cannot use, and would not have purchased from anyone. This is typically the equivalent of a higher price for product A. . . . This has nothing to do with gaining power in the B market or upsetting competition there.")); *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 317–18 (7th Cir. 2006); *Wells Real Estate, Inc. v. Greater*

*Lowell Bd. of Realtors*, 850 F.2d 803, 814–15 (1st Cir. 1988). The market is simply setting prices to meet demand, and there is no antitrust problem.

Examples of this effect are easy to find. If a consumer wants an 8-ounce cup of coffee, but her preferred coffee shop sells only a 12-ounce cup for $3, then if she buys the coffee, the price she is willing to pay for 8 ounces of coffee is $3; she has not been "forced" to "pay for" 4 extra ounces of coffee that she "does not want." If a television viewer wants to watch sports only and is willing to pay $80 for a bundle that includes sports and non-sports shows, then her price for sports-only shows is $80; she is not being forced to pay for shows that she does not want.[2] In these examples, to use the Supreme Court's articulation in *Jefferson Parish*, "the seller's power is just used to maximize its return in the tying product market, where presumably its product enjoys some justifiable advantage over its competitors"—i.e. the in-demand product—and in that instance "the competitive ideal of the Sherman Act is not necessarily compromised." 466 U.S. at 14.

---

[2] These examples show why Plaintiff's complaint is not really about tying but is actually about a "price squeeze." *Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 442 (2009). Plaintiff wants Defendants' sports only, yet thus far Plaintiff has been willing to pay a price for sports plus non-sports. That means the price Plaintiff has paid is essentially the price it is willing to pay for sports only. The allegation is that competition is harmed because Plaintiff is paying more for Defendants' sports programming than the joint venture is paying, and therefore Plaintiff is foreclosed from competing with the joint venture to distribute the sports programming. That is a price-squeeze allegation. Defendants' brief has already discussed a price-squeeze claim, and that issue will not be addressed here.

Accordingly, "when a purchaser is 'forced' to buy a product he would not have otherwise bought . . . , there can be no adverse impact on competition . . . ." *Id.* at 16.

The antitrust literature is filled with explanations of why the District Court's price theory of tying doesn't work. The unstated premise of the District Court's theory is that if consumers were not "forced" to "buy" products they "don't want," then consumers would be able to pay a lower price for only what they want. For example, this theory goes, if a bundle of four items is priced at $40, and if a consumer wants only two items out of the bundle, then the consumer will be able to pay less than $40 for those two items. But there is no reason to assume the market would provide that outcome. The price that consumers would be willing to pay for any given partial bundle would depend on the shape of the demand and supply curves; indeed it could depend on the shapes of the related curves for each of the permutations of partial bundles of the offered goods.

Professor Hovenkamp provides an illustration. *See* Hovenkamp, *supra*, at 9–10. In his hypothetical, a seller is bundling two products together for $11. (Marginal costs are sufficiently low that they can be treated as zero.) But then the seller is required to unbundle. The seller must now set prices for each product separately. Consumer A is willing to pay $7 for the first product and $4 for the second. Consumer B is willing to pay $3 for the first product and $13 for the

9

second product.  The seller decides to price the first product at $7 and the second product at $13, which is the profit-maximizing choice.  Everyone is now worse off. Consumer A previously got both products at the bundled price of $11, a price it was willing to pay, but now it can afford only the first product and cannot afford the second product that it wants and was previously able to get.  Consumer B previously got both products for $11, but now it is paying more ($13) for less (only one product rather than two).  The seller is also worse off; it previously sold a bundle to two consumers at $11 each, for a total of $22, but now it is selling only one product for $7 and one for $13, for a total of $20, or $2 less than what it earned by bundling.  Again, in this example, the move from bundling to unbundling made everybody worse off because of the shape of the demand curve.  To determine whether forced unbundling would benefit consumers as the District Court's theory assumes, one would need access to a huge volume of pricing data that might not even exist.  The District Court did not have access to such data, yet the District Court pronounced harm to competition with great confidence.  Although the District Court seemed to appreciate that consumers of live sports have *wildly* varying preferences (Op.38–39), the District Court failed to consider what this would mean for how prices would be set in a market without bundling.  Some consumers might be worse off, some might be better off, and some might be

neutral. The District Court did not assess any of that. Instead, the District Court simply assumed that unbundling would reduce prices and benefit consumers.

Tying can indeed sometimes be anticompetitive, but that occurs only in circumstances that Plaintiff did not allege and the District Court did not address. As the Supreme Court stated in *Jefferson Parish*, a plaintiff alleging tying must show foreclosure of competition in the *tied* product market (the product that the plaintiff is *less* interested in). 466 U.S. at 14; *see also Brantley*, 675 F.3d at 1203–04. To illustrate, here that would require allegations that (a) distributors throughout the market would have bought *non*-sports programming from suppliers *other than* Defendants; (b) but instead distributors were forced to buy non-sports programming from Defendants; and (c) those other suppliers of non-sports programming are then foreclosed from the market. Although a claim along those lines might theoretically satisfy *Jefferson Parish*, that is not what Plaintiff alleges here.

Instead, Plaintiff's theory of anticompetitive effect seems to be that Plaintiff cannot obtain in the upstream market a "skinny bundle" of Defendants' sports programming at a lower price (the *tying* product), which supposedly harms competition in the downstream market by reducing the number of distributors of skinny bundles of sports programming. But this theory of foreclosure regarding a *tying* product (not a *tied* product) is not a recognized antitrust theory.

11

II.     THE INJUNCTION BANNING A NEW, IN-DEMAND PRODUCT FAILS
        TO ACCOUNT FOR PROCOMPETITIVE BENEFITS.

Much of Appellants' Brief criticizes the District Court for failing to account

for the joint venture's procompetitive effects, including when addressing antitrust

injury and in examining the overall effects of the joint venture.  *See* Brief of

Defendants-Appellants (Dkt. 67.1) at 19–21, 46–48, 57.

For the same reasons, as a matter of antitrust law, the District Court's

analysis of whether the public interest would be best served by a preliminary

injunction was incomplete and wrong because it failed to account for

procompetitive benefits.  The District Court found that Plaintiff was likely to

succeed on the merits, and then it reasoned virtually by rote that an injunction

therefore best served the public interest.  (*See* Op.65–66 ("[B]ecause Fubo has

established a likelihood of success on the merits of its Section 7 Clayton Act

claims . . . the public interest is served by an injunction").)  The District Court's

analysis of the familiar injunction factors was wrong for two reasons.

First, the District Court's analysis of the public interest merely duplicated its

conclusion on the likelihood of success on the merits: Plaintiff was likely to

succeed at trial, so the public interest would be served by granting an injunction.

That syllogism leaves no work for the "public interest" factor to do, rendering it

surplusage.  That approach is incorrect; a court may conclude that a preliminary

injunction is against the public interest, and should not issue, even if the claim

12

might later succeed. "[A] federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (denying injunction as contrary to the public interest notwithstanding a showing of likelihood of success on the merits). This Court should clarify that district courts must analyze the public interest prong of the injunction analysis as separate from, and not redundant of, the likelihood of success on the merits prong.[3]

Second, the District Court's analysis failed to account whatsoever for the *benefits* to the public that the joint venture would serve—*i.e.*, "offer[ing] consumers an option to receive their must-have live sports content at a fraction of the cost" of what they would otherwise pay to watch sports. (Op.51.) The District Court's injunction annihilated those benefits.

The failure to weigh the equities in light of the benefits to consumers that the joint venture would create—and instead double-counting the likelihood-of-success determination—was error. In fact, "public equities include beneficial economic effects and procompetitive advantages for consumers." *FTC v. Pharmtech Rsch.,*

---

[3] Those prongs, of course, might overlap. If a court concludes at the preliminary injunction stage that a cartel has engaged in pure price-fixing, then enjoining the cartel will likely be in the public interest because pure price-fixing harms consumers and carries no public benefit. But that is very different from what the District Court did here, which was to employ the oversimplification that enforcing the antitrust laws is in the public interest when considering a preliminary injunction pending trial.

13

*Inc.*, 576 F. Supp. 294, 299 (D.D.C. 1983); *see FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1165 (9th Cir. 1984).

The D.C. Circuit in *FTC v. Weyerhaeuser Co.*, 665 F.2d 1072 (D.C. Cir. 1981) rejected the precise approach that the District Court took here. In *Weyerhaeuser*, then-Judge Ginsburg, writing for the court, explained that even though the FTC had established that it was likely to prevail on the merits in challenging a proposed merger under the Clayton Act, the merger should not be preliminarily enjoined. A likelihood of success was not enough to control the public-equities analysis, because "[t]he determination of a likelihood of success must be made under time pressure and on incomplete evidence" and is therefore "tentative" in nature. *Id*. at 1083. "Accordingly," then-Judge Ginsburg wrote, "it is permissible for the court to weigh among 'the equities' the potential benefits, public and private, that may be lost by a merger-blocking preliminary injunction." *Id*. The merger at issue in *Weyerhaeuser* carried "projected procompetitive benefits from construction of a new linerboard mill." *Id*. Those benefits are similar to the procompetitive benefits that the joint venture offers here, including a new product that consumers want and pricing that would be a "fraction" of what they would otherwise pay. (Op.51); *see FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 160 (D.D.C. 2004) (denying injunction because, in weighing the equities, "a preliminary injunction would effectively deprive the market of pro-competitive

14

savings, efficiencies, and a new strong competitor"). An assessment of the likelihood of success on the merits is merely a prediction of what the result will be months or years later at trial on a more developed record. In the interim, the lost benefits of the enjoined transaction are concrete and real. If the prediction turns out to be wrong and the outcome of the eventual trial is that the claims fail, there is no way for consumers to retroactively reap the benefits of Defendants' new, in-demand product. The District Court's shortcut public-interest analysis failed to take any of this into account,[4] and it should not stand.

The District Court's errors on this point appear to be similar to other errors that Appellants charge regarding antitrust injury. The District Court assumed that the likelihood of success was dispositive of the public-interest prong, while Defendants argue that the District Court determined that the likelihood of success dispensed with the need to discuss antitrust injury. *See* Brief of Defendants-Appellants (Dkt. 67.1) at 19–21. Further, the District Court failed to consider the procompetitive public benefits of the joint venture before issuing the injunction,

---

[4] The District Court's failure to acknowledge this public interest is especially puzzling given that (a) the District Court did not weigh procompetitive benefits against anticompetitive effects when conducting its antitrust analysis; and (b) one of the District Court's cited anticompetitive effects was about the *possibility* that the joint venture would increase prices at some point *years into the future*. (Op.53–54.) This concern with the possibility of higher prices in the future is in stark contrast to actually depriving consumers of a highly desirable product here in the present.

while Defendants argue the District Court failed to recognize that Plaintiff's injury

was caused by those same procompetitive public benefits. *Id.* at 21–25.

III. **THE DISTRICT COURT'S ANALYSIS OF ANTICOMPETITIVE EFFECTS IGNORED FUNDAMENTAL PRINCIPLES CONCERNING PROCOMPETITIVE BENEFITS OF VERTICAL INTEGRATION**

Finally, the District Court's analysis of certain purported anticompetitive

effects of the joint venture (Op.46–53) rests on a fundamental misunderstanding of

antitrust principles. In particular, the Ruling reflects an outmoded and unwarranted

hostility toward vertically integrated firms.

A. The Joint Venture Implements a Vertical Relationship with Respect to Programming and Distribution

The joint venture is owned by a consortium of multimedia and entertainment

companies that own television networks that are the programmers of live sporting

events. (Op.9.) The programmers negotiate with distributors (such as Fubo,

Verizon Fios, Comcast, and others); these distributors play the sports programming

on television or online. (Op.9–10.) The joint venture's aim is to provide a

"streaming application" that would provide live-sports programming *directly* to

consumers—and this streaming application would distribute sports programming

that the television networks own. In other words, the joint venture reflects a

vertical production-distribution relationship. *See Yankees Ent. & Sports Network,*

*LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 664 n.6 (S.D.N.Y. 2002)

16

("'Vertical integration' refers to Cablevision's ownership of both a distribution facility and programming networks.").

    B.    The District Court Did Not Apply Antitrust Principles on Vertical Integration

The District Court reasoned that the joint venture would harm competition because Defendants would now have greater "leverage" in negotiating with other distributors like Plaintiff. (*See* Op.51–53.) The theory is that if Defendants are not satisfied with the price that other distributors like Plaintiff are willing to pay for the right to distribute Defendants' programming, then Defendants have a "backstop" because they can choose to distribute instead through their own distribution system—the joint venture. (Op.51.)

This change in "leverage" does not typically present an antitrust concern. To the contrary, one of the primary reasons a manufacturer (or other upstream provider) will vertically integrate with a distributor (or other downstream provider) is precisely because the manufacturer is unhappy with its distribution deals and instead decides it would be better off doing its own distribution. Firms can vertically integrate to avoid being beholden to distributors; to do so they must often "create vertical integration efficiencies" in the production and distribution network; therefore "many if not most vertical mergers are either procompetitive or competitively neutral," David T. Scheffman and Richard S. Higgins, *Vertical Mergers: Theory and Policy*, 12 Geo. Mason L. Rev. 967, 972 (2004); Philip

17

Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 756a; *National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("vertical integration creates efficiencies for consumers"). The increase in "leverage" against other distributions can be an *effect* of a vertically integrated firm *achieving* such efficiencies.

The fact that the participants in a vertically-integrated programming and distribution venture would "increase their leverage" (Op.51) in negotiations with other distributors, such as Plaintiff, is a feature, not a bug. Defendants were free to determine that Plaintiff was a middleman that Defendants didn't need. Plaintiff will need to innovate—Plaintiff will need to improve its efficiency or will need to improve its customer experience so that it can attract or keep subscribers and become more profitable. Then it can pay the prices that Defendants will charge for the right to distribute Defendants' sports programming. These competitive forces have a downward pressure on prices and tend to increase consumer choice, some of the very *benefits* of vertically-integrated operations. *See Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 990 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("Vertical integration and vertical contracts in a competitive market encourage product innovation, lower costs for businesses, and create efficiencies— and thus reduce prices and lead to better goods and services for consumers."); Robert H. Bork, *The Antitrust Paradox* 227 (2d ed. 1993) ("Vertical mergers may

18

cut sales and distribution costs, facilitat[ing] the flow of information between levels of the industry [and] creat[ing] economies of scale in management, and so on.").

Antitrust law has no special sympathy for a distributor that is unable to compete on quality and price with other distributors. And whether those other, superior distributors are part of a vertically integrated firm is irrelevant in assessing anticompetitive effect. Vertical integration carries "no presumption of harm." *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 192 (D.D.C. 2018). Yet the District Court appears to have made such a presumption. The District Court essentially presumed that because an upstream provider has a vertical relationship with a downstream provider and thus by definition increased its leverage against other downstream providers, the result is anticompetitive. That conclusion is simply unjustified. The District Court appears to have been focused on finding harm to one particular *competitor* (Plaintiff), when instead it should have focused on whether there was harm to *competition*.

## CONCLUSION

For the reasons above, this Court should vacate and reverse.

19

Dated:    September 27, 2024
          New York, New York

/s/ *Brendon DeMay*

Brendon DeMay
Zachary Kerner
Brian T. Goldman
HOLWELL SHUSTER
 & GOLDBERG LLP
425 Lexington Avenue
New York, NY 10017
(646) 837-5151

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 4,615 words calculated by the word processing system used in its preparation, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

September 27, 2024

*/s/ Brendon DeMay*
Brendon DeMay

**CERTIFICATE OF SERVICE**

I hereby certify that on September 27, 2024, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of Appeals

for the Second Circuit using the appellate CM/ECF system.  I certify that all

participants in the case are registered CM/ECF users and that service will be

accomplished by the CM/ECF system.


September 27, 2024


                                       */s/ Brendon DeMay*
                                       Brendon DeMay