# 24-2210

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

## 𝔖𝔢𝔠𝔬𝔫𝔡 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

FUBOTV INC., FUBOTV MEDIA INC.,

*Plaintiffs-Appellees,*

– v. –

THE WALT DISNEY COMPANY, *et al.*,

*Defendants-Appellants.*

*(Full caption commences on inside cover)*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHRN DISTRICT OF NEW YORK

## BRIEF OF *AMICI CURIAE* INTERNATIONAL CENTER FOR LAW & ECONOMICS AND SCHOLARS OF LAW & ECONOMICS IN SUPPORT OF REVERSAL

AARON GOTT
BONA LAW PC
331 2nd Avenue S. #420
Minneapolis, MN 55401
(612) 284-5001

JAROD M. BONA
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589

*Counsel for* Amici Curiae *International Center for Law & Economics and Scholars of Law & Economics*

CP COUNSEL PRESS     (800) 4-APPEAL • (117134)

FUBOTV INC., FUBOTV MEDIA INC.,

*Plaintiffs-Appellees,*

– v. –

THE WALT DISNEY COMPANY, WARNER BROS. DISCOVERY, INC.,
ESPN, INC., ESPN ENTERPRISES, INC., HULU, LLC,
FOX CORPORATION,

*Defendants-Appellants.*

## CORPORATE DISCLOSURE STATEMENT

International Center for Law & Economics states that there is no parent corporation or any publicly held corporation that owns 10% or more of its stock.

Date: September 27, 2024

BONA LAW PC

*/s/ Aaron R. Gott*
AARON R. GOTT

*Counsel for* Amici Curiae *International Center for Law & Economics and Scholars of Law & Economics*

i

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES .....................................................................iv

INTEREST OF *AMICI CURIAE*...................................................................1

ARGUMENT ..................................................................................................3

    I.     FUBO WILL NOT SUFFER ANTITRUST INJURY FROM THE PROPOSED JOINT VENTURE .........................5

    II.    FUBO COMPLAINS OF A PRICE SQUEEZE BUT CANNOT ESTABLISH THE NECESSARY PREREQUISITES TO LIABILITY.........................................9

    III.   *COLUMBIA PICTURES*, WHICH TURNED ON AN EXCLUSIVITY PROVISION NOT PRESENT IN THE PROPOSED JOINT VENTURE, IS INAPPOSITE.............18

    IV.   THE DISTRICT COURT RELIED ON AN ANCILLARY NONCOMPETE AGREEMENT THAT IS IRRELEVANT TO FUBO'S CLAIM ............................................................21

    V.    THE COMPETITIVE SCENARIOS THAT THE DISTRICT COURT ASSUMED WOULD RESULT FROM ITS BLOCKING OF VENU ARE ECONOMICALLY IMPLAUSIBLE.....................................25

        A.    A Low-Priced, Comprehensive Sports Streaming Bundle Is Unlikely to Result from Defendants' Licensing Their Sports Content to Another Distributor on an Unbundled Basis.............................26

        B.    No Individual Defendant Is Likely to Offer a Live Sports-Streaming Bundle Matching Venu's Comprehensive Content and Relatively Low Price.....29

CONCLUSION ...............................................................................................33

ii

CERTIFICATE OF COMPLIANCE ........................................................ 35

ADDENDUM ................................................................................. 36

CERTIFICATE OF SERVICE ............................................................. 38

# TABLE OF AUTHORITIES

**Cases**                                                                         **Page(s)**

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)............................................................ 4

*Brantley v. NBC Universal, Inc.*,
  675 F.3d 1192 (9th Cir. 2012) ........................................... 12

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)...................................................... 4, 12

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)........................................................ 3, 4

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)................................................. *passim*

*Buccaneer Energy v. Gunnison Energy Corp.*,
  846 F.3d 1297 (10th Cir. 2017) ............................... 15, 17, 18

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986).......................................................... 3, 6

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
  370 U.S. 690 (1962).......................................................... 14

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984)...................................................... 3, 22

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  680 F. Supp. 3d 919 (N.D. Ill. 2023)....................... 15, 17, 18

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
  773 F.2d 1506 (9th Cir. 1985)........................................... 29

*Engine Specialties, Inc. v. Bombardier Ltd.*,
  605 F.2d 1 (1st Cir.1979) ................................................. 24

*FTC v. Qualcomm, Inc.*,
  969 F.3d 974 (9th Cir. 2020) ............................................................ 21

*In re HIV Antitrust Litig.*,
  656 F. Supp. 3d 963 (N.D. Cal. 2023) .......................................... 24

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) .................................................................... 3, 4

*Matsushita Elec. Indus. Co. v. Zenith Radio*,
  475 U.S. 574 (1985) ...................................................................... 28

*Murphy Tugboat Co. v. Crowley*,
  658 F.2d 1256 (9th Cir. 1981) ....................................................... 29

*Pacific Bell Tel. Co. v. Linkline Comm'cns., Inc.*,
  555 U.S. 438 (2009) ................................................................ *passim*

*Princo Corp. v. ITC*,
  616 F.3d 1318 (Fed. Cir. 2010) ..................................................... 24

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ..................................... 17

*United Food & Com. Workers Local 1776. v. Teikoku Pharma USA*,
  296 F. Supp. 3d 1142 ..................................................................... 29

*United States v. Addyston Pipe & Steel Co.*,
  85 F. 271 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899).................... 23

*United States v. AT&T Inc.*,
  310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029
  (D.C. Cir. 2019) ............................................................................. 32

*United States v. Columbia Pictures Indus., Inc.*,
  507 F. Supp. 412 (S.D.N.Y. 1980).......................................... *passim*

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963)......................................................................... 3

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .................................................................. *passim*

**Statutes and Rules**

15 U.S.C. §§ 1–7 ...................................................................... 15, 16, 17

15 U.S.C. §§ 12–27 ...................................................................... 7, 15, 16

Fed. R. App. P. 29 .............................................................................. 1

**Other Authorities**

Phillip Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841 (1989) .............................. 13

Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (CCH) (2018) ...................................................................................... 24

Yannis Bakos & Eric Brynjolfsson, *Bundling Information Goods: Pricing, Profits, and Efficiency* ................ ........................ 12, 13

Augustin Cournot, *Researches into the Mathematical Principles of the Theory of Wealth* (Nathaniel T. Bacon, trans., 1897) .............................................................................. 30

Makan Delrahim, *"Harder, Better, Faster, Stronger": Evaluating EDM as a Defense in Vertical Mergers*, 26 Geo. Mason L. Rev. 1427 (2019) .................................................. 30

Herbert Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L.J. 1952 (2021) .................................................................. 3

Thomas A. Lambert, *Appropriate Liability Rules for Tying and Bundled Discounting*, 72 Ohio St. L.J. 909 (2011) .................................................................. 12

vi

Thomas A. Lambert, *The Efficiency of Cable Bundling*, Truth
on the Market (July 10, 2011),
https://truthonthemarket. com/2011/07/10/the-efficiency-
of-cable-bundling/..................................................................... 12

Marginal Revolution University, *Double Marginalization
Problem*, https://www.youtube.com/watch?v=7MPdKMe
Gcv8.................................................................................. 30, 31

Hugo Sonnenschein, *The Dual of Duopoly Is Complementary
Monopoly: or, Two of Cournot's Theories Are One*, 76 J. Pol.
Econ. (1968)......................................................................... 30

# INTEREST OF *AMICI CURIAE*[1]

The International Center for Law & Economics (ICLE) is a nonprofit, non-partisan global research and policy center aimed at building the intellectual foundations for sensible, economically grounded policy. ICLE promotes the use of law and economics methodologies to inform public policy debates and has longstanding expertise in the interpretation and proper implementation of the U.S. antitrust laws.

*Amici* also include 12 scholars of antitrust law and economics at leading universities and research institutions across the United States. Their names, titles, and academic affiliations are listed in the Addendum. All possess expertise in, and collectively have conducted copious research on, antitrust law and economics.

*Amici* have an interest in the proper development of antitrust jurisprudence and believe the district court's decision, if left to stand,

---

1. Under Federal Rule of Appellate Procedure 29(c), *amici curiae* state that no party's counsel authored this brief in whole or in part, and no party or its counsel made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici* or their counsel contributed money that was intended to fund preparing or submitting the brief. All parties have consented to *amici*'s filing of this brief.

1

would undermine the fundamental goal of the antitrust laws: the protection of market competition.

# ARGUMENT

Federal courts have tremendous remedial powers under the U.S. antitrust laws. *See* Herbert Hovenkamp, *Antitrust and Platform Monopoly*, 130 Yale L.J. 1952, 2005 (2021) ("Antitrust's provisions for public equitable relief are extremely broad, with no explicit restriction on the nature of the relief."). They may prevent mergers or acquisitions *ex ante* or unwind them *ex post,* and they may prohibit all manner of concerted or unilateral action in commerce. Not surprisingly, firms often attempt to coopt these powers for their own advantage, petitioning courts for remedies that will aid them in competing against existing or potential rivals.

For that reason, the U.S. Supreme Court has repeatedly cautioned that "[t]he antitrust laws . . . were enacted for the 'protection of competition, not competitors.' " *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).[2] Across decades of decisions, the Court has

---

2.      *See also United States v. Phila. Nat'l Bank*, 374 U.S. 321, 367 n.43 (1963) (quoting *Brown Shoe*, 370 U.S. at 320); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767, n.14 (1984) (quoting *Brunswick*, 429 U.S. at 488); *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 (1986)

consistently recognized that this is the very "purpose of the antitrust laws." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 906 (2007).

This bedrock principle is a veritable mantra in antitrust jurisprudence. And yet it is flatly inconsistent with the decision below. Plaintiff FuboTV is a seller in a market the district court defined as the "live pay TV market."[3] Defendants Disney, Fox, and Warner Brothers Discovery have proposed to enter that market and compete with Fubo through a joint venture called Venu Sports. Venu will combine the three defendants' sports programming into a live-streaming offering for consumers who desire live sports programming. That programming is also available on Fubo. But because Venu will include only sports content, it will retail for a lower price than Fubo. In the words of the

---

(quoting *Brunswick*, 429 U.S. at 488); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (quoting *Brown Shoe*, 370 U.S. at 320); *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993) (quoting *Brown Shoe*, 370 U.S. at 320); *Leegin Creative*, 551 U.S. at 906 (quoting *Atl. Richfield*, 495 U.S. at 338).

3.    Amici take no position here on whether the district court correctly defined the relevant market. For reasons stated below, even if the district court's definition of the relevant market its correct, the preliminary injunction it entered is unwarranted. August 20, 2024 Op. & Order ("O&O") ECF 2.

district court, "[t]he target consumer will—for the first time—be able to subscribe to a vast array of the sports content he or she wants, without paying for entertainment content he or she does not." O&O at 19. By enjoining the JV's entry into the market, the district court protected Fubo from having to compete with this new and attractive offering and therefore inverted the fundamental antitrust principle articulated time and again by the Supreme Court: It allowed Fubo to use antitrust law to protect itself—a competitor—from competition. In particular, the district court (1) ignored the antitrust injury requirement and allowed Fubo to coopt the antitrust laws to insulate itself from competition, (2) flouted Supreme Court limits on price squeeze claims, (3) misapplied an inapposite and likely abrogated case involving a joint venture injunction, (4) cynically condemned a standard ancillary and necessary joint venture restraint, and (5) presumed economically irrational behavior would fill the competitive gap created by the injunction barring Venu's entry. This Court should reverse.

## I. FUBO WILL NOT SUFFER ANTITRUST INJURY FROM THE PROPOSED JOINT VENTURE

The Supreme Court imposes a threshold requirement on all private antitrust plaintiffs to ensure they cannot coopt the antitrust laws to

protect themselves from competition: they must establish that they have suffered "antitrust injury," which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489. Because the antitrust laws were intended to prevent competition-reducing behavior in the market, each antitrust plaintiff must demonstrate that its complained-of harm is a result of diminished—not enhanced—competition. This requirement applies even if the plaintiff is, like Fubo, seeking only injunctive relief. *Cargill,* 479 U.S. at 113 ("[W]e conclude that in order to seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.' ") (citing *Brunswick*, 429 U.S. at 489).

The proposed joint venture—the only conduct the district court condemned—creates no antitrust injury for Fubo. Fubo complains that the JV will prove so popular among Fubo's customer base that the JV will win significant business from Fubo, preclude its hoped-for—but never realized—profitability and threaten its continued viability. But those effects would be harms to an individual competitor, not competition, and

6

they stem from *increased*, not diminished, competition. Indeed, Fubo's asserted injury resembles that alleged in *Brunswick*. The plaintiff there brought a claim under Section 7 of the Clayton Act—the statute under which the district court condemned the JV here—alleging that the challenged merger reduced its profits by causing it to face greater competition. *Brunswick*, 429 U.S. at 488. Such injury, the Court held, is not antitrust injury and cannot sustain a Section 7 claim. *Id*.

Astoundingly, the district court's order never even mentions the term *antitrust injury*. The closest reference to the concept—a prerequisite to any private antitrust enforcement action—appears in a footnote:

> The JV Defendants also argue that any harm to Fubo from the JV is the result of legitimate competition at work. *See* Opp. at 54–55. However, since the Court herein finds that Fubo is likely to succeed on its Section 7 claims, it is also likely that any such competition posed by the JV is contrary to the antitrust laws.

O&O at 56 n.38.

To the extent this brief and passing remark is intended to address the antitrust injury requirement, it fundamentally conflicts with the Supreme Court's holding in *Brunswick*. The district court appears to have reasoned that a Section 7 plaintiff may maintain its action if it shows that a violation of Section 7 injured it (or is likely to do so). But

*Brunswick* expressly rejected that reasoning. The Supreme Court there took *as given* that the challenged merger both violated Section 7 and harmed the plaintiff. *Brunswick*, 429 U.S. at 484 ("[Defendant] does not presently contest the Court of Appeals' conclusion that a properly instructed jury could have found the acquisitions unlawful. Nor does [defendant] challenge the Court of Appeals' determination that the evidence would support a finding that had [defendant] not acquired these centers . . . [plaintiffs'] income would have increased."). Nevertheless, the Court concluded that the plaintiff did not suffer antitrust injury and could not maintain its claim. *Id.* at 488–89. *Brunswick* thus demonstrates that proving a Section 7 violation and resulting harm is not sufficient to establish antitrust injury.

Because the district court did not require Fubo to demonstrate antitrust injury, and because Fubo's anticipated injury from the enjoined JV results from an enhancement of competition in the live pay TV market, the district court committed reversible error. This Court should vacate the injunction, reverse the district court, and reaffirm the long-established principle that the antitrust laws protection competition, not competitors.

## II. FUBO COMPLAINS OF A PRICE SQUEEZE BUT CANNOT ESTABLISH THE NECESSARY PREREQUISITES TO LIABILITY

By the district court's own admission, the conduct it enjoined— defendants' launching of the JV—would increase competition in the live pay TV market and benefit consumers. O&O at 51 ("The JV will offer consumers an option to receive their must-have live sports content at a fraction of the cost of what current [sellers in the live pay TV market] can offer."); *id*. at 19 ("The target consumer will—for the first time—be able to subscribe to a vast array of the sports content he or she wants, without paying for entertainment content he or she does not."). The district court maintained, though, that the JV cannot be assessed in isolation. When examined in light of defendants' alleged practices of licensing their sports content only when bundled with their non-sports content, the court reasoned, the JV is likely anticompetitive. *Id*. at 45–46 ("[B]undling has been uniformly and systematically imposed on each distributor in the live pay TV industry except the JV, preventing any other distributor from offering a multi-channel sports-focused streaming service. . . . [T]he JV is the vehicle through which the JV Defendants will capitalize on this opportunity, to potential anticompetitive effects.").

9

The problem with imposing liability on that basis is that the anticompetitive conduct the district court purported to identify is a "price-squeeze," and the court did not find (because Fubo could not establish) the necessary prerequisites for condemning such a practice.

A price squeeze may result "when a vertically integrated firm sells inputs at wholesale and also sells finished goods or services at retail." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 442 (2009). As the Supreme Court has explained:

> If that firm has power in the wholesale market, it can simultaneously raise the wholesale price of inputs and cut the retail price of the finished good. This will have the effect of 'squeezing' the profit margins of any competitors in the retail market. Those firms will have to pay more for the inputs they need; at the same time, they will have to cut their retail prices to match the other firm's prices.

*Id.*

This precisely describes the conduct Fubo attacked: defendants participate in the upstream wholesale market as licensors of television programming. By licensing their sports content only on a bundled basis (so that licensees must also pay to license unwanted non-sports programming), they allegedly raise the effective price of the sports programming that is a necessary input for a live sports streaming service.

10

Then, because they license their sports content to their own JV on an unbundled—and thus cheaper—basis, they charge lower prices in the downstream retail market, pressuring rival sports streaming services to cut their retail prices. This pattern of behavior squeezes the profits of the defendants' retail competitors, including Fubo.

In *Linkline*, the Supreme Court set forth the requirements for a plaintiff that seeks to establish antitrust liability for an alleged price squeeze. The Court held that the plaintiff must prove either (a) that the defendant owed and breached an antitrust duty to deal with the plaintiff on particular terms in the wholesale market or (b) that the defendant engaged in predatory pricing in that it: (i) charged a below-cost price in the retail market and (ii) was likely to recoup its losses from such below-cost pricing through future supracompetitive pricing once its competition was eliminated or weakened. *Id*. at 452 ("If there is no duty to deal at the wholesale level and no predatory pricing at the retail level, then a firm is certainly not required to price *both* of these services in a manner that preserves its rivals' profit margins.").[4]

---

4. Note that with respect to the upstream duty to deal, the Court held that "a firm with no duty to deal in the wholesale market has no

11

Fubo did not show it was likely to prove either a duty to deal or predatory pricing. With respect to a duty to deal, the district court repeatedly emphasized that it was not concluding that defendants had an antitrust duty to license their sports programming on an unbundled basis.[5] *See* O&O at 4 ("The Court need not, and does not, reach the

---

obligation to deal under terms and conditions favorable to its competitors." *Linkline*, 555 U.S. at 450–51. And with respect to predatory pricing in the downstream market, the Court held that "to prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) 'the prices complained of are below an appropriate measure of its rival's costs'; and (2) there is a 'dangerous probability' that the defendant will be able to recoup its 'investment' in below-cost prices." *Id*. at 451 (citing *Brooke Grp.*, 509 U.S. at 222–24).

5.    This is no surprise. As the district court observed, bundling of television programming by content providers is a ubiquitous and long-standing practice. O&O at 2 ("These bundling requirements are not unique to Fubo's contracts with the JV Defendants; bundling has been a pervasive industry practice for decades. . . . "); *id*. at 10 ("Bundling has been an industry-wide practice for at least four decades. Bundling is ubiquitous because in many cases, at least some subset of consumers enjoy having ready access to hundreds of channels and doing so on a less-expensive basis than they otherwise would if they paid for each channel individually."). Prior antitrust challenges to such bundling have failed, *see Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012), and the practice generates efficiencies. *See* Thomas A. Lambert, *The Efficiency of Cable Bundling*, Truth on the Market (July 10, 2011) (https://truthonthemarket.com/2011/07/10/the-efficiency-of-cable-bundling/); Thomas A. Lambert, *Appropriate Liability Rules for Tying and Bundled Discounting*, 72 Ohio St. L.J. 909, 950–53 (2011); Yannis

question of the legality of bundling at this stage of the case."); *id.* at 45 ("[T]he Court need not (and does not) determine the legality of programmers' bundling practices in order to decide this Motion. . . ."); *id.* ("[W]hether bundling is itself illegal under the antitrust laws is not a question currently before the Court."); *id.* at 55 ("If bundling (as to Fubo specifically or as a general industry practice) is to be struck down as an antitrust violation, it should come only after a full trial on the merits.").

With respect to predatory pricing, Fubo produced no evidence, nor did it argue, that the JV would charge below-cost retail prices and ultimately

---

Bakos & Eric Brynjolfsson, *Bundling Information Goods: Pricing, Profits, and Efficiency*, 45 Mgmt. Sci. 1613 (1999). There is also no logical stopping point to a "Thou shalt offer TV content on an unbundled basis" rule. Must a programmer license individual television shows (e.g., *Seinfeld* only)? Individual seasons (e.g., only *Seinfeld* season eight)? Individual episodes (e.g., only episode 138: "The Little Kicks")? Individual scenes within episodes (e.g., the one where Elaine dances)? As the Supreme Court has cautioned (quoting Professor Phillip Areeda), "No court should impose a duty to deal that it cannot explain or adequately and reasonably supervise. The problem should be deemed irremediable by antitrust law when compulsory access requires the court to assume the day-to-day controls characteristic of a regulatory agency." Phillip Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841, 853 (1989). *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 (2004).

recoup its losses by charging monopoly prices once its rivals were extinguished. Thus, Fubo's challenge to the "one-two punch" of the JV's entry into the live pay TV market *coupled with* defendants' bundled licensing practices—an effective price squeeze claim—is legally deficient.

The district court rejected this reasoning on two grounds, each of which is unsound. First, it contended that defendants' alleged misconduct should not be parsed into its component parts—the individual defendants' bundling practices and the JV's entry into the retail market at a low price point—to analyze the legality of each separately. O&O at 37. This approach, the district court said, would disregard the Supreme Court's 1962 instruction that " 'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Id.* (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). But in 2009, the Supreme Court mandated precisely this sort of "compartmentalizing" approach for price squeeze claims such as that advanced by Fubo. *Linkline*, 555 U.S. 438. In *Linkline¸* the Court held that "[i]f there is no duty to deal at the wholesale level and no predatory pricing at the retail level, then a firm is certainly

14

not required to price *both* of these services in a manner that preserves its rivals' profit margins." *Id*. at 452.

The district court also asserted two reasons why neither *Linkline* nor one of the cases upon which its holding rested, *Trinko*, apply to Fubo's claims. (*Trinko* narrowly constrained the circumstances in which an antitrust duty to deal exists. 540 U.S. at 408–10.)[6] The district court first claimed that *Linkline* and *Trinko* are irrelevant here because they "involved actions brought under Section 2 of the Sherman Act, not Section 7 of the Clayton Act, and primarily allege specific technical *per se* violations of the Sherman Act not applicable here." O&O at 36. It then stated that "courts have been clear that the 'no duty to deal' defense raised by the JV defendants in reliance on *Linkline* and *Trinko* is not a defense to concerted actions." *Id*. at 37 (citing *Buccaneer Energy v. Gunnison Energy Corp.*, 846 F.3d 1297, 1309 (10th Cir. 2017); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 1004 (N.D. Ill. 2023)). Neither assertion is availing.

---

6.    *Trinko* is highly relevant to Fubo's claim that defendants owed some antitrust duty to license their sports content on an unbundled basis. Because the district court did not assess the legality of defendants' bundling practices, amici do not discuss *Trinko* in detail here.

With respect to the first, the court was wrong to claim that *Linkline* and *Trinko* "primarily allege specific technical *per se* violations of the Sherman Act." O&O at 36. The complained of conduct in *Trinko* was a unilateral refusal to deal on particular terms; in *Linkline*, it was a price squeeze. Neither behavior is *per se* illegal under the Sherman Act. Moreover, it is irrelevant that the claims in those cases were based on Section 2 of the Sherman Act rather than Section 7 of the Clayton Act. As explained above, the theory of harm underlying Fubo's Section 7 claim is that the launching of the JV will produce an illegal price squeeze. *See supra* § II. The legality of price squeezes must be assessed under *Linkline*. And when, as here, price squeeze defendants have not engaged (and are not expected to engage) in predatory pricing in the downstream market, the legality of their behavior turns on whether they possessed and breached an antitrust duty to deal on particular terms in the upstream market. *Linkline*, 555 U.S. at 452. That matter is governed by *Trinko*. 540 U.S. at 408–11. Defendants' reliance on *Linkline* and *Trinko* is thus not "inapt," as the district court asserted. O&O at 36.

Nor is the distinction between concerted action and single-entity conduct relevant under these circumstances, because the district court

enjoined a proposed joint venture under Section 7 of the Clayton Act. *Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006) ("When persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit . . . such joint ventures [are] regarded as a single firm competing with other sellers in the market." (citations omitted)). Regardless, courts have not held that *Trinko*'s limits on an antitrust duty to deal do not apply whenever a claim involves any sort of concerted conduct. One of the cases the district court cited in support of that proposition held merely that *Trinko* does not apply to one *type* of concerted conduct: concerted *refusals to deal* (i.e., agreements among firms not to deal with a particular rival). *Buccaneer*, 846 F.3d at 1309 (observing that "*Trinko* simply does not speak to claims, like those here, alleging concerted refusals to deal").[7] The other is a district court case that simply repeats the point. *Dealer Mgmt.*, 680 F. Supp. 3d at 1004

---

7.     In *Buccaneer*, two natural gas firms refused to transport gas for a rival using their jointly owned pipelines. 846 F.3d at 1302, 1306. The refusal to deal was itself concerted conduct. *Id.* at 1306 ("Buccaneer contends Defendants' agreement to deny it reasonable access to the RM System was a concerted refusal to deal that violated § 1 of the Sherman Act.").

("True, the 'general right to refuse to deal with competitors' applies only to unilateral refusals.") (citing *Buccaneer*, 846 F.3d at 1309).

The refusal to deal component of Fubo's claim—its assertion that each defendant refuses to license its sports content on the "skinny" basis Fubo would prefer—alleges *unilateral*, not concerted, refusals. So the cases cited by the district court are inapplicable.

Fubo's challenge to the totality of defendants' sports-content practices—each defendant's alleged unilateral practice of refusing to license such content on an unbundled basis, coupled with the defendants' collective entry into the downstream sports streaming market at a low price point—is a price squeeze claim. Because Fubo has not shown a likelihood of proving either an antitrust duty to deal in the wholesale licensing market or predatory pricing in the retail sports streaming market, it is unlikely to succeed on the merits of its underlying action. This Court should therefore vacate the district court's injunction.

## III. *COLUMBIA PICTURES*, WHICH TURNED ON AN EXCLUSIVITY PROVISION NOT PRESENT IN THE PROPOSED JOINT VENTURE, IS INAPPOSITE

The primary precedent the district court relied on in enjoining the launch of Venu was *United States v. Columbia Pictures Industries, Inc.*,

18

507 F. Supp. 412 (S.D.N.Y. 1980). In that case, the court enjoined four major U.S. film producers from launching "Premiere," a joint venture that would enter the growing pay television market to compete with existing services like HBO, Showtime, and The Movie Channel. *Id.* at 434. The four joint venturers would combine their film content, distribute it via television to subscribers, and share revenues. *Id.* at 419–20. According to the district court here, Premiere "present[ed] a scenario strikingly similar to this case" in that it was conceived "[a]t an analogous time of rapid change in the television and film industry," was comprised of participants "that controlled just over half" of the content needed for a service of its sort, and enabled participants "to capture a share of the burgeoning pay TV movie channel market." O&O at 36.

*Columbia Pictures* was decided long before *Trinko* recognized the significant limits of an antitrust duty to deal. But there is another outcome-determinative difference between the enjoined Premiere joint venture and the one at issue here. With Venu, the defendant joint venturers will be free to—and will—license their sports programming to rival distributors; those rivals will not be denied any content available to the JV. *Id.* at 22. With Premiere, by contrast, the joint venture was to

19

have the exclusive right to distribute the four participants' films for a nine-month period. *Columbia Pictures*, 507 F. Supp. at 419 ("The joint venture agreement provides that Premiere is to have certain films distributed by the movie company venturers available to it exclusively for a nine-month period, before those films are shown on the existing satellite-fed network programming services.").

The district court here downplayed this difference between Premiere and Venu, observing in a footnote that "[t]he decision in *Columbia Pictures* did not rest solely on the anticompetitive effects of this 'exclusivity' provision." O&O at 36 n.30. A fair reading of *Columbia Pictures*, however, suggests that the nine-month exclusivity provision was essential to the court's decision to enjoin Premiere. Most notably, the court concluded that the exclusivity provision was probably a *per se* illegal group boycott. *Columbia Pictures*, 507 F. Supp. at 428, 429. In addition, the court repeatedly stressed the centrality of the exclusivity provision to the joint venturers' economic interests and to the anticompetitive effect of the venture. *Id.* at 420–21, 430–32.

The *Columbia Pictures* court rightly fixated on the exclusivity provision of the Premiere joint venture because that feature is what

20

rendered the venture anti-, rather than pro-, competitive. Had it launched, Premiere would have hobbled its rivals by denying them access to inputs they needed for success. Their harm would have resulted from an effort *to reduce* competition—i.e., to make them less competitive. With Venu, which includes no exclusive licensing commitments from its participants, rivals' access to needed inputs will not change and any harm they suffer will be the result of *increased* competition—the entry of a new streaming service offering a product consumers are demanding. As the Ninth Circuit recently observed, there is a difference "between *anti*competitive behavior, which is illegal under federal antitrust law, and *hyper*competitive behavior, which is not." *FTC v. Qualcomm, Inc.*, 969 F.3d 974, 982 (9th Cir. 2020). Holding back one's competitors, as Premiere did, is anticompetitive. Entering their market with a superior offering, as defendants seek to do through Venu, is not.

## IV. THE DISTRICT COURT RELIED ON AN ANCILLARY NONCOMPETE AGREEMENT THAT IS IRRELEVANT TO FUBO'S CLAIM

In concluding that Fubo was likely to succeed in proving that the JV would harm competition, the district court made much of a non-compete agreement among the defendants. According to the court, that

agreement "forbids the JV Defendants from 'owning any form of equity interest, including a revenue-sharing or profit-sharing interest, in a commercial venture, where the focus of the commercial venture is the operation of a sports-centric [live-streaming service] similar to the JV Platform for a period of three (3) years from the Launch Date.'" O&O at 47 (quoting PX289 at 17). The court concluded that the non-compete agreement has "significant 'anticompetitive potential' [and] warrants scrutiny even in the absence of incipient monopoly." O&O at 49 (quoting *Copperweld Corp.*, 467 U.S. at 769).

Although the court was right to "scrutin[ize]" the noncompete agreement and assess its "anticompetitive potential" (as all features of a challenged joint venture should be evaluated for anticompetitive potential), this noncompete agreement is almost certainly procompetitive. O&O at 49. The agreement does not preclude the defendants from licensing their sports content—even on an unbundled basis—to any rival. *Id.* at 48 ("This non-compete agreement does not prevent the JV Defendants from licensing their programming to other [live pay TV distributors]. . . ."). All it requires is that they not invest in a sports-streaming service that competes with their own joint venture.

22

Such a commitment prevents each individual joint venture participant from free-riding on the JV's efforts to develop the market for comprehensive sports-only live streaming services (e.g., by introducing the novel service to consumers). Absent the noncompete, one of the JV defendants could rely on *all* the joint venturers to share those market development costs and then take a stake in a new rival that would not need to incur them. From the earliest days of federal antitrust law, non-compete agreements aimed at preventing such free-riding and thereby facilitating the creation of a venture have been deemed reasonable, and thus legal, as ancillary restraints. *See United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 280 (6th Cir. 1898), *aff'd*, 175 U.S. 211 (1899) (observing that "[r]estrictions in the articles of partnership upon the business activity of the members, with a view of securing their entire effort in the common enterprise, were, of course, only ancillary to the main end of the union, and were to be encouraged"); *id.* at 281 ("[C]ovenants in partial restraint of trade are generally upheld as valid when they are agreements . . . by a partner pending the partnership not

to do anything to interfere, by competition or otherwise, with the business of the firm. . . .").[8]

Because the defendants continue to license their content to others, the non-compete agreement does not eliminate competition but rather fosters the JV's ability to compete effectively. In short, there is nothing nefarious about the limited non-compete agreement among the Venu venturers.

---

8. *See also Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 11 (1st Cir. 1979) (agreement that "neither of the parties to the joint venture will compete with it" is "not offensive in and of itself"); *Princo Corp. v. ITC*, 616 F.3d 1318, 1336 (Fed. Cir. 2010) (observing that "ancillary restraints" that are often "important to collaborative ventures [include] agreements between the collaborators not to compete against their joint venture"); *In re HIV Antitrust Litig.*, 656 F. Supp.3d 963, 993 (N.D. Cal. 2023) (observing that "[c]ourts and other authorities have recognized that free riding is a legitimate concern when people or entities embark on a joint venture" and concluding that noncompete provisions among collaborating drug companies "may have facilitated the collaboration[]" because "they arguably prevented a collaborator from free riding on the efforts of the joint venture"); Philip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (CCH) 2213c2 (2018) (observing that: "[J]oint venturers may have quite legitimate reasons for restraining members' competitive business outside the venture. Most such concerns apply to some variation of the free rider problem.").

## V. THE COMPETITIVE SCENARIOS THAT THE DISTRICT COURT ASSUMED WOULD RESULT FROM ITS BLOCKING OF VENU ARE ECONOMICALLY IMPLAUSIBLE

In enjoining the launch of Venu, the district court stripped consumers of a novel offering for which there is significant demand: a sports-focused, live-streaming service featuring a vast array of content at a low price point. Insulating Fubo from competition by such a service, and denying it to consumers, could be justified only if preventing competition were likely to generate greater competition and enhance consumer welfare in the future. But the rosy competitive future the district court assumed would result from its barring of Venu is implausible.

The district court asserted that "the existence of the JV itself incentivizes the JV Defendants to prevent and suppress other potential sports-focused bundles from meaningfully competing" because "[t]he JV Defendants know the unique value of their unbundled sports programming and are aware that any competitor offering such unbundled live sports will devalue the JV." O&O at 49. Implicit in those remarks is the assumption that if Venu is enjoined, other live-streaming services offering the same sports-only content are more likely to enter the

25

market. It is highly unlikely, though, that enjoining Venu would result in the entry of a streaming service offering sports-only content as extensive as that available on Venu and at a similar price point.

The district court suggested that such an offering could come about in two ways: by all the defendants' deciding to license their sports content on an unbundled basis to another distributor or by a defendant's launching its own sports-only streaming service featuring its sports content and that licensed on an unbundled basis from the other defendants. *Id.* at 50 ("For such a competitor to emerge, in all likelihood one or more of the JV Defendants would have to be involved in launching it, whether by [1] agreeing to fully unbundle their sports channels for another distributor, or [2] launching a [streaming] service themselves that would feature their own sports channels alongside licensed sports channels from other programmers.").

Both of those scenarios are improbable.

### A. A Low-Priced, Comprehensive Sports Streaming Bundle Is Unlikely to Result from Defendants' Licensing Their Sports Content to Another Distributor on an Unbundled Basis

The defendants each hold exclusive rights to high-demand sports content and can therefore earn supracompetitive profits from licensing

26

their sports programming.[9] They could capture such profits by licensing their sports programming at very high prices. They have chosen instead to charge lower prices for their sports content but to require that licensees also license, at profit-generating prices, other content they control. Such bundling allows defendants to capture the profits their valuable sports programming makes possible—and to which they are entitled, *see supra* note 9—while subsidizing less popular content.

The district court assumed that if Venu is blocked, the defendants may eventually respond to consumer demand for a comprehensive, sports-focused live-streaming service by licensing their sports content on an unbundled basis to a third-party distributor. O&O at 50 (hypothesizing that defendants may "fully unbundle their sports channels for another distributor"). But given that bundling is the current

---

9. Antitrust law permits—indeed, encourages—firms that have gained monopoly power legitimately to earn supracompetitive profits. *See Linkline*, 555 U.S. at 454 ("[A]ntitrust law does not prohibit lawfully obtained monopolies from charging monopoly prices."); *Trinko*, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth.").

means by which defendants extract transactional surplus and capture the profits the law permits them to earn, it would be economically irrational for them to unbundle their sports content *without simultaneously raising the price of their unbundled sports content*. If they unbundled their sports content but charged more for it, a third-party could offer a sports-focused live-streaming service, but only at a high price reflecting the high cost of its content. The alternative offering—if one came to pass—would therefore lack an essential feature of Venu: its relatively low price.

In reasoning that the blocking of Venu may lead defendants to license their sports content to a third-party distributor on an unbundled basis *and* at prices that would allow the distributor to match Venu's price, the district court assumed defendants would act against their own economic interests. Antitrust law, though, rejects theories that assume economically irrational behavior. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–95 (1985) (granting summary judgment for defendants because plaintiffs' theory of conspiracy assumed economically irrational behavior). It also requires courts to assume rational behavior in hypothesizing scenarios that would exist "but for"

28

the conduct under review. *See, e.g., Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1510–11 (9th Cir. 1985) (Plaintiffs "must presume the existence of rational economic behavior in the hypothetical free market."); *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981) ("[E]conomic rationality must be assumed for all competitors, absent the strongest evidence of chronic irrationality."); *United Food & Com. Workers Local 1776 v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1179 n.42 ("[I]n construct[ing] but-for world scenarios, there is a presumption of economical rationality."). Because it would be economically irrational for defendants to respond to the blocking of Venu by unbundling their sports content without raising its price, this Court should not credit the district court's assumption that enjoining the launch of Venu would likely result in third-party offerings matching Venu's quality (i.e., its comprehensive sports coverage) and price.

### B. No Individual Defendant Is Likely to Offer a Live Sports-Streaming Bundle Matching Venu's Comprehensive Content and Relatively Low Price

The second purportedly superior outcome the district court assumed might result from its blocking of Venu—individual defendants' launching of their own sports-only live-streaming services featuring their

own offerings and those licensed from the other defendants—is similarly implausible, at least at prices as low as Venu's. That is because of a pricing dynamic known as "double marginalization." As a threshold matter, two of the three defendants had already entered or announced their own sports streaming services in addition to Venu, and there is no record evidence that the third was going to contemplate entry without Venu.

Double marginalization tends to result when two firms that separately sell complements that are used in combination to produce a "downstream" product or service—for example, the separate bits of sports programming that must be combined to create a comprehensive sports-streaming service—both possess power over pricing. *See generally* Makan Delrahim, *'Harder, Better, Faster, Stronger': Evaluating EDM as a Defense in Vertical Mergers*, 26 Geo. Mason L. Rev. 1427, 1429–30 (2019) (explaining the economics of double marginalization).[10]

---

10.    The basic concept of the double marginalization pricing externality was introduced by Cournot in 1838, Augustin Cournot, *Researches into the Mathematical Principles of the Theory of Wealth* (Nathaniel T. Bacon, trans., 1897), and formalized by Sonnenschein in 1968, Hugo Sonnenschein, *The Dual of Duopoly Is Complementary Monopoly: or, Two of Cournot's Theories Are One*, 76 J. Pol. Econ. 316 (1968). For an

Potential consumers of the downstream product—in this case, the comprehensive package of sports programming—mainly care about the total price they pay for the product (or package) that they seek. That is true if the consumer is purchasing the complete package from a single seller or cobbling the desired package together from multiple sellers. If a single firm controlled all the complements, it would set that combined price at a level that maximizes its profits.

When the component parts of an offering are sold by separate sellers who each have power over pricing for the component they sell, each has an incentive to price its own component at a level that will enable it to capture as much of the available profits on the combined offering as possible. But if each component seller takes that tack, the combined price of the separately sold components will exceed the profit-maximizing price of a single offering that combines them. If the separate component sellers were to combine, the combination would have an incentive to set a lower aggregate price for the components—one that would maximize the sellers' profits on the combined offering. Such a move

_____

informative video explanation of the double marginalization problem, *see* Marginal Revolution University, *Double Marginalization Problem*, https://www.youtube.com/ watch?v=7MPdKMeGcv8.

would benefit the sellers *and consumers*, who would enjoy lower package prices. *See United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 197 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) (explaining how merger of complement producers benefits consumers by eliminating double marginalization). In short, both individual component sellers (here, the three defendant programmers) and consumers benefit from the elimination of double—or here, triple—marginalization.

Because the second competitive scenario the district court envisioned contemplates each defendant's separately pricing its sports content, it would entail triple marginalization. Each defendant's attempt to set its individual price so as to maximize its share of the combined price consumers would be willing to pay for a Venu-like bundle would then result in a combined price that would exceed Venu's. Thus, any bundle that consumers could put together of separate live sports-streaming services launched by each individual defendant would likely be more expensive than Venu (because of triple marginalization) or less comprehensive (if the consumer decided to cobble together less than all the high-priced content offered by Venu). Indeed, it is likely that the defendants recognized this pricing problem and arrived at the Venu joint

venture as the solution. There is no basis for assuming that any other hypothesized arrangement would effectively solve the problem.

In the end, then, the district court's enjoining of Venu sacrifices a competitive "bird in the hand"—a comprehensive, low-priced live sports-streaming service whose entry would enhance competition in the live pay TV market and benefit consumers—for a highly speculative "bird in the bush" of economically implausible future sports-streaming offerings. Because such an outcome would harm rather than further the public interest, this Court should vacate the district court's injunction.

## CONCLUSION

The antitrust laws should remain singularly focused on the protection of market competition, and this Court should resist efforts by individual firms to coopt its remedial powers to insulate themselves from the competitive process. Accordingly, for the foregoing reasons, the Court should reverse the decision below.

Respectfully submitted,

Date:   September 27, 2024        BONA LAW PC

*/s/ Aaron R. Gott*
AARON R. GOTT

33

*Counsel for* Amici Curiae
*International Center for Law &*
*Economics and Scholars of Law &*
*Economics*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,831 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Word 2016, Century Schoolbook 14-point font.

Date:    September 27, 2024

BONA LAW PC

*/s/ Aaron. R. Gott*
AARON R. GOTT

*Counsel for* Amici Curiae
*International Center for Law &*
*Economics and Scholars of Law &*
*Economics*

# ADDENDUM

*Amici* Scholars of Law & Economics include:

| | | |
|---|---|---|
| **Alden Abbott** | *Senior Research Fellow, Mercatus Center* | George Mason University |
| | *Former General Counsel* | Federal Trade Commission |
| **Daniel J. Gilman** | *Senior Scholar, Competition Policy* | International Center for Law & Economics |
| | *Former Attorney Advisor, Office of Policy Planning* | Federal Trade Commission |
| **Justin (Gus) Hurwitz** | *Senior Fellow, Carey School of Law* | University of Pennsylvania |
| | *Director of Law & Economics Programs* | International Center for Law & Economics |
| **Yunsieg P. Kim** | *Associate Professor Law, Maurice A. Deane School of Law* | Hofstra University |
| **Thomas A. Lambert** | *Wall Chair in Corporate Law and Governance* | University of Missouri |
| **Stan J. Liebowitz** | *Ashbel Smith Professor of Economics* | University of Texas, Dallas |
| **John E. Lopatka** | *A. Robert Noll Distinguished Professor of Law* | The Pennsylvania State University |
| **Daniel A. Lyons** | *Professor of Law* | Boston College |

| | | |
|---|---|---|
| **Geoffrey A. Manne** | *President and Founder* | International Center for Law & Economics |
| | *Visiting Professor of Law* | IE University (Madrid) |
| | *Distinguished Fellow, Center on Law, Business & Economics* | Northwestern University |
| **Alan J. Meese** | *Ball Professor of Law* | William & Mary Law School |
| **Jonathan Williams** | *Professor, Department of Economics* | University of North Carolina |
| **John Yun** | *Associate Professor of Law* | George Mason University |

37

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date:   September 27, 2024

> BONA LAW PC
>
> */s/ Aaron. R. Gott*
> AARON R. GOTT
>
> *Counsel for* Amicus Curiae
> *International Center for Law &*
> *Economics and Scholars of Law &*
> *Economics*