# 24-2210

In The
## United States Court Of Appeals
FOR THE SECOND CIRCUIT

FUBOTV, INC., AND FUBOTV MEDIA, INC.,

*Plaintiffs - Appellees*

v.

THE WALT DISNEY COMPANY; ESPN, INC.;
ESPN ENTERPRISES, INC.; HULU, LLC;
FOX CORPORATION; WARNER BROS. DISCOVERY INC.,

*Defendants - Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF U.S. REPRESENTATIVE JIM JORDAN, U.S. SENATOR LINDSEY GRAHAM AND THREE OTHER MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS**

Patrick F. Philbin
Justin M. Romeo
TORRIDON LAW PLLC
801 Seventeenth Street NW, Suite 1100
Washington, DC 20006
(202) 249-6900
pphilbin@torridonlaw.com

*Counsel for* Amici Curiae

September 27, 2024

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Interest of *Amici Curiae* ......................................................................................... 1

Introduction and Summary of Argument ............................................................ 2

Argument .................................................................................................................. 4

I. Congress Passed The Sherman Act And The Clayton Act To Promote Competition And Benefit Consumers ..................................................... 4

II. Competition Drives Innovation, Just As It Drives Sports Enthusiasts. .............. 7

Conclusion ............................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Trade of Chicago v. United States*,
  246 U.S. 231 (1918) .................................................................................. 6

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979) ..................................................................... 11

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
  479 U.S. 104 (1986) ................................................................................. 12

*fuboTV Inc. v. Walt Disney Co.*,
  No. 24-CV-01363, 2024 WL 3842116 (S.D.N.Y. Aug. 16, 2024) ....... *passim*

*LaFlamme v. Societe Air France*,
  702 F. Supp. 2d 136 (E.D.N.Y. 2010) ...................................................... 10

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  507 F.3d 117 (2d Cir. 2007) ....................................................................... 4

*United States v. Columbia Pictures Indus., Inc.*,
  507 F. Supp. 412 (S.D.N.Y. 1980) ....................................................... 7, 10

**Statutes**

15 U.S.C. § 1 ................................................................................................... 5

15 U.S.C. § 18 ................................................................................................. 6

15 U.S.C. § 2 ................................................................................................... 5

15 U.S.C. § 45 (a)(1) ...................................................................................... 6

**Other Authorities**

21 Cong. Rec. 3, 2457 (1890) ........................................................................ 5

21 Cong. Rec. 5, 4100 (1890) ........................................................................ 5

51 Cong. Rec. 13, 13223 (1914) .................................................................... 6

Alex Sherman, *Venu, a $42.99 per month sports streamer, has a tough marketing challenge to find an audience*, CNBC (Aug. 1, 2024, 1:13 PM) ....................................................... 11, 12

Anna Durani, *Top Streaming Statistics In 2024*, Forbes (last updated Aug. 15, 2024, 3:20 PM) ................................................................................................................................ 7

Dade Hayes, *Apple And Major League Soccer Throw The Switch On Season Pass Streaming Venture*, Deadline (Feb. 1, 2023, 4:00 AM) ...................................................................... 9

Def. Opp. Mem., *fuboTV Inc. v. Walt Disney Co.*, 2024 WL 3842116 (S.D.N.Y. Aug. 16, 2024) (No. 24-CV-01363) ................................................................................................ 9

Dominick Mastrangelo, *Tech's entrance into live sports creates new threat to major broadcasters*, The Hill (Aug. 27, 2024, 6:00 AM) .......................................................................................... 9

Frankie Karrer, *Streaming Sports Viewership is a Growth Opportunity*, MNT Research (last accessed Sept. 25, 2024) ............................................................................................ 8, 9

Kristopher J. Brooks, *Disney, Fox and Warner Bros Discovery reveal price for new sports streaming service*, CBS News (last updated Aug. 1, 2024, 2:22 PM) ............................... 12

Robert H. Lande, *A Traditional and Textualist Analysis of the Goals of Antitrust: Efficiency, Preventing Theft from Consumers, and Consumer Choice*,
81 Fordham L. Rev. 2349 (2013) ............................................................................... 5, 6

S. Rep. No. 63-597 (1914) ............................................................................................... 6

Tyler Aquilina, *Regulators Shouldn't Blow the Whistle on Venu Sports Just Yet*, Variety (June 18, 2024, 6:00 AM) ...................................................................................................... 8, 12

## INTEREST OF *AMICI CURIAE* [1]

*Amici Curiae* are United States Representative Jim Jordan of Ohio, Chair of the House Judiciary Committee, United States Senator Lindsey Graham of South Carolina, Ranking Member of the Senate Judiciary Committee, and three other Members of the House Judiciary Committee: Representatives Darrell Issa of California, Scott Fitzgerald of Wisconsin, and Kevin Kiley of California. *Amici* represent constituents in different States and regions of the Country, many of whom are avid sports fans and who actively participate in the market for competitively priced access to live, televised sports. *Amici*'s constituents are not only in the market for the Cincinnati Bengals and Cleveland Browns, South Carolina Gamecocks and Clemson Tigers, Sacramento Kings and Los Angeles Chargers, and Milwaukee Bucks and Wisconsin Badgers, but they also have a broad interest in all kinds of amateur and professional sporting events played throughout the United States and the world.

*Amici* have a particular interest in ensuring that the current antitrust laws, as enacted by Congress, remain useful tools in driving robust competition and innovation while protecting their constituents from unfair competition and predatory practices. Any antitrust litigation involving the market for live televised sports must fully consider

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* states that no party's counsel authored this brief in whole or in part, and no entity or person other than *Amici* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2).

1

how the challenged activity or any corresponding injunction will impact sports consumers as a whole, rather than focus on a single participant in that market.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congress enacted the antitrust laws to encourage competition, promote innovation, and benefit consumers. Congress's purpose was to prevent injury from anti-competitive practices, such as monopolistic behavior and predatory prices. The antitrust laws were not written to shield private companies from market competition, or to endow courts with the power to pick winners and losers. Legislative history, ordinary meaning, and common sense all demonstrate that the antitrust laws were crafted to benefit competition and consumers.

This case concerns a new and innovative market offering – a sports-focused live TV streaming service. How Americans choose to access their favorite TV and visual media content is rapidly changing. That is especially true in the competitive market for live sports, as households have recently moved away from traditional cable and satellite offerings toward on-demand and streaming platforms, and as newer entrants such as Amazon, Apple, and Netflix enter into licensing deals for live sports content. To help create a product attractive to "cord-cutters" and stay competitive with large tech companies new to this arena, Disney, Fox, and Warner Bros. Discovery have developed a joint venture, called "Venu," which will stream sports-focused content from the major sports leagues.

Appellee Fubo,[2] a pay-TV provider, sued to enjoin this venture, arguing that it constituted a collusive effort to drive out competition in violation of Section 7 of the Clayton Act. The district court, at the preliminary injunction stage, held that Fubo was likely to succeed on the merits and enjoined Venu from launching this fall, just as sports programming reaches its peak with the start of college football, the NFL, NHL, and NBA seasons, as well as the MLB postseason.

*Amici* are troubled by the district court's injunction because it blocks a new and innovative product from the market, which will be attractive to consumers generally and to their constituents specifically. *Amici* are particularly troubled by the district court's decision in that its analysis was less focused on *antitrust* harm – *i.e.*, harm to consumers – but rather on potential harm to a single competitor (Fubo) in the fiercely competitive distribution market for sports content. The Clayton Act permits courts to enjoin transactions that will substantially reduce overall competition in the relevant market. However, the current market dynamic suggests that an innovative offering such as Venu could have the potential to promote competition, spur the development of more engaging content, and encourage companies to attract subscribers with more affordable pricing.

*Amici* are concerned that, in the decision below, the district court appears to have erred by confusing harm to a competitor with harm to competition. Because the district

---

[2] For purposes of this brief, Plaintiffs-Appellees FuboTV, Inc. and FuboTV Media, Inc. are referred to collectively as "Fubo" or "Appellee."

3

court failed to focus its analysis on how the sports package created by the joint venture would impact market-wide competition (and thus sports consumers as a whole), this Court should overrule the decision below.

## ARGUMENT

### I. Congress Passed The Sherman Act And The Clayton Act To Promote Competition And Benefit Consumers.

"[I]t is axiomatic that the antitrust laws" were enacted to promote market competition, "not [to] protect a competitor against competition." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007). Here, the district court's decision improperly focused on the latter, with the effect of enjoining an innovative product that likely will benefit consumers.

Congress enacted the antitrust laws primarily to protect members of the public in need of goods and services. At the turn of the twentieth century, the U.S. economy grew rapidly, fueled by its booming oil, steel, and railroad industries. While industrial titans helped forge modern America through dogged innovation, bold vision, and the tireless grit of the American worker, achieving monopoly status tempted some into fixing prices and setting discriminatory rates. In markets *deprived of competition*, hardworking citizens were often forced to accept subpar products and services – including basic necessities – at whatever exorbitant prices the monopolies saw fit to charge.

Responding to public outcry, Congress passed the Sherman Antitrust Act in 1890. Section 1 of the Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," 15 U.S.C. § 1, and Section 2 proscribes "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations," 15 U.S.C. § 2.

The statute responded directly to constituent concerns about unfair pricing. *See* Robert H. Lande, *A Traditional and Textualist Analysis of the Goals of Antitrust: Efficiency, Preventing Theft from Consumers, and Consumer Choice*, 81 Fordham L. Rev. 2349, 2357 (2013) ("There is little disagreement that supracompetitive pricing was the preoccupation of the [Sherman Act] debates."). In sponsoring the Act, Senator John Sherman said the law was intended to prevent "autocrat[s] of trade with power to *prevent* competition and to *fix the price* of any commodity." 21 Cong. Rec. 3, 2457 (1890) (emphasis added). In the House, Illinois Rep. William Mason described the Act as necessary to diffuse the monopolies that had not only increased prices, but "destroyed *legitimate* [business] competition and [drove] honest men from *legitimate* business enterprises." 21 Cong. Rec. 5, 4100 (1890) (emphasis added).

Additional reform came in 1914 with the passage of the Clayton Act and the Federal Trade Commission ("FTC") Act. The former further curbed predatory and discriminatory pricing while empowering the federal government to block mergers and acquisitions "the effect of . . . [which] may be substantially to lessen competition, or to

5

tend to create a monopoly." 15 U.S.C. § 18. The latter created the FTC and outlawed "[u]nfair methods of competition in or affecting commerce." 15 U.S.C. § 45 (a)(1). Senator Francis Newlands, the FTC Act's sponsor and the Chair of the Senate Committee on Interstate Commerce, stated that the bill, like the Sherman Act before it, targeted "unreasonable and extortionate prices." S. Rep. No. 63-597, at 25 (1914); *see* 51 Cong. Rec. 13, 13223 (1914) (statement of Sen. Harry Lane) ("[Americans] are . . . being compelled to pay arbitrarily fixed and unjustly high prices for what they consume."). Finally, in 1950, Congress amended Section 7 of the Clayton Act with the Celler-Kefauver Act, which banned vertical and conglomerate mergers that had the potential to wall off entire industries and economic sectors under concentrated corporate ownership.

The animating goal of American antitrust law was, and remains, promoting robust competition among market players and preventing anticompetitive conduct that produces "higher prices and wealth transfers from consumers to firms with market power." Lande, *supra* page 5, at 2360 (footnotes omitted). As an early Supreme Court case noted, "[t]he true test of legality [in the antitrust realm] is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918).

Yet none of those concerns are reasonably apparent in the district court's decision. While acknowledging its duty to "scrutinize" Venu's overall market effect

given the "structure, history and probable future" of the pay-TV market, the district court failed meaningfully to "perform a comprehensive market analysis." *fuboTV Inc. v. Walt Disney Co.*, No. 24-CV-01363, 2024 WL 3842116, at *17 (S.D.N.Y. Aug. 16, 2024) (cleaned up). Rather, the district court concluded that an injunction was warranted because, in its view, Venu "will likely cause the exit of *a* current market option for consumers." *Id.* at *13 (emphasis added). This reasoning ignores several key factors that bear on a Section 7 claim. Factors which, had the district court properly considered them, could have demonstrated Venu's potential to benefit consumers by offering *more* options for live sports content at *lower* prices.

The district court reasoned that Venu will be anticompetitive because it will pave the way for the joint venturers to *raise* prices. *Id.* at *24. Yet at the same time the court concluded that the venture was anticompetitive, in part, because Venu will charge *lower* prices than its competitors. *See id.* at *22. The district court also relied heavily on *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1063 (2d Cir. 1981), a case that involved exclusivity boycotts and complex pricing formulas that bear no resemblance to the joint venture here.

## II. Competition Drives Innovation, Just As It Drives Sports Enthusiasts.

Streamed content is in high demand among *Amici*'s constituents. Forbes estimates that Americans subscribe to an average of three unique content streaming platforms and pay a total of $46 per month for streaming services. *See* Anna Durani, *Top Streaming Statistics In 2024*, Forbes, https://perma.cc/3FKY-S5LN (last updated

7

Aug. 15, 2024, 3:20 PM). Moreover, nearly half of streaming subscribers reported that their subscription costs have increased in the last year, with 45 percent cancelling their service because the cost is too high. *See id.* With hardworking Americans coping with rising inflation and skyrocketing costs of household necessities, it is as important as ever to ensure robust competition in this market and affordable options for consumers. To that end, market observers have noted that "Venu should give consumers a way to consolidate and reduce their subscriptions, rather than simply add another to the pile." Tyler Aquilina, *Regulators Shouldn't Blow the Whistle on Venu Sports Just Yet*, Variety (June 18, 2024, 6:00 AM), https://perma.cc/5LDD-GED4.

Competitive sports have long played a critical role in American life and culture – and an especially critical role within the States and districts *Amici* represent. Research shows that 57 percent of Americans watch sports at least once a week, with a full 65 percent of 18–34-year-olds doing so outside of linear TV. *See* Frankie Karrer, *Streaming Sports Viewership is a Growth Opportunity*, MNT Research, https://perma.cc/65YR-VDBX (last accessed Sept. 25, 2024). It is no surprise, then, that the market for live sports programming is competitive and rapidly evolving. As viewing preferences shift away from traditional cable and satellite offerings, companies large and small are vying to win over customers with new content.

Large tech firms are no exception in this race for sports viewers. As one journalist noted, "[l]eading tech players including Netflix, Amazon and Apple are steadily expanding their offerings in sports, giving *more competition* to broadcast networks

8

– which risk eventually being outbid for rights to show games across the NFL, NBA and MLB." Dominick Mastrangelo, *Tech's entrance into live sports creates new threat to major broadcasters*, The Hill (Aug. 27, 2024, 6:00 AM), https://perma.cc/WU6D-QZLR (emphasis added). For example, Apple recently purchased exclusive rights to stream Major League Soccer (MLS) on Apple TV+ (complimenting its current MLB deal for Friday Night Baseball), and "Amazon's 11-year deal with the NFL will make the platform the exclusive home of 'Thursday Night Football' starting [in 2022]." Karrer, *supra* page 8; *see also* Dade Hayes, *Apple And Major League Soccer Throw The Switch On Season Pass Streaming Venture*, Deadline (Feb. 1, 2023, 4:00 AM), https://perma.cc/NR64-G79N. Similarly, Netflix recently "inked a multibillion-dollar deal with the NFL to show games on Christmas Day." Mastrangelo, *supra* page 9.

American sports enthusiasts, such as *Amici*'s constituents, will stand to benefit from the entry of a new option for sports viewing. Moreover, Venu's entry into the market may encourage other platforms and Big Tech players to offer similar sports bundles or other programming at a more competitive price. The record thus far developed has not shown that Venu prevents competitors from doing so, and Appellants have represented that they will continue to license their sports programming to third parties, while "[l]ike any other distributor, Venu will pay market rates" to license live sports. *See* Def. Opp. Mem. at 1–3, *fuboTV Inc. v. Walt Disney Co.*, 2024 WL 3842116 (S.D.N.Y. Aug. 16, 2024) (No. 24-CV-01363). Accordingly, the district court's reliance on *Columbia Pictures* is misplaced. *See fuboTV Inc.*, 2024 WL 3842116, at *16, 18 (citing

9

*Columbia Pictures*, 507 F. Supp. at 418, 430). In *Columbia Pictures*, this Court affirmed an injunction blocking a joint venture of movie studios under Section 1 of the Sherman Act. The decision rested, in large part, on the fact that the studios were "boycotting" other providers for nine months, allowing their movies to be shown exclusively by the joint venture during that period. *Columbia Pictures*, 507 F. Supp. at 429.

But the deal at issue in *Columbia Pictures* is critically distinguishable, as Appellants have no plans to license sports content exclusively to Venu. The district court noted that "*Columbia Pictures* did not rest solely on the anticompetitive effects of th[e] 'exclusivity' provision." *fuboTV Inc.*, 2024 WL 3842116, at *16 n.30. The decision also rested largely on another feature inapposite to the present case. Rather than let the market determine the prices of their movies, the studios in *Columbia Pictures* agreed on a profit-sharing formula what would "substitute[] . . . for the competitive negotiations over the value of individual films." *Columbia Pictures*, 507 F. Supp. at 431. But in the record below, Appellants' Venu deal contains no analogous price-setting formula or arrangement. And courts have refused to apply *Columbia Pictures* to enjoin a business transaction where, as here, it does not involve a similar price-determining formula. *See, e.g.*, *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 150 n. 19 (E.D.N.Y. 2010) (concluding "*Columbia Pictures* [was] factually distinct and inapplicable" because plaintiffs "d[id] not allege [defendants'] use of a common pricing formula, or any formula to set [prices]").

10

To sports fans trying to follow their teams while supporting their families, the district court's order could be seen to penalize Appellants for bringing a new product offering to the market (at an appealing price point) simply because Fubo, a competitor, cannot do the same. But Fubo "cannot complain of a [competitor's] product introduction," *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979), and enjoining a company from introducing a new product risks potentially jeopardizing American entrepreneurship and technological innovation.

Venu is likely to be attractive to some sports viewers and a poor fit for others. As the district court acknowledged, two out of the three main categories of sports viewers include those who regularly watch 1–3 sports leagues and/or teams. *See fuboTV Inc.*, 2024 WL 3842116, at *18. Thus, the market for consumers willing to pay roughly $44 per month for a sports-focused package is likely to be relatively modest, especially because many fans may be interested in subscribing only during their teams' specific seasons, perhaps forgoing the summer months altogether. *See e.g.,* Alex Sherman, *Venu, a $42.99 per month sports streamer, has a tough marketing challenge to find an audience*, CNBC (Aug. 1, 2024, 1:13 PM), https://perma.cc/V3HE-7WV7.

To be sure, there are already Venu competitors on the market, such as SlingTV, trying to sell similar sports-centric platforms. *See* Sherman, *supra* page 12. Confirming the highly-competitive nature of such offerings, SlingTV notes that it "continue[s] to experience increased competition, including competition from other subscription video-on-demand and live-linear [over-the-top] service providers, many of which are

11

providers of [SlingTV's] content and offer football and other seasonal sports programming direct to subscribers on an a la carte basis." *Id.* Such competition is likely to spur innovation – *e.g.*, by enhancing sports content with engaging commentary and analysis – a further benefit to the American consumer.

Indeed, while the district court claimed to be "aware of no third party extolling the allegedly pro-competitive benefits of [Venu], nor publicly supporting its launch," *fuboTV Inc.*, 2024 WL 3842116, at *30, *Amici* have seen various reports forecasting Venu's benefit to consumers and competition amidst the growing influence of Big Tech. *See, e.g.*, Aquilina, *supra* page 8; Kristopher J. Brooks, *Disney, Fox and Warner Bros Discovery reveal price for new sports streaming service*, CBS News, https://perma.cc/JDJ5-E95N (last updated Aug. 1, 2024, 2:22 PM) ("Venu Sports is coming amid increased competition in the business of streaming sporting events, with industry giants including Amazon and Netflix each striking deals with various sports leagues to add content for their streaming customers."). Under their reasoning, Venu's entry will encourage innovation in the form of more-competitively-priced sports bundles – all to the benefit of consumers.

Congress enacted antitrust laws "for the protection of *competition,* not *competitors*," and "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition." *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 115–16 (1986) (cleaned up). Because the district court failed to properly consider Venu's impact on competition, the Court should overrule the decision below.

## CONCLUSION

For the foregoing reasons, this Court should overrule the district court's decision below.

Respectfully submitted,

*/s/ Patrick F. Philbin*
Patrick F. Philbin
Justin M. Romeo
TORRIDON LAW PLLC
801 Seventeenth Street NW, Suite 1100
Washington, DC 20006
(202) 249-6900
pphilbin@torridonlaw.com

Counsel for *Amici Curiae*

September 27, 2024

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,053 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Second Circuit Rule 32.1.

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

Dated: September 27, 2024                                            /s/ *Patrick F. Philbin*

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2024, I caused the foregoing brief to be electronically filed with the United States Court of Appeals for the Second Circuit using the Court's Electronic Mailbox, pursuant to Local Rule 25.2 and the Notice published at https://www.ca2.uscourts.gov indicating the unavailability of the Court's ACMS document filing system after 6:00 p.m. on Friday, September 27, 2024 for maintenance. Consistent with Local Rule 25.2(g) service was effectuated upon all counsel of record via email.

Dated: September 27, 2024 /s/ *Philbin F. Philbin*