# 24-2210

In the United States Court of Appeals
for the Second Circuit

FUBOTV, INC., AND FUBOTV MEDIA, INC.,
*Plaintiffs-Appellees,*

v.

THE WALT DISNEY COMPANY, ET AL.,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF OF ECHOSTAR CORPORATION
AS *AMICUS CURIAE*
SUPPORTING APPELLEES & AFFIRMANCE**

Pantelis Michalopoulos
Andrew M. Golodny
Andrew Magloughlin
**STEPTOE LLP**
1330 Connecticut Ave NW
Washington, DC 20036
(202) 429-3000

November 12, 2024

*Counsel for Amicus Curiae EchoStar
Corporation*

**Corporate Disclosure Statement**

EchoStar Corporation is a publicly traded corporation on the NASDAQ

Global Select Market under the symbol "SATS." It has no subsidiaries with publicly

traded equity. Its subsidiaries operate pay-TV, wireless, and satellite businesses. No

publicly held corporation owns 10% or more of its stock except for BlackRock, Inc.

# Table of Contents

Interest of Amicus Curiae and Introduction....................................................... 1

I.     EchoStar's business. ....................................................................... 3

II.    The JV Defendants created Venu to destroy distributors like EchoStar with programming price increases. ...................................................... 6

     A.    The JV defendants force EchoStar to accept onerous carriage requirements and deny it the ability to offer sports skinny bundle........... 6

     B.    If Venu were launched, the JV Defendants would double-dip and would be empowered to charge higher programming fees.................................. 8

III.   Venu causes antitrust injury to Fubo (and EchoStar) as purchasers of sports programming. ............................................................................. 10

IV.   The JV Defendants mischaracterize the District Court's decision on bundling.... ........................................................................................................... 15

V.    Conclusion ......................................................................................... 16

## Table of Authorities

**Page(s)**

**Cases**

*Andrx Pharms., Inc. v. Biovail Corp. Int'l,*
  256 F.3d 799 (D.C. Cir. 2001) ........................................................................ 13

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990) ........................................................................................ 10

*Biddle v. Walt Disney Co.,*
  No. 22-cv-07317-EJD, 2024 WL 3171860 (N.D. Cal. June 25, 2024) ...................... 9

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ........................................................................................ 15

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
  996 F.2d 537 (2d Cir. 1993) ............................................................................ 12

*Cargill, Inc. v. Monfort of Colorado, Inc.,*
  479 U.S. 104 (1986) ........................................................................................ 15

*Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.,*
  753 F.2d 1354 (6th Cir. 1985) ........................................................................ 13

*Cmty. Publishers, Inc. v. DR Partners,*
  139 F.3d 1180 (8th Cir. 1998) ........................................................................ 12

*Gelboim v. Bank of Am. Corp.,*
  823 F.3d 759 (2d Cir. 2016) ............................................................................ 12

*HTI Health Servs., Inc. v. Quorum Health Grp., Inc.,*
  960 F. Supp. 1104 (S.D. Miss. 1997) .............................................................. 12

*Nelson v. Monroe Reg'l Med. Ctr.,*
  925 F.2d 1555 (7th Cir. 1991) ........................................................................ 12

*Saint Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.,*
  655 F. Supp. 3d 52 (D. Conn. 2023) .............................................................. 13

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.,*
  No. 97 CIV. 5499 (DNE), 2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ................ 13

*New York ex rel. Spitzer v. Saint Francis Hosp.*,
  94 F. Supp. 2d 399 (S.D.N.Y. 2000) ........................................................... 12

*Sprint Nextel Corp. v. AT & T Inc.*,
  821 F. Supp. 2d 308 (D.D.C. 2011) ........................................................... 12

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015) ...................................................................... 10

*United States v. Columbia Pictures Indus., Inc.*,
  507 F. Supp. 412 (S.D.N.Y. 1980) ............................................................ 14

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ..................................................................... 13

*Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*,
  224 F. Supp. 2d 657 (S.D.N.Y. 2002) ....................................................... 13

## Other Authorities

Anthony Crupi, *NFL Swallows TV Whole, with 93 of Year's Top 100
  Broadcasts*, Sportico (Jan. 5, 2024),
  https://www.sportico.com/business/media/2024/nfl-posts-93-of-
  top-100-tv-broadcasts-2023-1234761753/ .................................................. 6

Brad Adgate, *The Carriage Fee Negotiations Between Disney And DirecTV May
  Take Awhile*, Forbes (Sept. 6, 2024),
  https://www.forbes.com/sites/bradadgate/2024/09/06/the-
  carriage-fee-negotiations-between-disney--directv-may-take-awhile/ ...................... 8

*FuboTV Inc. v. Walt Disney Co.*,
  No. 1:24-cv-01363-MMG (S.D.N.Y. filed Apr. 29, 2024) (ECF No.
  144) ........................................................................................................ 11

## Interest of Amicus Curiae and Introduction[1]

EchoStar Corporation ("EchoStar") is the owner of live pay-TV brands DISH TV, a satellite pay-TV service, and Sling TV, an online streaming pay-TV service.[2] Both services offer popular sports content to customers, including content owned by Disney, FOX, and Warner Brothers ("the JV Defendants"). Both services, and the competition from them, would decline precipitously if this Court reverses the preliminary injunction. The JV Defendants would capitalize on their enviable position as both a supplier and a competitor to increase prices: Venu would effectively be a mechanism for securing programming fee increases from services such as DISH and Sling that cannot offer a sports skinny bundle because Venu's owners do not permit them to. Venu, of course, *would* offer such a package—Venu's own programmer owners would permit Venu to. Venu would hoard over 62% of live sports and would not charge customers for any other content. This tailored sports package would attract sports fans from DISH and Sling. Meanwhile, DISH and Sling would continue to pay the Venu owners fees on their remaining customers, even though the most avid sports fans will have left for Venu. The rest is clockwork.

---

[1] Per Federal Rule of Appellate Procedure 29(a)(4)(E), EchoStar states that no counsel for any party to this case authored this brief in whole or in part, and no person other than EchoStar and its counsel made a financial contribution for the preparation or submission of this brief. All parties have consented to filing of this brief. Fed. R. App. P. 29(a)(2).

[2] EchoStar has entered into an agreement to sell its pay-TV business to DIRECTV, pending regulatory approvals.

After you steal many of the distributors' customers who care for sports, and you continue to reap revenue from the distributors' customers who do not care for sports, you simply raise the price of sports to distributors, including DISH and Sling, desperate to hold onto at least some sports-loving customers. Then, you also raise the Venu prices for the customers who have left DISH or Sling for Venu, safe in the knowledge that DISH and Sling will continue to be unable to offer their own sports skinny bundle. This is antitrust injury, pure and simple. EchoStar has an interest in this matter because Venu is an existential threat to EchoStar's business. Accordingly, EchoStar supports Fubo, and this Court should affirm the preliminary injunction.

## ARGUMENT

The District Court's decision to enjoin the launch of the Venu sports joint venture correctly recognizes the profound threat this venture poses to competition in the relevant market, defined by the court as the live pay-TV market. This JV, orchestrated by three of the largest media conglomerates in the United States—The Walt Disney Company, Fox Corporation, and Warner Bros/Discovery—represents a blatant attempt on their part to leverage their live sports programming to stifle competition and ultimately harm consumers. While the JV Defendants claim Venu is pro-competitive, the reality is that it would further restrict consumer choice and lead to price increases. In this brief, EchoStar offers a distributor's perspective on the JV's potential impact on its business, which underscores the urgent need to preserve a competitive pay-TV landscape.

2

By granting themselves, through the JV, exclusive access to an unbundled sports offering—a product none of the JV Defendants makes available to distributors, including EchoStar—the JV Defendants aim to both capture dedicated sports fans who will migrate to the JV's lower-priced offering and continue to reap revenue from existing subscribers through EchoStar, regardless of their interest in sports. At the same time, the JV Defendants continue their practice of forcing carriage of bloated packages to the majority of EchoStar customers, using minimum penetration and a range of packaging or bundling restrictions. This "double-dipping" strategy creates a powerful anti-competitive lock, as EchoStar cannot drop the JV Defendants' content entirely due to the important role of that content in attracting and retaining subscribers. At the same time that the JV Defendants would enthusiastically drive consumers to Venu, they would continue to force distributors to carry all of their content to a significant percentage of remaining subscribers—whether they want the content or not. Furthermore, Venu would enhance the JV Defendants' leverage in carriage negotiations, as the threat of subscribers fleeing to Venu empowers them to demand even higher fees for distributors that are even more desperate to secure the sports content and at least stanch that subscriber outflow. This would further restrict EchoStar's already heavily constrained negotiating flexibility.

## I.    EchoStar's business.

EchoStar is a multichannel video distribution provider ("MVPD"), or provider of live pay-TV services. It has two live pay-TV services: DISH TV, a satellite TV

service that broadcasts television channels from space to antennas on subscribers' homes, and Sling TV, which broadcasts live TV over the Internet to subscribers' connected devices. Consumers pay a monthly fee to watch sports, news, and entertainment programming on these services.

EchoStar does not own any of the programming that it delivers to consumers. Large companies called "programmers" like Disney, FOX, Warner Brothers, NBC, and CBS own the channels. EchoStar negotiates "carriage" contracts to obtain access to programming for its customers.[3] Carriage prices have gone up dramatically over the past decade, even as subscribers for MVPD services like DISH have gone down.

Carriage negotiations are hard-fought. EchoStar tries to keep the fees that it pays to programmers as low as possible, since it passes those fees through in customers' monthly bills. Programmers typically demand more money with each contract renewal. But they also demand onerous "bundling" provisions that force EchoStar to carry channels that its consumers do not want.[4] Because of bundling restrictions, EchoStar is not able to offer sports content as a standalone package

---

[3] Op.9.

[4] *Id.* at 10-16.

through a so-called "skinny bundle," which is what the JV Defendants' would offer themselves through Venu.[5]  Forced bundling provisions prevent it.

Bundling is just one of programmers' anticompetitive tools in carriage negotiations.  They also demand "minimum penetration requirements" in carriage contracts, provisions that force EchoStar to offer unpopular bundled programming to a minimum percentage of EchoStar's total customers.[6]  The percentage required is often so high that EchoStar has no choice but to offer unwanted bundled channels in some of its cheaper offerings for consumers.  Limiting unwanted networks to the most premium DISH or Sling packages would often fail to satisfy the minimum penetration requirements.  Provisions such as "drag rights" (you must offer our X channel in any package that has a competing programmer's Y channel) accomplish the same effect.[7]  The result is that a majority of EchoStar customers pay for channels that they do not care for.[8]

If EchoStar cannot reach an agreement with a particular programmer before the expiration of an existing contract, a "blackout" occurs.[9]  Blackouts mean that

---

[5] *Id.* at 12-13 ("[P]rior to the JV, the JV Defendants' sports-focused channels have ***never*** been unbundled from their non-sports offerings, as corporate insider witnesses and documents reveal.") (emphasis original).

[6] Schanman Decl. at 3 ¶ 10; Hearing Tr. 434:24–435:1.

[7] Schanman Decl. at 3 ¶ 10; Hearing Tr. 435:2-25.

[8] Schanman Decl. at 3 ¶ 11.

[9] *See* Op.18.

EchoStar's customers cannot access programming that has not been renewed—they see a black screen on their TV when they flip to a blacked-out channel.  In a blackout, EchoStar typically experiences increased "churn" or movement of its subscribers to a competitor service that still offers the blacked-out content. The programmer, on the other hand, is typically less concerned about that churn: while the programmer may stop receiving fees from EchoStar for the departing subscribers, it starts receiving fees from the other distributors to which these subscribers move.  Venu would go even further in upsetting the balance in favor of the JV Defendants: each of the JV's members would not only continue to receive the programming fees, but would also receive an additional benefit in the form of Venu's revenue from the customer, in which each Venu member would have an economic stake.

II.   **The JV Defendants created Venu to destroy distributors like EchoStar with programming price increases.**

A.   **The JV defendants force EchoStar to accept onerous carriage requirements and deny it the ability to offer sports skinny bundle.**

Sports are the most important programs for many of EchoStar's customers.  In 2023, 96 of the top 100 most-viewed telecasts were NFL or college football games.[10] To obtain that sports content, EchoStar has had to accept unwanted channels forced

---

[10] Anthony Crupi, *NFL Swallows TV Whole, with 93 of Year's Top 100 Broadcasts*, Sportico (Jan. 5, 2024), https://www.sportico.com/business/media/2024/nfl-posts-93-of-top-100-tv-broadcasts-2023-1234761753/.

onto it by the JV Defendants' bundling practices.[11]  Take for instance Sling Orange: with 5 sports channels, Sling Orange is Sling's sports-focused package; alongside those 5 sports channels, however, Sling also offers 27 non-sports channels, many of them forced on Sling by bundling.[12]

The combination of contractual provisions such as "penetration requirements," "packaging requirements," and "drag rights," has resulted in bloated packages.[13]  The result is higher prices for consumers.  Fat bundles raise prices for consumers because EchoStar passes through the cost of those networks to customers, who wind up paying for channels they do not watch.

Venu would have offered lower prices than every other live pay-TV distributor, about $42.99 at launch, compared to Sling's industry-low pricing of $70-75 just to get the same channels (plus all the channels unwanted by DISH, Sling, or their customers but forced upon them).[14]  Venu would divert sports fans away from EchoStar, which the JV Defendants assure can only offer fatter bundles.  Because of the JV Defendants' bundling requirements, EchoStar's diminished, entertainment-focused

---

[11] Hearing Tr. 434:16-23.

[12] *Id.* at 429:17-24.  The names and total number of channels forced onto Sling Orange by bundling is a confidential trade secret, but EchoStar can state publicly that it is not zero.

[13] *Id.* at 434:16–437:14.

[14] *Id.* at 432:12-14.

7

viewership will keep having to pay for sports. There would be no entertainment skinny-bundle either. And sports programming is the most expensive of all content; for example, ESPN costs on average $9.42 per cable subscriber.[15]

### B. If Venu were launched, the JV Defendants would double-dip and would be empowered to charge higher programming fees.

But low prices from Venu and the fatter bundles demanded by the JV Defendants are just one part of the anticompetitive story. Venu's control of at least 62% of all sports content, and 75%+ of the most valuable sports content (like the NFL playoffs), would likely shift the JV Defendants' incentives towards raising prices on EchoStar, Fubo, and every other distributor until they give up.[16] EchoStar will have to keep licensing that content to stay in business. But the JV Defendants will gain viewers on Venu and then charge exorbitant programming prices on any holdouts who remain with EchoStar.

This incentive to hike prices on distributors is powerful. When carriage negotiations hit a bargaining impasse, and a customer's favorite channel goes dark, the JV Defendants lose both advertising and subscription revenue, since blackouts mean fewer viewers. Eventually, the pain brings them back to the table. But with Venu, the

---

[15] Brad Adgate, *The Carriage Fee Negotiations Between Disney And DirecTV May Take Awhile*, Forbes (Sept. 6, 2024), https://www.forbes.com/sites/bradadgate/2024/09/06/the-carriage-fee-negotiations-between-disney--directv-may-take-awhile/.

[16] Op.17 n.10, 18.

music never stops, as the most desirable sports programming will be available online. Any distributor who dares to demand lower prices for consumers will have no leverage, as customers will simply abandon it for Venu in the event of a blackout. Carriage fees will balloon faster than ever.[17]

Carriage fees could also spike because Venu serves as a potential catalyst for price coordination between the JV Defendants. Carriage agreements often contain "most-favored nation" ("MFN")-type clauses. These clauses may effectively establish a price floor when a programmer receives a high fee from one distributor. Technically, Venu is a separate distributor. The JV Defendants can leverage meaningless "rates" they pay to Venu as a stalking horse to raise prices elsewhere. Essentially, the JV Defendants will transfer money from their left pocket to their right pocket, and then use it to claim a price floor for every distributor by way of MFNs. This is not hypothetical: Disney has been accused of doing this with the "rates" it charges to its wholly-owned distributor Hulu in a consolidated class-action lawsuit in the Northern District of California that has survived two motions to dismiss. *See Biddle v. Walt Disney Co.*, No. 22-cv-07317-EJD, 2024 WL 3171860 (N.D. Cal. June 25, 2024).

Given the likelihood that Venu would incentivize programming price increases, eliminate its competitors, and set itself up for a durable monopoly by increasing prices

---

[17] *Id.* at 51 (citing testimony of Mr. Schanman, Hearing Tr. 449:13–450:5).

for the Venu customers themselves through anticompetitive means, it should be no surprise that the JV Defendants had first named it "Project Raptor" after a carnivorous predator.

## III. Venu causes antitrust injury to Fubo (and EchoStar) as purchasers of sports programming.

It is axiomatic that the antitrust laws protect competition, not competitors. *United States v. Apple, Inc.*, 791 F.3d 290, 332 (2d Cir. 2015). That is why the Supreme Court requires plaintiffs in antitrust cases to prove "antitrust injury," meaning an injury that the "antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). Antitrust injury must derive from some sort of anticompetitive conduct. *Id.* And the requirement ensures that plaintiffs can only recover losses caused by competition-reducing behavior. *Id.* at 344.

Venu would inflict antitrust injury on Fubo by creating an escalating incentive for the JV Defendants to raise sports licensing costs on all other live pay-TV distributors. That is the antitrust injury that the District Court found: the "JV has at least the potential to fundamentally harm competition and consumers . . . by *creating incentives for each JV Defendant to raise prices to distributors for their programming* rather than fairly negotiate as parties who both have something to lose." (Op.64) (emphasis added). It is also the antitrust injury that Fubo pled: "if the JV is allowed to proceed, Fubo will suffer antitrust injury as a direct purchaser" of sports programming because

10

the JV Defendants "will collectively and individually have much greater incentives to exercise their market power and raise the content costs they charge to Fubo." Amended Complaint at 63 ¶¶ 247-48, *FuboTV Inc. v. Walt Disney Co.*, No. 1:24-cv-01363-MMG (S.D.N.Y. filed Apr. 29, 2024) (ECF No. 144). This antitrust injury—the incentive to raise sports programming fees charged to distributors—would cause Fubo precisely the irreparable harm that the District Court credited, to the tune of 300,000-400,000 (or about 30%) subscriber loss, nearly $100 million in revenue loss, degraded ability to attract new subscribers, and imminent downfall of its business. (Op.57).

It is easy to see why Venu creates a price-increasing incentive for the JV Defendants. If the JV Defendants enter the live pay-TV market as a streaming skinny-bundle monopolist controlling at least 62% of all sports content, they have obvious incentive to drive viewers to that platform. (*Id.* at 17 n.10, 18). They would do this by raising sports programming fees and maintaining or beefing up the longstanding fat bundles they impose on distributors. As the District Court explained, Venu "provides the JV Defendants with a comfortable 'backstop' in negotiations, which will leave them able to raise prices or enforce additional bundling requirements on other distributors by changing the incentives of each JV participant to 'walk away' from negotiations." (*Id.* at 51). They "will be materially incentivized to act (whether explicitly coordinated or not) to prevent others from diminishing the value of their investment." (*Id.* at 50). Competition from Fubo, DISH, Sling, and other live pay-TV

11

distributors would diminish that investment, so the JV Defendants would have every reason to raise programming fees to destroy it.

Combinations that increase the incentive to raise prices on buyers cause antitrust injury to buyers. *See, e.g.*, *Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180, 1183 (8th Cir. 1998) (advertiser suffered antitrust injury from newspaper merger that would have raised advertising rates); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 774-75 (2d Cir. 2016) (financial product buyers that paid higher prices due to price-fixing scheme suffered antitrust injury); *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 547 (2d Cir. 1993) (antitrust injuries have "adverse impact on price, quality, or output of . . . services offered to consumers[.]"); *Sprint Nextel Corp. v. AT & T Inc.*, 821 F. Supp. 2d 308, 333 (D.D.C. 2011) (wireless carrier/buyer of roaming services suffered antitrust injury from merger that was likely to result in higher roaming prices); *HTI Health Servs., Inc. v. Quorum Health Grp., Inc.*, 960 F. Supp. 1104, 1111 (S.D. Miss. 1997) (finding antitrust injury to health care service consumer when merger creating hospital monopoly was likely to result in increased prices); *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 421 (S.D.N.Y. 2000) (two hospitals that charged supracompetitive prices by jointly negotiating rates for inpatient hospital services caused antitrust injury to the State of New York, a buyer of those services). After all, "antitrust injury means injury from higher prices or lower output, the principal vices proscribed by the antitrust laws." *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 (7th Cir. 1991) (quotations omitted). Business strategies

12

intended to drive a particular competitor out of a market through foreclosure cause antitrust injury too. *See, e.g.,* V*iamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 482 (7th Cir. 2020) ("We have also often recognized that competitors suffer antitrust injury when they are forced from the market by exclusionary conduct."); *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 804, 814-15 (D.C. Cir. 2001) (antitrust injury found when merger extended exclusivity period to prevent generic drug manufacturer from entering the market); *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1357 (6th Cir. 1985) ("Stroh and Schmidt allege that the economic power of the merged corporation would induce distributors to drop the smaller brewers as customers. This power is gained not from the marketplace, but from their dominance in it."); *Saint Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp.*, 655 F. Supp. 3d 52, 73 (D. Conn. 2023) (finding antitrust injury because plaintiff showed that the merged defendants with 60-80% market share "erected barriers that suppressed the plaintiffs' ability to compete"); *Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 664 (S.D.N.Y. 2002) (antitrust injury found when vertically integrated cable provider with 40% of distribution market excluded Yankees-themed sports channel from carriage "to protect its monopoly over local sports programming"); *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97 CIV. 5499 (DNE), 2000 WL 264295, at *22 (S.D.N.Y. Mar. 9, 2000) (film producer merger caused antitrust injury to theater by foreclosing its ability to obtain profitable films).

This case involves both an incentive to increase prices and to foreclose access to programming through those price increases.

Moreover, one of the cases relied on by the District Court to establish anticompetitive harm likewise supports Fubo's theory of antitrust injury. (Op.35-36) (citing *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 430 (S.D.N.Y. 1980)). In *United States v. Columbia Pictures Industries*, the Southern District of New York granted a preliminary injunction against a joint venture between major filmmakers Columbia, Universal, Paramount, and FOX called "Premiere." 507 F. Supp. at 419-20. Instead of competing against each other, the filmmakers behind Premiere agreed to license each of their films to cable systems for a price set by the joint venture, which replaced "the prices that would normally be set by the marketplace." *Id.* at 420. In issuing the injunction, the court stated: "The implementation of the Premiere venture has a high potential for the ultimate raising of prices. . . . These higher prices will be passed on to the consumers. Much of this harm, including the irreparable alteration of the marketplace, would likely occur long before a trial on the merits could be completed." *Id.* at 434. Of course, that case had the United States as the plaintiff, so antitrust injury was not an issue. But it is clear from the decision that the buyers, in that case, the cable systems, and also their customers, were injured by Premiere.

Yet the JV Defendants' ignore their incentive to raise prices throughout their brief. Missing the point, they argue that the District Court protected Fubo from

competing with Venu's low prices, and try to liken Fubo to the plaintiffs who failed to show antitrust injury in *Brunswick* or *Cargill*. (JV Defs.' Br. at 18-19, 22-23). In those cases, however, the injury claimed by the plaintiffs was their dissatisfaction with competing against competitors made more efficient by merger. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986) ("The kind of competition that Monfort alleges here, competition for increased market share, is not activity forbidden by the antitrust laws. It is simply, as petitioners claim, vigorous competition."); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-88 (1977). In stark contrast, Fubo's antitrust injury derives from the increased incentive for the JV Defendants *to charge Fubo higher prices* for sports programming. (Op.51). Higher prices are not procompetitive efficiencies. They are antitrust injury.

## IV. The JV Defendants mischaracterize the District Court's decision on bundling.

The incentive for the JV Defendants to raise prices on programming is the main reason that the District Court enjoined Venu. The District Court has not yet weighed in on whether programmers' bundling practices violate the antitrust laws. Nothing in the District Court's opinion purports to assess how Disney's, FOX's, and Warner Brothers' individual contracts with each distributor may harm competition. Rather, the opinion's foray into bundling was the prologue to Venu's status as the first-ever sports streaming skinny bundle, and how that skinny bundle would cause anticompetitive effects by incenting the JV Defendants to hike programming prices.

15

(Op.45-46) ("Again, whether bundling is itself illegal under the antitrust laws is not a question currently before the Court. But what is clear . . . is that bundling has been uniformly and systematically imposed on each distributor in the live pay TV industry except the JV, preventing any other distributor from offering a multi-channel sports-focused streaming service.").

Looking to avoid the issue of their price-increasing incentives, the JV Defendants seize on a red herring—characterizing the District Court's opinion as an edict on bundling. (Op.41-45). But the District Court limited its analysis to the harmful effects of Venu as a joint venture, and nothing more. The harmful, anticompetitive effects of bundling are currently being litigated in the District Court. For now, this Court should decline to address the legality of bundling without a developed factual record, and instead affirm the preliminary injunction.

## V. Conclusion

After years of denying EchoStar's attempts to offer a sports skinny bundle to consumers, the JV Defendants have proposed their own skinny bundle carefully engineered to incentivize industry-wide programming price hikes. The District Court saw through the anti-competitive ruse and enjoined Venu to preserve competition. This Court should affirm. In the meantime, the District Court will continue resolving the questions it has not evaluated yet, including the anticompetitive harm caused by longstanding bundling practices.

Respectfully submitted,

/s/ *Pantelis Michalopoulos*
Pantelis Michalopoulos
Andrew M. Golodny
Andrew Magloughlin
**STEPTOE LLP**
1330 Connecticut Ave NW
Washington, DC 20036
(202) 429-3000
pmichalo@steptoe.com
agolodny@steptoe.com
amagloughlin@steptoe.com

*Counsel for Amicus Curiae
EchoStar Corporation*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it contains 3,868 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and Second Circuit Rule 32.1.

This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

Dated: November 12, 2024                                 */s/ Andrew Magloughlin*

## CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2024, I caused the foregoing brief to be electronically filed with the United States Court of Appeals for the Second Circuit's ACMS system.

Dated: November 12, 2024                                                    */s/ Pantelis Michalopoulos*