# 24-2210

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

FUBOTV, INC., AND FUBOTV MEDIA, INC.,

*Plaintiffs-Appellees*

v.

THE WALT DISNEY COMPANY; ESPN, INC.;
ESPN ENTERPRISES, INC.; HULU, LLC;
FOX CORPORATION; WARNER BROS. DISCOVERY INC.,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF SPORTS FANS COALITION AND OTHER CONSUMER
ADVOCACY AND PUBLIC INTEREST ORGANIZATIONS AS *AMICI
CURIAE* IN SUPPORT OF APPELLEES**

AMANDA G. LEWIS
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Avenue, NW
Suite 200
Washington, D.C. 20016
(202) 789-3960
alewis@cuneolaw.com

*Counsel for Amici Curiae*

November 12, 2024

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ......................................................... i

TABLE OF AUTHORITIES.................................................... iii

CORPORATE DISCLOSURE STATEMENT.......................................... vii

STATEMENT OF INTEREST OF *AMICI CURIAE*................................. 1

SUMMARY OF ARGUMENT .................................................... 4

BACKGROUND.............................................................. 6

ARGUMENT ............................................................... 9

    I.  The District Court Correctly Found that Defendants' JV Would Cause Irreparable Harm to Consumers.................................. 9

       A. Defendants' Proposed JV Would Result in a Substantial Loss of Competition ...................................................... 10

          1.    The District Court Correctly Found that the JV Would Eliminate Competition Among Defendants in the Live Pay TV Market .... 11

          2.    The District Court Correctly Found that the JV Would Create a Single Entity with the Ability to Foreclose Entry by Actual or Potential Competitors ................................... 14

       B. The JV Would Increase the Risk of Anticompetitive Coordination Among the Defendants ........................................... 17

       C. The District Court Correctly Found that Consumers Would Suffer Irreparable Harm if Defendants Were Allowed to Consummate the JV ............................................................ 18

          1.    Consumers Would Be Vulnerable to Price Increases and Decreased Quality ........................................ 19

          2.    Consumers Would Have Fewer Options and Reduced Access to Diverse Sports Programming .............................. 19

          3.    The JV Would Result in Less Innovation ................... 21

i

D. Sports Leagues and Other Creators of Sports Content Would Suffer Irreparable Harm from the JV..................................................................... 22

II. The District Court Correctly Found that a Preliminary Injunction Serves the Public Interest by Preventing Harm to Consumers and Preserving Competition..................................................................................................... 24

CONCLUSION ....................................................................................................... 28

CERTIFICATE OF COMPLIANCE ........................................................................ 29

CERTIFICATE OF SERVICE................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Brooke Grp. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ................................................................ 17

*Brown Shoe v. United States*,
   370 U.S. 294 (1962) ........................................................ 13, 26

*Consumers Warehouse Center, Inc. v. Intercounty Appliance Corp.*,
   No. 05-CV-5549, 2007 WL 922423 (E.D.N.Y. Mar. 26, 2007) ............ 15

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
   290 F.3d 768 (6th Cir. 2002) .................................................... 27

*Doe v. Zucker*,
   No. 17-CV-1005, 2019 WL 111020 (S.D.N.Y. Jan. 4, 2019) ............... 25

*FTC v. Cardinal Health, Inc.*,
   12 F. Supp. 2d 34 (D.D.C. 1998) .............................................. 10

*FTC v. Sysco Corporation*,
   113 F. Supp. 3d 1 (D.D.C. 2015) ............................................. 25

*FTC v. Tronox Ltd.*,
   332 F. Supp. 187 (D.D.C. 2018) ............................................... 17

*fuboTV Inc. v. Walt Disney Company*,
   No. 1:24-CV-01363 (S.D.N.Y. Aug. 8, 2024) ........................... 5, 18

*In re Google Play Store Antitrust Litig.*,
   No. 21-md-02981, 2024 WL 4438249 (N.D. Cal. Oct. 7, 2024) .......... 27

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) .................................................... 27

*Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*,
   381 U.S. 311 (1965) ............................................................. 26

*New York v. Deutsche Telekom AG*,
   439 F. Supp. 3d 179 (S.D.N.Y. 2020) .............................. 11, 17, 19

iii

*United States v. Baker Hughes, Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ................................................................. 5

*United States v. Bertelsmann Se & Co. KGaA*,
  646 F.Supp.3d 1 (D.D.C. 2022) ............................................................ 23

*United States v. Columbia Pictures Industries, Inc.*,
  507 F. Supp. 412 (S.D.N.Y. 1980) ........................................................ 25

*United States v. H & R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) ................................................... 5, 10

*United States v. Phila. Nat'l Bank*,
  374 U.S. 370 (1963) ............................................................................. 13

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007) ............................................................................. 23

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  395 U.S. 100 (1969) ............................................................................. 26

**Other Authorities**

Andy Buhler et al., *Port Neches-Groves dethrones South Oak Cliff: Live Texas high school football championship updates recap*, SI.com (Dec. 17, 2023), https://perma.cc/99Y4-AEYX ........................................................... 20

*Broken Promises: Media Mega-Mergers and the Case for Antitrust Reform*, Writers Guild of Am. West (Dec. 21, 2021), https://perma.cc/R7AB-F3DE ..................... 21

Daniel Frankel, *Pay TV Companies, and the DOJ, Push Back on Big 'Spulu' Sports Streaming Joint Venture*, Next TV (Feb. 15, 2024), https://perma.cc/YR9S-4M5T 7

David Jarvis, et. al, *Live sports: The next arena for the streaming wars*, Deloitte Insights, (Nov. 30, 2022), https://perma.cc/ESH5-CBJU ....................................... 21

David Pierce, *Streaming services keep getting more expensive*, The Verge (June 24, 2024), https://perma.cc/CKK7-FV7X ................................................................. 7

*Earnings call: Warner Bros. Discovery has seen a reduction in debt*, Investing.com (Feb. 23, 2024), https://perma.cc/D55J-QUKV ................................................. 12

Fubo Home Page, https://perma.cc/SZV7-Y5L9 ..................................................... 16

iv

Jared Newman, *The little live-TV streaming service that could*, Fast Company (Aug. 9, 2018), https://perma.cc/JE9C-ANQB .................................................................. 22

John Koblin, *Zombie TV Comes for Cable*, N.Y. Times (Dec. 15, 2023), https://perma.cc/RP3A-XN5M.................................................................................... 7

Joseph F. Brodley, Joint Ventures and Antitrust Policy, 95 HARV. L. REV. 1523 (1982) .......................................................................................................................... 15

Letter from Reps. Jerrold Nadler and Joaquin Castro, Congress of the United States, to Robert Iger, Lachlan Murdoch and David Zaslav (Apr. 16, 2024), https://perma.cc/A99U-QKAB ......................................................................... 15, 18

Mark Lemley and Matt Wansley, Opinion, *How Big Tech Is Killing Innovation*, N.Y. Times (June 13, 2024), https://perma.cc/H5KP-SVVG.......................................... 22

Michael McCarthy, *Tuned In: Sports Leagues Suspicious of Giant Streamer*, Front Office Sports (Feb. 8, 2024), https://perma.cc/6XGY-2DPP ................................. 24

Press Release, Fubo, *Fubo Bolsters Expansive Sports Programming With Launch of Willow by Vricbuzz, The Premier Cricket Broadcaster* (May 30, 2024), https://perma.cc/P2P7-RCX9 ........................................................................... 20, 24

Press Release, Open Markets Institute, *Open Markets Institute Supports the Justice Department's decision to sue to block AT&T's effort to buy Time Warner* (Nov. 21, 2017), https://perma.cc/W2A5-U3WM ..................................................... 20

*Public Knowledge Petition to Deny on AT&T/DirecTV Merger*, Public Knowledge (Sept. 16, 2014), https://perma.cc/4WAH-SP2J ..................................................... 20

*Reviving Competition Part 3: Strengthening the Laws to Address Monopoly Power, Hearing Before the Subcomm. on Antitrust, Commercial, and Administrative Law of the H. Comm. on the Judiciary*, 117th Cong. 10 (2021).................................... 26

Sandeep Vaheesan, *Merger Policy for a Fair Economy*, Law and Political Economy Blog (Apr. 5, 2022), https://perma.cc/CQS7-MGXN............................................. 13

Shiva Stella, *Public Knowledge Calls for Thorough Antitrust Review to Block Disney-Fox Deal to Protect Consumers*, Public Knowledge (Dec. 14, 2017), https://perma.cc/N3CN-WUUJ ............................................................................... 21

Squawk Box, *Disney CFO Hugh Johnston on Q1 results, new sports streaming alliance and Epic Games investment*, CNBC (Feb. 8, 2024), https://perma.cc/EL9T-Z682 ............................................................... 9, 23

Steven C. Salop & Jennifer E. Sturiale, *Fixing "Litigating the Fix,"* 85-3 Antitrust L.J. (2024) ......................................................................................... 10

Tim Winter & David Goodfriend, Opinion, *Web-based content is ushering in affordable a la carte programming*, Washington Times (July 1, 2015), https://perma.cc/96WK-672F ..................................................................... 6

Tony Maglio, *A Running List of Everyone Who Already Hates the Disney, Fox, and WBD Sports-Streaming Service*, IndieWire (Feb. 21, 2024), https://perma.cc/EWJ9-TF6W........................................................... 14, 18

U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines (2023) ............. passim

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010), https://perma.cc/X8G5-PPNM ......................................................... 23

*Venu Sports may be available for $42.99 per month with its planned launch targeted for this fall*, Associated Press (Aug. 1, 2024), https://perma.cc/EV2E-68HR........ 16

*Walt Disney Co Q1 2024 Earnings Conference Call Transcript*, Rev (Feb. 8, 2024), https://perma.cc/KX49-93ZY.............................................................. 12

*What Soccer (Football) Leagues can I watch on Fubo?*, Fubo Help Center (Updated July 15, 2024), https://perma.cc/98HF-V3P6 ....................................... 20

**Rules**

Federal Rule of Appellate Procedure 29(a)(2) ............................................... 1

Federal Rule of Appellate Procedure 29(a)(4)(E) ......................................... 1

## CORPORATE DISCLOSURE STATEMENT

Sports Fans Coalition, American Antitrust Institute, American Economic Liberties Project, Electronic Frontier Foundation, Open Markets Institute, Center for Democracy and Technology, National Consumers League, and Public Knowledge state there is no parent corporation or any publicly held corporation that owns 10% or more of their respective stock.

Dated: November 12, 2024

/s/ Amanda G. Lewis
AMANDA G. LEWIS
CUNEO GILBERT & LADUCA, LLP
4275 Wisconsin Avenue, NW
Suite 200
Washington, D.C. 20016
(202) 789-3960
alewis@cuneolaw.com

Counsel for Amici Curiae

vii

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are eight organizations devoted to advocacy on behalf of consumers and the public interest in the context of antitrust policy and litigation, as well as other issue areas. Given their expertise in antitrust law, *Amici* are uniquely positioned to opine on this appeal of the district court's correctly decided and well-founded order enjoining Defendants-Appellants ("Defendants") from launching their proposed joint venture (the "JV"). In addition, *Amici* have relevant expertise in how anticompetitive mergers and conduct cause harm to consumers and the public interest. Consumers whose interests *Amici* represent, and advocate on behalf of, would be adversely affected if this Court were to reverse the district court's August 16, 2024 Opinion and Order (the "Opinion & Order").

*Amici* joining this brief are Sports Fans Coalition (SFC), American Antitrust Institute (AAI), American Economic Liberties Project (AELP), Center for Democracy & Technology (CDT), Electronic Frontier Foundation (EFF), National Consumers League (NCL), Open Markets Institute (OMI), and Public Knowledge (PK).

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici* state that no party's counsel authored this brief in whole or in part, and no entity or person other than *Amici* or their counsel made a monetary contribution intended to fund the preparation or submission of this brief. All parties have consented to the filing of this brief. Fed. R. App. P. 29(a)(2).

1

SFC is a grassroots, fan-driven sports advocacy organization that represents sports fans wherever public policy impacts the games people love. Established in 2009, SFC is the largest fan-oriented consumer group with advocates that transcend geographic, demographic, socio-economic, and political boundaries. SFC's Board of Directors includes a former member of the U.S. women's Olympic soccer team; a sportswriter; a former corporate CEO; and the CEO of a non-profit consumer advocacy group, among others. SFC has an engaged digital community of fan activists who are deeply concerned with issues of access to sports programming and the affordability of sports media more broadly.

AAI is an independent non-profit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders.

AELP is an independent non-profit research and advocacy organization dedicated to understanding and addressing the problem of concentrated economic power in the United States. AELP organizes and employs a diverse set of leading policy experts in a wide range of areas impacted by concentrated power that include digital media and the technology industry, private equity, airlines, and healthcare.

2

AELP advocates for policies that address today's crisis of concentration through legislative efforts and public policy debates.

CDT is a non-profit public interest organization. Since its founding 30 years ago, CDT has represented the public's interest in an open, decentralized Internet and worked to ensure that the constitutional and democratic values of free expression, privacy, and competition are protected in the digital age. CDT regularly advocates before legislatures, regulatory agencies, and courts in support of these values.

EFF is a non-profit civil liberties organization with tens of thousands of dues-paying members. EFF has worked for over 30 years to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF and its members have an interest in ensuring that the public receives all the benefits of robust competition in high-tech markets, including the ability to choose, curate, and engage with media through a diverse array of technologies that put users' interests first.

National Consumers League (NCL) is a non-profit, nonpartisan consumer advocacy organization representing consumers and workers on marketplace and workplace issues since its founding in 1899. Headquartered in the District of Columbia, NCL provides government, businesses, and other organizations with the consumer's perspective on concerns including aviation, child labor, food safety, healthcare, privacy, and telecommunications.

OMI is a non-profit organization dedicated to promoting fair and competitive markets. It does not accept any funding or donations from for-profit corporations. Its mission is to safeguard our political economy from concentrations of private power that undermine fair competition and threaten liberty, democracy, and prosperity. OMI regularly provides expertise on antitrust law and competition policy to Congress, federal agencies, courts, journalists, and members of the public.

PK is a non-profit technology policy organization that promotes freedom of expression, an open Internet, access to affordable communications tools and creative works, and a competitive media marketplace. As part of that mission, PK advocates on behalf of consumers, including sports fans, supporting policies that promote competition and open markets.

## SUMMARY OF ARGUMENT

The Court should affirm the district court order granting a preliminary injunction to prevent Defendants from consummating the JV. The district court correctly found that fuboTv Inc. and fuboTV Media Inc. ("Plaintiffs" or "Fubo") are likely to succeed on the merits. The court's decision was squarely grounded in its determination that allowing the JV to proceed would result in irreparable harm to consumers and that preliminarily enjoining the JV is in the public interest. *Amici* strongly agree with the district court's findings on these elements. As several *Amici* set forth in their district court brief, Defendants' restrictive licensing practices have

4

already caused significant harm to consumers and competition; and, combined with the JV, this conduct would all but guarantee Defendants an immediate and durable monopoly in the market for skinny sports bundles. Brief for Sports Fans Coalition & American Economic Liberties Project et al. as *Amici Curiae* Supporting Plaintiffs, *fuboTV Inc. v. Walt Disney Company*, No. 1:24-CV-01363 (S.D.N.Y. Aug. 8, 2024), ECF No. 253-1. In the context of a broader Live Pay TV market, the district court rightly found that the JV would substantially lessen competition. *Amici* commend the district court for evaluating the JV's risk of harm to competition with reference to "the totality of the evidence available" and "industry-specific market realities," including the role of bundling. U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines, § 1 (2023) [hereinafter Merger Guidelines]; *see also United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 50 (D.D.C. 2011) (quoting *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 984 (D.C. Cir. 1990)) (internal quotation marks omitted) ("[U]ltimately, the Supreme Court has adopted a totality-of-the-circumstances approach to the Clayton Act, weighing a variety of factors to determine the effects of particular transactions on competition.").

Given their expertise, *Amici* focus their arguments on the harm to consumers and competition that is likely to result absent injunctive relief and, relatedly, why the grant of a preliminary injunction, as the district court ordered, is decidedly in the public interest.

## BACKGROUND

As the district court correctly recognized, the cable industry has forced a big "fat" bundle of unwanted channels on consumers at "mind-bending costs," for decades. Opinion & Order at 2, 45. Sports Fans Coalition founder David Goodfriend described this situation in a 2015 op-ed as follows: "Ask any sports fan if he or she would prefer to watch just the home team's games, league or post-season championship, rather than buy the expensive pay-TV packages or sports programming tiers offered today, and you will get a loud yes." Tim Winter & David Goodfriend, Opinion, *Web-based content is ushering in affordable a la carte programming*, Washington Times (July 1, 2015), https://perma.cc/96WK-672F. In that same op-ed, Goodfriend noted the promise of the Internet as hopefully presenting an opportunity to every sports fan "who ever bemoaned the bundle." *Id.* He added that sports fans "would benefit from a more flexible, consumer-driven, unbundled video ecosystem that allows each of us to pay for what we want, rather than pay a ransom to watch what we don't." *Id. Amici* strongly agree that fans should have more freedom to subscribe to the content they want, without being forced to purchase large bundles that include pricey, non-sports content. Consistent with this, *Amici's* concerns with the JV center on its creation of a de facto monopolist, which would necessarily reduce consumers' freedom to choose the way in which they purchase and consume live sports content.

6

Nearly a decade after SFC's founder called out consumer dissatisfaction with bundling, sports fans are still saddled with bloated, expensive packages. To date, streaming services have failed to live up to their promise of offering unbundled sports programming and have steadily been hiking their prices. *See, e.g.*, David Pierce, *Streaming services keep getting more expensive*, The Verge (June 24, 2024), https://perma.cc/CKK7-FV7X. There are distributors that stand ready to deliver the benefits of innovation like unbundled content to consumers, but Defendants' anticompetitive restraints have largely blocked the way.

A handful of dominant U.S. television programmers and owners of most U.S. sports television rights (namely, the Defendants) have kept sports fans trapped in a bad deal. Defendants have actively sought to perpetuate the status quo by refusing to license sports content on an unbundled basis to companies like Fubo. Daniel Frankel, *Pay TV Companies, and the DOJ, Push Back on Big 'Spulu' Sports Streaming Joint Venture*, Next TV (Feb. 15, 2024), https://perma.cc/YR9S-4M5T ("The distributors have been begging for the right to offer cheaper and skinnier bundles, especially bundles that would segregate expensive sports from cheaper non-sports programming, for at least two decades, and they've been met with a brick wall."). They perpetuate this forced bundle because it serves their interests. *See, e.g.*, John Koblin, *Zombie TV Comes for Cable*, N.Y. Times (Dec. 15, 2023), https://perma.cc/RP3A-XN5M ("The media companies that own the channels are in a

7

bind. The so-called cable bundle was enormously profitable for media companies, and more than 100 million households subscribed at the peak."). But it does not serve the interests of consumers. Consumers have communicated their dissatisfaction with bundling by reliably switching—where they have the option to do so—from fat bundles to skinny, direct-to-consumer (DTC) offerings. *Id.*

On its face, it may seem that Defendants are finally willing to give consumers what they want, but that is far from the reality of what would ensue if this Court were to reverse the decision below and allow the JV to proceed. Defendants propose to address a common consumer complaint about sports streaming—the fragmentation of sports across a variety of different services and platforms—but they propose to do so in a way that deliberately continues to lock out competitors, who have long tried, and been blocked, from addressing that exact consumer demand. There is undoubtedly consumer demand for a skinny sports bundle, or even a la carte sports offerings, but Defendants' own licensing practices have thus far prevented anyone from satisfying that demand.

Consumers want independent companies offering a selection of skinny sports bundles that compete for their business on price, product innovation, customer service, or any multitude of factors. In stark contrast, Defendants aim to use their JV as a vehicle to create a monopoly and position themselves as the sole offeror of that product, with zero competitive constraints on its price or quality. To prevent this

8

anticompetitive result and the resulting harm to consumers, the Court should affirm the district court's decision. This is consistent with the spirit and letter of antitrust law and the public interest.

Contrary to Defendants' self-serving claims, consumers would be best served if this Court affirms the preliminary injunction. Doing so is the only way to ensure consumer access to new products and services that sports fans want without subjecting them to a monopolist's unchecked power over pricing and terms.

## **ARGUMENT**

### I.     **The District Court Correctly Found that Defendants' JV Would Cause Irreparable Harm to Consumers**

As the district court observed, the JV would combine three entities, which currently operate as independent competitors, into a single, dominant entity. Opinion & Order at 18. Collectively, Defendants control as much as 80% of the market for U.S. live sports broadcasting rights. Squawk Box, *Disney CFO Hugh Johnston on Q1 results, new sports streaming alliance and Epic Games investment*, CNBC (Feb. 8, 2024), https://perma.cc/EL9T-Z682.

The JV would result in a substantial loss of competition and greatly increased risk of anticompetitive coordination among competitors. Ultimately, the JV would create a single, dominant entity with no check on its ability to raise prices or reduce quality, and little incentive to innovate. The district court correctly dismissed Defendants' claims that they have no plans to exercise their new-found monopoly

9

power. Opinion & Order at 5 ("American consumers do not have to simply take [Defendants'] word for it and hope for the best."). Defendants' promises not to raise prices are largely irrelevant to a determination of whether a merger is likely to result in anticompetitive effects for consumers. *See, e.g.*, *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 65 (D.D.C. 1998) ("Defendants' guarantees alone cannot cure the likely anti-competitive effects of the mergers"); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d at 82 (holding that "this type of [price] guarantee cannot rebut a likelihood of anticompetitive effects in this case"); *see also* Steven C. Salop & Jennifer E. Sturiale, *Fixing "Litigating the Fix,"* 85-3 Antitrust L.J. (2024) (recommending that courts reject pricing commitments as a remedy in merger cases as they "cannot reliably preserve competition").

Given their expertise, *Amici* focus their arguments on the harm to consumers and competition that is likely to result absent injunctive relief and, relatedly, why the grant of a preliminary injunction, as the district court ordered, is decidedly in the public interest.

## A. Defendants' Proposed JV Would Result in a Substantial Loss of Competition

The proposed JV would eliminate competition between Defendants in several markets including the market for streaming live sports content to consumers, as the district court correctly found. Opinion & Order at 40 ("[T]he JV is likely to lessen competition in the Live Pay TV Market."). Specifically, the JV would eliminate

10

competition among Defendants to offer independent, competing skinny sports bundles. Furthermore, the JV would substantially reduce competition by driving competing distributors, like Fubo, out of business and raising barriers to entry for any new competitors to an insurmountable height.

### 1. The District Court Correctly Found that the JV Would Eliminate Competition Among Defendants in the Live Pay TV Market

Competition between rivals serves consumers and the public interest. As the U.S. Department of Justice (DOJ) and Federal Trade Commission (FTC) joint Merger Guidelines explain, "Competition often involves firms trying to win business by offering lower prices, new or better products and services, more attractive features, higher wages, improved benefits, or better terms relating to various additional dimensions of competition." Merger Guidelines § 2.2. With the consummation of the JV, Defendants would jointly control a majority of U.S. live sports broadcasting rights and face little competitive pressure to improve their services or their terms. *See, e.g.*, *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 238 (S.D.N.Y. 2020) (explaining that the elimination of competition between firms through mergers could lead to unilateral anticompetitive effects, such as higher prices and reduced quality, independent of competitive responses from other firms).

As the district court concluded, the JV would eliminate competition among Defendants to offer independent, competing skinny sports bundles. Opinion & Order

11

at 50 ("It does not require executive-level acumen to conclude . . . that once the JV is launched, the JV Defendants' incentives will not be aligned toward competition among themselves or competition between potential unilateral offerings and the JV."). Absent the JV, Defendants Disney, Warner Brothers, and Fox are likely to continue to develop stand-alone, DTC products. With Peacock, Max, Fox Sports, ESPN+, and ESPN's forthcoming DTC streaming service, consumers are currently getting the benefit of competition among the Defendants and other market participants over price, quality, innovation, and other metrics. If the Defendants could not combine their market power into a single, dominant JV, they would likely continue to develop their own DTC offerings in response to strong consumer demand for an alternative to the status quo fat bundle. *See, e.g.*, *Earnings call: Warner Bros. Discovery has seen a reduction in debt*, Investing.com (Feb. 23, 2024), https://perma.cc/D55J-QUKV (CEO David Zaslav describing the JV's forthcoming skinny sports bundle as "a unique product that's looking to meet a very strong demand"); *Walt Disney Co Q1 2024 Earnings Conference Call Transcript*, Rev (Feb. 8, 2024), https://perma.cc/KX49-93ZY (CEO Bob Iger stating that "[Disney] believe[s] there are a number of sports fans out there that want to watch sports on television, but didn't want to sign up to the big cable and satellite bundle."). Absent the JV, consumers would likely have more choice among DTC products, including new competitive offerings from Defendants and potential new entrants.

12

Antitrust law and policy generally favor entry or expansion into a new market by internal growth rather than acquisition. As the Supreme Court observed, "surely one premise of an antimerger statute such as § 7 is that corporate growth by internal expansion is socially preferable to growth by acquisition." *United States v. Phila. Nat'l Bank*, 374 U.S. 370 (1963); *see also* Merger Guidelines § 2.4.A ("Merging a current and a potential market participant eliminates the possibility that the potential entrant would have entered on its own—entry that, had it occurred, would have provided a new source of competition in a concentrated market."). Similarly, in another case, the Court stated that "[i]nternal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output." *Brown Shoe v. United States*, 370 U.S. 294, 345 n.72 (1962). The Court added, "Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output." *Id.*; *see also* Sandeep Vaheesan, *Merger Policy for a Fair Economy*, Law and Political Economy Blog (Apr. 5, 2022), https://perma.cc/CQS7-MGXN. Contrary to Defendants' characterization of the JV as adding competition to the market, *Amici* strongly agree with the district court's finding that the JV would result in a significant net loss of competition and, in practice, fewer options for consumers.

13

### 2. The District Court Correctly Found that the JV Would Create a Single Entity with the Ability to Foreclose Entry by Actual or Potential Competitors

The JV would enable Defendants to create a single entity with the ability and incentive to foreclose competition from actual or potential competitors in the Live Pay TV market. As the district court found, allowing the JV to proceed in combination with Defendants' longstanding and anticompetitive bundling practices effectively ensures the creation of a monopoly. Opinion & Order at 49 ("[T]he existence of the JV itself incentivizes the JV Defendants to prevent and suppress other potential sports-focused bundles from meaningfully competing, and the JV Defendants have the market power to follow through . . . ."). In other words, the JV would have the incentive and ability to drive competing distributors, like Fubo, out of business and raise barriers to entry for any new competitors to insurmountable heights. The Merger Guidelines explain that "[w]hen a merger creates a firm that can limit access to products or services that its rivals use to compete, the Agencies examine the extent to which the merger creates a risk that the merged firm will limit rivals' access, gain or increase access to competitively sensitive information, or deter rivals from investing in the market." Merger Guidelines § 5.

Here, Defendants collectively own a majority of live U.S. sports broadcasting rights. *See, e.g.*, Tony Maglio, *A Running List of Everyone Who Already Hates the Disney, Fox, and WBD Sports-Streaming Service*, IndieWire (Feb. 21, 2024),

14

https://perma.cc/EWJ9-TF6W. In forming the JV, Defendants will have the power

and the motive to deny competitors access to a significant portion of U.S. live sports

programming on competitive terms. Without access to this content at a competitive

price, no current or future distributor can offer a viable competing product.

Representatives Jerrold Nadler and Joaquin Castro accurately summarized the

situation, stating that "the Joint Venture raises questions about how this new offering

would affect access, competition, and choice in the sports streaming market." Letter

from Reps. Jerrold Nadler and Joaquin Castro, Congress of the United States, to

Robert Iger, Lachlan Murdoch and David Zaslav (Apr. 16, 2024),

https://perma.cc/A99U-QKAB.

In the Second Circuit, courts explicitly recognize that a joint venture can

increase the incentive and ability of otherwise independent entities to exclude

competitors from essential inputs in ways that may be harmful to competition. In

*Consumers Warehouse Center, Inc. v. Intercounty Appliance Corp.* a district court

discussed how joint ventures might injure competition by excluding outside firms

from essential requirements. No. 05-CV-5549, 2007 WL 922423, at *4, *5 (E.D.N.Y.

Mar. 26, 2007) (citing Joseph F. Brodley, Joint Ventures and Antitrust Policy, 95

HARV. L. REV. 1523, 1532-34 (1982)). The court endorsed the idea that such

exclusion could impair market efficiency and fairness, and that "market exclusion

and access discrimination provide early warnings of collusion risk." *Id.* (internal

15

quotation marks omitted).

Post-consummation of the JV, Defendants would jointly offer the same core content that competitors like Fubo offer, but reportedly for a significantly lower price. *See Venu Sports may be available for $42.99 per month with its planned launch targeted for this fall*, Associated Press (Aug. 1, 2024), https://perma.cc/EV2E-68HR; Fubo Home Page, https://perma.cc/SZV7-Y5L9 (last visited Nov. 12, 2024). The JV would be able to undercut rivals on cost because Defendants would not subject themselves (i.e., the JV) to anticompetitive restraints like bundling, which drive up rivals' costs. Contrary to Defendants' claims that the harms from Fubo going out of business to Plaintiffs and consumers are speculative, there is good reason to believe that if the JV is permitted, Fubo and other distributors of sports bundles would go out of business within a year. Opinion & Order at 57-60 (detailing extensive evidence in support of Fubo's likely forced exit if JV is allowed to proceed).

The JV, combined with Defendants' anticompetitive conduct, would "eliminate potential entrant[s] [and] eliminate current competitive pressure from perceived potential entrant[s]." Merger Guidelines § 1. Further, Defendants may be able to use their JV to raise rivals' costs even higher for access to the critical sports broadcast programming that any competitor needs to enter the market. The barrier to entry for any future entrant would become insurmountable, and the JV would be free

to raise prices or degrade customer experience with impunity.

## B. The JV Would Increase the Risk of Anticompetitive Coordination Among the Defendants

The district court correctly recognized that the JV would increase the risk of coordination in place of competition among Defendants. Opinion & Order at 49-50. As the Merger Guidelines explain, "Coordination among rivals lessens competition whether it occurs explicitly–through collusive agreements between competitors not to compete or to compete less–or tacitly, through observation and response to rivals." Merger Guidelines § 2.3. The markets in which Defendants operate are already vulnerable to harm from coordinated conduct, and the JV consolidates these markets further. In particular, the JV would increase concentration among owners of live sports programming and also among bidders for leagues' live sports content.

"In the § 7 context, it has long been settled that excessive concentration and the oligopolistic price coordination it portends, may be the injury to competition the Act prohibits." *Brooke Grp. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227-30 (1993). To determine whether a transaction increases the risk of coordination, courts consider "whether the relevant market shows signs of vulnerability to coordinated conduct and whether there is a credible basis on which to conclude that the merger may enhance that vulnerability." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d at 234; *accord, FTC v. Tronox Ltd.*, 332 F. Supp. 187, 210 (D.D.C. 2018).

17

Here, the markets in which Defendants operate show clear signs of vulnerability to coordinated conduct. Collectively, Defendants would control as much as 80% of the market for U.S. live sports broadcasting rights. *See, e.g.*, Tony Maglio, *A Running List of Everyone Who Already Hates the Disney, Fox, and WBD Sports-Streaming Service*. Defendants' past conduct also shows a tendency towards coordination rather than competition. *See, e.g.*, Amended Complaint at 31, *fuboTV Inc. v. Walt Disney Company*, No. 1:24-CV-01363, ECF No. 144 (alleging that the inclusion of MFN clauses in contracts between each of the Defendants and YouTube TV and HuluTV are part of a "larger collusive scheme" to raise rivals' costs). Lastly, Defendants' participation in the JV would facilitate the sharing of pricing or other competitively sensitive information. *See* Letter from Reps. Jerrold Nadler and Joaquin Castro to Robert Iger et al. (raising concerns about anticompetitive sharing of information among the JV partners).

## C. The District Court Correctly Found that Consumers Would Suffer Irreparable Harm if Defendants Were Allowed to Consummate the JV

As the district court concluded, if the JV is consummated, consumers are likely to suffer irreparable harm. In the aftermath of the JV, there would likely be (1) minimal constraints on the JV's ability to raise prices or decrease quality; (2) less choice and reduced access to diverse sports programming; and (3) less innovation from the elimination of an innovative competitor in Fubo, as well as the elimination of other actual or potential competitors.

18

### 1. Consumers Would Be Vulnerable to Price Increases and Decreased Quality

If the JV is allowed to proceed, consumers would be vulnerable to price increases and decreased quality, including on key features like customer service. As the sole entity that Defendants permit to offer a skinny sports bundle, the JV would have substantial power to raise prices and decrease quality, with no discipline from actual or potential competitors. *See, e.g.*, *Deutsche Telekom AG,* 439 F. Supp. 3d at 238.

Defendants' JV, combined with their continued anticompetitive conduct, would deprive consumers of the benefits of competition. In a competitive marketplace, sports fans would be able to choose among independent companies offering a selection of skinny sports bundles, that have to compete for fans' business on price, product innovation, customer service, or any multitude of factors. If the JV is allowed to proceed, however, the JV would hold unchallenged and unchecked market power over consumers.

### 2. Consumers Would Have Fewer Options and Reduced Access to Diverse Sports Programming

The JV is likely to reduce consumer choice and access to diverse sports programming, including niche sports, international sports, and foreign language broadcasts by eliminating or locking out competing distributors and innovative technologies. Fubo, for instance, is a large, virtual multi-channel video programming

19

distributor (vMVPD) that also offers a broad range of niche sports content. Fubo subscribers can access over 55,000 live sporting events annually, including diverse programming like Spanish-language soccer, high school sports, and cricket. *See, e.g.*, Press Release, Fubo, *Fubo Bolsters Expansive Sports Programming With Launch of Willow by Vricbuzz, The Premier Cricket Broadcaster* (May 30, 2024), https://perma.cc/P2P7-RCX9; *What Soccer (Football) Leagues can I watch on Fubo?*, Fubo Help Center (Updated July 15, 2024), https://perma.cc/98HF-V3P6; Andy Buhler et al., *Port Neches-Groves dethrones South Oak Cliff: Live Texas high school football championship updates recap*, SI.com (Dec. 17, 2023), https://perma.cc/99Y4-AEYX. Because Fubo is uniquely focused on offering a long tail of niche sports, including options for foreign-language broadcasts (e.g., soccer in French, Portuguese, and Spanish), its elimination would make it harder for consumers to access a diverse range of content.

Several *Amici* have previously raised similar concerns about other large media transactions that eliminated competition by consolidating market power among a smaller number of distributors. These mergers include AT&T-DirecTV, AT&T-Time Warner, and Disney-Fox, among others. *See, e.g.*, *Public Knowledge Petition to Deny on AT&T/DirecTV Merger*, Public Knowledge (Sept. 16, 2014), https://perma.cc/4WAH-SP2J; Press Release, Open Markets Institute, *Open Markets Institute Supports the Justice Department's decision to sue to block AT&T's effort to*

*buy Time Warner* (Nov. 21, 2017), https://perma.cc/W2A5-U3WM; Shiva Stella,

*Public Knowledge Calls for Thorough Antitrust Review to Block Disney-Fox Deal to*

*Protect Consumers*, Public Knowledge (Dec. 14, 2017), https://perma.cc/N3CN-

WUUJ. Despite promises that the mergers would result in countless benefits for

consumers, including an increase in output, those promises never came to fruition.

As the Writers Guild of America West observed, "Over and over, these companies

promised lower prices and more choice for customers. However, once regulators

cleared the mergers, consumers saw price hikes at AT&T-DirecTV, less diversity of

content at Disney-Fox, and fewer streaming choices at AT&T-Time Warner." *See,*

*e.g.*, *Broken Promises: Media Mega-Mergers and the Case for Antitrust Reform*,

Writers Guild of Am. West (Dec. 21, 2021), https://perma.cc/R7AB-F3DE.

### 3.  The JV Would Result in Less Innovation

As the sole offeror of a skinny sports bundle, the JV (i.e., Defendants) would

have little incentive to innovate. Competition is a key driver of innovation and the

absence of competition breeds stagnation. Currently, there is a particularly high rate

of innovation in sports broadcasting, thanks to some degree of competition and new

technologies. Real-time data analysis, multiple feeds, and new broadcasting

techniques like drone-mounted cameras are just a few of the relatively new features

that sports fans can enjoy. *See, e.g.*, David Jarvis, et. al, *Live sports: The next arena*

*for the streaming wars*, Deloitte Insights, (Nov. 30, 2022), https://perma.cc/ESH5-

CBJU. In the context of this broader trend, Fubo has shown itself to be a leading innovative competitor. One commentator noted, "FuboTV was the only live-TV streaming service . . . to support 4K HDR video for the World Cup, and it was the first to adopt an industry standard for handling sports blackouts. It also introduced dynamic ad insertion ahead of Hulu and YouTube TV. Those moves have helped turn industry skeptics into believers." Jared Newman, *The little live-TV streaming service that could*, Fast Company (Aug. 9, 2018), https://perma.cc/JE9C-ANQB.

If the JV drives companies like Fubo out of business, consumers would be deprived of the innovation that a relatively smaller and more nimble company can bring to market. The bottom line is that absent the threat of consumers switching to a different skinny sports bundle, Defendants would have little to no incentive to innovate. As a recent *New York Times* op-ed aptly stated, "[I]n the long run, it is competition — not consolidation — that delivers technological progress." Mark Lemley and Matt Wansley, Opinion, *How Big Tech Is Killing Innovation*, N.Y. Times (June 13, 2024), https://perma.cc/H5KP-SVVG.

### D. Sports Leagues and Other Creators of Sports Content Would Suffer Irreparable Harm from the JV

The JV would result in a loss of competition among Defendants, not only as sellers of sports broadcasting rights to distributors and as sellers of a skinny sports bundle to consumers, but also as buyers. While Disney CFO Hugh Johnston claims the Defendants would continue to compete as buyers, there is reason to be skeptical

of that claim. Squawk Box, *Disney CFO Hugh Johnston on Q1 results*. This JV would align Defendants' incentives in ways that promote coordination, rather than competition, which could well lead to illegal collusion.

Section 7 of the Clayton Act prohibits transactions that would result in monopsony power to the same degree that it prohibits transactions that would result in monopoly power. *See, e.g.*, *United States v. Bertelsmann Se & Co. KGaA*, 646 F.Supp.3d 1, 21-22 (D.D.C. 2022). Monopsony power, also known as buyer power, is the mirror image of monopoly power. Thus, transactions that create a monopsony are assessed under "essentially the [same] framework" as transactions that create a monopoly. *Id.* (quoting U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 12 (2010), https://perma.cc/X8G5-PPNM); *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 321-22 (2007) (because there is a "close theoretical connection" between monopoly and monopsony theories of harm, "similar legal standards should apply").

The JV could effectively reduce the number of buyers that bid for sports leagues' licenses. In markets where there are fewer buyers (and in turn, reduced competition), the price for media content is likely to decrease, causing economic harm to sellers. *See Bertelsmann SE & Co. KGaA*, 646 F. Supp. 1 at 35-38. Niche sports leagues and sellers of foreign-language sports content are most likely to be harmed by this loss of competition and Defendants' morphing from independent,

competing bidders into a single power buyer. Even larger professional leagues could be affected by the JV's creation of a power buyer, in the form of reduced media rights fees and pressure from the all-powerful JV to enter into exclusive deals. In other words, the JV may very well be in a position to make offers to large, professional leagues that "they can't refuse." *See, e.g.*, Michael McCarthy, *Tuned In: Sports Leagues Suspicious of Giant Streamer*, Front Office Sports (Feb. 8, 2024), https://perma.cc/6XGY-2DPP.

As noted above, Fubo is by far the largest MVPD that offers niche sports content including Spanish-language soccer, high school sports, and cricket. *See, e.g.* Press Release, Fubo. If the JV proceeds, driving Fubo and other distributors out of business, these niche sports, such as professional pickleball, ultimate frisbee, and chess boxing, may struggle to find media partners willing to pay for media rights. Instead, these up-and-coming sports would be forced to deal with the JV, likely having to accept whatever paltry deal is offered to the leagues. Because of this, these sports may never reach the eyeballs of potential fans who do not know what they are missing, including the excitement these newer sports can provide.

## II.    The District Court Correctly Found that a Preliminary Injunction Serves the Public Interest by Preventing Harm to Consumers and Preserving Competition

Where a preliminary injunction is necessary to prevent harm to consumers, as in this case, that is generally sufficient for courts to find that a grant of such relief is

24

in the public interest. Here, the district court correctly concluded that "the public interest is served by an injunction preserving the status quo pending full adjudication of these matters." Opinion & Order at 66. Public interest was defined by one district court in this Circuit as "the general welfare of the public that warrants recognition and protection." *Doe v. Zucker*, No. 17-CV-1005, 2019 WL 111020, at *7 (S.D.N.Y. Jan. 4, 2019). In antitrust cases, courts often rely on the potential for harm to competition and consumers as grounds for finding injunctive relief is in the public interest. *See, e.g.*, *United States v. Columbia Pictures Industries, Inc.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980) ("Far more important than the interests of either the defendants or the existing industry, however, is the public's interest in enforcement of the antitrust laws and in the preservation of competition."); *FTC v. Sysco Corporation*, 113 F. Supp. 3d 1, 87 (D.D.C. 2015) (finding that public equities favor grant of preliminary injunction where "the record as a whole . . . raises substantial questions about whether the merger will harm consumers"). In *United States v. Columbia Pictures Industries,* the district court held that "[a]ny doubt concerning the necessity of the safeguarding of the public interest should be resolved by the granting of a preliminary injunction." 507 F. Supp. at 434. In that case, the court held that where a joint venture had "a high potential for the ultimate raising of prices," and would irreparably alter the marketplace, a preliminary injunction was necessary to prevent harm to the public. *Id.* Here, the JV and Defendants' conduct similarly

25

present probable interim harm to the public.

Contrary to arguments set forth by several a*mici* in support of Defendants, private antitrust enforcement, including competitor lawsuits, are an important and valuable complement to the efficient detection of antitrust violations and enforcement of antitrust law. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969) ("[T]he purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief but was to serve as well the high purpose of enforcing the antitrust laws."); *Minn. Mining & Mfg. Co. v. N.J. Wood Finishing Co.*, 381 U.S. 311, 318 (1965) ("Congress has expressed its belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws."). Competitors are the canary in the coal mine. Because they are incentivized to monitor the market for potential opportunities and competitive threats, they are uniquely situated to identify "anticompetitive tendencies in their incipiency." Merger Guidelines § 1 (citing *Brown Shoe Co. v. United States*, 370 U.S. at 318 nn.32-33). Indeed, harm to a competitor is in no way inconsistent with harm to consumers; in fact, it may be the most immediately palpable symptom of harm to competition in the marketplace. As the Honorable Diane Wood, recently retired from the Seventh Circuit Court of Appeals, observed, "True as it might be that 'the antitrust laws are for the protection of competition, not competitors,' it is equally true that without competitors, there will be no competition." *Reviving Competition*

26

*Part 3: Strengthening the Laws to Address Monopoly Power, Hearing Before the Subcomm. on Antitrust, Commercial, and Administrative Law of the H. Comm. on the Judiciary*, 117th Cong. 10 (2021) (statement of the Hon. Diane P. Wood), https://perma.cc/4QAU-XA5L. In many instances, as the district court correctly found here, the relief requested by a competitor in the face of anticompetitive conduct is squarely aligned with the public interest. *See, e.g.*, *In re Google Play Store Antitrust Litig.*, No. 21-md-02981, 2024 WL 4438249, at *4 (N.D. Cal. Oct. 7, 2024) ("Considering the balance of hardships between [the parties], a remedy in equity is warranted, and the public interest, which is perfectly aligned with the restoration of free and unfettered competition, would be well served by a permanent injunction."); *see also LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("3M's exclusionary conduct not only impeded LePage's ability to compete, but also it harmed competition itself"); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 789-90 (6th Cir. 2002) ("[T]here was evidence showing that [Defendant's] actions caused higher prices and reduced consumer choice" in addition to restricting the growth of rivals' market share). Because an injunction barring Defendants from consummating the JV is necessary to prevent harm to consumers and competition, the district court rightly determined that such relief served the public interest.

## **CONCLUSION**

For the reasons set forth above, this Court should affirm the district court's order granting a preliminary injunction.

November 12, 2024                     Respectfully submitted,

*/s/ Amanda G. Lewis*
AMANDA G. LEWIS
CUNEO GILBERT & LADUCA, LLP
4275 Wisconsin Avenue, NW
Suite 200
Washington, D.C. 20016
(202) 789-3960
alewis@cuneolaw.com

*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE**

1.      I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5) and Local Rule 29.1(c). This brief contains 6,350 words, including all headings, footnotes, and quotations, and excluding the parts exempted under Fed. R. App. P. 32(f).

2.      In addition, this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

*/s/ Amanda G. Lewis*
AMANDA G. LEWIS

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 12th day of November 2024, this brief was electronically filed with the Clerk of Court using the ACMS system, which will serve all counsel of record.


*/s/ Amanda G. Lewis*
AMANDA G. LEWIS