# 24-2210

## United States Court of Appeals for the Second Circuit

FUBOTV INC., FUBOTV MEDIA INC.,

*Plaintiffs-Appellees,*

v.

THE WALT DISNEY COMPANY, WARNER BROS. DISCOVERY, INC.,
ESPN, INC., ESPN ENTERPRISES, INC., HULU, LLC, FOX CORPORATION,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF FOR THE STATES OF NEW YORK, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW JERSEY, OREGON, PENNSYLVANIA, RHODE ISLAND, VERMONT, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA, AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH N. VALE
 *Deputy Solicitor General*
SARAH COCO
 *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Amici States
28 Liberty Street
New York, New York 10005
(212) 416-6312

Dated: November 26, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTERESTS OF AMICI CURIAE ..................................................... 1

STATEMENT OF THE CASE ........................................................... 3

    A.   Factual Background .......................................................... 3

    B.   Procedural Background ..................................................... 8

ARGUMENT ..................................................................................... 10

POINT I

    As Antitrust Enforcers, Amici States Regularly Bring
    Actions to Address Anticompetitive Joint Conduct ................... 10

POINT II

    The District Court Correctly Concluded That the "No
    Duty to Deal" Doctrine Is Not a Defense to Joint Conduct ....... 16

    A.   The "No Duty to Deal" Doctrine Does Not Apply to Joint
        Conduct. ......................................................................... 17

    B.   The "No Duty to Deal" Doctrine Does Not Apply to
        Defendants' Joint Venture, Which Is the Concerted
        Action Subject to Plaintiffs' Clayton Act Claim. ............ 24

CONCLUSION ................................................................................. 30

i

## TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Anheuser-Busch, Inc. v. Abrams,*
   71 N.Y.2d 327 (1988) ........................................................................ 10

*Associated Press v. United States,*
   326 U.S. 1 (1945) .............................................................................. 19

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.,*
   846 F.3d 1297 (10th Cir. 2017) ..................................................... 22-23

*Copperweld Corp. v. Independence Tube Corp.,*
   467 U.S. 752 (1984) .................................................................. 11, 20-21

*Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC,*
   111 F.4th 337 (4th Cir. 2024) ........................................................... 27

*Federal Trade Comm'n v. Shkreli,*
   581 F. Supp. 3d 579 (S.D.N.Y. 2022) ............................................ 13-14

*Federal Trade Comm'n v. Syngenta Crop Prot. AG,*
   711 F. Supp. 3d 545 (M.D.N.C. 2024) ............................................... 14

*Hawaii v. Standard Oil Co.,*
   405 U.S. 251 (1972) .......................................................................... 10

*In re Adderall XR Antitrust Litig.,*
   754 F.3d 128 (2d Cir. June 19, 2014 (as corrected)) ......................... 22

*In re Dealer Mgmt. Sys. Antitrust Litig.,*
   680 F. Supp. 3d 919 (N.D. Ill. 2023) ................................................. 23

*In re Elevator Antitrust Litig.,*
   502 F.3d 47 (2d Cir. 2007) ............................................................... 22

*In re Generic Pharms. Pricing Antitrust Litig.,*
   No. 16-MD-2724, 2023 WL 2244685 (E.D. Pa. Feb. 27, 2023) ........... 13

| Cases | Page(s) |
|---|---|

*In re Namenda Indirect Purchaser Antitrust Litig.*,
338 F.R.D. 527 (S.D.N.Y. 2021) ........................................ 10

*New York ex rel. Schneiderman v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) ............................................. 26

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) .......................................... 2, 15, 19-21

*United States v. American Airlines Grp. Inc.*,
No. 23-1802, 2024 WL 4716418 (1st Cir. Nov. 8, 2024) ............... 12-13

*United States v. Apple, Inc.*,
791 F.3d 290 (2d Cir. 2015) .......................................... 28-29

*United States v. Terminal R.R. Ass'n of St. Louis*,
224 U.S. 383 (1912) .................................................. 19-20

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2001) .......................................... 2, 15, 18-21

*Watson Lab'ys, Inc.*,
101 F.4th 223, 235 (2d Cir. 2024) .................................... 27

*Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*,
331 F. Supp. 2d 513 (E.D. Tex. 2004) ................................. 23

## Statutes

15 U.S.C.
§ 1 ............................................................. 11-12, 23
§ 2 .................................................................. 12
§ 15c ............................................................... 10
§ 18 .............................................................. 1, 12
§ 26 ................................................................ 10

iii

**Miscellaneous Authorities**        **Page(s)**

Federal Trade Cmm'n & U.S. Dep't of Just., *Antitrust Guidelines for Collaborations Among Competitors* (Apr. 2000) ........................... 11

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (5th ed. Sept. 2024 update)......................................... 12, 17-18, 21, 23

Phillip E. Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J. 841 (1990)........................21-23

iv

## INTERESTS OF AMICI CURIAE

In this antitrust case, plaintiffs-appellees FuboTV, Inc., and FuboTV Media, Inc. ("Fubo"), allege that defendants-appellants the Walt Disney Company, Fox Corporation, and Warner Bros. Discovery, Inc., violated § 7 of the Clayton Act, 15 U.S.C. § 18, by forming a joint venture to create a new television streaming service, Venu Sports. Although defendants usually compete against each other in licensing television content to distributors, they have agreed to license their live-sports content—which constitutes at least sixty percent of all nationally broadcast U.S. sports content—to their joint venture unbundled from other, nonsports content. In stark contrast, defendants license the same live-sports content to distributors like Fubo only as a bundle with nonsports content, making it necessary for Fubo and other distributors to charge consumers more for the bundled content and preventing them from effectively competing or offering a sports-only product to consumers at all.

The U.S. District Court for the Southern District of New York (Garnett, J.) granted Fubo's motion for a preliminary injunction enjoining defendants from launching the joint venture pending adjudication of

Fubo's claims on the merits. The court found that defendants' joint venture is likely to substantially lessen competition in the live pay television market in violation of § 7 of the Clayton Act because defendants have ensured that the joint venture will be the only streaming service able to offer consumers defendants' live-sports content unbundled from other, nonsports content.

The States of New York, California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Minnesota, New Jersey, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and the District of Columbia file this brief as amici curiae in support of plaintiffs-appellees to address defendants' erroneous argument that their joint venture—which reflects concerted action among three horizontal competitors—can be shielded from antitrust scrutiny by the "no duty to deal" doctrine discussed in the Supreme Court's decisions in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2001), and *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009).

As enforcers of both federal and state antitrust law, Amici States have strong interests in combatting anticompetitive joint conduct, including anticompetitive joint ventures. States frequently bring antitrust

2

enforcement actions against joint conduct, including, for example, agreements among horizontal competitors not to compete on location or price and vertical agreements between manufacturers and distributors to prevent or inhibit new entrants to a market.

Amici States thus have strong interests in the sound development of the antitrust law governing such anticompetitive agreements and concerted actions. Here, the district court properly concluded that the "no duty to deal" doctrine—which posits that a lawful monopolist is not generally required to do business with its competitors—applies only to certain unilateral actions and has no application to concerted actions or agreements among separate entities. Defendants' contrary argument, if adopted, would significantly impede Amici States' ability to combat anticompetitive joint conduct.

## STATEMENT OF THE CASE

### A.  Factual Background

The following facts are drawn from the district court's detailed factual findings after a five-day evidentiary hearing. (*See* District Ct. Opinion & Order (Op.) at 5-24 (Aug. 16, 2024), ECF No. 290.)

In the live-sports television industry, defendants the Walt Disney Company, Fox Corporation, and Warner Bros. Discovery, Inc., each own television networks that act as programmers of live-sports content. Networks, such as ESPN, which is owned by Disney, reach agreements with sports leagues, including the National Football League, National Basketball League, and Major League Baseball, to obtain the rights to televise their sporting events. Programmers package the events for viewing with additional features like commentary and on-field interviews. (Op. at 8-9.)

Programmers like defendants here license their packaged content to distributors, which include cable and satellite television companies, like Comcast, and companies that stream content to consumers over the internet, like plaintiff Fubo. (Op. at 9-10.) Programmers and distributors enter into licensing agreements in which the distributor agrees to pay affiliate fees in exchange for permission to distribute the programmer's content. Affiliate fees are calculated on a per-subscriber, per-month basis. (Op. at 9.) Programmers often bundle content, requiring distributors to distribute and pay for content from several of the programmer's networks together. (Op. at 10.) Programmers generally require bundling of their

live-sports content, which is the most-watched live content, with less popular content—thus preventing distributors from selling unbundled products, like a sports-only bundle, to consumers who would want such products. (Op. at 12, 16.)

Defendants are three of the largest programmers of live-sports content in the television industry. As such, defendants are horizontal competitors who compete against each other to obtain the rights to live-sports content and to attract viewers to their content. (Op. at 18.) Although defendants normally compete, together they can control the rights to at least sixty percent of all nationally broadcast U.S. live-sports content. For professional football, basketball, baseball, and hockey, defendants together control the rights to eighty percent of nationally broadcast games and ninety-eight percent of all playoff games. (Op. at 17-18.)

Plaintiff Fubo launched in 2015 as a multichannel television streaming service focused primarily on live-sports content. (Op. at 5-6.) Fubo obtains licenses for content from networks owned by defendants. Defendants require Fubo and other distributors to obtain licenses for bundles of content, including nonsports content. For example, in order to obtain a license for ESPN, Fubo might be required to also distribute and

5

pay affiliate fees for the Disney Channel, a nonsports network, even if Fubo's sports-focused subscribers do not want the Disney Channel and would prefer to purchase sports-only products that could be offered at lower prices than the bundled products. (Op. at 10-12.)

In February 2024, defendants announced the formation of a joint venture to launch a television streaming service, Venu Sports, focused on live-sports content. Venu will offer fourteen of defendants' top sports networks. In contrast to defendants' usual agreements with distributors, defendants have agreed amongst themselves to license their sports content to Venu unbundled from their other, nonsports content. (Op. at 20-22.) In other words, Venu will pay defendants' affiliate fees only for live-sports content, not for bundled content licensed alongside live-sports content.

Defendants will each own a one-third stake in the joint venture and receive one third of any net profits generated by the joint venture. (Op. at 22, 52.) In addition, defendants will be compensated through individual licensing agreements with the joint venture. For example, Disney, which owns seven of the fourteen networks offered by the joint venture, will earn more in affiliate fees than Warner Brothers Discovery, which owns

6

only three of the networks offered. (*See* Op. at 21.) Defendants orally agreed to "all stay clear" of investments in streaming platforms similar to the joint venture (Op. at 48) and executed a non-compete agreement committing not to own an interest in any other live sports-focused streaming service for three years from the date of the launch of the joint venture (Op. at 22).

Defendants estimate that between fifty and seventy percent of the joint venture's subscribers will switch to the joint venture from an existing subscription to another distributor like Fubo. If existing distributors lose subscribers, affiliate fees that those distributors pay to defendants will shrink. (Op. at 20.) However, the market for live sports is so valuable that one defendant estimated that they will profit from the joint venture if just one new customer subscribes for every three customers who switch from an existing distributor. (Op. at 20-21.)

Venu will be able to offer a sports-only product and charge subscribers a lower price for that product than the price currently charged by Fubo and other distributors. (*See* Op. at 19-20, 60.) But because Fubo and other distributors have long been required to obtain licenses for and distribute defendants' live-sports content bundled with other nonsports

7

content, Fubo and other distributors are effectively prevented from offering any competing sports-only products to consumers at all—let alone sports-only products that could be lower priced than Venu's sports-only product. (*See* Op. at 19, 44-45.)

## B. Procedural Background

In February 2024, Fubo filed this action in the U.S. District Court for the Southern District of New York (Garnett, J.), alleging that defendants' conduct violated federal and state antitrust laws and seeking equitable relief in the form of a permanent injunction. In April 2024, Fubo moved for a preliminary injunction, seeking to enjoin the launch of defendants' joint venture, or, in the alternative, to enjoin defendants from enforcing certain bundling restrictions in their licensing agreements with Fubo. (Op. at 24.) The district court ordered discovery on Fubo's motion and held a five-day hearing. (Op. at 31.)

In August 2024, the district court granted plaintiffs' motion and issued a preliminary injunction enjoining the launch of the joint venture pending adjudication of Fubo's claims on the merits. The district court concluded that plaintiffs were likely to succeed in showing that the effect of defendants' joint venture may be substantially to lessen competition in

the live pay television market, in violation of § 7 of the Clayton Act. (Op. at 34, 39-40, 54.) The district court explained that the joint venture is likely to decrease competition in that market because existing distributors, who are forced by defendants to license and distribute sports content bundled with other content and therefore to charge consumers more, will be unable to compete with the joint venture for consumers of live-sports content. (*See* Op. at 46-47.) As relevant here, the district court rejected defendants' argument that their joint venture was shielded from antitrust scrutiny because, they say, each defendant generally has no duty to deal with Fubo on the same terms as it deals with other distributors, including defendants' own joint venture. The court explained that the "no duty to deal" defense is applicable only to a defendant's unilateral dealings with others and has no application to joint anticompetitive conduct—like the launch of defendants' joint venture—that is challenged under § 7 of the Clayton Act on the grounds that it is concerted action that substantially lessens competition. (Op. at 36-37.) And the court rejected defendants' argument that the effects of their joint venture should be analyzed without considering the context of defendants' licensing agreements requiring Fubo and others to license and distribute bundled content. (Op. at 37.)

9

# ARGUMENT

## POINT I

### AS ANTITRUST ENFORCERS, AMICI STATES REGULARLY BRING ACTIONS TO ADDRESS ANTICOMPETITIVE JOINT CONDUCT

Amici States, through their attorneys general, protect their residents from unfair and anticompetitive conduct by enforcing both federal and state antitrust law. Congress has authorized state attorneys general to bring antitrust actions under federal law to protect their residents from anticompetitive conduct. 15 U.S.C. §§ 15c(a)(1), 26; *see Hawaii v. Standard Oil Co.*, 405 U.S. 251, 261 (1972). Almost all States have also enacted their own state statutes to combat anticompetitive conduct and to authorize their respective state attorneys general to enforce state antitrust law. Although these statutes can be broader than federal law, they often parallel federal law, and courts in many States often rely on interpretations of federal law to interpret their state laws. *See, e.g., In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 572 (S.D.N.Y. 2021); *Anheuser-Busch, Inc. v. Abrams*, 71 N.Y.2d 327, 335 (1988).

In their roles as antitrust law enforcers, Amici States frequently pursue antitrust enforcement actions against joint or concerted conduct

10

that hampers competition. It is well established that such concerted action "inherently is fraught with anticompetitive risk" and is therefore treated more strictly than unilateral activity under antitrust law. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768-69 (1984). That is because joint conduct "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands" and "suddenly increases the economic power moving in one particular direction." *Id.* In other words, there is anticompetitive potential when companies that would normally compete against one another through innovation or price instead enter into agreements that discourage such competition among themselves or other actual or potential market participants. *See*, *e.g.,* Federal Trade Cmm'n & U.S. Dep't of Just., *Antitrust Guidelines for Collaborations Among Competitors* § 2.2 (Apr. 2000).

Indeed, many provisions of federal antitrust law are focused exclusively on joint or concerted conduct among multiple actors. For example, § 1 of the Sherman Act targets any "contract, combination . . . , or conspiracy" among multiple actors that results in a "restraint of trade." 15 U.S.C. § 1. Such contracts, combinations, and conspiracies inherently require cooperation among at least two separate actors. Similarly, § 7 of

11

the Clayton Act prohibits "acquisitions" among at least two actors, including joint ventures, the result of which "may be substantially to lessen competition." *Id.* § 18. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1402 (5th ed. Sept. 2024 update). By contrast, monopolies and attempts to monopolize charged under § 2 of the Sherman Act are typically concerned with *unilateral* conduct—a single actor's efforts to create or maintain a monopoly.[1] 15 U.S.C. § 2.

Joint conduct that violates federal and state antitrust laws can take a variety of forms. For example, anticompetitive joint conduct may take the form of agreements between horizontal competitors not to compete in a market. In *United States v. American Airlines Group Inc.*, six States and the District of Columbia sued American Airlines and JetBlue, seeking to enjoin the airlines' joint venture, through which the airlines agreed to operate as a single carrier with respect to routes in Boston and New York City. No. 23-1802, 2024 WL 4716418, at *1 (1st Cir. Nov. 8, 2024) (affirm-

---

[1] Sherman Act § 2 may also be used to charge actors who "combine or conspire" to monopolize. A § 2 conspiracy or combination claim *does* involve joint conduct, just as Sherman Action § 1 claims and Clayton Act § 7 claims do.

ing judgment for plaintiffs). The court concluded that the joint venture was likely to have anticompetitive effects, including decreased capacity, lower frequencies, or reduced customer choice in at least thirteen markets previously served by both carriers, which would now be served by only one. *Id.* at *7.

States have brought similar enforcement actions against horizontal competitors who have agreed not to compete on price. For example, forty-six States and the District of Columbia brought claims against manufacturers of generic topical pharmaceuticals, alleging that they had engaged in a long-running scheme to fix, maintain, and stabilize prices in the topical pharmaceutical market. *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724, 2023 WL 2244685, at *1, 4 (E.D. Pa. Feb. 27, 2023) (denying motion to dismiss conspiracy claim).

Joint anticompetitive conduct may take the form of vertical agreements with distributors and suppliers to prevent new actors from entering the market. In *Federal Trade Commission v. Shkreli*, for instance, seven States brought claims against defendant drug company Vyera and its founder, Martin Shkreli, after they entered into agreements with distributors to impede competition with their drug from generic drug

13

manufacturers. *See* 581 F. Supp. 3d 579, 590, 602 (S.D.N.Y. 2022). The court found that the agreements prevented generic manufacturers from obtaining quantities of the drug sufficient to conduct testing needed for regulatory approval to enter the market. *Id.* (entering judgment for plaintiffs).

States may bring antitrust actions against defendants for vertical joint conduct with distributors designed to prevent competitors from gaining market share. For example, in *Federal Trade Commission v. Syngenta Crop Protection AG*, twelve States sued Syngenta and Corteva, manufacturers of pesticides, alleging that defendants' loyalty programs for distributors were anticompetitive. 711 F. Supp. 3d 545, 556 (M.D.N.C. 2024) (denying motions to dismiss). Under the loyalty programs, pesticide distributors engaged in written agreements with defendants to cap their purchase of generic substitutes for defendants' products at less than fifteen percent of the total pesticides sold to farmers, in exchange for an annual bonus payment. *Id.* at 558.

As these examples show, States engage in a variety of enforcement actions to prevent joint conduct that harms competition. As explained below, such anticompetitive joint conduct has never been thought to be

14

shielded from antitrust scrutiny through the "no duty to deal" doctrine, which posits that a business, even one with lawfully obtained monopoly power, is not generally liable for unlawful monopolization in violation of § 2 of the Sherman Act by unilaterally refusing to do business with its competitors. *See Trinko*, 540 U.S. at 407-08; *linkLine*, 555 U.S. at 447-450. The "no duty to deal" doctrine applies only to certain types of unilateral conduct at issue in § 2 claims. Expanding the doctrine to apply to joint conduct, such as joint ventures subject to claims under § 7 of the Clayton Act, would significantly hamper States' antitrust enforcement efforts and substantially harm competition and consumers. For example, defendants that enter into vertical anticompetitive agreements with distributors might argue that they have no duty to deal with distributors on terms that do not prevent or impede access to the market for competitors.

## POINT II

### THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE "NO DUTY TO DEAL" DOCTRINE IS NOT A DEFENSE TO JOINT CONDUCT

The district court found that plaintiffs are likely to succeed in showing that defendants' joint venture may substantially lessen competition in the live pay television market, in violation of § 7 of the Clayton Act. (Op. at 34, 39-40.) On appeal, defendants argue that the district court erred because they have no duty to provide the same licensing agreements to Fubo that they have offered to Venu. Defs.-Appellants' Br. at 3, 27-39. That argument rests on two fundamental errors.

First, as the district court correctly concluded, the "no duty to deal" doctrine applies only to certain types of unilateral conduct challenged under § 2 of the Sherman Act and does not apply to joint conduct like the launch of defendants' joint venture here. Second, the relevant conduct enjoined by the district court is exclusively joint conduct—defendants' launch of the joint venture—not defendants' decisions to offer only bundled licensing agreements to Fubo and other distributors. Even assuming defendants' bundled licensing agreements constitute permissible unilat-

eral conduct if entered into on an individual basis, that does not immunize their joint conduct from antitrust liability.

## A. The "No Duty to Deal" Doctrine Does Not Apply to Joint Conduct.

Defendants err in arguing that the district court should have applied the Supreme Court's reasoning in *Trinko* and *linkLine* to defendants' joint venture here. Those decisions addressed only unilateral conduct alleged to violate § 2 of the Sherman Act, not a joint venture alleged to violate § 7 of the Clayton Act or any other concerted action between horizontal competitors. (Op. at 36-37.) As explained above, such concerted action is treated more strictly than unilateral conduct because there is anticompetitive potential when companies that would normally compete against one another through innovation or price instead enter into agreements that discourage such competition among themselves or other actual or potential market participants. See *supra* at 11-12. There are "good reasons" for regulating concerted action more closely than unilateral conduct. Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1402. In particular, concerted action "expands market power," "creates an anticompetitive restraint not

17

otherwise possible," and "surrenders important decision-making autonomy on a matter of competitive significance." *Id.*

Both *Trinko* and *linkLine* concerned Sherman Act § 2 claims in which a single firm's unilateral conduct in declining to deal with its rivals was alleged to constitute unlawful monopolization. In *Trinko*, the Court considered a claim that Verizon, an incumbent local telephone company, had violated § 2 by providing rival phone companies access to its network on a discriminatory basis, resulting in slower service for rivals' customers and incentivizing those customers to use Verizon's services. The Court concluded that while Verizon had a statutory duty under the Telecommunications Act of 1996 to provide rivals access to its network, a lawful monopolist like Verizon generally does not have an antitrust duty under § 2 to deal with its rivals—though there are circumstances where such a duty does exist under § 2. 540 U.S. at 407-08.

*LinkLine* likewise dealt exclusively with unilateral conduct. The Court there considered a Sherman Act § 2 claim against a single business, AT&T, which owned the infrastructure for providing digital subscriber line (DSL) internet service to customers. The plaintiffs, rival sellers of DSL internet, alleged that AT&T had engaged in unlawful monopoliza-

18

tion by effectuating a price squeeze, i.e., charging them high prices to use its infrastructure while charging customers low prices for its own DSL service, thereby preventing the plaintiffs from effectively competing in the market. 555 U.S. at 443-44. The *linkLine* Court relied on *Trinko* and rejected that claim, concluding that AT&T had no general duty to grant its rivals access to its infrastructure at prices that would allow them to compete in the retail market and that AT&T's unilateral conduct did not fall within the circumstances where there is an antitrust duty to deal. *Id.* at 448-50.

In both cases, the Supreme Court carefully cabined its application of the "no duty to deal" doctrine to solely the unilateral conduct at issue, differentiating such unilateral conduct from agreements among or joint conduct by competitors. For example, in *Trinko*, the Court emphasized that its reasoning applied to a single firm's "entirely private business" and the exercise of its "independent discretion," not to concerted conduct. 540 U.S. at 408 (quotation marks omitted). The Court explicitly rejected the *Trinko* plaintiffs' reliance on two earlier cases that had found liability for refusals to deal—*Associated Press v. United States*, 326 U.S. 1 (1945), and *United States v. Terminal Railroad Ass'n of St. Louis*, 224 U.S. 383

19

(1912)—because those cases had "involved *concerted* action, which presents greater anticompetitive concerns" than unilateral conduct. *Id.* at 410 n.3. Similarly, in *linkLine*, the Court recognized that AT&T's alleged price squeeze was "purely unilateral conduct" and repeatedly emphasized that its analysis was limited to "a firm's unilateral refusal to deal with its rivals." 555 U.S. at 448-49.

The key reasons the Court provided for applying the "no duty to deal" doctrine to unilateral conduct do not pertain to joint conduct. First, the Court reasoned that forcing a business that lawfully obtained monopoly power by developing innovative facilities or infrastructure to share those resources with its own competitors might "lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Trinko*, 540 U.S. at 407-08. But just as *forcing* rivals to work together can harm competition, allowing rivals to agree to work together can also harm competition. Indeed, applying the "no duty to deal" doctrine to joint conduct challenged under § 1 of the Sherman Act, § 2's conspiracy provision, or § 7 of the Clayton Act would be inimical to the fundamental premise of those provisions, which is that concerted action among competitors can be fraught with anticompetitive risk. *See Copperweld Corp.*, 467

20

U.S. at 768-69. As the Court in *Trinko* emphasized, "compelling negotiation between competitors may facilitate the supreme evil of antitrust: collusion." 540 U.S. at 408.

Second, the Court reasoned that imposing a duty to deal on a lawful monopolist's unilateral business decisions would create judicial administrability problems, such as requiring courts to identify "the proper price, quantity, and other terms of dealing." *linkLine*, 555 U.S. at 452 (quotation marks omitted). Joint refusals to deal, by contrast, pose no such difficult questions and are instead "amenable to a remedy that does not require judicial estimation of free-market forces." *Trinko*, 540 U.S. at 410 n.3. Specifically, "[p]rohibiting a collective refusal to deal requires no more than a finding that the agreement exists and an injunction against its continuation." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 770, 770e(3) (5th ed. Sept. 2024 update); *see also* Phillip E. Areeda, *Essential Facilities: An Epithet in Need of Limiting Principles*, 58 Antitrust L.J.

841, 844 (1990) ("concerted exclusion is much easier to remedy" than a unilateral refusal to deal).[2]

Consistent with *Trinko* and *linkLine*'s concern with solely unilateral conduct, courts have rejected attempts to assert a "no duty to deal" defense to joint conduct. In *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, plaintiff Buccaneer, a natural gas producer, sued two defendant natural gas producers that jointly owned a natural gas pipeline, alleging that they had conspired to refuse to provide Buccaneer access to their pipeline. 846 F.3d 1297, 1301 (10th Cir. 2017). The Tenth Circuit rejected defendants' argument that their joint conduct was "immunized" by *Trinko* because they had no duty to make their pipeline available to Buccaneer. As the court explained, the "general right to refuse to deal with competitors applies only to single, not multiple, actors—to unilateral, not concerted action." *Id.* at 1309. For that reason, "*Trinko* simply does

---

[2] Defendants also misplace their reliance (Defs.-Appellants' Br. at 33) on this Court's decisions in *In re Adderall XR Antitrust Litig.*, 754 F.3d 128 (2d Cir. June 19, 2014 (as corrected)) and *In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007). As relevant here, those cases addressed Sherman Act § 2 claims and involved the application of *Trinko* to exclusively unilateral conduct. *See In re Adderall*, 754 F.3d at 134-35; *In re Elevator*, 502 F.3d at 49, 52-54 (applying *Trinko* to plaintiffs' unilateral monopolization claims in Counts III-X).

not speak to claims . . . alleging concerted refusals to deal." *Id.*; *see In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 1004 (N.D. Ill. 2023). Other courts have similarly recognized that *Trinko* and *linkLine* are limited to Sherman Act § 2 claims alleging unilateral conduct, not § 1 claims alleging agreements that restrain trade or Clayton Act § 7 claims alleging anticompetitive acquisitions or joint ventures. *See Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 547 (E.D. Tex. 2004) (court "decline[d] to read *Trinko* so as to lessen antitrust liability in contexts other than those addressed in that opinion").

Antitrust scholars have recognized that the "no duty to deal" doctrine described in *Trinko* and *linkLine* does not apply to joint conduct. The leading treatise emphasizes the "contrast between collective and individual refusals to deal, and the consequences of attempting to apply antitrust law to them." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 770e(2). As the treatise explained, unlike unilateral conduct, a "collective refusal to deal is readily described as a 'combination or conspiracy in restraint of trade.'" *Id.*; *see also* Areeda, *Essential Facilities, supra*, at 842-45 (describing different

23

analyses courts should apply to "multifirm" and "single firm" refusals to deal) (cited in *Trinko*, 540 U.S. at 410-11).

## B. The "No Duty to Deal" Doctrine Does Not Apply to Defendants' Joint Venture, Which Is the Concerted Action Subject to Plaintiffs' Clayton Act Claim.

Defendants further err in arguing that the district court was required to consider whether their licensing agreements with Fubo, standing alone, constitute lawful unilateral refusals to deal. *See* Defs.- Appellants' Br. at 36. That argument misapprehends the legal question at issue in this appeal, which is whether defendants' concerted action, i.e., their *joint venture*, is likely to substantially lessen competition. Defendants' purportedly unilateral licensing deals do not immunize their joint conduct from antitrust liability.

The joint conduct challenged by Fubo's Clayton Act claim, and prohibited by the district court's preliminary injunction, is the launch of defendants' joint venture—not defendants' licensing deals with Fubo and other distributors. (Op. at 68.) While Fubo alleges separate antitrust claims based on other elements of defendants' business practices, including defendants' bundled licensing agreements, Fubo's § 7 claim is based on the anticompetitive effects of defendants' joint venture. (Am. Compl.

24

at 64-65, Dist. Ct. ECF No. 144.) For example, Fubo alleges that through their joint venture, defendants "will consolidate their sports content rights and offer that combined content to consumers," and that this combination will "substantially lessen competition" in the live pay television market. (Am. Compl. at 64-65.) Indeed, the district court explicitly declined to "reach the question of the legality of bundling" in issuing the preliminary injunction. (Op. at 4.) And the preliminary injunction enjoins defendants from launching their joint venture (Op. at 69) without proscribing defendants' existing licensing practices or requiring defendants to offer Fubo an unbundled licensing agreement.

The district court properly focused on whether defendants' joint venture may substantially lessen competition in violation of § 7. As the district court found, the joint venture will be the *only* live-sports streaming service to offer unbundled content, including at least sixty percent of all nationally broadcast content. (Op. at 4-5, 17-18.) As a result of its market position, the district court found, the joint venture is likely to have several anticompetitive effects. First, the joint venture includes an agreement among defendants not to invest in a similar live-sports focused streaming service for at least three years, eliminating one poten-

tial source of competition. (Op. at 47-49.) Second, the joint venture will incentivize defendants not to offer unbundled licensing agreements to other distributors that would allow those distributors to effectively compete with the joint venture. (Op. at 49-50.) Third, the joint venture creates an incentive for defendants to collude rather than compete with each other in the market for live-sports content. (Op. at 50.) Fourth, migration of subscribers from existing distributors to the joint venture will give defendants greater leverage in negotiating future licensing agreements with distributors. (Op. at 51-53.) And finally, the joint venture may allow defendants to raise prices for consumers because an effective competitor to the joint venture is unlikely to emerge. (Op. at 53.)

Contrary to defendants' argument (Defs.-Appellants' Br. at 39), the district court properly considered their existing licensing agreements as important context in determining the likely anticompetitive effects of the joint venture. "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015) (quoting *Trinko,* 540 U.S. at 411). Defendants cannot prevail by "tightly compartmentalizing the various factual components" of Fubo's case "and

26

wiping the slate clean after scrutiny of each." *Watson Lab'ys, Inc.*, 101 F.4th 223, 235 (2d Cir. 2024) (quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)); *see Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 355 (4th Cir. 2024). As the district court observed, defendants' bundling requirements are relevant because, absent those requirements, the joint venture could be one of many live-sports streaming services offering unbundled sports content to consumers, encouraging competition on price and innovation. But the district found that by refusing to provide unbundled live-sports content to other distributors, defendants have created a "multi-year monopolistic runway" for their joint venture. (Op. at 5.) That context is plainly relevant to determining the joint venture's likely effects on competition.

Amici States' experience as antitrust enforcers further undermines defendants' argument that their purportedly unilateral licensing deals with distributors other than Venu can immunize defendants from liability for the anticompetitive effects of their joint conduct. In Amici States' experience, joint conduct may violate the antitrust laws when it is properly

27

considered in context, even if one piece of a defendant's conduct might, standing alone, be lawful.

For example, in *United States v. Apple, Inc.*, this Court concluded that coordinated conduct violated the antitrust law regardless of whether parts of defendant's actions would be lawful on their own. In that case, Apple sought to wrest control of pricing in the ebook market away from Amazon by making agreements with the five major book publishers, in which the publishers required all distributors of ebooks, including Amazon and Apple, to set certain prices for ebooks. 791 F.3d 290, 296-97 (2d Cir. 2015). This strategy would have prevented Amazon from cornering the market by selling ebooks below their wholesale price. *See id.* at 299. Thirty-three States and territories brought antitrust claims under § 1 of the Sherman Act and state antitrust laws. *Id.* at 296. This Court held that Apple had orchestrated a horizontal price-fixing conspiracy by making agreements with publishers that incentivized publishers to collude to renegotiate their distribution agreements with Amazon. *See id.* at 314.

As relevant here, Apple argued that its conduct was permissible because its individual agreements with publishers were simply lawful contracts. This Court rejected that argument, concluding that even if

28

Apple's contracts with publishers were "lawful in the abstract," that conclusion could not immunize Apple from liability for the anticompetitive effects of its *joint* conduct with the five publishers to set higher prices for ebooks. *Id.* at 316-20. In other words, the Court concluded that irrespective of the legality of Apple's contract with each publisher, Apple's concerted conduct with all five publishers constituted an antitrust violation. *Id.*

In keeping with these precedents, the district court here properly rejected defendants' "no duty to deal" defense. Regardless of whether defendants' licensing deals might in the abstract be legal under that defense, defendants' joint venture violates § 7 of the Clayton Act if it substantially lessens competition in the relevant market.

## CONCLUSION

The Court should affirm the district court's judgment.

Dated:   New York, New York
         November 26, 2024

                              Respectfully submitted,

                              LETITIA JAMES
                                *Attorney General*
                                *State of New York*


                          By:   */s/ Sarah Coco*
                                SARAH COCO
                                Assistant Solicitor General

                                28 Liberty Street
BARBARA D. UNDERWOOD            New York, NY 10005
  *Solicitor General*           (212) 416-6312
JUDITH N. VALE
  *Deputy Solicitor General*
SARAH COCO
  *Assistant Solicitor General*
     *of Counsel*


            *(Counsel listing continues on next page.)*

30

ROB BONTA
 *Attorney General*
 *State of California*
1300 I St.
Sacramento, CA 95814

PHILIP J. WEISER
 *Attorney General*
 *State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
 *Attorney General*
 *State of Connecticut*
165 Capitol Ave.
Hartford, CT 06106

KATHLEEN JENNINGS
 *Attorney General*
 *State of Delaware*
820 N. French St.
Wilmington, DE 19801

KWAME RAOUL
 *Attorney General*
 *State of Illinois*
115 South LaSalle St.
Chicago, IL 60601

AARON M. FREY
 *Attorney General*
 *State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
 *Attorney General*
 *State of Maryland*
200 Saint Paul Pl., 20th Fl.
Baltimore, MD 21202

ANDREA JOY CAMPBELL
 *Attorney General*
 *Commonwealth of*
  *Massachusetts*
One Ashburton Pl.
Boston, MA 02108

KEITH ELLISON
 *Attorney General*
 *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
 King Jr. Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
 *Attorney General*
 *State of New Jersey*
25 Market St.
Trenton, NJ 08625

ELLEN F. ROSENBLUM
 *Attorney General*
 *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

MICHELLE A. HENRY
 *Attorney General*
 *Commonwealth of*
  *Pennsylvania*
Strawberry Sq., 16th Fl.
Harrisburg, PA 17120

PETER F. NERONHA
  *Attorney General*
  *State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
  *Attorney General*
  *State of Vermont*
109 State St.
Montpelier, VT 05609

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
P.O. Box 40100
Olympia, WA 98504

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 6th St., N.W., Ste. 8100
Washington, D.C. 20001

**CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Emily Paule, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 5,515 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

 /s/ *Emily Paule*