# No. 24-2210

IN THE

## United States Court of Appeals
## for the Second Circuit

FUBOTV INC. and FUBOTV MEDIA INC.,
*Plaintiffs-Appellees*,

v.

THE WALT DISNEY COMPANY, ESPN, INC., ESPN ENTERPRISES, INC.,
HULU, LLC, FOX CORPORATION, AND WARNER BROS. DISCOVERY, INC.,
*Defendants-Appellants*.

On Appeal from the United States District Court for the Southern
District of New York, Hon. Margaret M. Garnett, No. 1:24-cv-01363

## BRIEF FOR THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES

JONATHAN S. KANTER
    *Assistant Attorney General*

DOHA G. MEKKI
    *Principal Deputy Assistant
    Attorney General*

JOHN W. ELIAS
    *Deputy Assistant Attorney
    General*

DAVID B. LAWRENCE
    *Policy Director*

ALICE A. WANG
SPENCER D. SMITH
    *Counsels to the Assistant
    Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
MATTHEW A. WARING
    *Attorneys*

U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., NW
Room 3224
Washington, DC 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov

*Counsel for the United States*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. i

TABLE OF AUTHORITIES ........................................................ ii

INTEREST OF THE UNITED STATES ................................. 1

STATEMENT .................................................................................. 2

ARGUMENT ................................................................................... 9

    A.  Supreme Court Decisions On Unilateral Refusals To Deal With Rivals Under Section 2 Of The Sherman Act Do Not Apply To Fubo's Claim Under Section 7 Of The Clayton Act ..................... 12

    B.  The District Court's Conclusion That Plaintiffs Established A Likelihood Of Success On Their Section 7 Claim Should Be Affirmed. .................................................................................. 22

CONCLUSION ............................................................................... 36

CERTIFICATE OF COMPLIANCE ........................................ 37

CERTIFICATE OF SERVICE .................................................. 38

# TABLE OF AUTHORITIES

**Cases** Page(s)

*American Needle, Inc. v. NFL*,
  560 U.S. 183 (2010)................................................................15

*Andrx Pharmaceuticals, Inc. v. Biovail Corp. International*,
  256 F.3d 799 (D.C. Cir. 2001)................................................24

*Atlantic Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990)................................................................24

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................19

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)................................................................34

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)........................................................ *passim*

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984)................................................................15

*Ford Motor Co. v. United States*,
  405 U.S. 562 (1972)................................................................18

*Fraser v. Major League Soccer, LLC*,
  284 F.3d 47 (1st Cir. 2002)....................................................35

*Fruehauf Corp. v. FTC*,
  603 F.2d 345 (2d Cir. 1979).............................................17, 26

*FTC v. Hackensack Meridian Health, Inc.*,
  30 F.4th 160 (3d Cir. 2022)....................................................21

*FTC v. Penn State Hershey Medical Center*,
838 F.3d 327 (3d Cir. 2016) ..................................................... 31

*FTC v. Tapestry, Inc.*,
-- F. Supp. 3d --, 2024 WL 4647809 (S.D.N.Y. Nov. 1, 2024) .............. 16

*Geneva Pharmaceuticals Tech. Corp. v. Barr Labratories Inc.*,
386 F.3d 485 (2d Cir. 2004) ............................................... 28, 29

*Gulf & W. Industries, Inc. v. Great Atlantic & Pacific Tea Co.*,
476 F.2d 687 (2d Cir. 1973) .................................................. 19

*Illumina, Inc. v. FTC*,
88 F.4th 1036 (5th Cir. 2023) ........................................... 18, 20

*In re Elevator Antitrust Litigation*,
502 F.3d 47 (2d Cir. 2007) ................................................... 14

*NCAA v. Alston*,
594 U.S. 69 (2021) ........................................................... 26

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ............................................... 14

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
555 U.S. 438 (2009) ...................................................... 14, 21

*ProMedica Health System, Inc. v. FTC*,
749 F.3d 559 (6th Cir. 2014) ............................................. 16, 17

*Saint Alphonsus Medical Center.-Nampa Inc. v. St. Luke's Health
System, Ltd.*, 778 F.3d 775 (9th Cir. 2015) ......................... 21, 23, 30

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) .......................................................... 13

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
988 F.3d 690 (4th Cir. 2021) ................................................. 24

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ................................................................ 15

*United States v. American Airlines Group Inc.*,
  675 F. Supp. 3d 65 (D. Mass. 2023) .................................... 32

*United States v. American Airlines Group Inc.*,
  -- F.4th --, 2024 WL 4716418 (1st Cir. 2024) ................ 26, 32

*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017) .................................. 23, 30, 31

*United States v. Bertelsmann SE & Co. KGaA*,
  646 F. Supp. 3d 1 (D.D.C. 2022) .................................... 17, 18

*United States v. Columbia Pictures Industries, Inc.*,
  659 F.2d 1063 (2d Cir. 1981) .......................................... 10-11

*United States v. Columbia Pictures Industries, Inc.*,
  507 F. Supp. 412 (S.D.N.Y. 1980) ................................ 11, 32

*United States v. First National Bank & Trust Co. of Lexington*,
  376 U.S. 665 (1964) .............................................................. 32

*United States v. H & R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) ....................................... 17

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) (en banc) .......................... 16, 20

*United States v. Penn-Olin Chemical Co.*,
  378 U.S. 158 (1964) ...................................................... *passim*

*United States v. Waste Management, Inc.*,
  743 F.2d 976 (2d Cir. 1984) ................................................ 23

iv

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, *LLP*,
540 U.S. 398 (2004)............................................................... 13, 14, 15

**Statutes**

15 U.S.C. § 1 ................................................................. *passim*

15 U.S.C. § 2 ................................................................. *passim*

15 U.S.C. § 18 ............................................................... *passim*

15 U.S.C. § 26 ...................................................................13

**Rules**

Federal Rule of Appellate Procedure 29(a)(2) .........................................2

**Other Authorities**

United States Department of Justice & Federal Trade Commission,
*Merger Guidelines* (2023)………………………………….……..*passim*

## INTEREST OF THE UNITED STATES

The United States enforces the federal antitrust laws and has a strong interest in their correct interpretation. The district court preliminarily enjoined the formation of Defendants' joint venture under Section 7 of the Clayton Act, 15 U.S.C. § 18. In challenging that decision, Defendants argue that the district court failed to apply case law addressing unilateral refusals to deal with rivals under Section 2 of the Sherman Act, 15 U.S.C. § 2. The United States regularly files merits and amicus briefs addressing the proper application of Section 7, *see, e.g.*, Br. of Appellant, *United States v. U.S. Sugar Corp.*, No. 22-2806 (3d Cir. Nov. 1, 2022), ECF No. 52, https://www.justice.gov/media/1257481/dl?inline; Br. of Appellant, *United States v. AT&T Inc.*, No. 18-5214 (D.C. Cir. Oct. 18, 2018), https://www.justice.gov/media/973241/dl?inline; Statement of Interest, *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-cv-545 (E.D. Va. May 9, 2022), https://www.justice.gov/media/1221996/dl?inline, and addressing the scope of Section 2's refusal-to-deal doctrine, *see, e.g.*, Br. of U.S. as Amicus Curiae, *Chase Mfg., Inc. v. Johns Manville Corp.*, No. 22-1164 (10th Cir. Oct. 12, 2022), https://www.justice.gov/media/1251336/

dl?inline; Br. of U.S. as Amicus Curiae, *New York v. Facebook, Inc.*, No. 21-7078 (D.C. Cir. Jan. 28, 2022), https://www.justice.gov/media/ 1188646/dl?inline. The United States submits this brief under Federal Rule of Appellate Procedure 29(a)(2) and urges this Court to hold that Fubo established a likelihood of success on its Section 7 claim.

## STATEMENT

This case involves the formation of a joint venture among Disney (the owner of ESPN), Fox, and Warner Brothers Discovery, which together control over half the TV rights to live sports in this country. The joint venture, Venu, will have the "exclusive right to license" and distribute its owners' sports channels "unbundled from their general entertainment channels." Op. 46. The district court preliminarily enjoined Venu's launch, finding that Fubo had shown a likelihood of success on its claim that Venu's formation may substantially lessen competition in violation of Section 7 of the Clayton Act.

1. In the television industry, "[l]ive sports are special." Op. 16. They are almost always "consumed in real time," which attracts advertisers because ads during sporting events are less likely to be recorded and skipped. *Id.* The fans who watch live sports are a

2

"remarkably reliable and durable" audience. *Id.* And sports have "broad cultural appeal" to many different demographics. *Id.* This combination of attributes "makes live sports extraordinarily valuable media properties." *Id.*

Producing and distributing live sports TV content generally involves three steps. First, sports leagues create content by scheduling and holding sporting events. Op. 8. Second, the leagues sell the rights to televise those events to "programmers"—i.e., TV networks such as ESPN and FOX Sports 1. *Id.* Third, programmers license their channels to distributors through "carriage agreements" that charge distributors "affiliate fees" on a per-subscriber basis. *Id.* at 9. TV distributors include both traditional cable and satellite companies, such as Comcast, Charter, and DIRECTV (multichannel video programming distributors, or "MVPDs") and newer entrants, such as plaintiff Fubo,[1] that stream TV to subscribers over the internet (virtual MVPDs, or "vMVPDs"). *Id.* at 9.

---

[1]     Plaintiffs-Appellees are fuboTV Inc. and fuboTV Media Inc. This brief refers to them collectively as "Fubo." Op. 1.

Programmers carefully restrict how distributors can buy and package programmers' channels. "[F]or at least the last four decades," programmers have "bundled" their sports and nonsports channels together. Op. 12. This means distributors must carry "less-desirable" channels in order to receive programmers' "must have" sports channels. *Id.* Programmers' carriage agreements with distributors also typically impose "minimum penetration requirements," which require distributors to make particular networks available to at least a specified portion of their subscribers. *Id.* at 11.[2]

Due in large part to programmers' bundling and minimum penetration requirements, distributors have traditionally offered their subscribers only a "'fat' bundle" that "includes hundreds of television channels of all varieties purchased together for a single monthly fee." Op. 13. Some consumers appreciate this wide array of content. *Id.* at 11. But many others "resent[] paying for products they d[o] not want or

---

[2] For example, a minimum penetration requirement of 85% for a particular channel means that a distributor must provide that channel to 85% of its subscribers—and pay the affiliate fee for each subscriber receiving the channel—whether subscribers watch the channel or not. Op. 11.

watch." *Id.* As a result—and because of the rise of on-demand streaming services like Netflix—consumers have increasingly canceled traditional pay TV service in recent years: Since 2015, the number of subscribers to MVPDs and vMVPDs has dropped by 26%, a phenomenon called "cord cutting." *Id.* at 14. Because the fat bundle is "no longer as appealing to consumers as it may once have been, or as accepted by consumers (regardless of appeal) who now have other options," programmers and distributors face increasing pressure to adapt and offer alternatives. *Id.* at 13.

2.      Defendants-Appellees are programmers that each operate multiple channels with sports content. Op. 6-7.[3] Defendants are the "dominant" broadcasters of live sports, *id.* at 18, collectively controlling about 54% of U.S. sports rights and over 60% of nationally-broadcast sports rights, *id.* at 17.

---

[3]      This brief uses "Defendants" to refer to The Walt Disney Company, Fox Corporation, and Warner Brothers Discovery, Inc., the three parties that agreed to form Venu. The other defendants in this case are ESPN, Inc., and ESPN Enterprises, Inc., which are Disney subsidiaries, and Hulu, LLC, a Disney affiliate. Op. 6 nn. 2-3.

In early 2024, Defendants agreed to form a joint venture called "Venu Sports." Op. 21. Venu would be a sports-focused streaming service offering 14 of Defendants' sports networks, along with other sports content. *Id.* at 21. "Unlike any other offering currently in the market," Venu would offer these sports channels "*completely unbundled* from any other of the JV Defendants' networks." *Id.* at 19.

Under Venu, Defendants would each retain the ability to license their own sports networks to distributors and to stream their own networks directly to consumers. Op. 22. But a noncompete clause in the venture's binding term sheet expressly forbids Defendants, for three years from Venu's launch, from owning any interest in another "sports-centric vMVPD" that distributes multiple programmers' sports channels. *Id.* This written noncompete clause originated from a broader, oral agreement among Defendants that they "would all stay clear of a [Venu]-like platform." *Id.* at 48 (brackets omitted); *id.* at 4.

3.      Shortly after Venu was announced, Fubo filed this lawsuit, challenging Venu's formation under Section 7 of the Clayton Act and Section 1 of the Sherman Act. Dkt. 1; *see also* Dkt. 144 (Amended Complaint). Fubo then moved to preliminarily enjoin Venu's launch.

6

Op. 24. After "approximately three months of expedited but extensive discovery," *id.* at 29, the submission of hundreds of exhibits, Fubo Br. 15, and a five-day evidentiary hearing featuring 18 live witnesses and deposition testimony from seven witnesses, Op. 31-32, the district court granted a preliminary injunction, *id.* at 69.

As relevant here, the district court held that Fubo had shown a likelihood of success on its Section 7 claim because Venu may substantially lessen competition in a relevant market for live pay television, where distributors compete to sell packages of TV channels to consumers. Op. 39. The court found that Defendants had "uniformly and systematically" used bundling to prevent any distributor in the live pay TV market from "offering a multi-channel sports-focused streaming service," despite consumer demand for such a product. *Id.* at 45-46. "Not only do the JV [joint-venture] Defendants intend to capture this demand," the court explained, "but the JV is structured and incentivized to maximize the extent to which the JV Defendants keep that demand to themselves." *Id.* at 46.

The district court identified "at least" five ways in which Venu would tend to lessen competition in the relevant market. Op. 47. First,

7

Defendants' express agreement not to compete with Venu would prevent Defendants from "joining forces with other competitor sports licensors" to develop an alternative to Venu. *Id.* Thus, Venu would "enjoy[] the benefits of offering exclusive live sports-only content without competition" and have "an unobstructed runway to dominance." *Id.*

Second, the court found that "the existence of the JV itself incentivizes the JV Defendants to prevent and suppress other potential sports-focused bundles from meaningfully competing." Op. 49. The court found that Defendants would be "materially incentivized" to "prevent others from diminishing the value of their investment" in Venu, *id.* at 50—including "distributors seeking unbundled sports content after the JV launches," *id.* at 49.

Third, the court held that Venu would deter Defendants from "meaningful competition against each other." Op. 50. Once Venu was launched, Defendants would "not be aligned toward competition among themselves" (e.g., by forming their own multi-channel sports streaming services); they would "want to ensure their investment succeeds." *Id.*

8

Fourth, the district court found that Venu would serve as a "backstop" that would give Defendants increased leverage to raise prices and impose bundling requirements on distributors. Op. 51. Given the "central importance of live sports" to consumers, Defendants could walk away from negotiations with a distributor if necessary, secure in the knowledge that if that distributor dropped Defendants' channels, many of the distributor's subscribers would turn to Venu. *Id.*

Finally, the district court found that Venu may "eventually allow the JV Defendants to raise prices directly for consumers, unchecked by meaningful competition." Op. 53. Indeed, the evidence showed that Defendants expected Venu would be able to raise prices consistently once it established itself in the market. *Id.*

Thus, while recognizing that Venu would introduce a new product, Op. 45, the court found that Defendants' joint venture would "tend to lessen competition . . . when compared to a world without the JV." *Id.* at 47. This appeal followed.

## ARGUMENT

After considering five days of testimony and "voluminous documentary evidence," Op. 4, the district court found that Fubo had

shown a likelihood of success on its claim that Venu's effect "may be substantially to lessen competition," *id.* at 34, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.[4] Based on the district court's unchallenged factual findings, that conclusion was correct.

Among other things, the district found that Venu tended to lessen competition "when compared to a world without the JV," Op. 47, because the joint venture and its associated restrictions on potential competition among Defendants, including a three-year noncompete agreement, would effectively prevent any other sports-only TV package from emerging. Venu would thus grant Defendants—already the dominant players in licensing content from sports leagues—dominance in distributing sports-focused television packages to consumers, much like the joint venture condemned in *United States v. Columbia Pictures*

---

[4] This case involves two probabilistic standards stacked on top of one another: the standard for granting a preliminary injunction and the standard for liability under Section 7 of the Clayton Act. Because Section 7 seeks to prevent anticompetitive harm in its incipiency, it requires only a "reasonable probability" that a transaction may substantially lessen competition. *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 n.39 (1962).

*Indus., Inc.*, 507 F. Supp. 412, 418 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1063 (2d Cir. 1981).

Defendants' leading argument on the merits of Fubo's Section 7 claim is that foreclosing rival distributors from obtaining unbundled sports channels is not anticompetitive because, under Supreme Court case law on the application of *Section 2 of the Sherman Act* to claims for a dominant firm's *unilateral* refusal to deal with rivals, they have no antitrust duty to deal with distributors at all.[5] That argument is a red herring. This appeal is about a claim that Defendants' *creation* of Venu—indisputably *concerted* action—violates *Section 7 of the Clayton Act*. Section 7's purpose is to "arrest incipient threats to competition which the Sherman Act did not ordinarily reach." *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 171 (1964). Section 7 thus prohibits joint ventures or mergers when the joint venture or merged firm would be able to do something that harms competition, even if that same conduct would be legal when done by a single firm. Accordingly, whether a single programmer would violate Section 2 by refusing to unbundle its

---

[5] Defendants also argue that Fubo lacks antitrust injury. That argument is incorrect. *See* n.10, *infra*.

channels for distributors is irrelevant to a Section 7 claim against the formation of Defendants' joint venture.

Defendants' other claims of legal error are likewise misplaced. The district court correctly considered Defendants' bundling practices as part of assessing whether Venu's formation may substantially lessen competition "in the context of its particular industry." *Brown Shoe*, 370 U.S. at 321-22. And even if Venu created a new product, it could still violate Section 7 if there were a reasonable probability that it could harm "consumers and competition when compared to a world without the JV"—which the district court found to be true. Op. 47; *see Penn-Olin*, 378 U.S. at 173 (holding that a joint venture could violate Section 7 even though it was formed to add a new option to the market, by weakening the cooperating firms' incentives to compete on their own).

**A.    Supreme Court Decisions On Unilateral Refusals To Deal With Rivals Under Section 2 Of The Sherman Act Do Not Apply To Fubo's Claim Under Section 7 Of The Clayton Act.**

The district court rightly rejected Defendants' argument that the Supreme Court's "refusal to deal" decisions undermine Fubo's Section 7 claim. Those decisions holding that certain conduct did not violate Section 2 of the Sherman Act do not apply to a Section 7 claim

challenging the formation of a new joint venture. A transaction can violate Section 7 by facilitating conduct that would not be actionable under the Sherman Act; indeed, Section 7's central purpose is "to reach incipient monopolies and trade restraints outside the scope of the Sherman Act." *Brown Shoe*, 370 U.S. 318 n.32.

1. The claim at issue in this appeal is under Section 7 of the Clayton Act, which prohibits mergers and other transactions that may "substantially . . . lessen competition." 15 U.S.C. § 18; *see id.* § 26 (allowing private parties to sue for injunctive relief against Section 7 violations). The refusal-to-deal doctrine that Defendants invoke relates to a different statute—Section 2 of the Sherman Act, *id.* § 2, which "addresses the actions of single firms that monopolize or attempt to monopolize," *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993).

Refusal-to-deal analysis applies when a monopolist outright refuses to provide a rival with a product or service, *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004), or when a monopolist's rival challenges an ongoing deal with commercially disadvantageous terms, which the Supreme Court has viewed as

13

effectively challenging the defendant's refusal to offer more favorable terms, *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 443 (2009). In this "narrow field" of cases, *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1076 (10th Cir. 2013) (Gorsuch, J.), a monopolist's unilateral refusal to deal with competitors, without more, "does not typically violate § 2," *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007).

2. *Trinko* and *linkLine* do not apply here. *See* Op. 36-37. Fubo has not brought a Section 2 challenge to any defendant's unilateral conduct but instead asserts a Section 7 challenge to Defendants' joint creation of Venu.

Defendants dismiss the Section 7 context here as "a distinction without a difference" because a Section 7 plaintiff must still "show a harm to competition." Defs.' Br. 34-35. But the statutory distinction makes a world of difference. As the Court recognized in *Trinko*, different rules apply to "*concerted* action," such as the formation of a joint venture, because it "presents greater anticompetitive concerns" than the *unilateral* conduct subject to Section 2. 540 U.S. at 410 n.3 (emphasis in original). "'[C]oncerted activity inherently is fraught with

14

anticompetitive risk' insofar as it 'deprives the marketplace of independent centers of decisionmaking that competition assumes and demands.'" *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010) (quoting *Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768-69 (1984)); *cf. Texaco Inc. v. Dagher*, 547 U.S. 1, 6 n.1 (2006) (distinguishing a challenge to the "creation" of a joint venture from a subsequent challenge to the joint venture's post-formation conduct).

Moreover, the question in a Section 7 case is whether a transaction "*may*" substantially lessen competition or "tend to create a monopoly." 15 U.S.C. § 18 (emphasis added). That prophylactic test is "less stringent than those used in applying the Sherman Act." *Brown Shoe*, 370 U.S. at 329. Indeed, the purpose of Section 7 was "to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding," *id.* at 318 n.33—because it is easier to prevent monopoly power before it arises than to police its abuse afterward. *See Trinko*, 540 U.S. at 414 ("Under the best of circumstances, applying the requirements of § 2 'can be difficult' because 'the means of illicit exclusion, like the means of

15

legitimate competition, are myriad.'") (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc)).

Thus, in applying Section 7, a court can—indeed, must—consider how a transaction will affect firms' individual behavior, irrespective of whether that behavior would violate the Sherman Act. Only by understanding how participating firms and other firms (such as rivals and suppliers) might respond to the transaction can the court assess the "structure, history and probable future" of the relevant market, as Section 7's probabilistic standard requires. *Brown Shoe*, 370 U.S. at 332 n.38.

Courts do this in several ways. For example, they examine whether a transaction will eliminate substantial competition between the firms involved. U.S. Dep't of Justice & FTC, *Merger Guidelines* § 2.2 (2023), https://www.justice.gov/d9/2023-12/2023 Merger Guidelines.pdf.[6] Courts also look to whether the transaction creates a firm that may limit access to products or services that its rivals use to compete. *Id.*

---

[6] This is sometimes called the "unilateral effects" of the merger. *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 569 (6th Cir. 2014); *FTC v. Tapestry, Inc.*, -- F. Supp. 3d --, 2024 WL 4647809, at *62 (S.D.N.Y. Nov. 1, 2024).

§ 2.5. This analysis examines whether the merged firm may have an incentive to foreclose rivals' access to critical inputs or distribution channels. *Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 (2d Cir. 1979). And courts analyze how firms other than the merged firm will change their behavior due to a merger. In particular, courts look to whether a transaction increases the risk of anticompetitive coordination among the remaining firms in the market, *Merger Guidelines* § 2.3, "to restrict output and achieve profits above competitive levels," *ProMedica*, 749 F.3d at 568 (quoting *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 77 (D.D.C. 2011)); *United States v. Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 46 (D.D.C. 2022) (enjoining merger that would "increase the [publishing] market's already high susceptibility to coordination" between publishers bidding for book rights).[7] In the joint-venture context, courts similarly ask whether the venturers will relax their competition even among products that are not part of the joint venture. *Penn-Olin*, 378 U.S. at 173.

---

[7]     Courts sometimes call this "coordinated effects." *ProMedica*, 749 F.3d at 568.

These potential effects can form the basis of a Section 7 violation even though they involve conduct that—if analyzed as unilateral conduct outside the merger context—might not violate the Sherman Act. For example, a transaction may violate Section 7 if the merged firm or joint venture can "foreclose rivals from sources of supply or distribution," *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1051 (5th Cir. 2023), and thereby "crowd out [its] competitors from the market," *id.* at 1053; *cf. Ford Motor Co. v. United States*, 405 U.S. 562, 568 (1972) (Ford's acquisition of spark plug producer could substantially lessen competition through "the foreclosure of Ford as a purchaser" of spark plugs). That is so even though, outside the merger context, a single firm that refuses to provide products or services to its rivals might have a colorable defense to Sherman Act liability under *Trinko* and *linkLine*.

Likewise, anticompetitive harm can occur if a transaction increases the likelihood of "parallel accommodating conduct among competitors," in which firms make "individually rational" decisions that together raise prices or weaken competition. *Bertelsmann*, 646 F. Supp. 3d at 44 (quotation marks omitted). Such parallel behavior might not by itself establish an *agreement* restraining trade subject to Section 1 of

18

the Sherman Act, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007), but Section 7 prohibits transactions that produce "market structures conducive to such coordination," *Merger Guidelines* § 2.3. "[A]ctual restraints [of trade] need not be proved" under Section 7; "[t]he grand design" of Section 7 "was to arrest incipient threats to competition" before they rise to the level of actual Sherman Act violations. *Penn-Olin*, 378 U.S. at 170-71.

3.    Thus, in pointing to Venu's tendency to foreclose rival distributors from offering unbundled sports content, the district court was identifying a well-established Section 7 concern. It is common for courts in Section 7 cases to analyze the risk that rivals will be foreclosed from competing, p.18, *supra*, and the district court found a risk here that Venu would incentivize Defendants to "prevent and suppress" unbundled sports offerings by rival distributors. Op. 47. Defendants "control a significant amount of the [sports] content that would be necessary for any meaningful competitor to [Venu]." *Id.* at 50. And the district court found that Defendants were less likely, after forming Venu, to unbundle that content for other distributors like Fubo wishing to create their own sports-centric offerings. *Id.* at 49, 46 n.34.

19

This foreclosure would harm competition in the live pay TV market. *See Illumina*, 88 F.4th at 1052-53; *cf. Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 695 (2d Cir. 1973) (granting a preliminary injunction because the "post-acquisition arrangement" would give G&W, the purchaser, "a substantial advantage over its competitors in the sale to A&P of products which the latter either uses or retails and which G&W can supply").[8]

4.     Defendants' insistence that "[n]othing in the antitrust laws empowers federal courts" to require them to unbundle their channels is an attack on a straw man. Defs.' Br. 39. The district court did not

---

[8]     Defendants fault the district court for not defining the "upstream market for the licensing of TV programming to distributors," Defs.' Br. 55, but the court did not need to do so. The relevant market under Section 7 is the "area of effective competition," *Brown Shoe*, 370 U.S. at 324; that relevant market need not be defined to include *everything* that might be material to competition, *see, e.g., Microsoft*, 253 F.3d at 51-54, 58-78 (exclusionary actions targeting out-of-market middleware products protected Microsoft's monopoly in the relevant market for Intel-compatible operating systems). Given that the district court predicted anticompetitive effects in the downstream live pay TV market, it did not have to also define the upstream market, even if actions upstream harm competition in the downstream market. *See, e.g., Illumina*, 88 F.4th at 1055 (upholding FTC determination that testing company's acquisition by sole supplier of a critical input could substantially lessen competition in a relevant downstream market for cancer testing, without defining an upstream input market).

require Defendants to do anything unilaterally; it enjoined the formation of their planned joint venture, which Section 7 expressly empowered it to do.

Defendants' argument that enjoining Venu is tantamount to requiring them to unbundle their channels is incorrect. Otherwise, a court could never enjoin a transaction based on its potential effects on the merged firm's subsequent unilateral behavior unless that behavior would violate Section 2. That would drastically curtail the scope of Section 7 and turn existing Section 7 precedent on its head.

For example, it would mean that a court could not enjoin a merger that would give the merged firm power to charge a monopoly price, since "simply possessing monopoly power and charging monopoly prices does not violate § 2." *linkLine*, 555 U.S. at 447-48. That is not the law. Evidence that a merged firm will increase prices supports a "strong prima facie case of anticompetitive effects." *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 175 (3d Cir. 2022); *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015). So too here: The evidence that Defendants would have incentives to foreclose distributors like Fubo from access to

21

unbundled sports content, and "the market power to follow through on these incentives," Op. 49, indicated that the formation of Venu may substantially lessen competition in violation of Section 7.

**B.    The District Court's Conclusion That Plaintiffs Established A Likelihood Of Success On Their Section 7 Claim Should Be Affirmed.**

The briefing below did not focus on the traditional burden-shifting framework for analyzing Section 7 claims,[9] and neither did the district court's opinion. But the court's factual findings amply make out a prima facie Section 7 case. Defendants do not challenge those factual findings as clearly erroneous. Nor do Defendants argue they satisfied the established standards for rebutting a prima facie case. Instead, they claim the district court committed errors of law. Their arguments are unavailing.

1. Under the three-step framework that courts typically apply to Section 7 claims, the plaintiff first must establish a "prima facie case" that "the [transaction] will probably lead to anticompetitive effects in [a

---

[9]    The district court briefs did not discuss the Section 7 burden-shifting approach, though they made references to burden-shifting under Section 1 of the Sherman Act. *See* Dkt. 239 at 32 (describing burden-shifting framework that applies under Sherman Act Section 1's rule of reason); Dkt. 245 at 34 (same).

22

relevant] market." *Saint Alphonsus*, 778 F.3d at 785. "The burden shifts, once the prima facie case is made, to the defendant to rebut the presumption," *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (citation omitted), "by a demonstration that the [transaction] will not have anticompetitive effects," *United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 981 (2d Cir. 1984). "Upon rebuttal by the defendant, the burden of producing additional evidence of anticompetitive effect shifts to the plaintiff, and merges with the ultimate burden of persuasion, which remains with the plaintiff at all times." *Anthem*, 855 F.3d at 350 (quotation marks and brackets omitted).

Here, the district court found the evidence "overwhelming" that Venu would "tend to produce anticompetitive effects" in the live pay TV market. Op. 54. Venu would reduce Defendants' ability to compete individually at the distribution level, through its express noncompete clause, *id.* at 47-48, and Defendants' unwritten agreement that they would "stay clear of a [Venu]-like platform," *id.* at 48. The venture would also reduce Defendants' incentive to cooperate with a rival sports-focused product or to launch their own such products, because doing either of those things would "diminish[] the value of their

23

investment" in Venu. *Id.* at 50. And Venu would increase Defendants'
power to impose price increases and bundling requirements on rival
distributors, "further limiting any potential competition with the JV" by
those distributors. *Id.* at 53.[10] In short, by combining and consolidating
their control over sports programming into a single entity intended to
dominate the distribution level, Defendants created an arrangement of
the sort that the antitrust laws were designed to counteract—thus
making out a prima-facie Section 7 violation.

---

[10]     Defendants' argument that Fubo lacks antitrust injury—i.e.,
"injury of the type the antitrust laws were intended to prevent and that
flows from that which makes defendants' acts unlawful," *Atl. Richfield
Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (citation omitted)—
ignores the court's factual findings. Defendants say Fubo's harm would
come from "Venu's lower price." Defs.' Br. 18. But the district court
found that the joint venture would cause other harms. For example, the
court found (and Defendants have not challenged as clearly erroneous)
that the venture would foreclose Fubo from a critical input. Op. 49-50.
Input foreclosure is a well-established antitrust injury. *See, e.g.*, *Steves
& Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 711 (4th Cir. 2021)
(competitor had antitrust standing to challenge merger that "hindered
[its] access to other doorskin suppliers"); *Andrx Pharms., Inc. v. Biovail
Corp. Int'l*, 256 F.3d 799, 816-17 (D.C. Cir. 2001) ("A rival has clear
standing to challenge the conduct of rival(s) that is illegal precisely
because it tends to exclude competitors from the market.") (brackets
omitted).

2.    Defendants do not argue that the district court clearly erred in its factual findings or argue that any prima facie case was rebutted. Instead, defendants argue that the district court made two errors of law. First, they argue the district court improperly "grounded its analysis in bundling practices" predating Venu rather than focusing on the competitive effects of the transaction itself. Defs.' Br. 41. Second, they contend that "provid[ing] consumers an additional option at a lower price is unambiguously a pro-consumer outcome that cannot violate the Clayton Act." *Id.* at 46.

Both critiques are wrong. Market realities predating a transaction can inform a court's analysis of the transaction's anticompetitive effects. The district court thus properly considered bundling as context for its determination that "the launch of the JV will tend to lessen competition" when "compared to a world without the JV." Op. 47. And a transaction that creates a new option in the market can nevertheless violate Section 7. *Id.*

a.    The district court did not base its holding on "the preexisting effects of bundling," as Defendants contend. Defs.' Br. 43. On the contrary, the district court declined to "determine the legality of

25

programmers' bundling practices," Op. 45, by refusing to address Fubo's claim that bundling constitutes unlawful tying, *id.* at 54 n.37, or to enjoin Defendants' bundling requirements, *id.* at 54-55. Defendants point to the district court's comment that bundling appears "bad for consumers," Defs.' Br 44 (citing Op. 45), but the court's point was that many consumers demand the sort of smaller TV package that Defendants' existing bundling practices have precluded, Op. 44-45.

Instead, in assessing the impact of the joint venture itself on Defendants' behavior and incentives, the court properly considered bundling practices as "factual context of how the industry works and how the defendants have conducted their business." Op. 54 n.37. That is textbook Section 7 analysis. Making the predictive judgment that Section 7 calls for requires examining the "structure, history and probable future" of the market at issue. *Brown Shoe*, 370 U.S. at 332 n.38; *see Fruehauf*, 603 F.2d at 353; *cf. NCAA v. Alston*, 594 U.S. 69, 93 (2021) ("careful analysis of market realities"). And the district court found that bundling practices were "crucial" to understanding the history and future of the television industry. Op. 46; *see id.* at 54 n.37; *cf. United States v. Am. Airlines Grp. Inc.*, -- F.4th --, 2024 WL 4716418,

at *11 (1st Cir. 2024) (holding that defendants' "pre-[joint venture] incentives . . . properly figured into the [district] court's ultimate analysis" of the joint venture under Section 1).

The district court explained that bundling was central to the evolution of the live pay TV market. It found that Defendants have long used "bundling and minimum penetration requirements to make live pay TV distributors carry content they otherwise would reject" and distribute it to customers "who, in many cases, also do not want that content." Op. 40. Thus, although there is a "void in the pay TV market" for sports-only products, no distributor has been able to fill it by offering consumers a sports-focused package. *Id.* at 4.

Against that backdrop, the district court found that Venu's formation would tend to harm competition "when compared to a world without the JV." Op. 47. After Venu's creation, Defendants would be restrained from creating their own Venu-like products, *id.* at 48, and incentivized to use bundling to "prevent and suppress" Venu-like offerings from other distributors like Fubo, *id.* at 50. Thus, in place of the pre-JV world—where, Defendants acknowledge, programmers face strong and growing pressure to "diversify[] the manner in which their

27

networks are distributed to consumers," Defs.' Br. 9—the probable future of the post-JV world was that Venu would be the "first and *only* unbundled multi-channel sports" product, Op. 45.

Defendants say that the competitive effects of "bundling that preceded Venu by decades cannot be relevant to an assessment of Venu under Section 7"; "only the effect on competition of *Venu itself* is relevant." Defs.' Br. 43 (citing *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 511 (2d Cir. 2004)). But a transaction can harm competition by enhancing or altering market dynamics that already exist. The district court found, among other things, that Venu would enhance Defendants' incentives to "to prevent and suppress other potential sports-focused bundles," including by imposing and enforcing bundling requirements. Op. 49. That was new anticompetitive harm, even though bundling predated Venu's formation.[11]

---

[11]     Moreover, Defendants' argument fails even if one accepts the erroneous premise that the district court should have ignored bundling entirely. The court found that Venu would restrain Defendants from launching their own sports-centric TV services through their noncompete agreement, Op. 47, and Defendants' disincentive to "dilute" Venu's value, *id.* at 50. That finding does not relate to "bundling that preceded Venu."

The court's findings of new anticompetitive harm from Venu's formation distinguish this case from *Geneva Pharmaceuticals*, where the plaintiffs asserted both a Sherman Act challenge to an exclusive deal, 386 F.3d at 494, and a Section 7 challenge to certain defendants' purchase of the outstanding stock in a key supplier, *id.* at 510. This court affirmed the dismissal of the Section 7 claim after concluding that "the acquisition itself had no effect on the degree of concentration or competition" in the relevant market. *Id.* Here, by contrast, the district court found that Venu's formation increased Defendants' incentives to, among other things, suppress the emergence of rival sports-focused packages by maintaining their bundling practices. Thus, as the district court recognized, the joint venture itself threatened substantial harm to competition under Section 7.

b.    Defendants are likewise mistaken in arguing that Venu "cannot violate the Clayton Act" because it creates a new product. Defs.' Br. 46. If Defendants' point is that the procompetitive benefits of Venu's new product negate any threat to competition, under the traditional Section 7 framework, that argument must be made as a rebuttal to Fubo's prima facie case of threatened harm to competition. But

29

Defendants have not attempted to satisfy the requirements for such a rebuttal argument. *See Merger Guidelines* § 3. To rebut a prima facie case with evidence of procompetitive efficiencies, a defendant must establish, among other things, that "the claimed efficiencies are '[transaction]-specific,' which is to say that the efficiencies cannot readily be achieved without the [transaction]." *Saint Alphonsus*, 778 F.3d at 791 (quotation marks and citations omitted); *see also Anthem*, 855 F.3d at 356, 359; *Merger Guidelines* § 3.3. And Defendants do not argue on appeal that the benefits of Venu rebut the harms identified by the district court or that these benefits could not have been achieved without the joint venture.

To the extent that Defendants argue that Venu's potential for procompetitive benefits means it cannot harm competition at all, they are wrong. A transaction that creates a new option in the market can decrease competition at the same time—for example, by incentivizing the parties to refrain from competing with one another or partnering with third-party rivals going forward. *Penn-Olin*, 378 U.S. at 173. Ultimately, the factfinder must determine whether the effect of the transaction, assessed as a whole, may be substantially to lessen

30

competition. If so, the transaction is unlawful even if it would result in a new option in the market. *See, e.g.*, *Anthem*, 855 F.3d at 350; *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 349 (3d Cir. 2016).

*Penn-Olin* illustrates how a joint venture creating a new competitor can inhibit competition *among* the venturers and thus lessen competition overall. There, two chemical producers formed a joint venture to construct a chemical plant in the southeast United States, where neither firm had one. 378 U.S. at 163. Thus, the joint venture brought a new competitor to the relevant geographic market. Moreover, while one of the firms was currently producing the relevant chemical in another region, the other had never engaged in commercial production before and entered the market only through the joint venture. *Id.* at 161-62. Nevertheless, the Supreme Court held that the venture could still violate Section 7. If there was a reasonable probability that one of the venturers would have entered the market on its own, with the other "remain[ing] a significant potential competitor," the loss of that

potential competition *between* the venturers would be an

anticompetitive harm prohibited by Section 7. *Id.* at 175-76.[12]

    *Columbia Pictures*, meanwhile, illustrates how a joint venture

that creates a new product can foreclose rivals. There, four movie

producers controlling at least half of the "most popular movies on pay

television" agreed to form a joint venture, "Premiere," which would be a

new pay TV network showing the producers' films. 507 F. Supp. at 418.

Premiere would have exclusive rights to these films for a nine-month

period before they were released to other networks. *Id.* at 419. The

defendants stressed that "Premiere creates a totally new product," but

the district court noted that the "new product" consisted of films that

defendants "would, otherwise, be selling to the existing market." *Id.* at

---

[12]     A joint venture that eliminates competition among the venturers may also violate Section 1 of the Sherman Act as an unreasonable restraint of trade. *See, e.g.*, *United States v. First Nat'l Bank & Tr. Co. of Lexington*, 376 U.S. 665, 673 (1964) (where "merging companies are major competitive factors in a relevant market, the elimination of significant competition between them constitutes a violation of § 1 of the Sherman Act"); *United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 74, 113 (D. Mass. 2023) (airline joint venture purporting to create a "single 'optimized network'" harmed competition under Section 1 by "eliminat[ing] the once vigorous competition between" the venturers), *aff'd*, 2024 WL 4716418 (1st Cir. 2024).

430. Thus, the defendants were "arrogating to themselves one-half of the essential product of the industry." *Id.* The court held that the joint venture was likely both a per se illegal group boycott under Section 1 *and* anticompetitive under Section 1's rule of reason because of the way it "eliminate[d] competition in the network program service market." *Id.* at 430-31.

The district court found that Venu posed similar threats to competition as the ventures in *Penn-Olin* and *Columbia Pictures*. The court found that, like the *Penn-Olin* venture, Venu would likely harm potential competition between its owners by preventing Defendants from launching their own "competing sports-focused MVPD[s]." Op. 47. And like the venture in *Columbia Pictures*, Venu would hamper competition by rival distributors, by decreasing the likelihood that Defendants would provide unbundled sports programming to distributors seeking to create a sports-focused product. *Id.* at 50. That would effectively prevent any competitor from emerging in the foreseeable future and make Venu the only game in town for the substantial number of consumers who want an unbundled, multi-channel sports service. *Id.* at 45, 51-52. If not for the joint venture,

firms would be free to compete independently to attract those consumers. Accordingly, the district court concluded that Venu would tend to harm consumers and competition "when compared to a world without the JV." *Id.* at 47.

Defendants note that Venu would not have any period of exclusive rights to Defendants' content, as Premiere did in *Columbia Pictures*. Defs.' Br. 37. But the district court found that Venu "contains elements of express exclusivity," such as the non-compete provisions, and "clear incentives for other types of exclusive dealing," Op. 36 n.30, such that Venu would enjoy a *de facto* "exclusive right" to offer an *unbundled* package of Defendants' sports channels, *id.* at 46.[13] And in any event, the court found this case presented the same fundamental dynamic as

_____

[13] The absence of an explicit agreement to withhold unbundled sports programming from other distributors does not prevent the court from considering whether the joint venture would change Defendants' incentives in a way that leads to *de facto* exclusivity. Section 7 prohibits transactions when they facilitate tacit coordination among competitors (e.g., parallel pricing decisions) even if that coordination "does not rise to the level of an agreement and would not itself violate the law." *Merger Guidelines* § 2.3; *see also Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 229-30 (1993) ("In the § 7 context, it has long been settled that excessive concentration, and the oligopolistic price coordination it portends, may be the injury to competition the Act prohibits.").

*Columbia Pictures*: Competitors "have joined together to use their combined market power in the programming tier to create a joint venture that will allow them to dominate the distribution tier." Op. 40.

Defendants also point to *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 70 (1st Cir. 2002), which held that the formation of a U.S. soccer league did not lessen competition for soccer players because there was no such competition in the U.S. before the league's creation. But *Fraser* is distinguishable. As the district court found, "the current live pay TV market is highly competitive," with numerous distributors offering packages of television channels to consumers, and Venu would lessen that *current* competition by giving Defendants a path to collective dominance and foreclosing Venu's rivals. Op. 39-40. That is paradigmatic Section 7 harm.

## CONCLUSION

This Court should hold that Fubo established a likelihood of success on the merits of its Section 7 claim.

Respectfully submitted.

s/ *Matthew A. Waring*

JONATHAN S. KANTER
   *Assistant Attorney General*

DOHA G. MEKKI
   *Principal Deputy Assistant*
   *Attorney General*

JOHN W. ELIAS
   *Deputy Assistant Attorney General*

DAVID B. LAWRENCE
   *Policy Director*

ALICE A. WANG
SPENCER D. SMITH
   *Counsels to the Assistant Attorney*
   *General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
MATTHEW A. WARING
   *Attorneys*
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., N.W.
Room 3224
Washington, D.C. 20530-0001
(202) 532-4186
matthew.waring@usdoj.gov

*Counsel for the United States*

November 26, 2024

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limit of Local Rule 29.1(c) because, excluding the parts exempted by Fed. R. App. P. 32(f), the brief contains 6,979 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in Microsoft Word for Microsoft 365 using 14-point New Century Schoolbook font, a proportionally spaced typeface.

_s/ Matthew A. Waring_
Matthew A. Waring
*Counsel for the United States*

## CERTIFICATE OF SERVICE

I certify that on November 26, 2024, I caused the foregoing to be filed through this Court's Appellate Case Management System, which will serve a notice of electronic filing on all registered users.

s/ *Matthew A. Waring*
Matthew A. Waring
*Counsel for the United States*