# 24-2210

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

FUBOTV INC. and FUBOTV MEDIA INC.,

*Plaintiffs-Appellees*,

v.

THE WALT DISNEY COMPANY, *et al.*,

*Defendants-Appellants*.

(Full caption commences on inside cover)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## [REDACTED] REPLY BRIEF OF DEFENDANTS-APPELLANTS

Antony L. Ryan
J. Wesley Earnhardt
Yonatan Even
Damaris Hernández
Michael P. Addis
M. Brent Byars
CRAVATH, SWAINE &
  MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 474-1000

*Counsel for The Walt
Disney Company; ESPN,
Inc.; ESPN Enterprises,
Inc.; Hulu, LLC*

Andrew J. Levander
Steven E. Bizar
Steven A. Engel
John (Jay) Jurata
Michael H. McGinley
Erica Fruiterman
DECHERT LLP
1095 Avenue of the
Americas
New York, NY 10036
(212) 698-3500

*Counsel for Fox
Corporation*

David L. Yohai
Adam C. Hemlock
Theodore E. Tsekerides
Robert W. Taylor
A.J. Green
Elaina K. Aquila
WEIL, GOTSHAL &
  MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Counsel for Warner
Bros. Discovery, Inc.*

FUBOTV INC. and FUBOTV MEDIA INC.,

*Plaintiffs-Appellees*,

v.

THE WALT DISNEY COMPANY; ESPN, INC.;
ESPN ENTERPRISES, INC.; HULU, LLC;
FOX CORPORATION; WARNER BROS. DISCOVERY INC.

*Defendants-Appellants*.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

PARTIES ........................................................................................iv

INTRODUCTION ............................................................................1

ARGUMENT....................................................................................5

I.    Fubo Cannot Prove Antitrust Injury Because Its Only Threatened Imminent Harm Results from Increased Price Competition. ........................5

II.    Defendants' Bundling Practices Are Protected by *linkLine* and *Trinko*. ......12

III.    The District Court Erred by Concluding That Venu Is Likely To Have Anticompetitive Effects. ...............................17

    A.    Fubo Fails To Demonstrate That the District Court Focused Its Analysis on the JV Itself, as Required by *Geneva Pharmaceuticals*. ...............................18

    B.    The District Court Erroneously Treated a Lower-Priced, New Product as Anticompetitive. .............................20

IV.    The Anticompetitive Effects Identified by the District Court Cannot Occur in the Competitive Live Pay TV Market It Found.............................24

V.    Fubo Did Not Prove Irreparable Harm. ......................................29

VI.    The District Court Erred in Failing To Impose a Bond...............................31

CONCLUSION ...............................................................................32

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)(7)(C)................................................................35

CERTIFICATE OF SERVICE.............................................................36

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87 (2d Cir. 2018) .................3

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ................ 6, 7, 8, 11

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ..........................18

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)........................................................................................8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) .....................7

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986).........................7, 8, 10

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master
  Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010) ...........................................................28

*Consolidated Gold Fields PLC v. Minorco, S.A.*,
  871 F.2d 252 (2d Cir. 1989)...........................................................................10

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005)......................7

*Dexter 345 Inc. v. Cuomo*, 663 F.3d 59 (2d Cir. 2011).........................................29

*Dexter 345 Inc. v. Cuomo*, 2011 WL 1795824 (S.D.N.Y. May 3, 2011) .........29, 30

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47 (1st Cir. 2002) ........ 14, 22, 23

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
  386 F.3d 485 (2d Cir. 2004)......................................................................18, 19

*Heisman Trophy Tr. v. Smack Apparel Co.*,
  595 F. Supp. 2d 320 (S.D.N.Y. 2009) .............................................................31

*Illumina, Inc. v. FTC,* 88 F.4th 1036 (5th Cir. 2023)............................................27

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959)..........................17

*N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*,
  962 F. Supp. 2d 514 (S.D.N.Y. 2013) ...............................................31

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
  992 F.2d 430 (2d Cir. 1993) ...........................................................29

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015)...........................................................20

*Ohio v. American Express Co.*, 585 U.S. 529 (2018) .....................................24, 26

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) .....................12

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  507 F.3d 117 (2d Cir. 2007)......................................................6, 9, 10

*Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024)...............................................28

*United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412
  (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1063 (2d Cir. 1981).........................3, 9, 15, 16

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) (en banc)............................................21

*Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286 (1st Cir. 2022) .....................9

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2003).......................................................................12

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)...........................3, 9

**Statutes**

15 U.S.C. § 18 .................................................................................3

15 U.S.C. § 26 ...............................................................................10

## PARTIES

| <u>Abbreviation</u> | <u>Parties</u> |
| --- | --- |
| Disney | The Walt Disney Company; ESPN, Inc.; ESPN Enterprises, Inc.; Hulu, LLC |
| Fox | Fox Corporation |
| WBD | Warner Bros. Discovery, Inc. |
| Fubo | FuboTV Inc.; FuboTV Media Inc. |

# INTRODUCTION

Defendants' Brief demonstrated that Venu would offer consumers a new product at a lower price. That is precisely what the antitrust laws are designed to encourage, not enjoin. Fubo's Brief fails to rebut—or even meaningfully engage with—the legal errors that permeate the district court's analysis and require reversal.[1]

Fubo and the district court both agree that, if permitted to launch, Venu would join a crowded field of competing MVPDs and offer a new, previously unavailable product: a subscription to sports channels at a price lower than existing MVPDs offer for sports and non-sports channels together. In other words, Venu is procompetitive because it would increase competition by offering consumers more choice at a lower price. Any harm Fubo incurs in terms of lost subscribers and profits is directly attributable to Venu's procompetitive effects and, accordingly, cannot be cognizable antitrust injury as a matter of law.

Recognizing this fundamental flaw in the district court's reasoning, Fubo seeks to transform this case into one concerning exclusive dealing arrangements and their foreclosure effects. Fubo and its *amici* contend that Venu

---

[1] Despite Fubo's repeated references to "discretionary" or "clear error" standards of review (FuboBr.2, 19), the errors in Parts I to IV are legal errors reviewed *de novo*.

is anticompetitive because it would hold an "exclusive right" to unbundled sports programming because of an "exclusive arrangement" among Defendants. (*See, e.g.*, FuboBr.1.) But the district court never found that the JV included an agreement—exclusive or otherwise—that would prevent Defendants from licensing unbundled sports programming to other competing distributors. To the contrary, the district court made findings Fubo never challenged that Defendants were not contractually prohibited from "unbundling their own sports content for another distributor in the future" (SPA-46n.34) and that the JV "does not interfere with each JV Defendant's ability to license their programming to other distributors" (SPA-22). Additionally, all of Venu's channels are available through myriad other distributors; Venu will carry no channel exclusively. The district court called Venu "exclusive" only in the sense that it would be the first distributor to offer consumers a "skinny sports bundle", ***not because*** Defendants have agreed ***that it would be the only such distributor***, a critical difference under well-settled antitrust law. (SPA-40 (finding Defendants granted unbundled licenses "for the first time ever"), SPA-45 ("the first time").) Venu's expansion of consumer options is a procompetitive benefit of the JV, not a reason to enjoin it.

Fubo and its *amici* also err by relying on precedents that address concerted conduct that harms competition by excluding competitors, such as exclusive dealing agreements and group boycotts. (FuboBr.29-30, 35 (citing, *e.g.*,

*United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1063 (2d Cir. 1981), and *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012).)  But this case does not involve any concerted conduct that deprives Fubo or others of skinny sports bundles, nor are skinny sports bundles a necessary input for competing in the market found by the district court.  The district court found that other distributors do not currently offer skinny bundles because of programmers' unilateral historical bundling practices, not because of the JV or any other agreement between or among programmers.  Indeed, the district court found that it "makes sense" economically for each Defendant (and each major programmer, like NBC and CBS) to bundle its networks.  (SPA-12-13.) Thus, there is no basis to infer (and the district court did not find) that Defendants' bundling practices are now or have ever been concerted.  *See Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 102-04 (2d Cir. 2018).

Those facts are dispositive because all parties now agree that this appeal is ***not*** about whether Defendants' unilateral bundling practices violate the antitrust laws, or whether Fubo and other distributors are entitled to the skinny sports bundle Fubo wants.  Those claims are set for trial in October 2025.  This appeal is solely about whether the JV itself poses any harm to competition under Section 7 of the Clayton Act (15 U.S.C. § 18).  And once focus is properly trained on the district court's actual findings about Venu, rather than the unilluminating

"exclusive" label Fubo and the district court applied, there can be no dispute that Venu's introduction of a new and lower-priced product poses no threat to competition. For this and the multiple additional reasons set forth below and in Appellants' Brief, reversal is warranted.

*First*, the district court did not find that Fubo faces immediate antitrust injury, which is required for a preliminary injunction. The only immediate injury the district court found—Fubo's loss of subscribers to a lower-priced product—flows from Venu's procompetitive effects and cannot be antitrust injury as a matter of law. Fubo fails meaningfully to engage with decades of Supreme Court precedent confirming that rule. Fubo instead tries to hypothesize antitrust injuries that do not threaten immediate harm. Such ephemeral speculation cannot justify a preliminary injunction. (Part I.)

*Second*, the district court erroneously relied on the competitive effects of Defendants' historical, unilateral bundling practices, which Supreme Court precedent protects as unilateral refusals to deal. Fubo erroneously attempts to distinguish this precedent by imagining concerted agreements regarding bundling, but the district court expressly rejected the existence of any concerted agreement regarding bundling. (Part II.)

*Third,* Defendants demonstrated that the district court should have focused on the competitive effects of Venu itself, rather than bundling, and should

4

have determined that a new, lower-priced product, by definition, increases competition—whatever assessment is ultimately made about the competitive effects of bundling.  In response, Fubo essentially asks this Court to repeat the district court's error and to ignore the relevant precedent.  (Part III.)

*Fourth*, Defendants demonstrated that, under Supreme Court precedent, the district court could not properly find anticompetitive effects without defining the relevant market in which such effects may be assessed *and* analyzing Defendants' market power within it.  In response, Fubo and its *amici* invite this Court to violate that precedent, dispense with those inquiries, and illogically assume that introduction of a new product could harm competition in the "highly competitive" market the district court found.  (Part IV.)

*Finally*, Fubo cannot establish that it would suffer irreparable harm (Part V) or should have been excused from posting a bond (Part VI).

## ARGUMENT

**I.   Fubo Cannot Prove Antitrust Injury Because Its Only Threatened Imminent Harm Results from Increased Price Competition.**

The district court erred as matter of law by failing to address whether Fubo had proven antitrust injury.  (DefsBr.19-21.)  The lower court based its injunction on a singular immediate harm:  Fubo's loss of subscribers to Venu's new, lower-priced product.  Because lower prices are indisputably ***pro***competitive,

5

harm to Fubo from increased price competition cannot constitute antitrust injury as a matter of law.  (DefsBr.21-25.)  Rather, only harm from ***anti***competitive aspects of the challenged conduct can be cognizable antitrust injury.  Yet none of the potential anticompetitive effects the district court identified (*see infra* Part III) threatens Fubo with immediate and irreparable injury necessary to support a preliminary injunction.  (DefsBr.25-27.)

      ***First***, Fubo attempts to obscure the district court's failure to conduct ***any*** analysis of antitrust injury.  Fubo points to a footnote where the court commented that Fubo's injury "would be the result of conduct 'contrary to the antitrust laws'".  (FuboBr.32.)  But the Supreme Court repeatedly has rejected the notion that finding conduct to be contrary to the antitrust laws can itself suffice to demonstrate antitrust injury.  The lawfulness of Defendants' conduct and Fubo's antitrust injury are ***separate*** inquiries—Fubo must prevail on ***both*** to meet its burden.  Even conduct found to violate the antitrust laws "may have three effects, often interwoven:  In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).  A plaintiff's harm may flow from any one of these three effects—and a court can properly find antitrust injury only by matching "the actual injury the plaintiff alleges" to some "anticipated ***anti***competitive effect of the specific

6

practice at issue". *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007) (emphasis added).

The district court never undertook this analysis and, thus never addressed whether—much less concluded that—Fubo's "loss[es] stem[] from a competition ***reducing*** aspect or effect of the defendant's behavior". *Atl. Richfield*, 495 U.S. at 344 (emphasis added); *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986). Instead, it simply assumed antitrust injury "since the Court herein finds that Fubo is likely to succeed on its Section 7 claims". (SPA-56n.38.) That circular reasoning ignores established precedent that the mere "fact that private plaintiffs have been injured by acts that violate the antitrust laws is not enough". *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005); *see also Atl. Richfield*, 495 U.S. at 329; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977).

***Second***, Fubo contends that Defendants are not "truly competing on price" through Venu because "they have no intention of selling their sports channels more cheaply through the JV". (FuboBr.32.) But the district court held that Fubo is threatened with irreparable harm precisely because ***consumers*** will prefer Venu's lower price. (SPA-60 (Venu will be "an option for customers to get [Defendants' sports] networks at *half* of Fubo's price").) That price competition is

the sole cause of the purportedly irreparable harm on which the district court erroneously relied to issue the injunction. (SPA-57-60.)

Fubo argues that Venu's lower prices would not result from increased "efficiencies" as in *Cargill*. (FuboBr.33.) But the Supreme Court made clear that "[l]ow prices benefit consumers *regardless of how those prices are set*, and so long as they are above predatory levels, they do not threaten competition" and "cannot give rise to antitrust injury". *Atl. Richfield*, 495 U.S. at 340 (emphasis added). Indeed, in *Atlantic Richfield* the Court concluded that the lower prices resulted from an anticompetitive price-fixing agreement, yet even so, "adhered to this principle regardless of the type of antitrust claim involved". *Id.* That is because even anticompetitive conduct can have procompetitive effects, but a plaintiff cannot show antitrust injury based upon lower prices or other procompetitive benefits. *See id.* The Supreme Court has barred scrutiny of why firms lower prices, since courts lack the "practical ability" to distinguish anticompetitive prices from "legitimate price-cutting". *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993). Because lower prices for consumers is a goal of the antitrust laws, they cannot cause antitrust injury as a matter of law.

**Third**, Fubo attempts to obscure the actual source of its harm—Venu's lower prices—by arguing that it would be harmed by an "exclusive

licensing arrangement." (FuboBr.31.) In Fubo's cases, the various defendants had entered into exclusive agreements requiring customers to deal only with the defendant, thereby depriving competitors of access to a large share of the relevant market. *See, e.g.*, *ZF Meritor*, 696 F.3d at 289; *Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 294 (1st Cir. 2022). The defendants' competitors thus showed antitrust injury by pointing to the harms they suffered from the exclusionary effects of these agreements. *ZF Meritor*, 696 F.3d at 289; *Vázquez-Ramos*, 55 F.4th at 294-95. (*Columbia Pictures* involved claims by the government, which need not show antitrust injury; still the JV there deprived competing TV distributors of programming through a group boycott. 507 F. Supp. at 434.)

But Venu involves no such exclusive dealing agreement, and the JV would not deprive Fubo of any inputs that it currently receives and distributes. Fubo cannot distribute unbundled sports programming because of programmers' historical bundling practices in the Live Pay TV ecosystem, not because of anything related to Venu. (SPA-45-46.) Because Venu does not cause that alleged harm, it cannot be an antitrust injury warranting an injunction. *See Port Dock*, 507

F.3d at 122 (antitrust injury results only from the "anticipated anticompetitive effect of the **specific practice at issue**").[2]

      **Fourth**, Fubo claims that it could be harmed by threatened anticompetitive effects, even though the district court never found such an injury to Fubo. But even taking all of the anticompetitive effects the district court identified as a given (SPA-46-54), none could constitute the **immediate** antitrust injury **to Fubo** necessary to support a preliminary injunction. *See* 15 U.S.C. § 26 (SPA-72) (authorizing preliminary injunction upon "a showing that the danger of irreparable loss or damage is immediate"); *Cargill*, 479 U.S. at 113 ("[I]n order to seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." (internal quotation omitted)).

      Fubo invites basic legal error by relying on injuries that could occur only to consumers, such as speculative future increased prices. (FuboBr.33 ("over

---

[2] Fubo's reliance on *Consolidated Gold Fields PLC v. Minorco, S.A.* (FuboBr.34) is even further afield. There, this Court held that the target of a hostile takeover could challenge a competitor's acquisition of a stake that the defendant would then leverage to exert "anticompetitive influence" to stunt the target's competitiveness and reduce its output. 871 F.2d 252, 257 (2d Cir. 1989). There is nothing analogous here. Fubo's threatened collapse has nothing to do with Venu's "anticompetitive influence" and everything to do with price competition.

time … viewers would pay more for the JV's product each year").) Injuries that affect only consumers cannot constitute antitrust injury **to Fubo**, *see Atl. Richfield*, 495 U.S. at 344-45, nor can injuries that occur "over time" (and thus after trial) constitute the ***immediate*** antitrust injury required by Section 16 of the Clayton Act.

The Department of Justice ("DOJ") contends that Fubo can show antitrust injury based on the district court's conclusion that Defendants would be "incentivized" to prevent others from offering sports-focused skinny bundles. (SPA-49.) Defendants address the errors in this view below, in Part III, but even assuming arguendo that is correct, it does not constitute immediate antitrust injury to Fubo, for at least three reasons. *First*, DOJ is wrong to describe this conclusion as a finding that Defendants "would foreclose Fubo from a critical input". (DOJBr.24n.10.) The district court did ***not*** find that ***unbundled*** sports channels would be a "critical input" necessary to compete in the Live Pay TV Market (the only market the district court defined). Nor does it make sense to describe a "skinny sports bundle" as a critical input in that "highly competitive" market, where (by definition) all distributors are reasonable substitutes for viewers but none of which, other than Venu, would have this supposedly critical input. (SPA-39.) *Second*, the district court did ***not*** find that any Defendant (let alone all of them) likely would have provided Fubo with an unbundled license to only its sports channels in the absence of Venu; the "foreclosure" to which DOJ alludes

stems from programmers' longstanding bundled licenses, not the JV. (SPA-10, SPA-40-46, DOJBr.20.) *Third*, such future foreclosure could not produce an **immediate** antitrust injury because Fubo's access to Disney's and Fox's sports channels is governed by existing, multi-year license agreements that will not expire until after the merits trial, which could address any such future injury. (SPA-44, SPA-48.) Like Fubo, DOJ hypothesizes an antitrust injury that is inconsistent with the district court's findings and erroneous as a matter of law.

## II. Defendants' Bundling Practices Are Protected by *linkLine* and *Trinko*.

Defendants' Brief highlighted that each Defendant's past, unilateral decisions about whether to license MVPDs to a "skinny sports bundle" are protected by Supreme Court precedents holding that firms have no antitrust duty to deal with competitors. (DefsBr.27-33.) That remains true even when Defendants enter the downstream MVPD market through a joint venture that receives more favorable licensing terms than Fubo has previously obtained. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009); *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 410-11 (2003).

Fubo's only response is to contend that "the relevant conduct for purposes of Fubo's Section 7 claim" is supposed "concerted activity". (FuboBr.37.) But the only "concerted activity"—and thus the only activity relevant to the Section 7 claim—is the **downstream** launching of the JV as a new

distributor.  There was no finding that the JV members agreed not to license a "skinnier" set of their channels to Fubo; the alleged harm to Fubo and other distributors is caused by ***upstream***, ***unilateral*** bundling conduct.  The district court's entire theory of harm revolved around a supposed "advantage" Venu enjoys due to its unbundled licenses, which stems entirely from Defendants' ***unilateral***, ***upstream*** practices.  (DefsBr.32-33.)  Contrary to DOJ's and States' *amici* arguments, nothing in *linkLine* or *Trinko* turns on the formalistic distinction between whether the antitrust claim arises under Section 2 of the Sherman Act or Section 7 of the Clayton Act.  (DOJBr.12-19; StatesBr.17-24.)  Because the district court found harm based on Defendants' unilateral bundling practices, not Venu itself, *linkLine* and *Trinko* control.

Consider if Defendants offered unbundled sports programming rights to all MVPDs:  Venu would have no advantage and the court's stated concerns would be eliminated.  By contrast, had each Defendant provided unbundled sports programming unilaterally to an independent distributor, that distributor would have the exact same supposed "advantage" over other existing MVPDs and vMVPDs as Venu, confirming that any "advantage" has nothing to do with the only concerted action, the JV, and everything to do with pre-existing, unilateral conduct.  (JA-360:15-JA-361:6.)

Moreover, the "antitrust problem" identified by the district court was that Defendants "used their longstanding bundling practices to create the void in the pay TV market tailor-made for the live-sports-only JV to fill". (SPA-4.) That void could be entered by each Defendant unilaterally—by each opening its own DTC service, or by each individually deciding to license a single service—and such entry would create the exact same "antitrust problem", namely an advantage over distributors who are licensed on a bundled basis.

But under *linkLine* and *Trinko*, the district court's "antitrust problem" is not a problem at all. It cannot be anticompetitive for Defendants to offer consumers a new, cheaper option that did not exist previously—even if it assumed that bundling practices separate from the JV created the "void" that concerned the district court. *Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47, 69-70 (1st Cir. 2002) (it is "plainly correct" to say that "a combination that added Division I soccer in this country could hardly reduce competition where none before existed").

Fubo also argues that the no-duty-to-deal precedent does not fit because the JV involved an "exclusive license to [Defendants'] unbundled live sports programming" (FuboBr.36) that is equivalent to the unlawful group boycott addressed by *Columbia Pictures* (FuboBr.40). But, as noted above, the district court never found a concerted agreement not to license unbundled sports content to

14

other MVPDs.  In fact, it found the JV would *not* interfere with each Defendant's unilateral licensing decisions.  (SPA-22.)  The key feature of *Columbia Pictures* was an ***agreement*** that the partner studios would not provide their films to any other pay TV movie channel for the first nine months.  507 F. Supp. at 420.  The district court found no such agreement here, but erroneously concluded that *Columbia Pictures* "did not rest solely on the anticompetitive effects of this 'exclusivity' provision".  (SPA-36n.30.)[3]

In another attempt to shoehorn this case into *Columbia Pictures*, Fubo claims that Defendants reached an "oral agreement"—that is "broader" than the JV's written terms—to "stay clear" of services similar to Venu.  (FuboBr.40; *see also* FuboBr.12.)  But the district court found that the oral negotiations became the limited non-compete term in the written JV term sheet.  (SPA-48 ("Before it was written down, however, the agreement originated in a phone call in late January 2024 . . . .").)  There was never any separate oral agreement, just an orally negotiated agreement that was then "written down" in the term sheet, which "█████

---

[3] DOJ acknowledges there was no "explicit agreement to withhold unbundled sports programming from other distributors" but argues that Section 7 prohibits "tacit coordination".  (DOJBr.34n.17.)  Whether or not that is the law, it is inapt here.  The district court did not find that Venu facilitated such "tacit coordination", but rather that Venu was characterized by "independent management" and "firewalls" that prevented the "sharing [of] competitively sensitive information".  (SPA-22.)

███████████████████████████████████████████████

█████ ". (JA-1534.)  It was this limited non-compete term that the district court found would not interfere with Defendants' future licensing decisions because it related solely to participating in other joint ventures at the distribution level. (SPA-22, SPA-48.)[4]

Finally, Fubo argues that *Columbia Pictures* applies because, even in the absence of an agreement prohibiting unbundling, it is "implausible" that each Defendant would unilaterally do so "in the future". (FuboBr.41.)  There is no connection between a decision not to unbundle to others and the concerted action to form Venu.  Specifically, the district court did ***not*** find, and could not have found, that Defendants ***would*** offer MVPDs unbundled licenses but for the formation of Venu.  That is a critical distinction from *Columbia Pictures* because there the defendants historically ***did*** license their programming to others, but the JV agreement contractually prohibited them from doing so going forward.  507 F. Supp. at 418-20.  Here, by contrast, Fubo claims anticompetitive harm from Venu even though it has no impact upon their unilateral, pre-formation conduct.  Fubo

---

[4] Fubo has no response to the principle that the limited non-compete does not threaten competition because it is "part of a larger endeavor whose success [it] promote[s]".  (DefsBr.54.)

never showed and the district court never found that, but for Venu, Defendants would have deviated from their historical bundling practices.[5]

In all events, a 43-year-old district court ruling does not override later Supreme Court precedent. *linkLine* and *Trinko* hold that Defendants' unilateral decisions not to aid their competitors are entirely consistent with competition on the merits in a free market. The district court erred by failing to apply this principle to Defendants' unilateral, historical bundling practices, and thus erred by enjoining Venu based on supposed anticompetitive effects from those bundling practices.

## III. The District Court Erred by Concluding That Venu Is Likely To Have Anticompetitive Effects.

Fubo cannot dispute that Venu will offer consumers a new product at lower prices. The district court erred by failing to recognize this as a hallmark of competition, and instead relied on supposed harms to competition from

---

[5] Citing pre-*linkLine* and *Trinko* precedent, Fubo treats Defendants' "refusal[s] to sell at the same prices and conditions" as "a boycott as well as [a] complete refusal to sell". (FuboBr.41 (citing *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959).) But *Klor's* was an actual group boycott case, involving "a wide combination consisting of manufacturers, distributors and a retailer" who all expressly agreed to offer another retailer "unfavorable terms". *Klor's*, 359 U.S. at 209, 212-13.

Defendants' pre-existing bundling practices. (DefsBr.40-48.) Fubo has no answer to those legal errors.

### A. Fubo Fails To Demonstrate That the District Court Focused Its Analysis on the JV Itself, as Required by *Geneva Pharmaceuticals*.

While Fubo asserts the district court focused on the competitive effects of Venu itself, Fubo's own discussion of the district court's opinion shows otherwise. (FuboBr.42.)

*First*, Fubo attempts to downplay Defendants' historical bundling practices as mere "context" for the district court's analysis. (FuboBr.42-43.) But those prior bundling practices were the linchpin of the district court's conclusion. (*Supra* Part II.) Even Fubo does not defend the district court's speculation that bundling practices "are bad for consumers", a determination the court made without any analysis, discovery or evidence on the issue. (DefsBr.44.) That determination was particularly flawed because, when the Ninth Circuit carefully analyzed bundling's competitive effects in this industry after discovery, it determined that bundling was "fully consistent with a free, competitive market". *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012). This Court should hardly open a circuit conflict based on such scant evidence and analysis. Fubo attempts to distinguish *Brantley* by observing that *Brantley* involved "unilateral bundling" rather than "horizontal collusion". (FuboBr.44.) But this

18

case does not involve "horizontal collusion" on bundling, which has been the **unilateral** practice of each Defendant (and all other major programmers) for decades.

**Second**, Fubo seeks to distinguish *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*, 386 F.3d 485 (2d Cir. 2004), claiming the district court did not rule on the "legality of bundling". (FuboBr.42, 44.) But *Geneva Pharmaceuticals* did not hinge on whether the district court formally declared the pre-existing conduct unlawful. Rather, *Geneva Pharmaceuticals* recognized that the defendants' pre-existing conduct, unrelated to the challenged acquisition, **might** violate the Sherman Act. 386 F.3d at 506-10 (reversing summary judgment). Yet this Court still concluded that the Clayton Act claim failed because the "only evidence that competitors were foreclosed or that there was a clog on competition" flowed from that separate, pre-existing conduct, rather than the challenged acquisition. *Id.* at 511. Here, Fubo brought a separate Sherman Act challenge to the bundling practices, and those claims are set for trial in 2025. As in *Geneva Pharmaceuticals*, the future resolution of those claims provides no basis for issuing a preliminary injunction against Venu now.

**B.** **The District Court Erroneously Treated a Lower-Priced, New Product as Anticompetitive.**

Venu will be a new product that some consumers will likely prefer because of its lower price. (SPA-60.) These are unequivocally *pro*competitive effects. Yet the district court erroneously treated them as *anti*competitive. Fubo repeats the district court's errors.

*First*, Fubo argues that new products can be anticompetitive "when part of an anticompetitive scheme". (FuboBr.45.) But that begs the question since there is no broader "scheme". Rather, there is only a new, lower-priced alternative that will *enhance* competition, which Fubo claims will draw away subscribers precisely because it will be cheaper. Fubo's cases have nothing in common with this case. In *New York ex rel. Schneiderman v. Actavis PLC*, a drug manufacturer (1) withdrew a successful drug from the market on the eve of generic entry and (2) released a similar drug that was protected from generic competition for years. 787 F.3d 638, 659 (2d Cir. 2015). The withdrawal of the drug forced patients to switch to the new patented drug, thereby impeding generic competition. *Id.* Here, Defendants will withdraw no product nor force any consumer to switch to Venu, which is nonexclusive and will be offered in competition with all other options in the "highly competitive" Live Pay TV Market. (SPA-40.)

20

**Second**, Fubo gets nowhere by citing *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc). The *Microsoft* court held that a new version of Windows launched by Microsoft blocked competition from web browsers. (FuboBr.46.) But the **features** of Windows blocked consumers from choosing competing web browsers, and that had anticompetitive effect. *Microsoft*, 253 F.3d at 66. There is no allegation here that features of Venu will prevent consumers from choosing Fubo or any other options in the Live Pay TV Market.

**Third**, Fubo also argues that Venu will not lead to lower prices. (FuboBr.46.) Fubo attempts to obscure the finding that Venu will be a **lower-priced** offering that some consumers will prefer. (SPA-60.) Fubo instead claims that Venu will "be the only product of its kind available to consumers", which will allow Venu "to raise prices directly for consumers". (FuboBr.46.) But the district court rejected Fubo's argument that Venu would occupy its own market for "Skinny Sports Bundles" and instead found that Venu would be one option in the "highly competitive" Live Pay TV Market. (SPA-38&n.31, SPA-40.) That means that Venu will **not** be "the only product of its kind", as relevant to the antitrust analysis. Indeed, the district court found "that viewers who want a skinny sports bundle were not a separate relevant market from other Live Pay TV viewers". (FuboBr.49.) And including Venu within a broader market of other products necessarily means that the many products in the Live Pay TV Market "may all be

21

acceptable substitutes for one another". (FuboBr.39n.33.) The district court could not properly treat Venu as "unique" in the market while recognizing the existence of numerous substitutes.

Fubo concedes this point when it attempts to distinguish *Fraser*, 284 F.3d at 69-70, in which the First Circuit held that creating a new product previously unavailable to consumers was necessarily procompetitive. (FuboBr.47.) Fubo asserts that "this case involves a preexisting market (the Live Pay TV market) with preexisting participants (*e.g.*, MVPDs and virtual MVPDs)." (FuboBr.47.) Fubo cannot have it both ways: either Venu would be one-of-a-kind and would give consumers a new option not previously offered (by definition a procompetitive outcome), or Venu is one of many substitutes, which means it would lack the market power required to raise consumer prices above competitive levels or foreclose competitors, as the district court suggested. (SPA-45, SPA-47.)

**Fourth**, Fubo's *amici* likewise cannot distinguish *Fraser*. DOJ argues that a joint venture can violate Section 7 "even though it was formed to add a new option to the market, by weakening the cooperating firms' incentives to compete on their own". (DOJBr.12, 30-31.) DOJ thus hypothesizes that, without Venu, each Defendant might enter the downstream MVPD market on its own (which Disney already plans to do with ESPN Flagship and which WBD has already done with Bleacher Report (DefsBr.9)), and that their independent offerings would

22

increase competition more than the JV would. But the First Circuit explained that "striking down a combination that does not threaten present competition could be justified, in the hope of obtaining more competition in the future, *only in already concentrated markets*". *Fraser*, 284 F.3d at 71 (emphasis added). That is because "[i]n the absence of significant market power in the hands of existing firms", even "the loss through merger of a potential entrant would not affect present or future competition." *Id.* There is no finding that the Live Pay TV Market is "already concentrated"; rather, the district court found that the market is "highly competitive and in the midst of dramatic change due to technological and demographic changes." (SPA-40.)

  *Finally*, Fubo again falls back on its claim that the JV is an "exclusive licensing arrangement" giving Venu a "built-in advantage" that harms competition. (FuboBr.47.) But the district court attributed Venu's advantage to "Defendants' past (and current) bundling practices" and Venu's "first mover advantage"—not any agreement that Defendants would reserve unbundled programming only for Venu. (SPA-53.) In the absence of a finding that Venu would have market power in the Live Pay TV Market, it was error for the district court to presume that *any of these things would permit* Venu to raise prices above a competitive level. (SPA-53.) And the district court's reliance on forecasted price increases of $5 per year (FuboBr.46) does not show that Venu would increase prices beyond competitive

23

levels.  Indeed, undisputed record evidence showed that because of the cost of

content, price inflation is widespread among MVPDs, and Fubo has typically

raised its prices at a faster pace.  (JA-354:17-20.)

Thus, the district court erred as a matter of law by treating the

introduction of a new, lower-priced product as evidence of harm to competition.

## IV.   The Anticompetitive Effects Identified by the District Court Cannot Occur in the Competitive Live Pay TV Market It Found.

Defendants' Brief showed that the district court erred by identifying

anticompetitive effects in markets it never defined.  The district court erroneously

(i) concluded that Venu would monopolize a "segment" of the Live Pay TV

Market that the court declined to identify as a relevant antitrust market, and (ii)

identified anticompetitive effects concerning the licensing of sports networks to

MVPDs in a separate upstream market it never identified or defined.  (DefsBr.49-

57.)  This violated the Supreme Court's instructions that courts cannot properly

assess anticompetitive effects without first establishing an "accurate definition of

the relevant market" and determining whether the defendant has sufficient market

power in that market to cause the claimed anticompetitive effects.  *Ohio v. Am.*

*Express Co.*, 585 U.S. 529, 543 & n.7 (2018).  Fubo cannot correct this basic legal

error.

*First*, Fubo defends the district court's mistaken conclusion that Venu would monopolize a "segment" of the Live Pay TV Market by asserting that Venu would have a "unique ability to serve" sports fans. (FuboBr.48-49.) But Fubo replicates this fundamental antitrust mistake: if Venu would compete in the Live Pay TV Market, then it would not monopolize some other, undefined market serving only (or mostly) sports fans. All participants in an antitrust market are, by definition, "acceptable substitutes" for one another, as the district court recognized. (SPA-39n.33.) That is true even when focusing on "sports fans", rather than TV watchers generally. Indeed, when defining the relevant market, the district court concluded that, for sports fans, "MVPDs, vMVPDs, and some DTCs (such as YES, for Yankees fans) may all be acceptable substitutes for one another". (SPA-39.) All of the sports on Venu will also be available on numerous other MVPDs— which will also offer other popular sports programming not available on Venu (such as from CBS, NBC, and others), as well as news, entertainment, and children's programming that may well be valued by sports fans. Simply put, there will be many substitutes for Venu; all Venu consumers are likely to be sports fans—but most sports fans will prefer another distributor to Venu's limited sports-only offerings.

*Second*, Fubo asserts that the district court "reasonably considered the impact of the JV's exclusive licensing arrangement on licensing negotiations

between distributors and Defendants." (FuboBr.50.) But the district court failed to define the upstream market in which those licensing negotiations occur or assess whether each of the Defendants would have market power in that market. That was a critical error: the Supreme Court has held that without such an analysis, courts cannot evaluate whether vertical arrangements are anticompetitive under the rule of reason. *Am. Express*, 585 U.S. at 543 n.7 ("Vertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market."). Fubo offers no response.

Fubo also complains that "economic modeling" was not made part of the record in this case. (FuboBr.50-51.) But Fubo was the movant and bore the burden of showing a "likelihood of success" on the merits, which it could not do without complying with the Supreme Court's instructions in *American Express*. Fubo cites no precedent holding that it can dispense with the market definition and market power analysis that *American Express* requires. (FuboBr.51.)

***Third***, DOJ asserts that Venu would harm competition by "foreclos[ing] rivals' access to critical inputs". (DOJBr.17.) The "critical input" asserted by DOJ is "unbundled sports content". (DOJBr.18.) But the district court never found that unbundled sports content is a "critical input" necessary for success in the Live Pay TV Market. To the contrary, the court found that

"unbundled sports content" never has been offered in the market, but the market already was "highly competitive" without it, and products within it (which all lack the alleged "critical input") would be "acceptable substitutes" for Venu. (SPA-39-40.) This distinguishes the Section 7 precedents DOJ relies on, which concluded that foreclosure of a critical input would harm competition by denying potential competitors access to an input they would need to compete.

In *Illumina, Inc. v. FTC*, for example, the acquiring company "was already established as the monopoly supplier of a key input" critical to competing in the downstream market in which the acquired company participated. 88 F.4th 1036, 1051 (5th Cir. 2023). DOJ argues that the *Illumina* court concluded that the acquisition would give the acquiror the incentive to foreclose potential competitors, but a necessary condition of that holding was the acquiror's ***ability*** to foreclose competitors by denying them access due to the acquiror's monopoly control over it. *Id.* There is no such finding here, and DOJ's assertion that *Illumina* reached that conclusion "without defining an upstream input market" (DOJBr.20n.8) is a mischaracterization. *Illumina* found that the acquiror had "monopoly power" as the "sole supplier" of the critical input, and it was that power that allowed the acquiror to execute on its incentives to foreclose downstream competitors. *Id.* at 1053. There is no finding that any Defendant has monopoly power—they each license a relatively small portion of sports programming, as do

27

other well-resourced programmers (DefsBr.6-9)—much less has sufficient control over a "critical input" to foreclose competitors. And each of the Defendants would have a non-exclusive agreement with Venu.

The district court here never defined an upstream market, never found that Defendants had monopoly power in whatever upstream market might be defined, and declined to find a downstream market for which "unbundled sports content" could be a critical input. Without those findings, there is no manner in which the Venu JV could be equated to a market foreclosure case, as in *Illumina*.

**Finally,** as a last-ditch effort, Fubo claims it has shown "serious questions" on the merits, even if it has not shown that it is likely to succeed. (FuboBr.51.) But the Supreme Court has clarified that to obtain a preliminary injunction, a plaintiff must show it is "likely to succeed on the merits". *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024). Fubo argues that the "serious questions" test remains valid despite *Starbucks*, but cites a decision predating *Starbucks* by 14 years. (FuboBr.52 (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010)).) *Starbucks* itself rejected an agency's similar attempt to "substantively lower[] the bar for securing a preliminary injunction." *Starbucks*, 602 U.S. at 349. *Starbucks* requires a likelihood of success.

## V.    Fubo Did Not Prove Irreparable Harm.

Fubo's effort to defend the district court's irreparable harm finding also fails at every turn.

***First***, Fubo's claimed injury is not antitrust injury and thus cannot suffice for irreparable harm.  The district court found irreparable harm solely based upon Fubo's claimed loss of subscribers due to the forces of competition.  (*See supra* Part I.)

***Second***, Fubo's claimed injury is not irreparable.  "[T]hreat[s] to the continued existence" of a business are reparable if there is "a basis from which to extrapolate damages."  *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011); *see also Dexter 345 Inc. v. Cuomo*, 2011 WL 1795824, at *2 (S.D.N.Y. May 3, 2011) (Sullivan, J.) (explaining how "foundational" Second Circuit precedent found irreparable injury only when a failed business "'lack[ed] a track record from which to extrapolate' damages" (quoting *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 436 (2d Cir. 1993))).  Fubo suggests *Dexter* does not apply because the plaintiff hotels in that case had a "long history of operation" helpful to "calculat[ing] money damages."  (FuboBr.55-56.)  But Fubo has been around for a decade—and the district court relied upon its records to calculate projected subscriber loss.  (SPA-2, SPA-57-60.)  Indeed, Fubo conceded that it would "know in hindsight" how many subscribers would have left for Venu.  (JA-

321:20-JA-322:14). Nor is Fubo correct that the *Dexter* plaintiffs did not assert a fear of business failure. (FuboBr.56.) The *Dexter* plaintiffs argued that "their businesses will be destroyed" absent a preliminary injunction. *Dexter*, 2011 WL 1795824, at *2; *see also Dexter,* 663 F.3d at 63 (claiming a "threat to the continued existence of their budget hotel business"). None of Fubo's other cases conflict with *Dexter*'s rule.

   ***Third***, the projections on which Fubo relies to calculate its expected loss of subscribers are facially implausible, and the district court clearly erred by relying on them. Neither Fubo nor the district court explained how Fubo would lose ***20 to 30 times*** more subscribers than its market share would indicate. (DefsBr.58-59.) In response, Fubo mischaracterizes the evidence. Pointing to two preliminary research surveys, Fubo suggests that Defendants "predicted" that a Fox-Disney joint venture "would attract 19 million subscribers" and ███████

████████████████████████████. (FuboBr.56 (citing JA-1079; JA-523).) But the Disney-Fox study ████████████████████

████████████████████████████████

████████████████████████████████

████████████████. (JA-1079.) The Fox-WBD research is no more illuminating. (JA-519.) ████████████████████████

████████████████████████████████

████████████████████████████████████████  (JA-523.)  Neither

study supports Fubo's lost subscriber estimates.

## VI.    The District Court Erred in Failing To Impose a Bond.

Defendants proved that a bond was necessary to protect against irreparable harm in the event of a wrongful injunction.  (DefsBr.60-62.)  Fubo argues that Defendants waived security by requesting it in briefing, rather than at the hearing.  (FuboBr.58-60.)  Fubo mischaracterizes precedent to argue that a party commits waiver "by failing to request a bond *at the preliminary-injunction hearing or* by failing to introduce evidence showing that it *would suffer harm*". (FuboBr.58-59 (emphases added).)  But in Fubo's precedent, the court did not consider issuing a bond because the party (1) did not request one at the hearing *or "in its papers"*, *and* (2) it did not show it would "*likely* suffer harm".  *Heisman Trophy Tr. v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 329 (S.D.N.Y. 2009) (emphases added).

Fubo argues that Defendants did not prove "likelihood of harm" (FuboBr.59-60), but the district court concluded only that the harm was not "quantifiable" (SPA-65).  But courts do not require certainty to avoid causing irreparable harm to wrongfully enjoined parties; rather, "*some* security is appropriate" where enjoined parties would not be "totally unharmed".  *N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 524 (S.D.N.Y. 2013)

(emphasis added). (*See also* DefsBr.60.) Fubo's assertion that Venu will be unprofitable (and an injunction therefore harmless) (FuboBr.59) is contradicted by the district court's finding that Venu will be "extremely profitable" if it successfully attracts subscribers outside the pay TV ecosystem (SPA-20-21).

## CONCLUSION

The injunction should be reversed.

Dated:  December 9, 2024

CRAVATH, SWAINE & MOORE LLP

*/s/ J. Wesley Earnhardt*
Antony L. Ryan
J. Wesley Earnhardt
Yonatan Even
Damaris Hernández
Michael P. Addis
M. Brent Byars
Two Manhattan West
   375 Ninth Avenue
      New York, NY 10001
         (212) 474-1000

*Counsel for The Walt Disney Company;*
*ESPN, Inc.; ESPN Enterprises, Inc.; and*
*Hulu, LLC*

DECHERT LLP

*/s/ Andrew J. Levander*

Andrew J. Levander
Steven E. Bizar
Steven A. Engel
John (Jay) Jurata
Michael H. McGinley
Erica Fruiterman
1095 Avenue of the Americas
    New York, NY 10036
        (212) 698-3500

*Counsel for Fox Corporation*

WEIL, GOTSHAL & MANGES LLP

*/s/ David L. Yohai*

David L. Yohai
Adam C. Hemlock
Theodore E. Tsekerides
Robert W. Taylor
A.J. Green
Elaina K. Aquila
767 Fifth Avenue
    New York, NY 10153
        (212) 310-8000

*Counsel for Warner Bros. Discovery Inc.*

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate

Procedure, I certify under penalty of perjury that the foregoing Brief of Defendants

is prepared in a proportionally spaced typeface (14-point Times New Roman) and

contains 7000 words, and excluding parts of the Brief exempted by Rule 32(f).

December 9, 2024

*/s/ J. Wesley Earnhardt*
J. Wesley Earnhardt

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2024, I electronically filed the Brief of the Walt Disney Company; ESPN, Inc.; ESPN Enterprises, Inc.; Hulu, LLC; Fox Corporation; and Warner Bros. Discovery Inc. with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF.

*/s/ J. Wesley Earnhardt*
J. Wesley Earnhardt