# 24-2210

IN THE

## United States Court of Appeals
## for the Second Circuit

---

FUBOTV INC., FUBOTV MEDIA INC.,

*Plaintiffs-Appellees*,

v.

THE WALT DISNEY COMPANY, WARNER BROS. DISCOVERY, INC.,
ESPN, INC., ESPN ENTERPRISES, INC., HULU, LLC,
FOX CORPORATION,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Southern District of New York
No. 1:24-cv-1363, Hon. Margaret M. Garnett

---

**[REDACTED] FINAL FORM BRIEF FOR PLAINTIFFS-APPELLEES
FUBOTV INC. AND FUBOTV MEDIA INC.**

---

MICHAEL K. KELLOGG
MARK C. HANSEN
GREGORY G. RAPAWY
THOMAS G. SCHULTZ
GAVAN W. DUFFY GIDEON
GEOFFREY J.H. BLOCK
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Plaintiffs-Appellees*

December 11, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellees fuboTV Inc. and fuboTV Media Inc. submit the following corporate disclosure statement:

fuboTV Media Inc. is a wholly owned subsidiary of fuboTV Inc. fuboTV Inc. is a publicly traded company whose shares are listed on the New York Stock Exchange. fuboTV Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF AUTHORITIES.................................................................iv

PRELIMINARY STATEMENT............................................................1

ISSUES PRESENTED........................................................................3

STATEMENT OF THE CASE..............................................................4

    A.    Sports and the Live Pay TV Ecosystem ................................4

    B.    Defendants' Joint Venture .................................................9

    C.    The Proceedings Below.....................................................14

SUMMARY OF ARGUMENT.............................................................18

STANDARD OF REVIEW ................................................................20

ARGUMENT ..................................................................................20

I.    The Record Supports the District Court's Finding That Fubo
Will Likely Succeed on the Merits ................................................20

    A.    The JV May Substantially Lessen Competition in the
Live Pay TV Market........................................................21

        1.    The Live Pay TV market is a relevant market .........................21

        2.    The JV would likely reduce competition in the
Live Pay TV market ................................................23

                a.    Defendants collectively control a critical
input to the Live Pay TV market ...................24

                b.    Defendants have agreed to enter the Live
Pay TV market collectively through an
exclusive arrangement ....................................24

                c.    Defendants' exclusive arrangement will
likely cause harm to competition in the
Live Pay TV market.......................................26

d.    *Columbia Pictures* persuasively supports the district court's opinion .................................................29

3.    Fubo and other competitors face injury from the JV's anticompetitive effects ........................................30

B.    Defendants Fail To Show That the District Court Erred ...................32

1.    Fubo is threatened with antitrust injury because the JV's exclusive arrangement will exclude Fubo from the market ........................................................................32

2.    Unlike *Trinko* and *linkLine*, this case does not involve a unilateral refusal to deal ...........................36

3.    The JV's exclusive arrangement is unlawful regardless of whether Defendants could lawfully bundle their sports and non-sports networks ...........................41

4.    The JV is not procompetitive and will not compete with Fubo based on price .........................................45

5.    The JV's anticompetitive effects will occur in the Live Pay TV market ................................................47

C.    Alternatively, Fubo Has Shown At Least Serious Questions Going to the Merits .......................................51

II.    The District Court Reasonably Found That the JV Threatens Fubo and the Public with Irreparable Injury.................................52

A.    The JV Threatens To Injure Fubo Irreparably by Causing It To Lose Market Share and Go Out of Business .............53

B.    Defendants Fail To Show That the District Court Erred ...................55

III.    The District Court Reasonably Waived a Bond Requirement.......................58

CONCLUSION ....................................................................60

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## CASES

*American Needle, Inc. v. NFL*, 560 U.S. 183 (2010) ................................38

*American Tobacco Co. v. United States*, 328 U.S. 781 (1946) ................................40

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ........................31

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ............................44

*Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999) ................................52

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ..........................................21

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297 (10th Cir. 2017) ................................37, 38

*Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986) ...............33, 34, 35

*Ceraso v. Motiva Enters., LLC*, 326 F.3d 303 (2d Cir. 2003) ................................20

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010) ..........................................52

*Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252 (2d Cir. 1989) ........................................21, 34, 35, 36, 49

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ........................................28, 33, 38

*Dexter 345 Inc. v. Cuomo*, 663 F.3d 59 (2d Cir. 2011) ......................................55, 56

*Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126 (2d Cir. 1997) ..............................58

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996) ..................................58

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ........................................33

*Eng v. Smith*, 849 F.2d 80 (2d Cir. 1988) ..........................................21

*Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393
    (2d Cir. 2013).................................................................52

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47 (1st Cir. 2002) ....................47

*Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112 (2d Cir 2005) ...........................53

*FTC v. Advocate Health Care Network*, 841 F.3d 460 (7th Cir. 2016)............. 20-21

*FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34 (D.D.C. 1998)...........................22

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989)......................................21

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485
    (2d Cir. 2004).................................................................44

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60
    (2d Cir. 2007).................................................................53

*Heisman Trophy Tr. v. Smack Apparel Co.*, 595 F. Supp. 2d 320
    (S.D.N.Y. 2009) .............................................................59

*International Controls Corp. v. Vesco*, 490 F.2d 1334 (2d Cir. 1974)....................59

*JTH Tax, LLC v. Agnant*, 62 F.4th 658 (2d Cir. 2023) ........................................52

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959)..........................41

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638
    (2d Cir. 2015)..........................................43, 45, 46, 51, 54

*Ohio v. American Express Co.*, 585 U.S. 529 (2018) .....................................23, 48

*Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429
    (2d Cir. 2002).................................................................58

*Pacific Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438
    (2009)..........................................................36, 38, 39, 40

*Pacific Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814
    (9th Cir. 1992).................................................................34

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) ..............................22

*Pippins v. KPMG, LLP*, 759 F.3d 235 (2d Cir. 2014).............................................43

*Red Earth LLC v. United States*, 657 F.3d 138 (2d Cir. 2011)...............................20

*Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327
    (2d Cir. 2024)...............................22

*Starbucks Corp. v. McKinney*, 144 S. Ct. 1570 (2024)...............................52

*Suboxone Antitrust Litig.*, *In re*, 64 F. Supp. 3d 665 (E.D. Pa. 2014),
    *on recon. in part*, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015) ...............46

*Todd v. Exxon Corp.*, 275 F.3d 191 (2d Cir. 2001) ...............................21

*Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119 (S.D.N.Y.
    1996) ...............................34

*US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir. 2019) ...............22

*United States v. American Express Co.*, 838 F.3d 179 (2d Cir.
    2016), *aff'd sub nom. Ohio v. American Express Co.*,
    585 U.S. 529 (2018)...............................22

*United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ...............................23, 45

*United States v. Columbia Pictures Industries, Inc.*:

    507 F. Supp. 412 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1063, 1981
    U.S. App. LEXIS 21309, 7 Media L. Rep. 1342 (2d Cir. 1981) ....29, 30, 40, 41

    659 F.2d 1063, 1981 U.S. App. LEXIS 21309, 7 Media L.
    Rep. 1342 (2d Cir. 1981) ...............................30

*United States v. General Dynamics Corp.*, 415 U.S. 486 (1974) ...............................43

*United States v. Isiofia*, 370 F.3d 226 (2d Cir. 2004)...............................54

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)...............................46

*United States v. Penn-Olin Chem. Co.*, 378 U.S. 158 (1964)...............................20, 21, 38

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ...............................20

*Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286 (1st Cir. 2022)...............................31

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004)...............................36, 37, 38, 39, 40, 43

*Winter v. NRDC*, 555 U.S. 7 (2008) ........................................................52

*Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101
    (2d Cir. 2003) ........................................................................20

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) .........................35, 36

## STATUTES AND RULES

Clayton Act, 15 U.S.C. § 12 *et seq.* ...............................................2, 14, 20, 40

    § 7, 15 U.S.C. § 18................................................................2, 14, 16, 20,
                            21, 37, 43, 44, 47

National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ...........................................52

Sherman Act, 15 U.S.C. § 1 *et seq.* ...............................................2, 14, 37, 46

    § 1, 15 U.S.C. § 1..................................................................2, 14, 43

    § 2, 15 U.S.C. § 2..................................................................37, 38

Donnelly Act, N.Y. Gen. Bus. L. § 340 *et seq.* ...........................................2

Fed. R. Civ. P.

    Rule 65.............................................................................58

    Rule 65(c) .........................................................................58

## PRELIMINARY STATEMENT

Disney, Fox, and Warner Bros. Discovery ("Defendants") each controls critical and unique live televised sports programming; each licenses that programming to distributors in the United States. The three now propose to form a joint venture ("JV") that would consolidate their rights to more than half of all U.S. live televised sports content, including rights to broadcast the Super Bowl, the World Series, and March Madness. They further propose to give their JV the exclusive right to offer consumers the ability to subscribe to sports and only to sports programming – a coveted arrangement known as a "skinny sports bundle."

No distributor can compete in the market for live pay television without the commercially critical sports content that Defendants control and the JV would offer. As a condition of licensing that content, Defendants now force distributors to carry other, unwanted content. Under Defendants' anticompetitive agreement, the JV would become the only distributor able to carry their sports content without also carrying (and paying for) their other content. That exclusive access would give the JV a built-in advantage over every other distributor – a manufactured pathway to instant market dominance.

Fubo is a distributor that focuses on sports content. Since its launch, Fubo has sought to offer viewers sports content with as little unnecessary non-sports content as possible. Defendants' launch of a JV with exclusive access to a critical

majority of unbundled live sports programming threatens to drive Fubo and other distributors out of business. Even distributors that survive will be weakened as they attempt to negotiate with Defendants while losing viewers to Defendants' JV. The predictable and intended result will be less competition, higher prices, and fewer choices for viewers.

Fubo brought this action to stop the JV from forcing it and other distributors out of the market. It brought antitrust claims under Section 1 of the Sherman Act, Section 7 of the Clayton Act, and New York's Donnelly Act. It then sought a preliminary injunction to prevent the JV from launching. The district court authorized expedited discovery focused on the Section 7 claim. After a five-day evidentiary hearing with in-person testimony from Fubo's, Defendants', and other industry witnesses, the court found that Fubo would likely succeed in showing that the JV may reduce competition in the market for live pay television. The court also found that Fubo would suffer irreparable injury from the loss of its business and market share; and that the equities and the public interest favored protecting competition – and, with it, Fubo.

The district court's discretionary ruling and credibility determinations are due deference on appeal. Defendants fail to overcome that deference. The record amply supports the court's findings that Defendants' JV was concerted rather than unilateral action, that the JV would reduce competition in the relevant market, that

Fubo was threatened with antitrust injury, and that Fubo's injuries would be irreparable. Defendants' scattershot challenges fail to undermine the district court's well-reasoned exercise of discretion based on a well-developed factual record and on key determinations of witness credibility.

## ISSUES PRESENTED

1.      Whether the district court acted within its discretion in preliminarily enjoining Defendants from launching a joint venture with the exclusive right to distribute their commercially critical sports channels unbundled from other content, based on findings that the joint venture would likely drive Fubo from the market and otherwise substantially lessen competition in the market for live pay television programming.

2.      Whether the district court acted within its discretion in declining an injunction bond, based on a finding that Defendants failed to meet their burden of showing the purported harm they would suffer from a preliminary injunction.

## STATEMENT OF THE CASE

### A.    Sports and the Live Pay TV Ecosystem

"The linear pay TV industry is made of three basic tiers:  (1) creation, *i.e.*, the development of television content; (2) programming, *i.e.*, the packaging of television content by the networks; and (3) distribution, *i.e.*, the delivery of television to consumers."  SPA7.[1]  Companies at the third tier – known as multichannel video programming distributors, or MVPDs – license the rights to distribute programmers' linear TV networks through "carriage agreements" with programmers.  SPA9.  MVPDs pay programmers "affiliate fees" for licensed networks on a per-subscriber basis.  *Id.*  MVPDs have traditionally delivered programmers' networks through cable (*e.g.*, Comcast) or satellite (*e.g.*, DISH).  SPA9-10.  Over the past decade, new distributors have emerged, called "virtual MVPDs," that deliver TV content over a broadband internet connection.  SPA10.  Plaintiff-Appellee fuboTV, Inc. (collectively with fuboTV Media Inc., "Fubo") is a virtual MVPD founded in 2015.

The most valuable content in the linear pay TV industry is live sports.  SPA8-9, SPA16-17.  Live sports attract massive, devoted, and predictable audiences.  SPA16.  Unlike non-sports, live sports are almost always "consumed

---

[1] "'Linear' channels are those that are programmed in a time sequence, with content offered in a particular order and at a specific time."  SPA7 n.4.

in real time." *Id.* "Indeed, with few exceptions (rare and one-off events like the Oscars or a presidential debate), live sports are the only remaining 'appointment television.'" *Id.* "In 2023," for example, "96 of the 100 most watched telecasts across the pay TV ecosystem were live sports events." SPA17. Those qualities make live sports "extraordinarily valuable media properties." SPA16. The multi-year contracts through which programmers secure live sports are worth billions of dollars. SPA8-9. For instance, the NFL's most recent media rights deal is valued at $110 billion over 11 years. SPA8. And networks with live sports are "the most expensive of all television content for distributors to license from programmers." SPA16.

Defendants are dominant TV programmers that collectively control access to most live sports broadcast in the United States, including "content from all the major professional sports leagues and college sports." SPA19. Defendant-Appellant The Walt Disney Company ("Disney") and its subsidiary ESPN own rights to live sports from an array of leagues, including the NFL, NBA, MLB, NHL, and college football and basketball. SPA6. Defendant-Appellant Fox Corporation ("Fox") owns rights to events from the NFL, MLB, Major League Soccer, and NASCAR, among others. SPA7. And Defendant-Appellant Warner Bros. Discovery ("WBD") owns rights to events from the NBA, NHL, MLB, NCAA's March Madness, and other NASCAR events. *Id.* Defendants air those

5

events on linear networks like ESPN (Disney), the Fox broadcast network (Fox), and TNT and TBS (WBD), which they license to distributors.

Together, Defendants control at least "54% of all U.S. sports rights, and at least 60% of all nationally broadcast U.S. sports rights." SPA17. Defendants' own documents and executives suggest "that the true figures may be even larger." *Id.*; *see also*, *e.g.*, SPA17 n.10 (Defendants' internal document stating that "FOX-DIS-WBD Combined" "Total Sports Viewing" "Market Share" is "62%") (quoting JA1233); *id.* (ESPN's Chairman James Pitaro stating Defendants' share of "U.S. sports rights" is "actually over 60%!") (quoting JA1497). WBD's CEO David Zaslav claimed on July 10, 2024, that Defendants collectively control "about 75% of the sports." SPA18 n.11 (quoting video footage); *see* JA1637 (screenshot).

Defendants especially dominate the most popular U.S. sports. They control close to three-fourths of rights to what are known as the "Big Five" sports – the NFL, NBA, MLB, NHL, and college football. SPA17-18. ESPN's Chairman reported that Defendants' "networks and services captured over 85% of college football, NBA, MLB, and NHL audience share in 2022." SPA18 n.11 (quoting JA1500).

Defendants' live sports properties give them "significant leverage in carriage negotiations with distributors."  SPA18.  Because networks with live sports are so popular, they are "essential to . . . any competitive live pay TV package."  SPA17.  And because of the breadth and importance of Defendants' holdings, distributors "must . . . contract with one or more" Defendants "to offer customers even the most basic array of live sports content."  SPA2.  Defendants understand this:  Disney's CEO Bob Iger has boasted that "you cannot launch a new multi-channel . . . platform or bundle . . . successfully without ESPN."  JA1580.

Defendants use that leverage to force distributors to bundle their valuable sports networks with their less-valuable non-sports networks.  That is, Defendants force distributors "to carry (and pay for) unwanted non-sports networks that its customers rarely watch, as a condition of securing the rights to carry must-have sports channels."  SPA2; *see also* SPA40-42 (finding it "indisputable" that Defendants engage in bundling and finding Defendants' "denials of the existence of their bundling practices to be entirely incredible and completely belied by the ample evidence before the Court").  Defendants enforce their bundling through, among other provisions, "minimum penetration requirements" in carriage agreements, which require distributors to distribute a programmer's channel to a

minimum percentage of subscribers (and pay an affiliate fee for each subscriber).  SPA11.

Bundling imposed by Defendants and other programmers has created what is known as "[t]he 'fat' bundle – meaning a linear pay TV model that includes hundreds of television channels of all varieties purchased together for a single monthly fee."  SPA13.  This model "allow[s] programmers to extract significant value from under-performing or lower-performing channels" – sometimes "twice the revenue" they would get absent forced bundling.  SPA12.  Forced bundling imposes "mind-bending costs" on distributors and consumers, who must pay for channels they neither want nor need.  SPA45.  Distributors pay per-subscriber fees for a channel regardless of whether or how widely they want to distribute it, and consumers pay for the full "fat bundle" even if they would prefer fewer channels.

Over the past decade, many consumers of non-sports programs have abandoned the fat bundle for subscription-video-on-demand ("SVOD") services like Netflix – a trend known as "cord-cutting."  SPA14.  But because SVODs carry very few live sports, "linear pay TV remains the dominant source of live sports programming."  *Id.*  Accordingly, "a disproportionate percentage of sports fans have remained in the fat bundle in order to retain access to the

content they value most," despite having to pay for non-sports channels to get it. SPA15.

The record is "clear" that, if Defendants "were willing to unbundle live sports content, distributors would jump at the opportunity to offer sports-only content." SPA44. For instance, Fubo – whose name is a play on "football," the sport called "soccer" in the U.S. – has sought to "provid[e] a streaming service focused on live sports" since it launched. SPA2. Fubo wants to offer a "skinny sports bundle" featuring only channels that include live sports. SPA44. But Defendants have stymied the efforts of Fubo and other MVPDs through their bundling requirements. SPA40-45. The result is a "void" in the distribution market. SPA4. Many sports fans want a skinny sports bundle, but Defendants have blocked all existing distributors from meeting that demand.

## B. Defendants' Joint Venture

In 2023, Defendants began discussing a plan to fill the void they had created with their own skinny sports bundle. SPA19. From the start, they recognized they could achieve greater power in the distribution market by combining their live sports programming. *See*, *e.g.*, JA1488-1489 (April 17, 2023 internal Disney email: "One big concern: with our portfolio, are we enough of a must have? So we started to think about partners . . . . Fox adds 20% of sports viewership . . . .

9

Combined with our 30+% it puts us over 50%").  Defendants decided to create a new JV and distribute all of their sports networks to consumers through the JV "*completely unbundled* from any other of [their] . . . networks." SPA19.  Defendants used the internal codename "Raptor" for the JV, *id.*, suggesting a predatory threat.  For public consumption, they chose the innocuous "Venu."  SPA1.

On February 6, 2024, Defendants signed a nonbinding term sheet, then announced publicly that their JV would "bring together [their] portfolios of sports networks":  seven Disney networks (ABC, ESPN, ESPN2, ESPNU, ESPNews, SEC Network, and ACC Network); four Fox networks (Fox, FS1, FS2, and Big Ten Network); and three WBD networks (TNT, TBS, and TruTV).  SPA19, SPA21. Each Defendant would own one-third of the JV and control two of six board seats. SPA22.  The JV would launch in Fall 2024 ██████████████  SPA21; *see* JA1534.  It would charge consumers $42.99 per month for a skinny sports bundle (half the price of the "fat bundle" Defendants force on other distributors), SPA21, SPA60, with projected $5 annual increases, SPA53.

Departing from their otherwise universal practice, Defendants agreed to license their sports networks to the JV without also requiring it to license their non-sports networks.  SPA12-13.  Each has consistently refused to license

unbundled sports to any other distributor. SPA40-41 (crediting testimony of Fubo's executives; ███████████████████████████; and declaration from DirecTV's Chief Content Officer Robert Thun). Defendants' own documents and witnesses confirm this fact.[2]

By unbundling their sports content for the JV alone, Defendants "are granting [it] an exclusive right to license their sports networks unbundled from their general entertainment channels." SPA46. That exclusive licensing arrangement is the core of the JV. According to Defendants themselves, the JV "is primarily about creating and launching a new package which others cannot currently develop and others likely have significant encumbrances to launch." JA1486 (July 24, 2023 email from Disney's President of Platform Distribution Justin Connolly). It would become the only distributor offering a skinny sports bundle. *See, e.g.*, SPA19; JA441 (Tr.1040:13-25) (Defendants' expert agreeing that "Raptor will be the only virtual distributor to offer only networks that have live sports content when [it] launche[s]" and that "others cannot currently develop" this

---

[2] *See, e.g.*, JA213 (Tr.363:8-16) (Fox's COO John Nallen agreeing that "Fox has not licensed its sports channels separately from its nonsports channels" and "has never historically unbundled its channels"); JA430 (Tr.1028:15-21) (Defendants' expert agreeing that "Defendants currently do not license unbundled sports channels to any third-party distributor" and that "Raptor represents the first time in the history of these companies that the defendants are unbundling their sports channels from their other channels"); SPA45 ("Raptor represents the first time we are unbundling our networks") (quoting JA1230).

package); JA399 (Tr.857:14-17) (WBD's Chief Revenue and Strategy Officer Bruce Campbell agreeing that, "[w]hen it launches," the JV "will be the only virtual MVPD to offer only networks that have live sports content"); JA229 (Tr.394:1-4) (Fox's COO John Nallen agreeing that, "currently," "[n]o distributor in the market . . . has the right or the ability to sell consumers a package that includes only Fox's sports channels").

Defendants have also sought "*to avoid*" "[a]nything that can offer competing features or functions to the sports fan around a material set of content e.g. a dedicated sports product, that can be marketed head on against Raptor." SPA49 (quoting JA1003) (notes by Fox's executive Paul Cheesbrough; emphasis his). Their binding JV term sheet ███████████ includes a provision that prevents each from launching a competing skinny sports bundle for a three-year period. SPA47 (barring any ownership of "a commercial venture, where the focus of the commercial venture is the operation of a sports-centric vMVPD similar to the JV Platform") (quoting JA1550). "This agreement contractually prohibits any of the [Defendants] from joining forces with other competitor sports licensors – such as CBS and NBC – in order to develop a competing sports-focused vMVPD." *Id.* In addition, Defendants agreed in the JV's term sheet "not to distribute the JV through other third-party MVPDs." SPA47 n.35; *see id.* ("[t]he JV Platform shall

not be licensed to, or distributed by, any current or former distributor of any JV Network") (quoting JA1538).

Apart from the term sheet, "shortly before the JV was announced, [Defendants] *explicitly agreed* to 'stay clear' of supporting another platform like the JV for at least the next three years." SPA4; *see also* JA236-237 (Tr.402:24-403:2) (Fox's COO admitting that, in late January 2024, he "agreed on a phone call" with ESPN's Chairman and WBD's Chief Revenue and Strategy Officer that Defendants "would all stay clear of a Raptor-like platform"); SPA48 (citing JA1227) (same). That oral agreement to "stay clear" was broader than the written non-compete that Defendants' later signed, ██████████████████ ████████████████████. *See generally* JA1534-1562. Defendants have also recognized that, regardless of any non-compete agreement, none would have an incentive to compete with the JV. When a Fox executive questioned internally whether Disney and WBD would compete against Raptor with separate products, Fox's COO replied: "Don't know why they would really want to compete with a platform they [are] putting $300m each into. Don't overthink this one." SPA50 (quoting JA1001) (brackets in district court opinion).

The JV's exclusive right to offer a skinny sports bundle will allow it to capture huge numbers of subscribers from distributors that can offer only fat

13

bundles. Defendants have projected that "between 50 and 70% of the JV's subscribers will be viewers who drop a current MVPD subscription to instead subscribe to the JV." SPA20. Fubo, whose subscribers "are predominantly sports-motivated consumers," has projected that, if the JV launched in Fall 2024, it would lose between 300,000 and 400,000 subscribers by the end of the year. SPA23. Independent third parties view the JV similarly. ████████████████

████████████████████████████████████████

████████████████████████████ JA1482. ████████████

████████████████████████████████████

████████████████████████████████████████

████████████████

## C.    The Proceedings Below

On February 22, 2024, Fubo filed an antitrust complaint against Defendants in the Southern District of New York. It alleges that Defendants' JV may substantially lessen competition, violating Section 7 of the Clayton Act. Fubo also brings Section 1 claims under the Sherman Act, but those are not on appeal.

On April 9, Fubo sought a preliminary injunction to prevent Defendants from launching the JV. Dkts. 94-96. The court set an expedited discovery schedule and a hearing on the motion. SPA25; Dkt. 140. On July 25, "after approximately three months of expedited but extensive discovery," Defendants

filed a 65-page opposition to Fubo's motion. SPA29; *see* Dkts. 238-239.

Defendants attached 140 exhibits to their opposition, mostly documents from

discovery. Dkts. 234, 236. Fubo filed a 45-page reply with 143 more exhibits.

Dkts. 245-248. Consumer organizations also submitted an *amicus* brief about the

harm the JV would cause consumer welfare. Dkt. 253-1; *see also* Dkt. 267.

On August 6, the preliminary injunction hearing began. During the five-day

hearing, the district court heard live testimony from 18 witnesses and video

deposition testimony from seven more. SPA31-32. It admitted 258 exhibits into

evidence. *See* Dkt. 295 at 4-60 (exhibit list). It also received post-hearing briefing.

SPA32; Dkts. 285-287.

On August 16, the district court granted Fubo's motion. Its 69-page

opinion made detailed findings of fact based in significant part on credibility

determinations, including observation of witnesses. *See*, *e.g.*, SPA34 ("The Court

has observed each witness's demeanor [and] considered the content of their

testimony within the context of the documentary evidence and entire facts of this

case[.]"); SPA57 (finding statements by Fubo's witnesses regarding the JV's

impact "credible and reliable based on [their] backgrounds as experienced

businesspeople, the Court's observation of their demeanor, and the internal

consistency and coherence of the totality of their testimony"); SPA42 (finding

Defendants' "denials of the existence of their bundling practices to be entirely incredible and completely belied by the ample evidence before the Court").

*First*, the district court found that Fubo will likely succeed in demonstrating that Defendants' JV violates Section 7, which prohibits joint ventures that "may . . . substantially . . . lessen competition." 15 U.S.C. § 18; *see* SPA34-55. The court began by noting that "[t]he antitrust laws recognize that joint ventures between horizontal competitors pose particular dangers to competition." SPA35. It identified the Live Pay TV market – the market where distributors sell packages of linear TV channels to consumers – as a relevant market for the JV's likely impact. SPA37-40. The court found that Defendants were "granting the JV an exclusive right to license their sports networks unbundled from their general entertainment channels"; and that, through this exclusive arrangement, the JV would allow Defendants to control the Live Pay TV market and "drive out competitors." SPA46-47.

*Second*, the district court found that Fubo and consumers would face irreparable harm in the absence of a preliminary injunction. SPA55-64. The court credited Fubo's "sworn declarations, live witness testimony, ordinary course business documents, and statistical data all uniformly evidencing that the launch of the JV will precipitate the imminent downfall of its business." SPA55-60. In addition, the court found that the JV's launch would "greatly increase the risk that

16

consumers will be vulnerable to price increases, decreased quality, and decreased options in the market." SPA64.

*Third*, the district court found that the equities and the public interest supported the issuance of a preliminary injunction. SPA64-66. Fubo "made a clear showing that it faces imminent subscriber loss, likely followed by bankruptcy, delisting, and the collapse of its business," if the JV were to launch. SPA64. Defendants "offered ***no*** witness testimony or documentary evidence on the harms (economic or otherwise) that they may face from" delay in the JV's launch. SPA65. Accordingly, "the balance of the hardships tip[ped] firmly in Fubo's favor." *Id.* In addition, because the JV's launch would "likely cause the exit of a current market option for consumers," the public interest favored an injunction. SPA66.

The district court declined to require Fubo to post a bond. Defendants had first sought a bond in their post-trial brief and "offer[ed] no legitimate analysis in support" of the bond amount that they proposed. SPA65 n.4. "In the face of such a conclusory and undeveloped record, and without the opportunity for Fubo to respond," the court concluded that it "need not issue a bond." *Id.*

17

## SUMMARY OF ARGUMENT

**I.**     The record supports the district court's finding that Fubo will likely show at trial that Defendants' JV may substantially lessen competition in the Live Pay TV market.  The court did not clearly err by defining that market based on evidence about demand for live TV, especially live sports.  The JV may substantially lessen competition in that market because Defendants have given it a built-in advantage:  the exclusive right to distribute their combined, commercially critical sports content without also having to pay for – and force viewers to pay for – unwanted non-sports channels.  Defendants have structured the JV to avoid anything like competition on the merits.  Its artificial advantage will capture hundreds of thousands of subscribers and tens of millions of dollars from Fubo alone, driving Fubo into insolvency, and destroying or damaging other distributors.  The foreseeable outcome for viewers will be higher prices and fewer choices.

Contrary to Defendants' contentions, Fubo is threatened with antitrust injury because a major anticompetitive effect of the JV's launch will be to drive would-be competitors like Fubo out of the market.  Cases rejecting liability for unilateral refusals to deal do not apply here.  The JV is concerted, not unilateral, action; so are Defendants' agreements not to compete with it.  Nor is it relevant to this appeal whether, in the absence of the JV, Defendants could lawfully tie their sports and non-sports content.  At issue is only whether, in the context of this particular

market, the formation of the JV (and its attendant exclusive right to offer a skinny sports bundle) may substantially decrease competition.  The district court did not clearly err by finding that the JV's effects would be anticompetitive, nor do Defendants succeed in poking holes in its market definition.  The court's conclusions follow from the facts it found, and there is no error – much less clear error – in those findings.

**II.**     The record likewise supports the district court's finding that the JV threatens Fubo with irreparable injury.  Loss of a business and loss of market share are well-settled types of irreparable injury, and the court properly found both.  Defendants cannot overcome the deference owed these findings, which rely on in-person evaluation of Fubo's and Defendants' witnesses at the hearing.

**III.**     Finally, the district court had discretion to reject Defendants' eleventh-hour request for a $100 million bond.  It was Defendants' burden to show the harm an injunction would cause them.  They chose not to introduce evidence that would support such a showing, or to even request a bond until after the hearing.  They cannot complain to this Court that the district court held them to their well-recognized burden.

## STANDARD OF REVIEW

This Court reviews a grant of a preliminary injunction "[u]nder the deferential abuse of discretion standard." *Red Earth LLC v. United States*, 657 F.3d 138, 144 (2d Cir. 2011). "[A]s long as the district court did not act arbitrarily, [this Court] will overturn the preliminary injunction only if the district court made an error of law or a clearly erroneous finding of fact." *Id.* "Clear error" requires "a firm belief that the district court was mistaken." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 108 (2d Cir. 2003); *see also Ceraso v. Motiva Enters., LLC*, 326 F.3d 303, 316 (2d Cir. 2003) ("In reviewing findings for clear error," this Court does not "second-guess either the trial court's credibility assessments or its choice between permissible competing inferences.").

## ARGUMENT

### I.    The Record Supports the District Court's Finding That Fubo Will Likely Succeed on the Merits

Section 7 of the Clayton Act prohibits transactions that "may . . . substantially . . . lessen competition" in "any line of commerce." 15 U.S.C. § 18. The statute "arrest[s] anticompetitive tendencies in their 'incipiency.'" *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 171 (1964) (quoting *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 362 (1963)). It applies to "joint venture[s]" because they "often create[] anticompetitive dangers." *Id.* at 169. In a Section 7 case, "'[d]oubts are to be resolved against the transaction.'" *FTC v. Advocate*

*Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016) (quoting *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989) (Posner, J.)).

The district court reasonably found that Fubo will likely prove that Defendants' JV may substantially lessen competition in the Live Pay TV market. *See Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (preliminary-injunction movant "need only make a showing that the probability of his prevailing is better than fifty percent"); *Penn-Olin*, 378 U.S. at 175 (Section 7 requires only "reasonable probability" of anticompetitive effects). The court based its decision on "voluminous briefing," three months of "extensive discovery," a five-day hearing, live testimony from 18 witnesses, seven video deponents, and many credibility determinations. SPA29, SPA34. Defendants attack that decision from many angles, but identify no error, let alone an abuse of discretion.

## A. The JV May Substantially Lessen Competition in the Live Pay TV Market

### 1. The Live Pay TV market is a relevant market

To evaluate a Section 7 claim, a court first finds a relevant market. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). "[M]arket definition is a deeply fact-intensive inquiry." *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001); *see also Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261 (2d Cir. 1989) (applying clear-error review to district court's "determination of the relevant market"). A relevant market includes "'all products reasonably

21

interchangeable by consumers for the same purposes.'" *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 338 (2d Cir. 2024) (quoting *United States v. American Express Co.*, 838 F.3d 179, 196 (2d Cir. 2016), *aff'd sub nom. Ohio v. American Express Co.*, 585 U.S. 529 (2018)). "Products will be considered to be reasonably interchangeable if consumers treat them as 'acceptable substitutes.'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998)).

The district court reasonably found a relevant Live Pay TV market in which distributors sell packages of live TV channels to consumers. SPA38-40. The court noted that it is "undisputed" that "the relevant consumer [in this case] is the sports fan who watches, or would like to watch, sports on a live telecast." SPA38. It appropriately defined the market by reference to that consumer demand.

The district court included MVPDs in the market because they provide "the vast majority of current live sports offerings." SPA15. It included sports-only direct-to-consumer ("DTC") services owned by sports leagues and regional sports networks – such as NFL Sunday Ticket and YES for Yankees games – because those services fulfill the needs of some sports fans. SPA15, SPA39; *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 55 (2d Cir. 2019) ("Courts 'combine different products or services into a single market when that combination

22

reflects commercial realities.'") (quoting *Ohio v. American Express Co.*, 585 U.S. 529, 544 (2018)). But the court excluded SVODs like Netflix because they "carry very few live sports" and are not acceptable substitutes to a sports fan. SPA39 & n.33.

The district court also reasonably recognized that there is unmet demand in the Live Pay TV market for a "skinny sports bundle" – a smaller package consisting only of networks with live sports. SPA46. That demand remains unmet because Defendants have blocked any distributor "from offering a multi-channel sports-focused streaming service," SPA45-46, creating a "void" in the market, SPA4.

### 2. The JV would likely reduce competition in the Live Pay TV market

Defendants collectively control most live sports programming in the United States – a critical input to the Live Pay TV market. They plan to consolidate their live sports content in the JV and to give the JV an exclusive right to license and distribute their live sports without bundling. The district court reasonably found that this exclusive arrangement may substantially lessen competition in the Live Pay TV market. Its decision rested on factual findings reviewable only for "clear[ ] err[or]." *E.g.*, *United States v. Anthem, Inc.*, 855 F.3d 345, 368 (D.C. Cir. 2017) (reviewing "factual findings that [a] merger would have anticompetitive effects").

### a. Defendants collectively control a critical input to the Live Pay TV market

The most important input to the Live Pay TV market is live sports content. *See supra* pp. 4-5. Live sports are, with few exceptions, "the only remaining 'appointment television.'" SPA16. In 2023, "96 of the 100 most watched telecasts across the pay TV ecosystem were live sports events." SPA17. Given strong consumer demand for live sports, linear networks with live sports content are "essential to . . . any competitive live pay TV package." *Id.* Defendants admit that a distributor "cannot launch a new multichannel platform" without, for example, "ESPN." *Id.* (Disney's CEO).

"When it comes to live sports programming, [Defendants] dominate." SPA2. Together, they "control approximately 54% of all U.S. sports rights," "at least 60% of all nationally broadcast U.S. sports rights," and nearly "*three-fourths*" of the rights to the NFL, NBA, MLB, NHL, and college football. SPA17-18. Defendants' own executives boast that Defendants collectively control as much as 75% of all sports. *See supra* p. 6.

### b. Defendants have agreed to enter the Live Pay TV market collectively through an exclusive arrangement

After long serving as upstream providers of a critical input to the Live Pay TV market, Defendants now seek to enter that market themselves. Instead of each entering individually, Defendants plan to enter collectively through a JV that they jointly own and ███████████████. *See supra* pp. 9-10; JA329-331

(Tr.638:18-640:6) (unrebutted expert testimony that there is no meaningful consumer benefit to Defendants entering the market collectively as opposed to individually). Defendants' JV includes an exclusive arrangement to offer Defendants' unbundled sports content to the JV alone. The district court found that, before the JV, Defendants' "sports-focused channels have ***never*** been unbundled from their non-sports offerings." SPA12-13. But the JV will have "an exclusive right to license their sports networks unbundled from their general entertainment channels." SPA46. Indeed, Defendants' own documents recognize that the JV "is primarily about creating and launching a new package which others cannot currently develop and others likely have significant encumbrances to launch" because of Defendants' otherwise universal bundling practices. JA1486.

That exclusivity would allow the JV to offer the only skinny sports bundle in the Live Pay TV market. *See supra* pp. 11-12. The district court found the record "clear" that other "distributors would jump at the opportunity to offer sports-only content" if given the opportunity and have "long desired to offer such a sports-focused package to their consumers." SPA44. Defendants have used their control over the critical input of sports programming to require third-party distributors to license and distribute their sports and non-sports networks as a bundle. They have thus "prevent[ed] any other distributor from offering a multi-channel sports-focused

streaming service." SPA45-46. Defendants understand the exclusive skinny sports bundle to be the JV's "fundamental appeal." SPA45.

### c. Defendants' exclusive arrangement will likely cause harm to competition in the Live Pay TV market

The district court correctly found that Fubo will likely show that Defendants' agreement to license unbundled sports exclusively to the JV may substantially lessen competition in the Live Pay TV market by "put[ting] [other] distributors at a significant disadvantage," allowing Defendants to "drive out competitors," and providing them "with an unobstructed runway to dominance." SPA47-48. By combining forces, Defendants intend to create the only actor in the Live Pay TV market that can offer sports fans a skinny, low-priced option to watch sports. That anticompetitive conduct would harm Fubo and other distributors because it will give the JV a built-in advantage they cannot match. The JV's advantage would come neither from offering higher-quality sports programming nor from licensing any channels at a lower price. It would come from exclusive rights granted by a cartel of horizontal competitors that "exercise near-monopolistic control over the ability for a different live-sports-only streaming service to exist and compete with the JV" and have used that control to prevent other distributors from offering a competing service. SPA4.

26

In light of that exclusivity, the district court identified five ways in which "overwhelming" evidence shows that "at least one . . . aspect[] of the JV will tend to produce anticompetitive effects." SPA54. Each independently supports that court's decision that Fubo will likely succeed on the merits.

*First*, the district court found that Defendants entered into a three-year non-compete agreement that contractually prohibits them from developing or participating in a product competitive with the JV's skinny sports bundle. SPA47-48. In addition to that express non-compete, the court relied on documentary evidence and live testimony from Defendants' witnesses showing that they "agreed that they 'would all stay clear of a Raptor-like platform.'" SPA48 (quoting JA1227); *see* JA236-237 (Tr.402:24-403:2). These agreements not to compete reinforce the JV's exclusive nature by preventing Defendants from supporting any potential competitor.

*Second*, the district court found that the JV "incentivizes [Defendants] to prevent and suppress" any potential competition that could draw subscribers from the JV and that Defendants "have the market power to follow through" on those incentives as suppliers of critical inputs to distributors. SPA49. By suppressing competition, Defendants can remove potential roadblocks to the JV's dominance. Again, Defendants' own documents and testimony support the court's finding. *Id.*

27

(notes by Fox executive: "*Things we're trying to avoid*: . . . Anything that can offer competing features or functions . . . .") (quoting JA1003).

*Third*, the district court found that the JV deters Defendants from competing with each other by entering the Live Pay TV market unilaterally or licensing unbundled content to other distributors. SPA50; *see also Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768-69 (1984) ("[c]oncerted activity is inherently fraught with anticompetitive risk" because "[i]t deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands"). Competition with the JV would threaten Defendants' substantial investments in it and undermine its dominance in the Live Pay TV market. Defendants have no reason to want that. The court cited, among other evidence, an email by Fox's COO dismissing concerns that Disney and WBD would "want to compete" with the JV, and observing that they were "putting $300m each into" it. SPA50 (quoting JA1001). Defendants' lack of incentive to compete further decreases the chances of any challenge to the JV.

*Fourth*, the district court found that the JV's exclusive arrangement "will significantly lessen the negotiating power of existing MVPDs and vMVPDs" by creating a "backstop" for Defendants if negotiations fail, thereby "further limiting any potential competition with the JV" in the Live Pay TV market. SPA51-53. Without the JV, Defendants are "incentivized not to end negotiations without a

deal because they do not wish to risk the total loss of the distributor's viewers." SPA51. With the JV, Defendants' incentives to negotiate decrease, because they can offset any such loss by attracting those distributors' subscribers to the JV. *Id.* (relying on third-party industry testimony in support of this analysis). Defendants will thus have the bargaining power to extract higher fees from other distributors, further undermining those distributors' ability to compete with the JV. SPA51-52.

*Fifth*, the district court cited evidence from Defendants' own internal documents showing that the JV's exclusive arrangement would likely allow Defendants "to raise prices directly for consumers." SPA53. Those documents showed that Defendants had already planned $5 annual increases in the price of the JV's product. *Id.* If Defendants genuinely thought (as they now argue, at 23) that the JV would gain market share by "offer[ing] a new, attractive product at a lower price," they would not be planning price increases years in advance.

### d. *Columbia Pictures* persuasively supports the district court's opinion

The district court's conclusion that the JV would harm competition draws support from *United States v. Columbia Pictures Industries, Inc.*, 507 F. Supp. 412 (S.D.N.Y. 1980), *aff'd*, 659 F.2d 1063, 1981 U.S. App. LEXIS 21309, 7 Media L. Rep. 1342 (2d Cir. 1981), *cited in* SPA35-36. In that case, four movie production companies agreed to launch a new pay TV network through a JV and license their

films exclusively to that JV for nine months before licensing them to other pay TV networks (such as HBO and Showtime). *See* 507 F. Supp. at 419-21. The Southern District of New York preliminarily enjoined the joint venture, finding that the movie companies' exclusive arrangement would undermine other distributors' ability to compete. *See id.* at 431-32 (the exclusive arrangement could put other pay TV networks "out of business"). This Court affirmed "substantially on the basis of the [district court's] opinion." 1981 U.S. App. LEXIS 21309, at *1.

Like *Columbia Pictures*, this case involves an attempt by competing content owners to dominate a downstream distribution market by combining "one-half of the essential product of the industry" in a new JV. 507 F. Supp. at 430. And like Defendants, the movie production companies denied any third-party distributor the opportunity to offer a product competitive with their JV through an exclusive arrangement – impairing competition in the downstream distribution market. SPA40 ("[J]ust like in *Columbia Pictures*," Defendants "have joined together to use their combined market power in the programming tier to create a joint venture that will allow them to dominate the distribution tier.").

### 3. Fubo and other competitors face injury from the JV's anticompetitive effects

The district court found that, through their exclusive licensing arrangement, Defendants have manufactured a built-in advantage for the JV that will give it an "unobstructed runway to dominance" in the Live Pay TV market and help it "drive

out competitors." SPA47-48.  Those anticompetitive effects would directly harm Fubo and other competitors.  The injury that threatens Fubo is thus "attributable to an anti-competitive aspect of the practice under scrutiny."  *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

The JV would likely capture many customers from Fubo, causing Fubo significant, irreparable loss of market share.  Following the announcement of the JV, Fubo projected that it would lose "between 300,000 and 400,000 subscribers before the end of 2024, causing an almost-immediate projected revenue loss between $75 million and $95 million."  SPA23-24.  In testimony that the district court found "credible and reliable," SPA57, Fubo's CEO and CFO explained that these financial impacts would likely lead to Fubo's delisting from the New York Stock Exchange and, ultimately, its insolvency.  JA190 (Tr.127:15-22); JA305-306 (Tr.592:24-593:5); *cf. Vázquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 294 (1st Cir. 2022) ("The competitor of an entity granted exclusive rights to a market is . . . directly harmed by the elimination of competition in the foreclosed market.").

The projections of other MVPDs corroborate this testimony.  ███████

████████████████████████████████████████████

███████████████████; a DirecTV executive attested to "grave concerns about the [JV's] effect . . . on competition," JA90-91 (¶¶ 5-6);  ███████

███████████████████████████████████

███████████████████████████████████

████████████████████████   JA1481-1482.

**B.    Defendants Fail To Show That the District Court Erred**

**1.    Fubo is threatened with antitrust injury because the JV's exclusive arrangement will exclude Fubo from the market**

Defendants fail to show that the district court erred in finding that the JV threatens Fubo with antitrust injury.  Contrary to their assertion (at 18), the court did not "decline[] to consider" this issue.  It acknowledged their argument that "any harm to Fubo from the JV is the result of legitimate competition," but rejected that argument, finding instead that such harm would be the result of conduct "contrary to the antitrust laws."  SPA56 n.38.  As set forth above, that finding is supported by evidence showing that Fubo is threatened with injury through the anticompetitive effect of the JV's exclusive built-in advantage, created by Defendants' horizontal agreement.

Defendants mischaracterize (at, *e.g.*, 1-2) Fubo's injury as merely "losing customers to a lower-priced product" or to an "innovative" one.  Their *amici* (*e.g.*, Hedlund Br. 3-5) echo the point.  But Defendants are not truly competing on price: they have no intention of selling their sports channels more cheaply through the JV.  *See* Defs. Br. 11 (Defendants plan to license their networks to the JV "at market

rates"). Nor are Defendants truly innovating: the JV would offer no new programming. The sole reason viewers would pay less for the JV's product than for Fubo's would be Defendants' agreement to exempt the JV (and the JV alone) from their bundling requirements that make distributors and viewers buy content (*e.g.*, non-sports channels) they do not want. And Defendants' documents show that over time, in the new less-competitive market that the JV would create, viewers would pay more for the JV's product each year. *See supra* p. 29. The antitrust laws, which are "aimed at substance rather than form," did not require the district court to overlook those realities. *Copperweld*, 467 U.S. at 760; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992) (explaining that "formalistic distinctions . . . are generally disfavored in antitrust law" and that courts look to "actual market realities").

Defendants accordingly misplace reliance (at 22) on *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986). *Cargill* denied injunctive relief to a competitor that sought to challenge the merger of two rival companies. The challenger's theory was that the merger would create "efficiencies" that would enable the merged company to "lower its prices," forcing the challenger to lower prices as well. *Id.* at 114-15. The Supreme Court held that "the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden

by the antitrust laws." *Id.* at 117. Defendants have not claimed (nor could they plausibly claim) any efficiencies that would lower prices.[3] Nor does the JV threaten Fubo with mere price competition. The threat comes from the market power of a cartel that controls commercially critical sports programming and intends to use it to block competition on the merits.

After *Cargill*, courts have recognized that "[a] competitor plaintiff has standing as long as it can demonstrate 'that its injury was caused by anticompetitive or predatory aspects of [the defendant's] conduct, not by competition.'" *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1149 (S.D.N.Y. 1996) (quoting *Pacific Express, Inc. v. United Airlines, Inc.*, 959 F.2d 814, 818 (9th Cir. 1992)). This Court's decision in *Consolidated Gold Fields* is a good example. There, the district court preliminarily enjoined a mining company's proposed hostile acquisition of its horizontal competitor, finding that it would substantially lessen competition. *See* 871 F.2d at 257. This Court affirmed, explaining that, unlike in *Cargill*, the plaintiffs' theory was not simply that they would face "increased

---

[3] Defendants' *amici* (*e.g.*, Hedlund Br. 9-11; Epstein Br. 16-19) inaccurately identify the JV as "vertical integration," which often creates efficiencies. This is not a case about any one Defendant becoming or launching a distributor. What makes the JV anticompetitive is that Defendants have granted it an exclusive right to the coveted skinny sports bundle – which they can do only through a horizontal agreement as competitors.

competition from the merged entity" but that "the takeover w[ould] enable [the acquirer] to cause [the acquired company] to restrain its own competitiveness and thereby reduce competition in the relevant market" – "precisely the type [of injury] that the antitrust laws were designed to protect against." *Id.* at 257-58.

Similarly, in *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012), a manufacturer brought antitrust claims against a competitor for "long-term *de facto* exclusive dealing arrangements" that required distributors to give "preferential price[s]" to the defendant's products, ensuring that the defendant's "average prices were lower than Plaintiffs' average prices." *Id.* at 263, 266. The Third Circuit distinguished *Cargill* and similar cases in which "the defendant's pricing itself operated as the exclusionary tool." *Id.* at 279. The plaintiffs in *ZF Meritor* "did not rely solely on the exclusionary effect of [the defendant's] prices, and instead highlighted [the] anticompetitive provisions" in the defendant's exclusive contracts that "ensur[ed] that Plaintiffs would be unable to build enough market share to pose any threat to [the defendant]." *Id.* at 277. The defendant's "attempt to characterize this case as a pricing practices case" analogous to *Cargill* was therefore "unavailing." *Id.* at 281.

This case is like *Consolidated Gold Fields* and *ZF Meritor*, and unlike *Cargill*. Fubo has presented evidence that the JV would likely reduce competition in the relevant market and lead to higher prices for consumers. It would do so by

removing or weakening other distributors like Fubo.  The JV's exclusive right to offer unbundled services plays the same role here as the coercive tender offer in *Consolidated Gold Fields* or the exclusive-dealing contracts in *ZF Meritor* – an anticompetitive practice that reduces competition by reducing the number of competitors.  Fubo, a competitor targeted by such a practice, has standing to seek relief from that threat.

### 2. Unlike *Trinko* and *linkLine*, this case does not involve a unilateral refusal to deal

**a.** The unlawful conduct at issue is concerted action:  the activity of several firms, not one firm.  A JV is by definition collective action.  Defendants have pooled their combined 54% of U.S. sports rights and 60% of nationally broadcast sports rights in their JV.  They have collectively granted it an exclusive license to their unbundled live sports programming and collectively agreed not to compete with it in the Live Pay TV market.  *See supra* pp. 23-29.  Those actions are concerted.  Defendants identify no basis on which to disturb the district court's factual findings regarding their concerted action.

Defendants assert (at, *e.g.*, 36) that this case is about unilateral conduct because each has bundled its networks for years.  But as the district court made clear, Defendants' bundling is not the conduct from which they are enjoined; instead, those practices provide important context for Defendants' collective

decision to unbundle sports content exclusively for their JV. *See infra* pp. 41-43.[4] The relevant conduct for purposes of Fubo's Section 7 claim and this appeal is Defendants' concerted activity. Regardless of whether Defendants' individual bundling would be lawful on its own, the district court properly found that Fubo will likely prove that their concerted action violates Section 7.

 **b.** Because this appeal concerns Defendants' concerted conduct, they err in citing (at 27-33) cases about single firms' unilateral refusals to deal. In *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), the plaintiffs alleged that Verizon violated Section 2 of the Sherman Act by denying rival telephone companies access to its network, which the Telecommunications Act of 1996 required. *Id.* at 401-02, 407. The Supreme Court held that Verizon had no antitrust duty to provide interconnection services, emphasizing "the difficulty of identifying and remedying anticompetitive conduct by a single firm." *Id.* at 408. It distinguished cases that "involved *concerted* action, which present[ ] greater anticompetitive concerns." *Id.* at 410 n.3. As the Tenth Circuit put it in *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297 (10th Cir. 2017),

---

[4] For this reason, *amicus* briefing on the abstract virtues of bundling (*see* Epstein Br. 3-11) has little relevance. If bundling in this industry really "reduce[d] transaction costs" or created "economies of scope," *id.* at 5-6, Defendants would not be so eager to deprive their JV of those supposed benefits. As for the assertion that bundling tends to "reduce prices," *id.* at 5, that is inconsistent with record evidence that Defendants' practices drive prices up. *See supra* p. 8.

"*Trinko* simply does not speak to claims . . . alleging concerted refusals to deal."
*Id.* at 1309.

Similarly, in *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
555 U.S. 438 (2009), internet service providers alleged that AT&T violated Section
2 by "subject[ing] them to a 'price squeeze'" – that is, "a high wholesale price for
DSL transport and a low retail price for DSL Internet service." *Id.* at 442-43. The
Supreme Court rejected that claim because AT&T had "no duty to deal at the
wholesale level" and engaged in "no predatory pricing at the retail level." *Id.* at
452. In concluding that there was no duty to deal wholesale, the Court observed
that it was dealing with "purely unilateral conduct," *id.* at 448, and engaged in a
"straightforward application of [its] recent decision in *Trinko*," *id.* at 449. Nothing
in *linkLine* extended *Trinko* to concerted action, nor do Defendants cite any case
doing so.

Congress has long "'treated concerted behavior more strictly than unilateral
behavior'" because "'[c]oncerted activity inherently is fraught with anticompetitive
risk.'" *American Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010) (quoting
*Copperweld*, 467 U.S. at 768-69). That concern extends to joint ventures, which
"often create[] anticompetitive dangers." *Penn-Olin*, 378 U.S. at 169; *see id.*
("If the parent companies are in competition, or might compete absent the joint
venture, it may be assumed that neither will compete with the progeny in its line of

38

commerce.").  The district court properly applied that principle here, reasoning that "[t]he antitrust laws recognize that joint ventures between horizontal competitors pose particular dangers to competition."  SPA35.

Attempting to make this case resemble *linkLine*, Defendants inaccurately suggest (at, *e.g.*, 32, 39) that it involves a price-squeeze claim.  But Fubo challenges neither the wholesale price each Defendant charges programmers nor the retail price the JV would charge viewers.  As relevant to this appeal, Fubo challenges only Defendants' formation of their JV.  The district court's decision properly considers the anticompetitive effects of the JV – and its exclusive rights – in the Live Pay TV market.  *See supra* pp. 23-29.

Accordingly, the district court's decision does not adopt "the duty-to-deal theory rejected by *linkLine* and *Trinko*," as Defendants claim (at 32) and their *amici* echo (*e.g.*, ICLE Br. 12-13).  Assume in Defendants' favor that each Defendant could license its content to any distributor on any terms of its choice, or on no terms at all.  It does not follow that Defendants can collectively agree to license it only to, or to reserve particularly good terms for, a favored distributor.  Nor does the district court's decision raise the "[i]nstitutional concerns" that animated *Trinko* and *linkLine* – the concern of a "'court . . . impos[ing] a duty to deal that it cannot explain or adequately and reasonably supervise'" or "'assum[ing] the day-to-day controls characteristic of a regulatory agency.'"

*linkLine*, 555 U.S. at 452-53 (quoting *Trinko*, 540 U.S. at 415).  The remedy at issue is an order barring Defendants from consummating their JV.  That is the familiar remedy applied in many successful Clayton Act cases.

**c.**  Defendants also fail (at 37-38) to distinguish *Columbia Pictures*, on which the district court relied.  *See supra* pp. 29-30.  *First*, they suggest (at 38) they have agreed only to a non-compete that prevents them "from owning an equity interest in another" skinny sports bundle.  Their *amici* (*e.g.*, ICLE Br. 21-24) similarly urge this Court to look at the narrower written non-compete, rather than at Defendants' broader oral agreement.  But "any exchange of words" – even "circumstances" alone – can show a "meeting of minds in an unlawful arrangement"; no "formal agreement" is required.  *American Tobacco Co. v. United States*, 328 U.S. 781, 809-10 (1946).  The district court's finding that Defendants "*explicitly agreed* to 'stay clear' of supporting another platform like the JV for at least the next three years," SPA4, is more than enough.

*Second*, Defendants (at 37) and their *amici* (*e.g.*, ICLE Br. 18-21) contend that this case lacks the exclusivity of *Columbia Pictures* because Defendants will continue to license their networks as part of fat bundles.  That is irrelevant, because Defendants intend to "grant[ ] the JV an exclusive right to license their sports networks *unbundled* from their general entertainment channels."  SPA46 (emphasis added).  In *Columbia Pictures* itself, the movie companies argued that

their exclusive arrangement was not a true boycott because they would release the movies after a nine-month exclusivity period. *See* 507 F. Supp. at 428. The court rejected that argument, citing the holding of *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959), that "refusal to sell at the same prices and conditions can be a boycott as well as complete refusal to sell." *Columbia Pictures*, 507 F. Supp. at 429. The same logic applies here.

*Third*, Defendants assert (at 37) that they "could" individually offer their networks on "unbundled terms[]" sometime "in the future." They identify no clear error in the district court's finding that it was implausible that they would do so based on the "record in this case and . . . [on] a common-sense assessment of the economic incentives created by the JV." SPA46 n.34. Even apart from an express agreement, Defendants' ubiquitous bundling practices (and long-term contracts embodying those practices) make their agreement to license unbundled sports to the JV functionally exclusive. SPA48-50.

### 3. The JV's exclusive arrangement is unlawful regardless of whether Defendants could lawfully bundle their sports and non-sports networks

Defendants incorrectly assert (at, *e.g.*, 43) that this appeal concerns "the preexisting effects of bundling." To the contrary, the district court made clear that it would not "reach the question of the legality of bundling at this stage of the case." SPA4. It assessed Defendants' JV. And it found that, regardless of whether

41

each Defendant could individually bundle its sports and non-sports networks, the JV would likely harm competition because of its exclusive right to unbundled sports – an arrangement that has never before existed.

Defendants misleadingly quote the district court out of context (at 41), asserting that the court "considered the root of 'the antitrust problem' to be [their] 'longstanding bundling practices.'" What the court actually wrote was:

> Put simply, the antitrust problem presented by the JV is as follows: if the JV is allowed to launch, it will be the *only* option on the market for those television consumers who want to spend their money on multiple live sports channels they love to watch, but *not* on superfluous entertainment channels they do not.

SPA4. It then explained that Defendants' "longstanding bundling practices" set the stage for that problem by "creat[ing] the void in the pay TV market tailor-made for the live-sports-only JV to fill" and allowing Defendants to "control . . . the ability for a different live-sports-only streaming service to exist and compete with the JV." *Id.*; *see* SPA46 (describing "the JV Defendants' bundling practices [as] crucial context"). That is not a ruling on the legality of bundling.[5]

---

[5] Defendants also quote the district court out of context in contending (at 54) that it "recognized that '[t]his non-compete agreement does not prevent'" Defendants from licensing to other distributors or launching their own DTC products. In the very next sentence, the court went on to say: "Before it was written down, however, the agreement originated in a phone call in late January 2024 in which the JV Defendants agreed that they 'would all stay clear of a Raptor-like platform.'" SPA48. The court further explained that, apart from an explicit non-compete agreement, Defendants could rely on the existence of their long-term

The district court's contextual treatment of bundling adhered to the principle that "'antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015) (quoting *Trinko*, 540 U.S. at 411) (cleaned up).  Courts consider the "structure, history and probable future" of a market when assessing anticompetitive effects under Section 7.  *United States v. General Dynamics Corp.*, 415 U.S. 486, 498 (1974).  That is what the district court did here.  *See, e.g.*, JA220-221 (Tr.382:22-383:2) ("Obviously the fact of bundling is very relevant to . . . [the] factual context of how the industry works and how the defendants have conducted their business.").  Nor can Defendants credibly claim that the court clearly erred in its analysis of that context.  Their own executives recognize "the fundamental appeal" of the JV is that it will be the only distributor in the Live Pay TV market able to offer Defendants' unbundled sports.  SPA45.[6]

---

contracts with other distributors that "obligated" those distributors "to continue to offer bundled content" while "the JV enjoys the benefits of offering exclusive live sports-only content." *Id.*

[6] Defendants come nowhere close to demonstrating reversible error in their complaints (at 44-45) about the district court's discovery rulings on bundling.  *See Pippins v. KPMG, LLP*, 759 F.3d 235, 251 (2d Cir. 2014) ("[W]e will reverse a district court's discovery ruling only upon a clear showing of an abuse of discretion.") (cleaned up).  Even though the court did not resolve Fubo's Section 1 tying claims in the decision below, the court permitted discovery on bundling *as it related to the JV* – as Defendants recognize (at 44).  That discovery informed the court's ultimate decision that the JV violates Section 7.  *See, e.g.*, SPA46.  That approach was more than reasonable at the preliminary-injunction stage.

Because the district court determined that the JV itself would likely harm competition, *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*, 386 F.3d 485 (2d Cir. 2004), offers no guidance. *Geneva* concerned the purchase by a company's 75% controlling shareholder of the remaining 25%. *See id.* at 510. This Court affirmed dismissal of a Section 7 challenge because the plaintiffs had failed to allege that the "remov[al]" of "a layer of internal corporate control" harmed competition. *Id.* at 511. Instead, those plaintiffs had only a "sneaking suspicion that something illegal occurred from the acquisition." *Id.* at 511-12. There was no such failure of allegation – or proof – here. Fubo alleged, and the district court found it likely after hearing evidence, that the JV would harm competition and injure Fubo.

Nor does *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012), help Defendants. *Brantley* involved tying claims brought by consumers against TV programmers and distributors, challenging unilateral bundling. *See id.* at 1195. Unlike Fubo, the *Brantley* plaintiffs did "not . . . allege[]" any "horizontal collusion." *Id.* at 1203. Further, they "disavow[ed] any intent to allege that the [challenged] practices . . . foreclosed rivals from entering or participating in the upstream or downstream markets." *Id.* at 1201. Here, by contrast, Fubo has

44

alleged, and the district court found, both a horizontal agreement and likely foreclosure in the downstream distribution market.

### 4. The JV is not procompetitive and will not compete with Fubo based on price

The district court found that the JV will harm competition in the Live Pay TV market by allowing Defendants to "drive out competitors." SPA47; *see supra* pp. 26-29. Defendants identify no basis for this Court to disturb the multiple factual findings that underlie that conclusion. *See Anthem*, 855 F.3d at 368. They assert (at 47) that their JV is procompetitive because it will "result in the creation of a new product that does not now exist." Their *amici* (*e.g.*, Hedlund Br. 3-5; Epstein Br. 12-16) likewise assert that the JV's product is new. But the JV would create a new product only in the most formalistic sense, and the district court did not err in looking to substance over form. *See supra* pp. 32-33; *see also* SPA1 ("Although the JV itself is new, the idea of a live-sports-only streaming service is not.").

In any event, there is no bright-line rule that every new product is procompetitive. The launch of a new product can be anticompetitive when part of an anticompetitive scheme. For example, *Actavis* held that the launch of a new Alzheimer's drug was anticompetitive when combined with the withdrawal of an existing drug, with the effect of "coerc[ing] consumers" to switch and "imped[ing]"

. . . competition" from generic drugs. 787 F.3d at 654. And *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam), held that Microsoft's launch of a new version of Windows was anticompetitive to the extent its features blocked competition from web browsers that competed with Microsoft's Internet Explorer. *See id.* at 64-67; *see also In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 679 (E.D. Pa. 2014) (rejecting in the Sherman Act context the claim "that the introduction of a new product by definition increases competition in the relevant market, and therefore cannot be found to be anticompetitive"), *on recon. in part on other grounds*, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015). The record supports the district court's finding that the JV would ultimately reduce competition and leave viewers with fewer choices, not more.

Nor will the JV lead to lower prices, as Defendants claim (at 48). Instead, as the district court found, Defendants' exclusive licensing arrangement with the JV "may eventually allow the JV Defendants to raise prices directly for consumers, unchecked by meaningful competition." SPA53 (citing Defendants' documents planning for $5 annual price increases). Defendants' claim (at 46) that an outcome where the JV would be the only product of its kind available to consumers "unambiguously" benefits consumers defies both common sense and the district court's well-supported contrary factual findings. *E.g.*, SPA64 (the JV "greatly

increase[s] the risk that consumers will be vulnerable to price increases, decreased quality, and decreased options in the market").

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47 (1st Cir. 2002), does not help Defendants. In *Fraser*, soccer players asserted a Section 7 claim against Major League Soccer, arguing that the combination of the league's team investors and operators in forming the league lessened potential competition between the league's teams for players. *See id.* at 55, 69. The First Circuit rejected the Section 7 claim because, "prior to the formation of MLS, there was no enterprise engaged in providing Division I soccer in the United States," so that "the creation of MLS added a new entrant without subtracting any existing competitors." *Id.* at 69-70. Unlike *Fraser*, this case involves a preexisting market (the Live Pay TV market) with preexisting participants (*e.g.*, MVPDs and virtual MVPDs). And unlike the MLS in *Fraser*, the JV would likely "subtract . . . competitors" from the market: no distributor would be able to compete on an equal footing, and the JV would drive other distributors, such as Fubo, from the market altogether.

###     5.    The JV's anticompetitive effects will occur in the Live Pay TV market

The anticompetitive effects that the district court identified are effects that the JV would have on competition in the Live Pay TV market. By "granting the JV an exclusive right" to their unbundled sports, Defendants have manufactured a built-in advantage for the JV over other distributors in that market. SPA46-47.

47

Defendants' exclusive arrangement will "tend to lessen competition in the Live Pay TV market by allowing [Defendants] an unobstructed runway to establish market dominance over future submarkets and drive out competitors within the rapidly changing Live Pay TV Market." SPA47. Defendants themselves "expect *at least* 50% of the JV's subscribers will" abandon other MVPDs and virtual MVPDs – distributors in the Live Pay TV market – in favor of the JV. SPA51.

Defendants incorrectly criticize (at 50-51) the district court for considering a "segment" of the Live Pay TV market in its analysis of anticompetitive effects. The court reasoned that "sports fans have become the primary audience for [MVPDs and virtual MVPDs], as they are among the few categories of consumer who cannot meet their television content needs elsewhere," SPA15-16; that, to meaningfully compete in the Live Pay TV market, a distributor must serve the demand of viewers of live sports, the "undisputed" relevant consumers, SPA38; and that the desire of many sports fans to pay for sports channels and only sports channels would allow the JV to "'capture demand' in the market" that is currently unmet due to Defendants' "bundling practices," SPA46. The court's treatment of those fans as an important market segment appropriately reflects the "commercial realities" that should drive market analysis. *US Airways*, 938 F.3d at 55 (quoting *American Express*, 585 U.S. at 544).

Contrary to Defendants' assertions (at 49-50), the district court's discussion of those realities did not entail "disregar[ding]" the JV's "anticompetitive effects" in the Live Pay TV market as a whole. The court assumed (in Defendants' favor) that viewers who want a skinny sports bundle were not a separate relevant market from other Live Pay TV viewers. SPA38 & n.31. That assumption did not require the court to disregard the JV's unique ability to serve those viewers and therefore enjoy an "anticompetitive runway . . . to control the future of the Live Pay TV market." SPA46. Whether or not there is a discrete market or submarket for "skinny sports bundles," there is certainly *demand* for a skinny sports bundle. And Defendants identify no clear error in the court's consideration of that significant unmet demand within the Live Pay TV market when assessing the JV's anticompetitive effects. *See Consolidated Gold Fields*, 871 F.2d at 261 (clear-error standard applies to "determination of the relevant market").

Defendants incorrectly claim (at 52) that "unrebutted evidence demonstrates that [the JV] would face significant competition even for sports-focused services within the Live Pay TV Market." They rely principally on ESPN Flagship – a service that has not yet launched and may never launch – and WBD's "B/R" product – a service available only as an "add-on" to Max, a non-sports streaming service. JA434 (Tr.1032:3-18); Defs. Br. 9. They also suggest that DISH's virtual MVPD service, called Sling, provides a product comparable to the JV's – a claim

49

DISH's own executive debunked. JA244-247, JA248-249 (Tr.427:25-430:11, 431:6-432:14); *see also* SPA41 (crediting that testimony). And they rely on SVOD services, which the district court reasonably excluded from the Live Pay TV market because they "carry very few live sports." SPA39 & n.33. Defendants fail to engage with their own "witnesses and documents," which recognize the JV as the "first *and only* unbundled multi-channel sports programming" service. SPA45.

The district court also reasonably considered the impact of the JV's exclusive licensing arrangement on licensing negotiations between distributors and Defendants. Defendants contend (at 55) that those negotiations are transactions "upstream" of the Live Pay TV market, not in the market itself. But upstream negotiations can affect competitive conditions in a downstream market. As the court explained, third-party distributors' likely loss of bargaining power would "limit[] any potential competition with the JV" in the Live Pay TV market (where those distributors compete with the JV) and "alter[] the market in an anti-competitive direction." SPA53. That reasoning tied back to the relevant market.

Defendants' *amici* contend (Hedlund Br. 12-15) that the negotiations would be "complex and nuanced," that the district court should have considered a six-point list of factors, and that it should have looked to "economic modeling" to predict the result. No such model was before that court or is before this one;

*amici* merely conjecture about facts an expert might consider. The district court properly relied on fact and expert witness testimony in the record, including testimony from Fubo and third-party executives that the JV would "affect negotiations dramatically" and ██████████████████████████ ██████ [7] In any event, bargaining power was only one of five bases supporting a finding that the JV would likely harm competition. *See supra* pp. 26-29.

## C. Alternatively, Fubo Has Shown At Least Serious Questions Going to the Merits

This Court may also affirm because Fubo has shown "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in [its] favor." *Actavis*, 787 F.3d at 650 (cleaned up). The district court made findings to support a preliminary injunction under either the likelihood-of-success or the serious-questions standard. SPA33 n.29 (observing that Fubo would prevail under a serious-questions standard); SPA68 (the "balance of equities tips decidedly in favor of Plaintiffs").

---

[7] JA197-198 (Tr.218:23-219:16) (testimony of Fubo executive); ██████ ████████████████████████████████████████; *see also* JA183 (Tr.77:8-23) (testimony of Fubo expert that the JV "will allow [Defendants] to be more aggressive in negotiations with distributors"); JA338-339 (Tr.661:2-662:24) (testimony of Fubo expert that the JV makes Defendants' "incentive to raise price stronger").

Defendants have incorrectly argued (*e.g.*, Dkt. 239) that *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570 (2024), abrogated the serious-questions standard. *Starbucks* applied the "traditional four-part test," *id.* at 1576, for preliminary-injunctive relief set forth in *Winter v. NRDC*, 555 U.S. 7 (2008). In *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30 (2d Cir. 2010), this Court held that the "venerable" serious-questions standard "remain[ed] valid" after *Winter*. *Id.* at 38; *see id.* (reasoning that, "[i]f the Supreme Court had meant . . . to abrogate the more flexible standard for a preliminary injunction, one would expect some reference to [that standard's] considerable history"). The same reasoning applies after *Starbucks*, which construes the National Labor Relations Act and does not mention the serious-questions standard. *See* 144 S. Ct. at 1575-77.

## II. The District Court Reasonably Found That the JV Threatens Fubo and the Public with Irreparable Injury

Fubo presented ample evidence to show "a substantial chance that upon final resolution of the action the parties [could not] be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). The threatened loss of a business can be irreparable harm. *See*, *e.g.*, *Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013); *see generally JTH Tax, LLC v. Agnant*, 62 F.4th 658, 668 & nn.3-4 (2d Cir. 2023) (collecting cases involving threatened closures of both large and small

52

businesses).  Further, "[i]t is well-established that a movant's loss of current or future market share may constitute irreparable harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007); *see also Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).

### A.    The JV Threatens To Injure Fubo Irreparably by Causing It To Lose Market Share and Go Out of Business

The record supports the district court's findings that the JV will irreparably harm Fubo by causing Fubo to lose so much market share as to threaten its continued existence.  SPA55-63.  That court reasonably credited Fubo's analyses and financial modeling showing that "the JV's expected launch in late August will cause it to lose approximately 300,000 to 400,000 (or nearly 30%) of its subscribers," resulting in an almost immediate revenue loss between $75 million and $95 million.  SPA57; *see also* JA305-307 (Tr.592:24-594:11).  Fubo's CFO testified in court that losing several hundred thousand subscribers would result in "catastrophic harm" to the company "that would likely lead to insolvency" by 2025.  JA306 (Tr.593:1-5), JA314-315 (Tr.615:24-616:8).  Fubo's CEO testified that, if the JV were to launch, Fubo would "very quickly lose customers" and "find [itself] very quickly in bankruptcy court, Chapter 7."  JA190 (Tr.127:15-22).  The court "found these statements credible and reliable based on these witnesses' backgrounds as experienced businesspeople, [its] observation of their demeanor, and the internal consistency and coherence of the totality of their testimony."

SPA57; *see also supra* pp. 31-32 (discussing testimony of other distributors about similarly likely harms to their businesses). Those in-person credibility determinations are due great deference. *See United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004).

The district court also relied on "[a]mple documentary evidence kept in the ordinary course of Fubo's business [that] corroborate[d]" the testimony of Fubo's CEO and CFO. SPA57. For example, the court found that "Fubo's ordinary course data reveal[] not only that most customers join Fubo to watch sports programming, but also that they *stay* for sports programming, and then sometimes *leave* when their particular sports season is over." SPA59. The data "bolster[ed] Fubo's showing of irreparable harm" by showing that "Fubo's customers care particularly about live sports, and they are driven to Fubo primarily for its sports – not entertainment – programming." *Id.*

The district court's findings that Fubo would likely lose substantial market share and face insolvency soon after the JV launches support its discretionary determination that Fubo adequately established irreparable harm. So does the court's finding that "allowing an anticompetitive JV to enter the market prior to full resolution of the merits" would likely cause "irreparable harm to consumers." SPA64 (citing *Actavis*, 787 F.3d at 661). The court reasonably found that, based on the record before it, the JV's launch would "greatly increase the risk that

consumers will be vulnerable to price increases, decreased quality, and decreased options in the market." *Id.* Those harms would result both from driving Fubo (and likely some of its rivals) out of the market and from Defendants' increased ability to force even distributors that remained viable to pay more for their channels. *Id.*

## B. Defendants Fail To Show That the District Court Erred

Defendants fail to show any error, much less an abuse of discretion, in the district court's finding that the JV threatens Fubo with irreparable injury.

*First*, Defendants incorrectly criticize (at 57) the district court for "bas[ing] its injunction on irreparable harm that is not also an antitrust injury." As already shown, this argument is without merit because driving Fubo and others from the market using an exclusive unbundling arrangement is the core threat that the JV poses to competition. *See supra* pp. 32-36.

*Second*, contrary to Defendants' assertions (at 58), Fubo's threatened losses of market share and of its business cannot be fixed with money damages. *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59 (2d Cir. 2011), does not show otherwise. In that case, this Court affirmed a finding that "budget hotel" operators had not shown irreparable harm from a statute that prevented them from operating "budget hotel businesses." *Id.* at 61. The operators could and did rent out rooms for other purposes, which the statute did not bar. *See id.* at 61-62. They also had an unusually "long history of operation" that would help them to "calculate money

damages." *Id.* at 63.  There is also no suggestion in *Dexter* that the hotel operators were threatened with insolvency or even (if the statute had later been invalidated) with permanent loss of market share.  That decision did not compel this district court, on the very different record before it, to find that money damages could compensate Fubo.

*Third*, Fubo's evidence of likely harm was ample, credible, and consistent with the projections of other distributors.  Defendants assert (at 58) that Fubo's predicted loss of 300,000 to 400,000 subscribers is "implausible" based on Defendants' "pre-launch, pre-litigation projections estimat[ing] that Venu would attract roughly 1 million total subscribers by year-end 2024."  But the district court found that Defendants' projections "tend[ed] to contradict [their] own commissioned research studies which indicate that a skinny sports offering like the JV will have significantly broader appeal."  SPA51-52.  For instance, Defendants predicted that a sports streaming service that included live sports content from just Disney and Fox would attract 19 million subscribers.  JA373-374 (Tr.816:25-817:23) (discussing JA1079); *see also* JA390-393 (Tr.848:11-851:23) (discussing JA523) (projecting that joint WBD-Fox offering would attract 7-8 million subscribers).  Defendants' more recent projections were not based on any analyses, but were instead "based on [consumer demand for] Hulu Live."  JA395 (Tr.853:14-19) (quoting JA598).  At the preliminary-injunction hearing, no witness could justify

56

using Hulu Live's subscriber count to predict the JV's success. *See*, *e.g.*, JA396-397 (Tr.854:20-855:16); *see also* SPA52 n.36 (internal WBD email stating that the claim the JV would attract just 5 million subscribers by 2028 was "thr[own] out there to try to allay concerns the JV product would drive a ton of incremental cord cutting") (quoting JA1704). Fox's COO ultimately admitted that Defendants based their revised lower figures on "judgment" unsupported by "additional data analysis." JA228 (Tr.393:5-10).

After reviewing the whole record, the district court found that "[t]here are indications in the record that the JV Defendants do not really believe their own estimate, or that such a lowball estimate stretches reason." SPA52 n.36. Defendants have shown no basis to overturn that credibility finding.

Defendants also quote (at 58) Fubo's CEO out of context to suggest that his statements have been inconsistent. His full statement shows otherwise. When asked how Fubo's business would change "if the lawsuit goes against you," he replied that "things would remain status quo" because Fubo would still "have to deal with unreasonable pricing and . . . above-market terms." JA619-620. He further noted that he did not "believe that any of these companies would retaliate against us for filing what we believe is a credible complaint." *Id.* A prediction that Fubo will still suffer from unreasonable prices and terms and that Defendants would not retaliate for this lawsuit says nothing about expected subscriber loss

from the JV.  As the CEO explained in that same interview, the JV is "the latest example of this sports cartel's attempt to block and steal Fubo's vision of what a sports streaming bundle should look like, resulting in billions of dollars in damages to our business."  JA610.[8]

## III.   The District Court Reasonably Waived a Bond Requirement

The district court reasonably required no bond because Defendants offered no evidence that the preliminary injunction would harm them.  Under Rule 65, the court could order "security in an amount that [it] consider[ed] proper."  Fed. R. Civ. P. 65(c).  That Rule "gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement 'where there has been no proof of likelihood of harm.'"  *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (quoting *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996)).  A party can waive its right to request a bond by failing to request a bond at the preliminary-injunction hearing or by failing to introduce evidence

---

[8] Defendants do not challenge the district court's finding that an injunction would serve the public interest.  To the extent their *amici* do (*e.g.*, Epstein Br. 12-16), "an issue raised only by an *amicus curiae* is normally not considered on appeal."  *Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429, 436 n.5 (2d Cir. 2002).  In any event, *amicus*'s public-interest arguments largely overlap with Defendants' erroneous arguments that the JV is procompetitive.  *See supra* pp. 45-47.

showing that it would suffer harm from the injunction.  *See*, *e.g.*, *Heisman Trophy Tr. v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 329 (S.D.N.Y. 2009).

Here, Defendants requested (for the first time in a post-trial brief) a $100 million bond to account for "expected affiliate fees from [the JV] over the first four months."  SPA65 n.42 (quoting Dkt. 286 at 10) (brackets in district court opinion).  They did not show that their loss of fees is a net harm stemming from the injunction.  ███████████████████████████████████████

███████████████████████████████████████████

██████ JA598.  And Defendants' cursory showing that they would lose fees

████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

████████████████████████ SPA65 n.42.  The court reasonably ruled that, because Defendants had left the record "conclusory and undeveloped," and because Fubo had no "opportunity . . . to respond," it would "not issue a bond."  *Id.*

Defendants have no basis to complain (at 60-61) that the district court did not affirmatively "find that a wrongful injunction would cause Defendants no harm." It was Defendants' burden to "pro[ve] . . . likelihood of harm," *International Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974), which they did not. Nor did the court require them, as they suggest, to "prove their likely harm with

certainty." Defs. Br. 61 (cleaned up). It found that they "offer[ed] *no* legitimate analysis" supporting their bond request. SPA65 n.42 (emphasis added). The court did not abuse its discretion in recognizing Defendants' failure to meet their burden of proof.

## CONCLUSION

For the foregoing reasons, this Court should affirm the order granting a preliminary injunction.

Respectfully submitted,

/s/ *Michael K. Kellogg*

MICHAEL K. KELLOGG
MARK C. HANSEN
GREGORY G. RAPAWY
THOMAS G. SCHULTZ
GAVAN W. DUFFY GIDEON
GEOFFREY J.H. BLOCK
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@kellogghansen.com
mhansen@kellogghansen.com
grapawy@kellogghansen.com
tschultz@kellogghansen.com
ggideon@kellogghansen.com
gblock@kellogghansen.com

*Counsel for Plaintiffs-Appellees*

December 11, 2024

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g), that this brief complies with the type-volume limitation of Local Rule 32.1(a)(4) because, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 13,539 words.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) and Local Rule 32.1 because it has been prepared using Microsoft Word in a proportionally spaced typeface (Times New Roman, 14 point).

/s/ *Michael K. Kellogg*
Michael K. Kellogg

December 11, 2024

## CERTIFICATE OF SERVICE

I certify that, on December 11, 2024, I electronically filed the REDACTED Final Form Brief for Plaintiffs-Appellees fuboTV Inc. and fuboTV Media Inc. with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Michael K. Kellogg*
Michael K. Kellogg

December 11, 2024